UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
DUNKIN' DONUTS FRANCHISED RESTAURANTS
LLC, a Delaware Limited Liability Company,
DUNKIN' DONUTS FRANCHISING LLC,
a Delaware Limited Liability Company,
DD IP Holder LLC,
a Delaware Limited Liability Company,
BASKIN-ROBBINS FRANCHISED SHOPS LLC,          Case No. 08-CV-00217 (RWS)
a Delaware Limited Liability Company,
BASKIN-ROBBINS FRANCHISING LLC,
a Delaware Limited Liability Company,
BR IP Holder LLC,
a Delaware Limited Liability Company, and
DB REAL ESTATES ASSETS I LLC,
a Delaware Limited Liability Company,

                    Plaintiffs,

          v.                                  **FURTHER AFFIRMATION OF
                                              LAWRENCE A. KUSHNICK IN
                                              OPPOSITION TO THE
INNER CITY DOUGH, INC.,                       PLAINTIFFS' MOTION FOR A
a New York Corporation,                       PRELIMINARY INJUNCTION**
SOUTH BRONX INNER CITY DOUGH INC.,
a New York corporation,
TRIPLE J 3 DONUTS, INC.,
a New York corporation,
URBAN CITY DOUGH, INC.,
a New York corporation,
NANCY DAVIS,
a resident of New Jersey,
DB DONUTS, INC.,
a New York corporation,
DB DONUTS II, INC.,
a New York corporation,
DB DONUTS IV, INC.,
a New York corporation,
DB DONUTS VI, INC.,
a New York corporation, and
DJENANE BARTHOLOMEW,
a resident of New Jersey.

                    Defendants.
-------------------------------------------------------------------x

       Lawrence A. Kushnick, an attorney duly admitted to practice law before this Court, does

hereby certify the truth of the following statements, to the best of his knowledge, under the penalty

of perjury:

1.    I am a member of Kushnick & Associates, P.C., the attorney of record for defendants Djenane Bartholomew, DB Donuts, Inc., DB Donuts II, Inc., DB Donuts IV, Inc., and DB Donuts, VI, Inc. (hereafter the "Bartholomew Entities"), and, as such, I am fully familiar with the facts set forth herein.

2.    I make this further affirmation in opposition to the motion filed by the plaintiffs' for a preliminary injunction to shut down each of the four Dunkin' Donuts franchises owned and operated by the Bartholomew Entities.

3.    The Bartholomew Entities have previously submitted a Memorandum of Law in Opposition to the Plaintiffs' motion which more fully sets forth the legal arguments in opposition to the plaintiffs' motion.

4.    We have previously submitted requests for additional time to conduct discovery, which requests have been denied.

5.    The entirety of plaintiffs case and instant application for an injunction stem from Plaintiffs allegation that fraudulent bank documents where discovered from the files of Plaintiffs' preferred lender - CIT Group, Inc.  Pursuant to the Certifications submitted by plaintiffs in support of their motion, CIT Small Business Lending Group provided an SBA loan to Bartholomew Foods IV Corp. On September 12, 2005 in the sum of $1,219,000[1] to purchase the assets of  Urban City Dough, Inc., the owner and operator of a Dunkin Donut Franchise at 30 Rockefeller Plaza, NY, NY.[2] The loan was not conditioned upon the procurement of a franchise agreement and there was no

---

[1]  See Exhibit "A" (September 12, 2005 CIT Note)

[2]  See Exhibit "B" Asset Purchase Agreement.

franchise agreement used as collateral on the loan.

6.      Thereafter, as outlined by the certification of Jack Laudermilk of Dunkin' Brands and Karen Bailey of CIT, Bartholomew and her corporations were sold four(4) franchises from May 31, 2007 to November 9, 2007, allowed to invest $119,000 into construction of another store, paid to Plaintiffs hundreds of thousands in Franchise purchase fees and, via the alliance between CIT and Plaintiffs and Bartholomew borrowed millions of dollars in loans to purchase, build and operate the Dunkin' Franchises.

7.      Importantly, on April 30, 2007, CIT provided Bartholomew with a refinance loan in the form of a "security agreement", to refinance the $1.2 million dollar loan on 30 Rockefeller Plaza and to purchase stores located at 132 Nassau St. And 130 Church Street.[3]  While the "security agreement" was for a term of ten(10) years, Bartholomew only possessed a seven(7) year lease on the 30 Rockefeller location.  Further, there again was no requirement for a franchise agreement for the 30 Rockefeller location as security for the loan.

8.      Thereafter on January 23, 2008, Plaintiffs sent termination correspondence to Davis and Bartholomew claiming that the 2005 transfer of the 30 Rockefeller franchise was not approved and via cross-collateral clauses in the franchise agreements and the CIT loans, all of the nine(9) stores were taken and all the CIT loans were held in default.

9.      Discovery thus far has revealed that Plaintiffs explicitly or implicitly participated in, acquiesced to and approved the 2005 CIT loan , the 2007 CIT loan and the Bartholomew purchase of the assets of  Urban City Dough, Inc. We anticipate that further discovery will reveal that CIT and plaintiffs are engaged in a scheme or plan in this matter and matters at large where predatory lending

---

[3]  See Exhibit "C" (April 30, 2007 Security Agreement)

practices are disguised as an "alliance", between CIT and plaintiffs, whereby franchise fees and bank fees are extracted from franchisees who also build and operate the stores, which soon become fruit on the vine for plaintiffs to pluck at their convenience. [4]

10.    Under the circumstances, the plaintiffs seek a preliminary injunction to do the opposite of what a preliminary injunction is generally intended to do.  The purpose of a preliminary injunction is  to preserve the status quo pending a determination on the merits. Here, all of the Bartholomew stores are, without dispute,  fully operational and in full compliance and subject to complete and unfettered inspection by plaintiffs. Additionally, it is quite obvious that CIT will become a third-party to this action.

11.    For the foregoing reasons, it is respectfully set forth that the plaintiffs' motion should be denied in its entirety and that this matter be permitted to progress through discovery to trial.

Dated: Melville, New York
        April 22, 2008

                            /s/ Lawrence A. Kushnick_____
                            Lawrence A. Kushnick, Esq. (LAK 2146)

---

[4]  See Exhibit "D" (April 22, 2008 correspondence and exhibits annexed thereto)

# EXHIBIT A



# U.S. Small Business Administration

# NOTE

| | |
|---|---|
| SBA Loan # | **PLP9039014007** |
| SBA Loan Name | **Bartholomew Foods IV Corp.** |
| Date | **September 12, 2005** |
| Loan Amount | **$1,219,000.00** |
| Interest Rate | **Prime plus 2.500%** |
| Borrower | **Bartholomew Foods IV Corp.** |
| Operating Company | **N/A** |
| Lender | **CIT Small Business Lending Corporation** |

## 1. PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of One Million Two Hundred Nineteen Thousand Dollars and No Cents ($1,219,000.00), interest on the unpaid principal balance, and all other amounts required by this Note.

## 2. DEFINITIONS:

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

3. PAYMENT TERMS:

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

---

**NOTE TERMS:**

**Maturity:** This Note will mature in 120 months from date of the Note.

**Repayment Terms:**

The interest rate on this Note will fluctuate. The initial interest rate is **9.000%** per year. This initial rate is the prime rate on the date SBA received the loan application, plus 2.500%. The initial interest rate must remain in effect until the first change period begins.

Borrower must pay one payment of interest only on the disbursed principal balance one month from the month this Note is dated; payment must be made on the first calendar day in the month it is due.

Borrower must pay principal and interest payments of $15,442 every month, beginning 2 month(s) from the month this Note is dated; payments must be made on the first calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted every calendar quarter (the "change period").

The "Prime Rate" is the prime rate in effect on the first business day of the month in which an interest rate change occurs, as published in the Wall Street Journal on the next business day.

The adjusted interest rate will be 2.500% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change. The initial interest rate must remain in effect until the first change period begins.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

All remaining principal and accrued interest is due and payable 120 months from the date of the Note.

**Loan Prepayment:**

Notwithstanding any provision in this Note to the contrary:

**Borrower may prepay this Note.** Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:

a.   Give Lender written notice;

b.   Pay all accrued interest; and

c.   If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

**Late Charge:** If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5% of the unpaid portion of the regularly scheduled payment.

---

4. DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A. Fails to do anything required by this Note and other Loan Documents;

B. Defaults on any other loan with Lender;

C. Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;

D. Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;

E. Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;

F. Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;

G. Fails to pay any taxes when due;

H. Becomes the subject of a proceeding under any bankruptcy or insolvency law;

I. Has a receiver or liquidator appointed for any part of their business or property;

J. Makes an assignment for the benefit of creditors;

K. Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;

L. Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or

M. Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

5. LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A. Require immediate payment of all amounts owing under this Note;

B. Collect all amounts owing from any Borrower or Guarantor;

C. File suit and obtain judgment;

D. Take possession of any Collateral; or

E. Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

6. LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A. Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;

B. Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;

C. Release anyone obligated to pay this Note;

D. Compromise, release, renew, extend or substitute any of the Collateral; and

E. Take any action necessary to protect the Collateral or collect amounts owing on this Note.

7. WHEN FEDERAL LAW APPLIES:

714

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8. SUCCESSORS AND ASSIGNS:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9. GENERAL PROVISIONS:

A. All individuals and entities signing this Note are jointly and severally liable.

B. Borrower waives all suretyship defenses.

C. Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D. Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E. Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

F. If any part of this Note is unenforceable, all other parts remain in effect.

G. To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

10. STATE-SPECIFIC PROVISIONS:

To the extent permitted by applicable law, the Guarantor hereby waives all right to trial by jury in any action, proceeding or counterclaim involving this Guarantee

11.  BORROWER'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

Bartholomew Foods IV, Corp.

By: _____

Djenane Bartholomew, President

CCAN: 46476

| **U.S. Small Business Administration** **Settlement Sheet** | | OMB APPROVAL NO.: 3245-0200 EXPIRATION DATE: 3/31/95 |
|---|---|---|
| Lender (Name and Address - Include Zip Code) CIT Small Business Lending Corporation 1 CIT Drive Livingston, NJ 07039 | Borrower (Name) Bartholomew Foods IV Corp. | |
| SBA Loan Number (10 digits) PLP9039014007 | Lender Computes interest on a  365  day basis. | |

| Sum of Prior disbursements | $0.00 | + This Disbursement | $1,219,000.00 | = Total | $1,219,000.00 |
|---|---|---|---|---|---|

The provisions of 18 U.S.C. 1001 and 15 U.S.C. 545 provide certain criminal penalties for making false statements, willfully overvaluing collateral, or other prohibited acts.  To induce SBA, directly or indirectly, to participate in this loan, the *Borrower*, subject to these provisions acknowledges receipt of $1,219,000.00 on 9/12/2005 and certifies (1) that the proceeds at this disbursement will be, and all previous disbursements have been, used in accordance with the Loan Authorization,  (2) that there has been no substantial adverse change in financial condition, organization, operations, or fixed assets since application for this loan was filed or since the previous disbursement, and (3) that there are no liens or encumbrances against the real or personal property securing the loan except those disclosed in the application for this loan.

*Lender* certifies that disbursement of the loan proceeds was made and the loan proceeds were used as set forth below and in accordance with the Loan Authorization *by issuance of joint payee checks as detailed below except checks for cash operating capital, cash to reimburse borrower for evidenced expenditures made after loan approval date for such authorized use of proceeds, or as otherwise directed by the Loan Authorization,* and that construction, paid with loan proceeds as listed below has been completed.  **(Any deviation from the Loan Authorization must be authorized in writing by SBA prior to expenditure of the loan funds.)**

See paragraph _G_ of Authorization "Use of Proceeds"

| Subparagraph | Name of Payee | Date and Amount of Payment | Purpose |
|---|---|---|---|
| 4 | CIT Small Business Lending Corporation | 09/12/2005  $7,941.00 | Other Misc Expenses |
| 3 | CIT Small Business Lending Corporation | 09/12/2005  $31,999.00 | SBA Guaranty Fee |
| 2 | Bartholomew Foods IV, Corp. | 09/12/2005  $75,560.00 | Working Capital |
| 1 | Nancy Davis | 09/12/2005  $1,000,000.00 | Purchase of Business |
| 1 | Frank R. Seddio, As Attorney | 09/12/2005  $100,000.00 | Purchase of Business |
| 4 | Cullen and Dykman Bleakley Platt, LLP. | 09/12/2005  $3,500.00 | Other Misc Expenses |

To further induce SBA to participate in the loan, Lender certifies that neither the Lender nor its Associates, officers agents, affiliates or attorneys have charged or will charge or receive, directly or indirectly, any bonus, fee commission, or other payment or benefit, or require a compensating balance, Certificate of Deposit, or other security in connection with making or servicing of this loan (other than those reported on SBA Forms 4 or 159 "Compensation Agreement).  It is understood that all fees not approved by SBA are prohibited, except as may be specifically permitted by the Loan Authorization, SBA regulations or the SBA Form 750 "Guaranty Agreement".

| Lender CIT Small Business Lending Corporation Angela Torres As Kit Poon, Loan Closer | Borrower Bartholomew Foods IV, Corp Djenane Bartholomew, President |
|---|---|
| Date  9/12/05 | Date  9/12/2005 |

This Certification must be signed and returned to the SBA immediately after each disbursement.  If there is a large number of checks, itemize on separate sheets, sign and attach hereto.

| SBA Review By | Title | Date |
|---|---|---|
| | | |

The estimated burden for completion of this form is 1 hour per response.  If you have any questions or comments concerning this estimate or any other aspects of this information collection, please contact Chief, Administrative Information Branch, U.S. Small Business Administration, Washington, D.C. 20416 and Clearance Officer, Paperwork Reduction Project (3245-0200), Office of Management and Budget, Washington, D.C. 20503.

SBA Form 1050 (5-91) REF 70 50 Use 4-89 Edition Until Exhausted.          YELLOW to SBA, PINK to Lender, BLUE to Borrower

717

718

:45 PM
9/12/05
.ccrual Basis

# CULLEN AND DYKMAN LLP
## Find Report
### All Transactions

| Type | Date | Num | Name | Memo | Account | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| Deposit | 9/12/2005 | | WIRE IN | 00112-00358... | NORTH FORK IOL... | | Deposit | 1,219,000.00 | 1,219,000.00 |
| Check | 9/12/2005 | 5359 | CIT SMALL BUSIN... | 00112-00358... | NORTH FORK IOL... | | Banking Expe... | -7,941.00 | 1,211,059.00 |
| Check | 9/12/2005 | 5360 | CIT SMALL BUSIN... | 00112-00358... | NORTH FORK IOL... | | Banking Expe... | -31,999.00 | 1,179,060.00 |
| Check | 9/12/2005 | 5361 | BARTHOLOMEW F... | 00112-00358... | NORTH FORK IOL... | | Banking Expe... | -75,560.00 | 1,103,500.00 |
| Check | 9/12/2005 | 5362 | NANCY DAVIS | 00112-00358... | NORTH FORK IOL... | | Banking Expe... | -1,000,000.00 | 103,500.00 |
| Check | 9/12/2005 | 5363 | FRANK R. SEDDIO... | 00112-00358... | NORTH FORK IOL... | | Banking Expe... | -100,000.00 | 3,500.00 |
| Check | 9/12/2005 | 5364 | CULLEN AND DYK... | 00112-00358... | NORTH FORK IOL... | | Banking Expe... | -3,500.00 | 0.00 |
| Total | | | | | | | | 0.00 | 0.00 |

Page 1

CCAN: 46476

# CIT Small Business Lending Corporation
## Customer Statement for Bartholomew Foods IV Corp.
### (as of September 07, 2005)

| Statement of Charges & Credits | Charges | Credits |
|---|---|---|
| **Credits Received** | | |
| Check 916 for $3,000.00 received on 07/20/2005 | | |
| - applied to Out-of-Pocket Expense | | $2,000.00 |
| - applied to Packaging Fee | | $1,000.00 |
| Check 927 for $3,000.00 received on 08/09/2005 | | |
| - applied to Out-of-Pocket Expense | | $3,000.00 |
| **Total Credits** | | $6,000.00 |

| Charges Detail | Charges | Credits |
|---|---|---|
| **Charges Detail** | | |
| CIT Packaging Fee | $1,000.00 | |
| Federal Express Charge | $60.00 | |
| SBA Guaranty Fee | $31,998.75 | |
| - SBA Guaranty Fee - $31,998.75 | | |
| Site Visit Report | $200.00 | |
| - Site Visit Fee - $200.00 | | |
| TRW Credit Report | $3.50 | |
| **Total Charges** | $33,262.25 | $0.00 |

| Customer Credits/Charges | | |
|---|---|---|
| **Customer Credits/Charges** | Credits | $6,000.00 |
| | Less Charges | $33,262.25 |
| | **Customer Balance/(Shortage)** | ($27,262.25) |

| Loan Proceeds | | |
|---|---|---|
| **Loan Proceeds** | | $1,219,000.00 |
| Payoff to Cullen and Dykman Bleakley Platt, LLP. (Funded 09/12/2005) | $1,103,500.00 | |
| Miscellaneous Closing Costs paid to Cullen and Dykman Bleakley Platt, LLP (Funded 09/12/2005) | $7,941.00 | |
| SBA Guaranty Fee paid to Cullen and Dykman Bleakley Platt, LLP (Funded 09/12/2005) | $31,999.00 | |
| Working Capital paid to Cullen and Dykman Bleakley Platt, LLP. (Funded 09/12/2005) | $75,560.00 | |
| **Total Proceeds** | $1,219,000.00 | $1,219,000.00 |

| Balance to Fund | | |
|---|---|---|
| **Balance to Fund** | Loan Amount | $1,219,000.00 |
| | Less Amount Funded To Date | $1,219,000.00 |
| | **Balance To Fund** | $0.00 |

9/12/2005

719

# EXHIBIT B

# Assets Purchase Agreement

This Assets Purchase Agreement (the "Agreement") is made and entered into on the 9th day of August 2005, by and among:

Urban City Dough, Inc., a New York corporation (the "Seller"); having a principal place of business at 30 Rockefeller Plaza, New York, NY 10022

**Nancy Davis** (the "Shareholder"), the owner of all of the issued and outstanding shares of capital stock of the Seller; and residing at 16 Great Hall Road, Mahwah, NJ, 07043.

**Djeanine Bartholomew**, an individual residing at 1068 East 94th Street, Brooklyn, NY 11236 (the "Purchaser").

## RECITALS

A. Seller is engaged in the service business selling food products, and services. Shareholder is the sole owner, of record and beneficially, of all of Seller's issued and outstanding capital stock.

B. Purchaser desires to enter the service business and desires to purchase the business operations of Seller. All of such business operations of Seller desired to be purchased by Purchaser are referred to as "Dunkin Donuts, **located at 30 Rockefeller Plaza, Concourse Level, New York, NY.**

C. Subject only to the limitations and exclusions contained in this Agreement and on the terms and conditions of this Agreement, Seller desires to sell to the Purchaser and the Shareholder desires that the Seller sell to the Purchaser, and the Purchaser desires to buy from the Seller, the Business and certain assets, properties and rights of the Seller described in this Agreement.

NOW, THEREFORE, in consideration of the recitals and of the representations, warranties, covenants and agreements contained, and intending to be legally bound, the parties agree as follows:

## ARTICLE I - PURCHASE AND SALE

1.1 *Agreement to Sell.* At the Closing (as defined in Section 2.1) and except as otherwise specifically provided in this Section 1.1, the Seller will, and the Shareholder will cause the Seller to, validly and effectively grant, sell, convey, assign, transfer and deliver to the Purchaser, upon and subject to the terms and conditions of this Agreement, (a) all of the Seller's right, title and interest in and to (i) the Business as a going concern, and (ii) certain of the Seller's assets set forth in Section 1.1.1, properties and rights constituting the Business or used in the Business, which are described in this Agreement, free and clear of all liens, pledges, security interests, charges, claims, restrictions and encumbrances of any nature whatsoever, and (iii) all of the

Seller's rights, title and interest in the name "Dunkin Donuts," or any derivative thereof. The Business, name, and assets, properties and rights being sold are called the "Assets."

1.1.1 *Included Assets.* The Assets referred to in Section 1.1(a)(ii) shall include, without limitation, the following assets, properties and rights of Seller used directly or indirectly in the conduct of, or generated by or constituting, the Business, except as otherwise expressly set forth in this Agreement:

(a) all machinery, equipment, tools, vehicles, furniture, furnishings, leasehold improvements, goods and any rights under lease to use such machinery, vehicles, furnishings and equipment and those items of personal property and other tangible personal property listed on Schedule 1.1.1(a).

(b) all office and other supplies set forth on Schedule 1.1.1(b);

(c) all inventory set forth on Schedule 1.1.1(c);

(d) all rights under any written or oral contract, agreement, plan, instrument, registration, license, certificate of occupancy, other permit, certification, authorization or approval of any nature, or other document, commitment, arrangement, undertaking, practice or authorization set forth on Schedule 1.1.1(d);

(e) all rights under any patent, trademark, service mark, trade name or copyright, whether registered or unregistered, and any applications therefor;

(f) all technologies, methods, formulations, data bases, trade secrets, know-how, inventions and other intellectual property used in the Business or under development listed on Schedule 1.1.1(f);

(g) all rights or choses in action arising out of occurrences before or after the Closing, including without limitation all rights under express or implied warranties relating to the Assets, except relating to Excluded Assets in 1.1.2;

(h) all records, manuals and other documents (collectively, the "Records") relating to or used in connection with the Seller's quality assurance/quality control programs, if any, developed for the Business, records relating to personnel qualifications in connection with the quality assurance/quality control program and administration of any quality assurance program; provided, however, that after the Closing the Purchaser will promptly provide Seller with access to and copies of any original documents comprising the Records which Seller or the Shareholder requests;

(i) all information, files, records, data, plans, and contracts and recorded knowledge, including customer and supplier lists related to the foregoing that the Purchaser may request; provided, however, that after the Closing the Purchaser will promptly provide Seller and Shareholder with access to and copies of any original of the foregoing documents comprising the Records which Purchaser requests;

998

(j) the maintenance and service contracts ("Maintenance Contracts") set forth in Schedule 1.1.1(j), if any.

(k) all telephone numbers to its Business;

(l) all other assets of the Seller, except those excluded under 1.1.2.

(m) the corporate seals, certificates of incorporation, minute books, stock books, tax returns, books of account and/or other records having to do with corporate organization of Seller;

(n) all Maintenance Contracts, except those set forth on Schedule 1.1.1(j);

(o) all the rights that accrue or will accrue to Seller under this Agreement;

(p) the computer, computer lease and software, set forth on Schedule 1.1.2(j);

1.1.2 *Excluded Assets.* The following assets of the Seller shall be specifically excluded from the sale:

(a) any cash or cash equivalents held by or on behalf of Seller;

(b) all securities;

(c) all accounts receivable invoiced by Seller relating to the Business that are set forth on Schedule 1.1.2(c);

(d) all work in process, meaning all claims for services performed or goods sold prior to the Closing and billed by the Seller as set forth on Schedule 1.1.2(d);

(e) all notes receivable owing to the Seller as set forth on Schedule 1.1.2(e);

(f) all the rights to any of Seller's claims for any federal, state, local, or foreign tax refunds;

(g the real property set forth on Schedule 1.1.2(k); and

(h the vehicle set forth on Schedule 1.1.2(l).

1.2 *Agreement to Purchase.* At the Closing, Purchaser shall purchase the Assets from Seller, upon and subject to the terms and conditions of this Agreement and in reliance on the representations, warranties and covenants of Seller and Shareholder, in exchange for the Purchase Price (hereinafter defined in Section 1.2.1). Except as specifically provided in Section 1.3, Purchaser shall not assume or be responsible for any liabilities or obligations of the Business or Seller.

1.2.1 *The Purchase Price; Payment.*

3

(a) The purchase price shall be $1,300,000.00 plus the sum of the liabilities set forth in Schedule 1.2.1(a) (the "Purchase Price"). The liabilities listed on Schedule 1.2.1(a) are set forth solely for the purpose of determining, in part, the *amount* of the Purchase Price.

(b) Upon the signing of this contract, $195,000.00 (initial deposit).

(c) Balance to be paid at closing of title, in cash or by certified or bank cashier's check (subject to adjustment at closing), $1,105,000.00.

(d) On the Closing Date, on account of the Purchase Price, Purchaser shall assume the liabilities set forth on Schedule 1.2.1(b) and shall deliver its certified check for the balance of the Purchase Price. The liabilities listed on Schedule 1.2.1(b) are set forth solely to identify the liabilities to be assumed and the manner in which the Purchase Price shall be paid in part by the Purchaser.

1.3 *No Assumption of Liabilities.*

(a) Purchaser agrees to accept the Maintenance Contracts set forth on Schedule 1.1.1(j).

(b) Except for and limited solely to the liabilities set forth on Schedule 1.2.1(b) and the contractual obligations under the Maintenance Contracts listed on Schedule 1.1.1(j), the Purchaser shall not assume, and shall not be liable for, any liabilities or obligations of the Seller of any nature whatsoever, express or implied, fixed or contingent, including, but not limited to any liability owing to the Shareholder or any claim, regardless of when made or asserted, which arises out of or is based upon negligence, strict liability or any express or implied representation, warranty, agreement or guarantee made by the Seller or the Shareholder, or alleged to have been made by the Seller or the Shareholder, or which is imposed or asserted to be imposed by operation of law, in connection with any product designed, manufactured, sold, shipped or installed by or on behalf of the Seller, of or for any service performed by or on behalf of the Seller, including without limitation any claim relating to the service, repair or replacement of any such product and any claim seeking recovery for property damage, consequential damage, lost revenue or income or personal injury. In addition to the foregoing, in no event shall the Purchaser assume any liability or incur any liability or obligation in respect of any federal, state or local income or other tax liability of Seller payable with respect to the Business, Assets, properties or operations of the Seller for any period through the Closing Date or incident to or arising as a consequence of the negotiation or consummation by the Seller of this Agreement and the transactions contemplated by this Agreement.

1.4 *Allocation of Purchase Price.* The Purchase Price shall be allocated among the Assets acquired in accordance with Schedule 1.4. This allocation was arrived at in arm's length negotiations between the parties. The parties covenant and agree with each other that none of them will take a position on any income tax or in any judicial proceeding that is in any way inconsistent with the allocation set forth on Schedule 1.4.

4

## ARTICLE II - CLOSING, ITEMS TO BE DELIVERED, THIRD-PARTY CONSENTS, CHANGE IN NAME AND FURTHER ASSURANCES

2.1 *Closing.* The closing (the "Closing") of the sale and purchase of the Assets shall take place at the offices of the Seller's Attorney, commencing at 10:00 a.m., local time, on or about September 9, 2005, or at such other place, date and time as shall be mutually satisfactory to the parties hereto. The date of the Closing is sometimes referred to as the "Closing Date."

2.2 *Items to be Delivered at Closing.* At the Closing and subject to the terms and conditions contained in this Agreement:

(a) The Seller will, and the Shareholder will cause the Seller to, deliver to the Purchaser the following:

(i) such bills of sale with covenants of warranty, assignments, endorsements, and other good and sufficient instruments and documents of conveyance and transfer, in form and substance satisfactory to the Purchaser and its counsel, as shall be necessary and effective to convey, transfer and assign to, and vest in, the Purchaser all of the Seller's right, title and interest in and to the Assets to be sold under this Agreement, including, without limitation, (A) good, valid and marketable title in and to all of the Assets owned by the Seller, (B) good and valid leasehold interests in and to all of the Assets leased by the Seller, and (C) all of the Seller's rights under all agreements, contracts, commitments, leases, plans, bids, quotations, proposals, licenses, permits, authorizations, instruments and other documents to which the Seller is a party or by which it has rights on the Closing Date and which are to be sold under this Agreement; and

(ii) all agreements, contracts, commitments, leases, plans, bids, quotations, proposals, licenses, permits, authorizations, instruments, manuals and guidebooks, price books and price lists, customer and subscriber lists, supplier lists, sales records, files, correspondence, and other documents, books, records, papers, files and data belonging to the Seller which are part of the Assets or relate to the Business of the Seller; and simultaneously with such delivery, all such steps will be taken as may be required to put the Purchaser in actual possession and operating control of the Assets.

(iii) a New York State Sales Tax Return for its sales tax liability for the taxable portion of the Assets and shall file it with its check for the sales tax disclosed upon the return with the New York State Sales Tax Department.

(b) The Purchaser will deliver to the Seller the following:

(i) its certified check in an amount equal to the Purchase Price as provided in section 1.2.1; and

(ii) its check for the sales tax for the taxable portion of the Assets.

2.3 *Third-Party Consents.* To the extent that the Seller's rights under any agreement, contract, commitment, lease, license, permit, authorization or other Asset to be assigned to the Purchaser may not be assigned without the consent of another person which has not been

5

obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach or be unlawful, and the Seller shall use its best efforts to obtain any such required consent(s) promptly. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair the Purchaser's rights under the instrument in question so that the Purchaser would not in effect acquire the benefit of all such rights, the Seller, to the maximum extent permitted by law and the instrument, shall act as the Purchaser's agent in order to obtain for it the benefits and shall cooperate, to the maximum extent permitted by law and the instrument, with the Purchaser in any other reasonable arrangement designed to provide such benefits to the Purchaser.

If any contract shall be assigned, the Purchaser shall agree to be bound by and assume all of its terms and conditions.

2.4 *Change in and Use of Name.* The Seller and the Shareholder shall take all such actions not later than the Closing Date as may be required to change the Seller's name on that date to one distinctly different in sound and appearance from its present name, including but not limited to filing a name change amendment with the Secretary of State of the State of New York and filing an appropriate name change notice in the appropriate office in each state where the Seller is qualified to do business. After the Closing, neither the Seller nor the Shareholder nor any direct or indirect subsidiary of the Seller will use the name XYZ Corporation, or any similar variant thereof. The Purchaser shall have the right to use the name XYZ Corporation, or any similar variant thereof after the Closing Date, and the Seller and the Shareholder will take all necessary steps to permit the Purchaser to use this name.

2.5 *Further Assurances.* The Seller from time to time after the Closing, at the Purchaser's request, will execute, acknowledge and deliver to the Purchaser such other instruments of conveyance and transfer and will take such other actions and execute and deliver such other documents, certifications and further assurances as the Purchaser may reasonably request in order to vest more effectively in the Purchaser, or to put the Purchaser more fully in possession of, any of the Assets, or the Business.

### ARTICLE III - REPRESENTATIONS AND WARRANTIES

3.1 *Representations and Warranties of the Seller and the Shareholder.* The Seller and the Shareholder jointly and severally represent and warrant to the Purchaser as of the date of this Agreement and the Closing Date as follows:

3.1.1 *Corporate Existence; Certificate of Incorporation and Bylaws.*

(a) The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of New York. The Seller has all requisite power and authority and all necessary licenses, permits and authorizations to carry on its business as it has been and is being conducted and to own, lease and operate the assets and properties used in connection therewith. A list of the Seller's licenses, permits and authorizations is attached as part of Schedule 3.1.1(a). The Seller is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the character of the properties owned or leased by it or the nature of the

6

business transacted by it requires it to be so qualified, all of which jurisdictions are listed on Schedule 3.1.1(a).

(b) A copy of the Seller's Certificate of Incorporation and all amendments effected prior to the date of this Agreement and of the Seller's Bylaws as amended to the date of this Agreement have been delivered to the Purchaser and are correct and complete.

3.1.2 *Corporate Power; Authorization: Enforceable Obligations.* The Seller has the corporate power, authority and legal right to execute, deliver and perform this Agreement. The execution, delivery and performance of this Agreement by the Seller have been duly authorized by all necessary corporate and shareholder action. This Agreement has been, and the instruments of transfer, assignment and conveyance referred to in Section 2.2(a)(i) will be, duly executed and delivered by a duly authorized officer of the Seller, and this Agreement constitutes, and such instruments when executed and delivered will constitute, legal, valid and binding obligations of the Seller enforceable against the Seller in accordance with their respective terms.

3.1.3 *The Shareholder.* The Shareholder is the lawful owner of record and beneficially of all of the issued and outstanding shares of capital stock of the Seller. The Shareholder has the power, authority and legal right to execute, deliver and perform this Agreement. This Agreement has been duly executed and delivered by the Shareholder and constitutes the legal, valid and binding obligation of the Shareholder enforceable against the Shareholder in accordance with its terms.

3.1.4 *No Other Business.* Neither the Seller nor the Shareholder owns any shares of any corporation and has no ownership or other investment interest, either of record, beneficially or equitable, in any association, partnership, joint venture or other legal entity, except as set forth in Schedule 3.1.4.

3.1.5 *Financial Statements.* The Seller has delivered to the Purchaser the balance sheets of the Seller as of December 31, 2003, and December 31, 2004, and the related statements of income and retained earnings and notes thereto. These financial statements have been examined by a public accountant. The balance sheet and the related statements of income and retained earnings, are correct and complete, copies of which have been delivered to the Purchaser, and they present the complete and correct financial position and assets and liabilities of the Seller as of each respective period and the results of its operations in conformity with generally accepted accounting principles applied on a consistent basis.

The Seller shall deliver its balance sheet as of August 31, 2005, and the related statements of income and retained earnings and notes thereto (the "December 31, 2004 Financial Statement"). These statements will be prepared by a certified public accountant and will be complete and correct and will present the complete and correct financial position and assets and liabilities of the Seller as of December 31, 2004, and the results of its operations for the six-month period then ended, in conformity with generally accepted accounting principles applied on a consistent basis.

All references in this Agreement to the "Financial Statements" shall be deemed to refer to these financial statements.

7

3.1.6 *Accounts Receivable.* All accounts receivable reflected on the Financial Statements, a correct and complete list of which is attached as Schedule 3.1.6, and all accounts receivable acquired by the Seller or arising subsequent to the last Financial Statement date, have been acquired or have arisen only in the ordinary course of business, consistent with past practice, and are not subject to defenses, set-offs or counterclaims. All of such accounts receivable are generally due within 30 days after being accrued on the books of the Seller and have been collected, or will be collected within 90 days after billing, in the full aggregate recorded amounts thereof, less the amount of the allowance for doubtful accounts shown on the Financial Statement. The allowance for such doubtful accounts has been determined in accordance with generally accepted accounting principles consistent with past practice.

3.1.7 *Absence of Undisclosed Liabilities.* The Seller has no liabilities or obligations, either accrued, absolute, contingent or, to the best of knowledge of the Seller and the Shareholder, after a due, proper and complete investigation, otherwise, except those liabilities and obligations set forth on the Financial Statements and not heretofore paid or discharged.

For purposes of this Agreement, the term "liabilities" shall include, without limitation, any direct or indirect indebtedness, guaranty, endorsement, claim, loss, damage, deficiency, cost, expense, obligation or responsibility, whether known or unknown, fixed or unfixed, choate or inchoate, liquidated or unliquidated, secured or unsecured.

3.1.8 *Existing Condition.* Except as disclosed on Schedule 3.1.8, since December 31, 2004, the date of the last Financial Statement, the Seller has not:

(a) declared, set aside or paid any dividend or made or agreed to make any other distribution or payment in respect of or agreed to make any other distribution or payment in respect of its capital shares or redeemed, purchased or otherwise acquired or agreed to redeem, purchase or acquire any of its capital shares;

(b) incurred any liabilities, or discharged or satisfied any lien or encumbrance, or paid any liabilities, other than in the ordinary course of its business consistent with past practice, or failed to pay or discharge when due any liabilities of which the failure to pay or discharge has caused or will cause any material damage or risk of material loss to it or any of its assets or properties;

(c) sold, assigned or transferred any of its assets or properties, other than in the ordinary course of its business;

(d) created, incurred, assumed or guaranteed any indebtedness for money borrowed, or mortgaged, pledged or subjected to any lien, pledge, security interest, conditional sales contract or other encumbrance of any nature whatsoever against any of its assets or properties;

(e) made or suffered any amendment or termination of any agreement, contract, commitment, lease or plan to which it is a party or by which it is bound, or canceled, modified or waived any debts or claims held by it, or waived any rights of substantial value;

8

1004

(f) suffered any damage, destruction or loss, whether or not covered by insurance, materially and adversely affecting its business, operations, assets, properties, prospects or condition (financial or otherwise);

(g) suffered any change in its financial condition or in the nature of its business or operations which has had or might have a material adverse effect on its business, operations, assets, properties, prospects or condition (financial or otherwise);

(h) made any capital expenditure or capital addition or betterment except such as may be involved in the ordinary repair, maintenance and replacement of its assets;

(i) increased the salaries or other compensation of, or made any advance (excluding advances for ordinary and necessary business expenses) or loan to, any of its directors, officers or employees or the Shareholder, or made any increase in, or any addition to, other benefits to which any of its directors, officers or employees or the Shareholder may be entitled;

(j) made any payment to the Shareholder with respect to any indebtedness owed by the Seller to the Shareholder; or

(k) entered into any transaction other than in the ordinary course of its business consistent with past practice.

3.1.9 *Title to Properties; Leasehold Interests.* The Seller has good, valid and marketable title to the Assets to be sold, including all of the properties and assets reflected on the December 31, 2005 Financial Statements and those acquired since that date, free and clear of all liens, pledges, security interests, charges, claims, restrictions and other encumbrances and defects of title of any nature whatsoever.

To the best of knowledge of the Seller and the Shareholder, after a due, proper and complete investigation, all leases, licenses, permits and authorizations in any manner related to the assets, properties or business of the Seller and all other instruments, documents and agreements pursuant to which the Seller has obtained the right to use any real or personal property are in good standing, valid and effective in accordance with their respective terms, and there is not under any of such leases, licenses, permits, authorizations, instruments, documents or agreements any existing default or event which with notice or lapse of time, or both, would constitute a default and in respect of which the Seller has not taken adequate steps to prevent a default from occurring. The Seller has the unrestricted right to sell the Assets as herein provided. The Seller does not own any real property, except as set forth on Schedule 1.1.2(k).

3.1.10 *Condition of Tangible Assets.* All facilities, vehicles, machinery, equipment and other items of tangible personal property owned or used by the Seller and to be transferred to the Purchaser (a) are in good operating condition and repair, subject to normal wear and maintenance; (b) to the best knowledge of the Seller and the Shareholder, after due, proper and complete investigation, are in conformity with all applicable laws, regulations and ordinances, including the Uniform Commercial Code and customary trade standards of marketability; and (c) are usable and salable in the regular and ordinary course of business of the Seller.

9

The inventory conforms and at the Closing will conform to all applicable laws, regulations and ordinances, including the Uniform Commercial Code and customary trade standards of marketability and are usable and salable in the regular and ordinary course of Seller's business. As of the Closing, the inventory will consist of current, readily salable goods and merchandise and will not include obsolete items or items below standard quality, or in disrepair, nonsalable, or slow turnover merchandise or products. At the Closing the inventory shall have a value of not less than $2,500.00, determined at the lower of cost or market, exclusive of freight.

No person other than the Seller owns any vehicles, equipment or other tangible assets or properties situated on the premises which the Seller leases, or necessary to the operation of its business.

All tangible assets are now and at the time of Closing Date will be located at 30 Rockefeller Plaza, New York, NY 10022, and will not be removed without Purchaser's consent.

All tangible assets to be transferred under this Agreement will be transferred to Purchaser together with an assignment by Seller to Purchaser of all of Seller's right, title and interest in all manufacturer warranties, if any.

3.1.11 *Books of Account.* The books of accounts of the Seller reflect all of its items of income and expense, and all of its assets, liabilities and accruals required to be reflected therein in accordance with generally accepted accounting principles.

3.1.12 *Tax and Other Returns and Reports.* All federal, state and local tax returns, reports and statements (including all income, unemployment compensation, social security, payroll, sales and use, excise, privilege, property, *ad valorem,* franchise, license, school and any other tax under the laws of the United States or any state or municipal or political subdivision thereof) required to be filed by the Seller have been filed with the appropriate governmental agencies in all jurisdictions in which such returns, reports and statements are required to be filed, and all such returns, reports and statements properly reflect the taxes of the Seller for the periods covered thereby. There are no tax liens (other than any lien for current taxes not yet due and payable) on any of the assets or properties of the Seller. The Seller has made all deposits required by law to be made with respect to employees' withholding taxes.

3.1.13 *Litigation.* Except as set forth on Schedule 3.1.19(j), there is no litigation, arbitration, investigation or other proceeding of or before any court, arbitrator or governmental or regulatory official, body or authority pending or threatened against the Seller, any of its assets, properties or business, any of its officers or employees, or the transactions contemplated by this Agreement, nor does the Seller or the Shareholder know or have reasonable grounds to know of any basis for any such litigation, arbitration, investigation or proceeding. The Seller is not a party to or subject to the provisions of any judgment, order, writ, injunction, decree or award of any court, arbitrator or governmental or regulatory official, body or authority.

3.1.14 *Compliance with Law.* To the best of knowledge of the Seller and the Shareholder, after a due, proper and complete investigation, the Seller has complied with each, and is not in violation of any law, rule or regulation to which it or its business, operations, assets or properties

10

is subject and has not failed to obtain or to adhere to the requirements of any license, permit or authorization necessary to the ownership of its assets and properties or to the conduct of its business, which noncompliance, violation or failure to obtain or adhere might adversely affect its business, operations, assets, properties, prospects or condition (financial or otherwise). Neither the Seller nor the Shareholder nor any officer, employee or agent of, nor any consultant to, the Seller or the Shareholder has unlawfully offered, paid or agreed to pay, directly or indirectly, any money or anything of value to, or for the benefit of, any individual who is or was a candidate for public office (other than lawful campaign contributions), or an official or employee of any governmental or regulatory body or authority or an officer or employee of any client, customer or supplier of the Seller. The Seller has not engaged in any transaction, maintained any bank account or used any corporate funds except for transactions, bank accounts and funds which have been and are reflected in its normally maintained books and records.

3.1.15 *Validity of Contemplated Transactions, etc.* The execution, delivery and performance of this Agreement by the Seller and the Shareholder will not contravene or violate (a) any law, rule or regulation to which the Seller or the Shareholder is subject, (b) any judgment, order, writ, injunction, decree or award of any court, arbitrator or governmental or regulatory official, body or authority which is applicable to the Seller or the Shareholder, or (c) the certificate of incorporation or Bylaws of the Seller or any securities issued by the Seller; nor will such execution, delivery or performance violate, be in conflict with or result in the breach (with or without the giving of notice or lapse of time, or both) of any term, condition or provision of, or require the consent of any other party to, any indenture, agreement, contract, commitment, lease, plan, license, permit, authorization or other instrument, document or understanding, oral or written, to which either the Seller or the Shareholder is a party, by which the Seller may have rights or by which any of the assets or properties of the Seller may be bound or affected, or give any party with rights thereunder the right to terminate, modify, accelerate or otherwise change the existing rights or obligations of the Seller thereunder. No authorization, approval or consent, and no registration or filing with, any governmental or regulatory official, body or authority is required in connection with the execution, delivery and performance of this Agreement by the Seller or the Shareholder.

3.1.16 *Conditions Affecting the Seller.* To the best of knowledge of the Seller and the Shareholder, after a due, proper and complete investigation, there are no conditions existing with respect to the Seller's markets, products, services, clients, customers, facilities, personnel or suppliers which are known to the Seller or the Shareholder or which should be known to the prudent businessman in charge of the operations of the Seller which would adversely affect the business, operations or prospects of the Seller, other than such conditions as may affect as a whole the industry in which the Seller operates.

3.1.17 *Insurance.* The assets, properties and business of the Seller are insured under various policies of general liability, products liability and other forms of insurance, as set forth on Schedule 3.1.17. The Seller has not failed to give any notice or present any claim under any such policy in a timely fashion or in the manner or detail required by the policy, and all existing notices and claims are listed on Schedule 3.1.17. No notice of cancellation or nonrenewal with respect to, or disallowance of any claim under, any such policy has been received by the Seller or the Shareholder. There are no outstanding unpaid premiums or claims, and there are no

11

provisions for retroactive or retrospective premium adjustments. Neither the Seller nor the Shareholder has knowledge of any state of facts or the occurrence of any event which reasonably might form the basis of any claim against the Seller or which might materially increase the insurance premiums payable under any such policy. Schedule 3.1.17 also contains a true and complete description of all outstanding bonds and other surety arrangements issued or entered into in connection with the business and operations of the Seller.

3.1.18 *Contracts and Commitments.* Each of the agreements, contracts, commitments, leases and other instruments, documents and undertakings listed on Schedules of this Agreement or to be assigned to Purchaser is (a) valid, to the best of knowledge of the Seller and the Shareholder, after a due, proper and complete investigation; (b) enforceable in accordance with its terms; (c) the parties thereto are in compliance with the provisions thereof; (d) no party is in default in the performance, observance or fulfillment of any material obligation, covenant or condition contained therein; and (e) no event has occurred which with or without the giving of notice or lapse of time, or both, would constitute a default thereunder; furthermore, no such agreement, contract, commitment, lease or other instrument, document or undertaking, in the reasonable opinion of the Seller or the Shareholder, contains any contractual requirement with which there is a reasonable likelihood any party thereto will be unable to comply. The failure of the Seller or the Shareholder to obtain the consent or approval of any party to any agreement, contract, commitment, lease or other instrument, document or undertaking listed on the Schedules of this Agreement or to be assigned to Purchaser, prior to the execution of this Agreement or the consummation of the transactions contemplated hereby will not result in a default, termination, breach, renegotiation or acceleration of any thereof.

3.1.19 *Additional Information.* Schedule 3.1.19 contains, to the extent not described in some other Schedule, (A) complete, correct and detailed Schedules, in form and substance reasonably acceptable to Purchaser, as of the date of this Agreement, specifying with respect to the business, properties, assets and obligations of the Seller each and every item in the following categories referred to below, and (B) true and complete copies of the documents and other materials that underlie such Schedules:

(a) *Schedule 3.1.19(a)* - presently outstanding contracts, agreements, commitments and bids (other than those included on Schedule 3.1.19(d)); written and oral leases (other than leases disclosed on Schedule 3.1.19(h)); security deposits under leases; licenses; franchises; dealership, service, agency and other agreements. With respect to each item in each category referred to above, a specification as to whether the consent of any third person or agency is required for the effective assignment thereof;

(b) *Schedule 3.1.19(b)* - machinery, equipment, tools, dies, furniture, furnishings, leasehold improvements, vehicles, buildings and other tangible physical assets and fixtures and the location of such;

(c) *Schedule 3.1.19(c)* - (A) the policies of insurance presently in force in Schedule 3.1.17, and, without restricting the generality of the foregoing, those covering Seller's public and product liability and its personnel, properties, buildings, machinery, equipment, furniture, fixtures and operations, specifying with respect to each such policy, the name of the insurer, type of coverage,

12

term of policy, limits of liability and annual premium, (B) Seller's premiums and losses, by year, by type of coverage, for the past three years based on information received from Seller's insurance carrier(s), (C) all outstanding insurance claims by or against Seller for damage to or loss of its property or income which have been referred to insurers or which Seller believes to be covered by commercial insurance, (D) general comprehensive liability policies carried by Seller for the past five years, including excess liability policies, and (E) any agreements, arrangements or commitments under which Seller indemnifies any other person;

(d) *Schedule 3.1.19(d)* - Names, current annual compensation rates (including bonuses and commissions), accrued bonus, accrued sick leave and accrued severance pay of all present salaried employees of Seller; aggregate accrued vacation pay, the current base salary rate of each of such individuals; employment, managerial, advisory or consulting agreements and confidentiality or other agreements protecting proprietary processes, formulae or information; copies of all pension, profit-sharing, thrift, or other retirement plans, employee stock ownership plans, deferred compensation, stock ownership, stock purchase, performance share, individual or group bonus or other deferred or incentive plans, severance plans, hospitalization, insurance, vacation, death benefit, collective bargaining, union or other employee association agreements, or other similar plans in each case covering employees of Seller and as amended to date, and all amendments thereto prior to the Closing Date, agreements, arrangements, commitments or understandings providing for any employee benefit, the latest annual report (on Form 5500, if applicable) for each plan, the most recent actuarial valuations with respect to all defined benefit plans, copies of all Internal Revenue Service determination letters regarding such plans, all such reports, actuarial valuations and determination letters as may be made, received or issued prior to the Closing Date, the annual cost of each such plan or arrangement and a summary description with respect to the funding of each such welfare benefit plan or arrangement; all other contracts and relationships with or with respect to, and all other obligations or liabilities with any employee (or other individual with whom Seller has a business relationship) of Seller;

(e) *Schedule 3.1.19(e)* - individual refundable deposits, prepaid expenses, deferred charges and "other assets";

(f) *Schedule 3.1.19(f)* - all loans or advances made by Seller to any person;

(g) *Schedule 3.1.19(g)* - liens, encumbrances, charges, restrictions, claims and security interests with respect to the business, assets and property to be transferred hereunder which do not constitute real property;

(h) *Schedule 3.1.19(h)* - each and every parcel of real property or interest therein owned in whole or in part by Seller or held for the benefit of Seller under a title-holding agreement or held under a lease; and complete and correct copies of each and every of the following, if any, in the possession of Seller will be made available for review by Buyer: (A) title reports, title binders, survey documents and data affording information or opinions with respect to, certifying to, or evidencing the extent, current title, title history, title marketability, use, possession, restriction or regulation, if any (governmental or otherwise), and compliance with applicable laws, of (x) the real property or (y) any estate or interest in (or in the nature of) real property or in a land or building lease or chattel real; (B) deed or title-holding or trust agreements, if any, under which

13

any of the parcels may have been conveyed to Seller or under which the same may be held for the benefit of Seller; and (C) leases; except as noted in such Schedule, all such buildings, structures, leasehold improvements and the equipment therein currently are used by or useful to Seller in the ordinary course of business and, except as so noted and except for normal wear and tear, there are no material defects with respect thereto which would impair the day-to-day use by Purchaser of any such buildings, structures, leasehold improvements or equipment which would subject Purchaser to material liability under applicable law;

(i) *Schedule 3.1.19(i)* - trademark registrations and applications and notices of infringement therefor, service mark registrations (which list shall include but not be limited to indications of length of use of each trade and service mark as well as identification of product(s) on which each trade and service mark is used, and registration numbers, registration and renewal dates, affidavit of use filings), patents and patent applications, copyrights, and applications therefor (including information as to expiration date of all the foregoing where applicable) presently owned, in whole or in part, by Seller and used or useful in Seller's business; and all trademark licenses, service mark licenses, copyright licenses, royalty agreements, patent licenses, assignments, grants and contracts with employees or others relating in whole or in part to disclosure, assignment, registering or patenting of any trademarks, service marks, copyrights, inventions, discoveries, improvements, processes, formulae, trade secrets or other know-how and used or useful in Seller's business. Seller represents (i) the foregoing trademarks, service marks, copyrights, licenses, assignments, grants, agreements and contracts are valid; (ii) the foregoing trademark registrations, service mark registrations, copyright registrations and patents have been duly issued and have not been canceled, abandoned or otherwise terminated; (iii) the foregoing trademark applications, service mark applications, copyright applications and patent applications have been duly filed; (iv) Seller is not in default under any of the foregoing licenses or agreements other than defaults, if any, which will not result in any material loss or liability; and (v) all such licenses and agreements are binding in accordance with their terms;

(j) *Schedule 3.1.19(j)* - all litigation, governmental or regulatory proceedings, investigations or labor disputes pending, or threatened against Seller, the officers or directors of Seller as such officers or directors, or any of the business assets or properties of Seller to be transferred pursuant hereto or to which Seller or its officers or directors as such officers or directors, is a party, as plaintiff, defendant or otherwise;

(k) *Schedule 3.1.19(k)* - all federal, state, local and foreign governmental licenses and permits necessary in the conduct of Seller's business; each jurisdiction in which the nature of the business of Seller requires Seller to qualify to do business as a foreign corporation; all federal, state, local and foreign governmental or judicial consents, orders, decrees and other compliance agreements under which Seller is operating or bound; all reports of inspection of Seller's businesses and properties from July 31, 2005 to the date hereof under all applicable federal, state and local health and safety laws and regulations; and copies of all of the foregoing and correspondence relating thereto.

(l) *Schedule 3.1.19(l)* - all licenses, permits, authorizations, tariffs, schedules of charges and orders issued by or filed with any governmental or regulatory official, body or authority, in any manner related or applicable to the Assets;

14

3.1.20 *Pension and Other Benefit Plans.* Neither the Seller nor any Affiliated Company (as defined in this Section 3.1.20) has incurred or will incur by reason of any relationship presently or heretofore maintained, or any act or omission occurring or existing prior to the Closing Date, any liability (a) to the Pension Benefit Guaranty Corporation pursuant to the provisions of Title IV of ERISA, (b) to any multiemployer plan, as that term is defined in Section 4001(a)(3) of ERISA or (c) to any taxing authority by reason of the operation of existence of any employee benefit plan. Neither the Seller nor any Affiliated Company has at any time prior to the Closing Date participated in any transaction involving the assets of any employee benefit plan (regardless of by whom sponsored) which has given rise or will give rise to a liability which could be asserted against the Seller pursuant to either Section 501(i) of ERISA or Sections 4975(a) and (b) of the Internal Revenue Code of 1954, as amended, (the "Code"). There is set forth or identified on Schedule 3.1.20 hereto all of the plans, funds, policies, programs, arrangements or understandings sponsored or maintained by the Seller pursuant to which any employee of the Seller (or any dependent or beneficiary of any such employee) might be or become entitled to (1) retirement benefits; (2) severance or separation from service benefits; (3) incentive, performance, stock, share appreciation or bonus awards; (4) health care benefits; (5) disability income or wage continuation benefits; (6) supplemental unemployment benefits; (7) life insurance, death or survivor's benefits; (8) accrued sick pay or vacation pay; (9) any type of benefit offered under any arrangement subject to characterization as an "employee welfare benefit plan" within the meaning of section 3(3) of ERISA; or (10) benefits of any other type offered through any arrangement that could be characterized as providing for additional compensation or fringe benefits. As to any plan, fund, policy, program, arrangement or understanding identified on Schedule 3.1.20, all of the following are true: (1) all amounts due as contributions, insurance premiums and benefits to the date hereof have been fully funded and paid by the Seller; (2) all applicable requirements of law have been observed with respect to the operation thereof, and all material reporting and disclosure requirements have been timely satisfied; and (3) neither the Seller nor the Shareholder is aware, after a due, proper and complete investigation, of any claim or demand by any employee (or beneficiary or dependent of any employee) for benefits, or by any taxing authority for taxes or penalties, which has not been satisfied in full or which may be or become subject to litigation or arbitration. For purposes of this Section 3.1.20, "Affiliated Company" shall mean any member (whether or not incorporated) of a group which is under common control (within the meaning of the regulations promulgated under Section 414 of the Internal Revenue Code) and of which the Seller is a member.

3.1.21 *No Third-Party Options.* There are no existing agreements, options, commitments or rights with, to or in any person to acquire any of the Seller's assets, properties or rights or any interest therein, except for those contracts entered into in the ordinary course of business consistent with past practice for the sale of the Seller's products and services.

3.1.22 *No Patent Violations, etc.* Except as disclosed on Schedule 3.1.19(i), the business of the Seller as formerly and presently operated did not and does not utilize any patent, trademark, trade name, service mark, copyright or trade secret, and did not and to the best of knowledge of the Seller and the Shareholder, after a due, proper and complete investigation, does not conflict with, or infringe upon, any patent, trademark, trade name, service mark, copyright or trade secret owned or claimed by another. No person owns or has any proprietary, financial or other interest,

direct or indirect, in any unpatented design or device which the Seller is using or the use of which is necessary in the operation of the Seller's business as now or heretofore conducted.

3.1.23 *Transactions with Affiliates.* Neither the Shareholder nor any director or officer of the Seller owns or during the past two-and-one-half years has owned, directly or indirectly, or has, or within the past two-and-one-half years has had, an interest, either of record, beneficially or equitably, in any business, corporate or otherwise, which (a) has or had, or which is or was a party to or in any asset or property which is or was the subject of any contract, agreement, business arrangement, relationship or course of dealing with the Seller, or (b) conducts the same business as, or a similar business to, that conducted by the Seller.

3.1.24 *No Other Agreement.* Except as otherwise disclosed in this Agreement, Seller is not a party to any (a) contract with any guild or labor union, (b) pension, profit-sharing, retirement, bonus, insurance or similar plan in effect with respect to its employees or others, or (c) other contract, agreement or understanding affecting or relating to the Business or Assets of Seller.

3.1.25 *Maintenance Contracts.* The Seller has not billed or received any payment for services to be performed or materials to be provided after the Closing under any Maintenance Contract. The Seller has complied with all obligations imposed by the Maintenance Contracts and is not in default under any of them.

3.1.26 *Completeness of Disclosure.* Neither this Agreement nor any certificate, schedule, statement, document or instrument furnished or to be furnished to the Purchaser pursuant hereto, or in connection with the negotiation, execution or performance of this Agreement, contains or will contain any untrue statement of a fact or omits or will omit to state a fact required to be stated herein or therein or necessary to make any statement herein or therein not misleading. There is no fact, development or threatened development (excluding general economic factors affecting business in general) which the Seller has not disclosed to the Purchaser in writing which adversely affects or, so far as the Seller or the Shareholder can now foresee, may adversely affect, the business, operations, assets, properties, prospects or condition (financial or otherwise) of the Seller.

3.2 *Representations and Warranties of the Purchaser.* The Purchaser represents and warrants to the Seller and the Shareholder as of the date of this Agreement and the Closing Date as follows:

3.2.1 *Corporate Existence.* The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of New York.

3.2.2 *Corporate Power and Authorization.* The Purchaser has the corporate power, authority and legal right to execute, deliver and perform this Agreement. The execution, delivery and performance of this Agreement by the Purchaser have been duly authorized by all necessary corporate action. This Agreement has been duly executed and delivered by the Purchaser and constitutes the legal, valid and binding obligation of the Purchaser enforceable against it in accordance with its terms.

16

1012

3.2.3 *Validity of Contemplated Transactions, etc.* The execution, delivery and performance of this Agreement by the Purchaser will not contravene or violate (a) any existing law, rule or regulation to which the Purchaser is subject, (b) any judgment, order, writ, injunction, decree or award of any court, arbitrator or governmental or regulatory official, body or authority which is applicable to the Purchaser, or (c) the Certificate of Incorporation or Bylaws of the Purchaser or any securities issued by it; or will such execution, delivery or performance violate, be in conflict with or result in the breach (with or without the giving of notice or lapse of time, or both) of any term, condition or provision of, or require the consent of any other party to, any mortgage, indenture, agreement, contract, commitment, lease, plan or other instrument, document or understanding, oral or written, to which the Purchaser is a party or by which the Purchaser is otherwise bound. No authorization, approval or consent, and no registration or filing with, any governmental or regulatory official, body or authority is required in connection with the execution, delivery and performance of this Agreement by the Purchaser.

3.3 *Survival of Representations and Warranties.* All representations, warranties, covenants and agreements made by the parties in this Agreement or in any certificate, schedule, statement, document or instrument furnished hereunder or in connection with the negotiation, execution and performance of this Agreement shall survive the Closing. Notwithstanding any investigation or audit conducted before or after the Closing Date or the decision of any party to complete the Closing, each party shall be entitled to rely upon the representations, warranties, covenants and agreements set forth in this Agreement.

## ARTICLE IV - COVENANTS PRIOR TO CLOSING

4.1 *Conduct of Business.* Until the Closing, the Seller shall:

(a) conduct the Business in the normal, useful and regular manner;

(b) not enter into any contract, including but not limited to, contracts for the performance of services without the Purchaser's approval;

(c) not advertise or conduct inventory reduction sales or reduce the prices of any items of inventory without Purchaser's approval;

(d) not increase the compensation of any employee or change the personnel without Purchaser's approval;

(e) use its best efforts to preserve the Business; to keep available to Purchaser the services of the present employees; to preserve the goodwill of Seller's suppliers, customers and others having business relations with Seller;

(f) permit Purchaser's representatives to remain on the business premises during normal business hours and to observe the operation of the business wherever conducted; provided Purchaser's representatives do not interfere with Seller's business operations.

4.2 *No Shop.* Neither the Shareholder, the Seller, nor any agent, employee, officer, director, trustee or any representative of any of the foregoing will, during the period commencing on the

1013

date of this Agreement and ending with the earlier to occur of the Closing Date or the termination of this Agreement in accordance with its terms, directly or indirectly, solicit or initiate the submission of proposals or offers from any person or entity for, participate in any discussions pertaining to, or furnish any information to any person or entity other than the Purchaser or the Purchaser's authorized agent, relating to any acquisition or purchase of all or a material amount of the assests of, or any equity interest in, the Seller or any merger, consolidation or business combination of or involving the Seller.

## ARTICLE V - CONDITIONS PRECEDENT TO THE CLOSING

5.1 *Conditions Precedent to the Purchaser's Obligations.* All obligations of the Purchaser under this Agreement are subject to the fulfillment or satisfaction, prior to or at the Closing, of each of the following conditions precedent, any of which may be waived by the Purchaser in its sole and absolute discretion:

5.1.1 *Representations.* All representations and warranties of the Seller and the Shareholder being true, complete and correct at the Closing.

5.1.2 *Performance by the Seller and the Shareholder.* The Seller and the Shareholder shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by each of them prior to or at the Closing; and the Purchaser shall have been furnished with a certificate or certificates of the Seller and the Shareholder, dated the Closing Date, signed by the President of the Seller and the Shareholder, certifying, in such detail as the Purchaser may reasonably request, to the fulfillment of the foregoing condition.

5.1.3 *Employment Agreement.* Non Applicable.

5.1.4 *Restrictive Covenant.* John Doe and the Seller shall have entered into a restrictive agreement with the Purchaser, dated the Closing Date, in substantially the form of Exhibit B, simultaneously with the closing of this Agreement, which will include any right of refusal for any new location to be openedin the geographical territory owned by Seller.

5.1.5 *Litigation Affecting Closing.* On the Closing Date, no proceeding shall be pending or threatened before any court or governmental agency in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with this Agreement or the consummation of the transactions contemplated hereby, and no investigation that might eventuate in any such suit, action or proceeding shall be pending or threatened.

5.1.6 *Corporate Matters.* The Seller shall have furnished the Purchaser with certified copies of all such corporate documents of good-standing certificates for the Seller, and of all proceedings of the Seller authorizing the transactions hereby contemplated as the Purchaser reasonably shall require.

5.1.7 *Approvals.* The holders of any indebtedness of the Seller or Shareholder, the lessors of any real or personal property or assets leased by the Seller, the parties (other than the Seller) to any agreement, contract or commitment to which the Seller is a party, any governmental agency or body or any other person, firm or corporation which owns or has authority to grant any

18

franchise, license, permit, right or other authorization necessary for the business or operations of the Seller, to the extent that their consent or approval is required, necessary or, in the opinion of the Purchaser, desirable under the pertinent debt, lease, agreement, contract or commitment or other document or instrument or under applicable laws, rules or regulations for the consummation of the transactions contemplated hereby in the manner herein provided, shall have granted such consent or approval without resulting in the modification, cancellation or termination of any such lease, agreement, contract or commitment or of any such franchise, license, permit, right or other authorization or the subjection of the Purchaser to any law, rule, regulation or condition which, in the judgment of the Purchaser, shall be unduly burdensome. The holders of any indebtedness of the Seller or Shareholder shall release any real property, personal property and assets leased by the Seller and other assets which are part of the Assets from any lien or other security interests pertaining to such assets.

5.1.8 *Liens and Encumbrances.* On or before the Closing, the Purchaser shall have obtained a release and discharge of any and all liens, security interests, restrictions, defects and encumbrances which affect the Business or Assets to be transferred.

5.1.9 *Material Damage.* The business, operations, Assets, properties, prospects or condition (financial or otherwise) of the Seller shall not be, or be threatened to be, adversely affected by fire, explosion, earthquake, disaster, accident, cessation or interruption of utility or other services, flood, drought, contamination of water supply, embargo, riot, civil disturbance, uprising, activity of armed forces or act of God or public enemy, or any other event or occurrence.

5.1.10 *Tax Obligations.* Prior to the Closing the Purchaser shall notify the State of New York of the proposed sale of assets under this Agreement. Purchaser shall hold the Purchase Price and other consideration under this Agreement in an interest-bearing account for Seller's benefit and in accordance with any notice from the State of New York and applicable provisions of law.

5.1.11 *December 31, 2004 Financial Statement.* The Seller shall furnish Purchaser with the December 31, 2004 Financial Statement, which shall disclose a financial position, assets and liabilities of Seller and results of Seller's operations, which are satisfactory to Purchaser, in its sole and absolute discretion.

5.2 *Conditions Precedent to the Seller's and the Shareholder's Obligations.* All obligations of the Seller and Shareholder under this Agreement are subject to the fulfillment or satisfaction, prior to or at the Closing, of each of the following conditions precedent, any of which may be waived by the Seller and the Shareholder, in their sole and absolute discretion:

5.2.1 *Representations.* All representations and warranties of the Purchaser being true, complete and correct at the Closing.

5.2.2 *Performance by the Purchaser.* The Purchaser shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing; and the Seller and the Shareholder shall have been furnished with a

1015

certificate or certificates, dated the Closing Date, signed by the President of the Purchaser, certifying, in such detail as the Seller and the Shareholder may reasonably request, to the fulfillment of the foregoing condition.

5.2.3 *Employment Agreement.* Not Applicable

5.2.4 *Litigation Affecting Closing.* On the Closing Date, no proceeding shall be pending or threatened before any court or governmental agency in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with this Agreement or the consummation of the transactions contemplated hereby, and no investigation that might eventuate in any such suit, action or proceeding shall be pending or threatened.

5.2.5 *Corporate Matters.* The Purchaser shall have furnished the Seller and the Shareholder with certified copies of all such corporate documents of, and good-standing certificates for, the Purchaser, and of all such proceedings of the Purchaser authorizing the transactions hereby contemplated, as the Seller and the Shareholder reasonably shall require.

5.3 *Termination.* In the event any of the conditions contained in Sections 5.1 and 5.2 are not satisfied and the conditions shall not have been waived, this Agreement shall terminate upon notice by one party to the other and neither party shall have any liability or obligation of any kind or nature to the other.

## ARTICLE VI - INDEMNIFICATION

6.1 *Indemnification by the Seller and the Shareholder.* From and after the Closing, the Seller and the Shareholder will jointly and severally reimburse, indemnify and hold harmless the Purchaser and each of its affiliates (each such person and its successors and assigns is referred to herein as a "Seller Indemnified Party") against and in respect of:

(a) any and all liabilities and obligations of any nature whatsoever relating to the Shareholder or the Seller, the Seller's business or the Assets prior to the Closing;

(b) any and all actions, suits, claims, or legal, administrative, arbitration, governmental or other proceedings or investigations against any Seller Indemnified Party that relate to the Shareholder or the Seller, the Seller's business or the Assets and which result from or arise out of any event, occurrence, action, inaction or transaction occurring prior to the Closing Date;

(c) any and all damages, losses, deficiencies, liabilities, costs and expenses incurred or suffered by any Seller Indemnified Party that result from, relate to or arise out of:

(i) any material misrepresentation, breach of material warranty or nonfulfillment of any material agreement or covenant on the part of the Seller or the Shareholder under this Agreement or from any misrepresentation in or omission from any certificate, schedule, statement, document or instrument furnished to the Purchaser pursuant hereto or in connection with the negotiation, execution or performance of this Agreement;

(ii) any claim by any former officer or employee of the Seller; and

1016

(iii) any of the matters referred to in subparagraphs (a) and (b) above; and

(d) any and all actions, suits, claims, proceedings, investigations, demands, assessments, audits, fines, judgments, costs and other expenses (including, without limitation, reasonable legal fees and expenses) incident to any of the foregoing or to the enforcement of this Section 6.1.

6.2 *Indemnification by the Purchaser*. From and after the Closing, the Purchaser will reimburse, indemnify and hold harmless the Seller and the Shareholder (each such person and its successors and assigns is referred to herein as a "Purchaser Indemnified Party") against and in respect of:

(a) any and all liabilities and obligations of any nature whatsoever relating to the Purchaser or the Purchaser's business, prior to the Closing;

(b) any and all actions, suits, claims, or legal, administrative, arbitration, governmental or other proceedings or investigations against any Purchaser Indemnified Party that relate to the Purchaser, the Purchaser's business or its Assets and which result from or arise out of any event, occurrence, action, inaction or transaction occurring after the Closing Date;

(c) any and all damages, losses, deficiencies, liabilities, costs and expenses incurred or suffered by any Purchaser Indemnified Party that result from, relate to or arise out of:

(i) any misrepresentation, breach of warranty or nonfulfillment of any agreement or covenant on the part of the Purchaser under this Agreement or from any misrepresentation in or omission from any certificate, schedule, statement, document or instrument furnished to the Seller or Shareholder pursuant hereto or in connection with the negotiation, execution or performance of this Agreement;

(ii) any claim by any former employee of Seller, other than the Shareholder, which results from or arises out of any event, occurrence, action, inaction or transaction occurring after the Closing Date;

(iii) any of the matters referred to in subparagraph (a) and (b) above; and

(d) any and all actions, suits, claims, proceedings, investigations, demands, assessments, audits, fines, judgments, costs and other expenses (including, without limitation, reasonable legal fees and expenses) incident to any of the foregoing or to the enforcement of this Section 6.2.

6.3 *Procedure*. Notice must be given within a reasonable time after discovery of any fact or circumstance on which a party could claim indemnification ("Claim" or "Claims"). The notice shall describe the nature of the Claim, if the Claim is determinable, the amount of the Claim, or if not determinable, an estimate of the amount of the Claim. Each party agrees to use its best efforts to minimize the amount of the loss or injury for which it is entitled to indemnification. If the party, in order to fulfill its obligations to the other party must take legal action or if the party is involved in legal action, the outcome of which could give rise to its seeking indemnification, one party shall consult with the other party with respect to such legal action and allow it to participate therein.

1017

No Claim for which indemnification is asserted shall be settled or compromised without the written consent of the Seller and the Purchaser; provided, however, if a party does not consent to a bona fide settlement proposed by the other, the other party shall be liable for indemnification only to the lesser of the final judgment or the amount to be paid in settlement.

Subject to the provisions of the Section, neither party shall have recourse for indemnification until the Claims are fully and finally resolved. For a period of thirty (30) days following the giving of the notice of such Claim, the Purchaser and the Seller shall attempt to resolve any differences they may have with respect to such Claim. If a resolution is not reached within the thirty (30) day period (unless the parties agree to extend the period), the matter may be submitted to a court of competent jurisdiction.

A Claim shall be deemed finally resolved in the event a matter is submitted to a court, upon the entry of judgment by a court of final authority.

6.4 *Payment of Indemnification Obligation.* The Seller and the Shareholder agree to pay promptly to any Seller Indemnified Party, and the Purchaser agrees to pay promptly to any Purchaser Indemnified Party, the amount of all damages, losses, deficiencies, liabilities, costs, expenses, claims and other obligations to which the foregoing indemnities relate.

6.5 *Other Rights and Remedies Not Affected.* The indemnification rights of the parties under this Article VI are independent of and in addition to such rights and remedies as the parties may have at law or in equity or otherwise for any misrepresentation, breach of warranty or failure to fulfill any agreement or covenant hereunder, including without limitation the right to seek specific performance, rescission or restitution, none of which rights or remedies shall be affected or diminished hereby.

### ARTICLE VII - POST-CLOSING MATTERS

7.1 *No Solicitation or Hiring.* The Seller and the Shareholder agree that neither they nor any affiliate of either of them will solicit, employ or in any other fashion hire persons who are employees of the Seller on the date hereof for a period of one year after the Closing, unless such persons have been discharged by the Purchaser.

7.2 *Escrow.* On and after the Closing, Purchaser shall hold in escrow the Purchase Price and other consideration under this Agreement in accordance with the terms of any notice from the New York State Tax Commission.

### ARTICLE VIII - MISCELLANEOUS

8.1 *Brokers' and Finders' Fees.* The Seller and the Shareholder jointly and severally represent and warrant to the Purchaser, and the Purchaser represents and warrants to the Seller or Shareholder that all negotiations relative to this Agreement have been carried on by the parties directly without the intervention of any person who may be entitled to any brokerage or finder's fee or other commission in respect of this Agreement or the consummation of the transactions contemplated hereby, and the Seller and the Shareholder jointly and severally agree to indemnify and hold harmless the Purchaser, and the Purchaser agrees to indemnify and hold harmless the

22

Seller and Shareholder, as the case may be, against any and all claims, losses, liabilities and expenses which may be asserted against or incurred by them as a result of either party's dealings, arrangements or agreements with any such person.

8.2 *Sales, Transfer and Documentary Taxes, etc.* Neither the Seller nor the Purchaser shall be responsible for the other's sales, transfer or documentary taxes, if any, due as a result of the transfer of the Assets to the Purchaser, or all other fees directly relating to the transfer of the Assets.

8.3 *Expenses.* The parties shall pay their own expenses incidental to the preparation of this Agreement, the carrying out of the provisions of this Agreement and the consummation of the transactions contemplated hereby.

8.4 *Remedy.* The Seller and the Shareholder acknowledge that the Assets are unique and not otherwise available and agree that, in addition to any other remedy available to the Purchaser, the Purchaser may invoke any equitable remedy to enforce performance hereunder, including, without limitation, the remedy of specific performance.

8.5 *Contents of Agreement; Parties in Interest; etc.* This Agreement sets forth the entire understanding of the parties with respect to the transactions contemplated hereby. It shall not be amended or modified except by written instrument duly executed by each of the parties hereto. Any and all previous agreements and understanding between or among the parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement.

8.6 *Assignment and Binding Effect.* Neither the Seller nor the Purchaser shall assign this Agreement nor any part of it, nor delegate any obligation imposed by this Agreement without the prior written consent of the other. All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the successors and assigns of the Seller, Shareholders and Purchaser.

8.7 *Waiver.* Any term or provision of this Agreement may be waived at any time by the party or parties entitled to the benefit thereof by a written instrument duly executed by such party or parties.

8.8 *Notices.* Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given only if delivered personally or sent by telegram or by fax or by registered or certified mail, postage prepaid, as follows:

If to the Purchaser to:

Frank Seddio
9306 Flatlands Avenue
Brooklyn, NY 11236
(718) 927-4100 (tel)
(718) 927-1507 (fax)

1019

If to the Seller and/or the Shareholder, to:

    Robert B. Davis, Esq.
    420 Lexington Avenue Suite 602
    New York, NY 10170
    (212) 818-0893 (Tel)
    (646) 619-4592 (fax)

or to such other address as the addressee may have specified in a notice duly given to the sender as provided herein. Such notice, request, demand, waiver, consent, approval or other communication will be deemed to have been given as of the date so delivered, telegraphed, faxed or mailed.

8.9 *New York Law to Govern.* This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the State of New York.

8.10 *No Benefit to Others.* The representations, warranties, covenants and agreements contained in this Agreement are for the sole benefit of the parties hereto and, in the case of Article VI hereof, the other indemnified parties, and their heirs, administrators, legal representatives, successors and assigns, and they shall not be construed as conferring any rights on any other persons.

8.11 *Headings, Gender and "Person."* All section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement. Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires. Any reference to a "person" herein shall include an individual, firm, corporation, partnership, trust, governmental authority or body, association, unincorporated organization or any other entity.

8.12 *Schedules and Exhibits.* All Schedules and Exhibits referred to herein are intended to be and hereby are specifically made a part of this Agreement.

8.13 *Tax Consequences.* No party to this Agreement, nor any of their officers, employees or agents has made any representation or agreement, express or implied, as to the tax consequences of the transactions contemplated by this Agreement or the tax consequences of any action pursuant to or arising out of this Agreement.

8.14 *Severability.* Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without

1020

8.14 *Severability.* Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.15 *Counterparts.* This Agreement may be executed in any number of counterparts and any parties hereto may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. This Agreement shall become binding when one or more counterparts taken together shall have been executed and delivered by the parties. It shall not be necessary in making proof of this Agreement or any counterpart hereof to produce or account for any of the other counterparts.

8.16 *Guarantee.* Shareholder unconditionally guarantees to Purchaser and its affiliates the full and timely performance of all of the obligations and agreements of Seller. The foregoing guarantee shall include the guarantee of the payment of all damages, costs and expenses which might become recoverable as a result of the nonperformance of any of the obligations or agreements so guaranteed or as a result of the nonperformance of this guarantee. Any guaranteed person may, at its option, proceed against Shareholder for the performance of any such obligation or agreement, or for damages for default in the performance thereof, without first proceeding against any other party or against any of its properties. Shareholder further agrees that his guarantee shall be an irrevocable guarantee and shall continue in effect notwithstanding any extension or modification of any guaranteed obligation, any assumption of any such guaranteed obligation by any other party, or any other act or thing which might otherwise operate as a legal or equitable discharge of a guarantor and the Shareholder waives all special suretyship defenses and notice requirements.

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the date first written.

(Corporate Seal)

Attest:

By: _____

As its Secretary

**Inner City Dough, Inc.**

By: _____

As its President

(Nancy Davis)

(Corporate Seal)

Attest:

By: _____

**Bartholomew 4 Foods Corp.**

By: _____

1021

# EXHIBIT C

# Security Agreement
### To Collateralize Guaranty

## 1. Obligations Secured.

This Agreement secures the payment and performance of all Guarantor's present and future obligations of any kind owed to

Secured Party including obligations under the guaranty dated _____4/30/07_____, of all present and future obligations

Of Bartholomew Foods IV, Corp. ("Debtor") to Secured Party ("Guaranty"). The terms and conditions of the Guaranty are incorporated herein by reference.

## 2. Grant of Security Interest.

Guarantor grants to Secured Party a security interest in the property described below, along with all present and future attachments, accessories and replacements, including amounts payable under any insurance policy ("Collateral").

## 3. Description of Collateral.
Describe Collateral fully including make, kind of unit, model and serial numbers and any other pertinent information.

**Guarantor 1-**All furniture, fixtures, equipment, machinery, general intangibles, inventory, accounts and all other personal property relating in whole or in part to the foregoing, now owned or hereafter acquired by the Debtor including all additions, attachments, substitutions, replacements, accessions and accessories and all proceeds thereof including, but not limited to, amounts payable under any insurance policy. The foregoing is presently located at (132 Nassau Street, New York, NY 10038 and PC#340908).

**Guarantor 2-**All furniture, fixtures, equipment, machinery, general intangibles, inventory, accounts and all other personal property relating in whole or in part to the foregoing, now owned or hereafter acquired by the Debtor including all additions, attachments, substitutions, replacements, accessions and accessories and all proceeds thereof including, but not limited to, amounts payable under any insurance policy. The foregoing is presently located at (130 Church Street, New York, NY 10007 and PC#340611).

## 4. Location of Collateral.

Guarantor 1 warrants that the Collateral will be located at:

| 132 Nassau Street | New York | New York | NY | 10038 |
|---|---|---|---|---|
| Address | City | County | State | Zip Code |

Guarantor 2 warrants that the Collateral will be located at:

| 130 Church Street | New York | New York | NY | 10007 |
|---|---|---|---|---|
| Address | City | County | State | Zip Code |

Guarantor and Secured Party agree that regardless of the manner of affixation, the Collateral shall remain personal property and not become part of the real estate. Guarantor agrees to keep the Collateral at the location set forth above and will notify Secured Party promptly in writing of any change in the location of the Collateral within such State, but will not remove the Collateral from such State without the prior written consent of Secured Party (except that in the State of Pennsylvania, the Collateral will not be moved from the above location without such prior written consent).

## 5. Guarantor's Warranties and Representations.

Guarantor warrants and represents:

(a) that, except for security interest granted above, the Collateral is free from and will be kept free from all liens, claims, security interests, and encumbrances;

(b) that no financing statement covering the Collateral or any proceeds is on file in favor of anyone other than Secured Party, but if such other financing statement is on file, it will be terminated or subordinated;

(c) that Guarantor has full authority to enter into this agreement and in doing so, it is not violating its charter or by-laws, any law, regulation or agreement with third parties, and it has taken all action as may be necessary or appropriate to make this agreement binding; and

(d) if Debtor is an organization, Debtor (a) is the type of organization, (b) is organized under the laws of the jurisdiction, (c) has its chief executive office, and (d) if it is a "registered organization" as defined in Article 9 of the Uniform Commercial Code (i.e. organized solely under the laws of a single State and as to which the State must maintain a public record showing the organization to have been organized), has the organizational identification number (or, if none, has been assigned no such number by the State of organization), all as set forth under Debtor's name (which is its exact and complete legal name) at the signature line of this Security Agreement. If Debtor is an individual, Debtor's exact and complete legal name and principal residence are set forth at and under your name at the signature line of this Security Agreement. Debtor agrees to notify Secured Party immediately in the event of a change in any of the foregoing facts and information.

## 6. Guarantor's Agreements.

Guarantor agrees:

(a) to defend at Guarantor's own cost any action, proceeding, or claim affecting the Collateral;

(b) to pay reasonable attorneys' fees and other expenses incurred by Secured Party in enforcing its rights against Guarantor under this Security Agreement;

(c) to pay promptly all taxes, assessments, license fees and other public or private charges when levied or assessed against the Collateral or this agreement, and this obligation shall survive the termination of this agreement;

(d) that if a certificate of title be required or permitted by law, Guarantor shall obtain such certificate with respect to the Collateral, showing the security interest of Secured Party and do everything necessary or expedient to preserve or perfect the security interest of Secured Party;

(e) that Guarantor will not misuse, fail to keep in good repair, secrete, or without the prior written consent of Secured Party, and notwithstanding Secured Party's claim to proceeds, sell, rent, lend, encumber or transfer any of the Collateral;

(f) that Secured Party may enter upon Guarantor's premises or wherever the Collateral may be located at any reasonable time to inspect the Collateral, and Guarantor's books and records pertaining to the Collateral, and Guarantor shall assist Secured Party in making such inspection;

(g) that the security interest granted by Guarantor to Secured Party shall continue effective so long as there are any obligations of any kind, including obligations under guaranties or assignments, owed to Secured Party, provided, however, upon any assignment of this Security Agreement the Assignee shall thereafter be deemed for the purpose of this Paragraph the Secured Party under this Security Agreement; and

(h) upon the request of Secured Party, if any of the Collateral consists of software, to inform Secured Party of the name of the licensor of such software and to provide Secured Party with a copy of the license agreement.

## 7. Insurance and Risk of Loss.

All risk of loss, damage to or destruction of the Collateral shall at all times be on Guarantor. Guarantor will procure forthwith and maintain at Guarantor's expense insurance against all risks of loss or physical damage to the collateral for the full insurable value thereof for the life of this agreement plus breach of warranty insurance and such other insurance thereon in amounts and against such risks as Secured Party may specify, and shall promptly deliver each policy to Secured Party with a standard long-form mortgagee endorsement attached thereto showing loss payable to Secured Party; and providing Secured Party with not less than 30 days written notice of cancellation; each such policy shall be in form, terms and amount and with insurance carriers satisfactory to Secured Party; Secured Party's acceptance of policies in lesser amounts or risks shall not be a waiver of Guarantor's foregoing obligations. As to Secured Party's interest in such policy, no act or omission of Guarantor or any of its officers, agents, employees or representatives shall affect the obligations of the insurer to pay the full amount of any loss.

Guarantor hereby assigns to Secured Party any monies which may become payable under any such policy(s) of insurance and irrevocably constitutes and appoints Secured Party as Guarantor's attorney in fact to (a) hold each original insurance policy; (b) make, settle and adjust claims under each policy of insurance; (c) make claims for monies which may become payable under such and other insurance on the collateral including returned or unearned premiums; and (d) endorse Guarantor's name on any check, draft or other instrument received in payment of claims or returned or unearned premiums under each policy and to apply the funds to the payment of the indebtedness owing to Secured Party, provided, however, Secured Party is under no obligation to do any of the foregoing.

Should Guarantor fail to furnish such insurance policy to Secured Party, or to maintain such policy in full force, or to pay any premium in whole or in part relating thereto, then Secured Party, without waiving or releasing any default or obligation by Guarantor may (but shall be under no obligation to) obtain and maintain insurance and pay the premium therefor on behalf of Guarantor and charge the premium to Guarantor's indebtedness under this Agreement. The full amount of any such premium paid by Secured Party shall be payable by Guarantor upon demand and failure to pay same shall constitute an event of default under this Agreement.

## 8. Events of Default; Acceleration.

An essential element of this Agreement is that the Collateral continue to be in good condition and adequate security for the indebtedness. The following are events of default under this Agreement which will allow Secured Party to take such action under this Paragraph and under Paragraph 9 as it deems necessary:

(a) Guarantor breaches any warranty or provision of this Agreement or of any note or of any other instrument or agreement delivered by Guarantor to Secured Party in connection with this or any other transaction;

(b) Guarantor dies, becomes insolvent or ceases to do business as a going concern;

(c) any of the Collateral is lost or destroyed;

(d) a complaint in bankruptcy or for arrangement or reorganization or for relief under any insolvency law is filed by or against Guarantor or Guarantor admits its inability to pay its debts as they mature;

(e) property of Guarantor is attached or a receiver is appointed for Guarantor;

(f) whenever Secured Party in good faith believes the prospect of payment or performance is impaired or in good faith believes the Collateral is insecure;

(g) Guarantor fails to pay any of Guarantor's present or future obligations to Secured Party when due;

(h) Guarantor defaults under, or fails to comply with, any of the terms or conditions of any present or future agreement with Secured Party;

(i) Guarantor defaults under any of the terms or conditions of the Guaranty referred to in Paragraph 1 of this Agreement;

(j) there is an event of default under any present or future obligation between Debtor and Secured Party; or

(k) a third party takes any action to foreclose on, obtain possession or control of, collect, sell or otherwise dispose of, or exercise any rights with respect to, any of the Collateral without the express written consent of Secured Party.

### 9. Secured Party's Remedies After Default; Consent to Enter Premises.

**Upon the occurrence of an event of default and at any time thereafter, Secured Party shall have all the rights and remedies of a secured party under the Uniform Commercial Code and any other applicable laws, including the right to any deficiency remaining after disposition of the Collateral for which Guarantor agrees to remain fully liable. Guarantor agrees that Secured Party, by itself or its agent, may without notice to any person and without judicial process of any kind enter into any premises or upon any land owned, leased or otherwise under the real or apparent control of Guarantor or any agent of Guarantor where the Collateral may be or where Secured Party believes the Collateral may be, and disassemble, render unusable and/or repossess all or any item of the Collateral, disconnecting and separating all Collateral from any other property and using force if necessary.** Guarantor expressly waives all further rights to possession of the Collateral after default and all claims for injuries suffered through or loss caused by such entering and/or repossession. Secured Party may require Guarantor to assemble the Collateral and deliver it to Secured Party at a place to be designated by Secured Party which is reasonably convenient to both parties.

Secured Party may sell or lease the Collateral at a time and location of its choosing provided that the Secured Party acts in good faith and in a commercially reasonable manner. Secured Party will give Guarantor reasonable notice of the time and place of any public sale of the Collateral or of the time after which any private sale or any other intended disposition of the Collateral is to be made. Unless otherwise provided by law, the requirement of reasonable notice shall be met if such notice is mailed, postage prepaid, to the address of Guarantor shown herein at least ten days before the time of the sale or disposition. Expenses of retaking, holding, preparing for sale, selling and the like shall include reasonable attorneys' fees (at least 15% of the indebtedness owed if not prohibited by law) and other legal expenses. Guarantor understands that Secured Party's rights are cumulative and not alternative.

### 10. Waiver of Defaults; Agreement Inclusive.

Secured Party may in its sole discretion waive a default, or cure, at Guarantor's expense, a default. Any such waiver in a particular instance or of a particular default shall not be a waiver of other defaults or the same kind of default at another time. No modification or change in this Security Agreement or any related note, instrument or agreement shall bind Secured Party unless in writing signed by Secured Party. No oral agreement shall be binding.

### 11. Financing Statements; Certain Expenses.

Guarantor authorizes Secured Party to file a financing statement with respect to the Collateral and ratifies the filing by Secured Party of any such financing statements previously filed. At the request of Secured Party, Guarantor will execute any financing statements, agreements or documents, in form satisfactory to Secured Party which Secured Party may deem necessary or advisable to establish and maintain a perfected security interest in the Collateral, and will pay the cost of filing or recording the same in all public offices deemed necessary or advisable by Secured Party. Guarantor also agrees to pay all costs and expenses incurred by Secured Party in conducting UCC, tax or other lien searches against the Guarantor or the Collateral and such other fees as may be agreed.

### 12. Miscellaneous.

Guarantor waives all exemptions. Secured Party may correct patent errors in this Agreement and fill in such blanks as serial numbers, and the like. Any provisions contrary to. prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted, but shall not invalidate the remaining provisions. **Guarantor acknowledges receipt of a true copy and waives acceptance.** If Guarantor is a corporation, this Security Agreement is executed pursuant to authority of its Board of Directors. Except where the context otherwise requires, "Guarantor" and "Secured Party" include the heirs, executors or administrators, successors or assigns to those parties. If more than one Guarantor executes this Security Agreement, their obligations under this Security Agreement shall be joint and several.

Dated: 4/30/07

**Guarantor 1:**

DB Donuts Inc
Name of individual, corporation or partnership

By _____  Title _President_
If corporation, have signed by President, Vice President or Treasurer and give official title
If owner or partner, state which.

132 Nassau Street
Address

New York _____  NY   10038
City                                 State  Zip Code

**Guarantor 2:**

DB Donuts II Inc.
Name of individual, corporation or partnership

By _____  Title _President_
If corporation, have signed by President, Vice President or Treasurer, and give official title.
If owner or partner, state which.

130 Church Street
Address

New York _____  NY   10007
City                                 State  Zip Code

If an organization, type of organization: _Corporation_.

If an individual, principal residence: _____.

Jurisdiction of organization: _NY_.

Organizational identification number (or "none"): _____.

Location of chief executive office: _____.

**Secured Party:**

The CIT Group/Equipment Financing, Inc.
Name of individual, corporation or partnership

By _____   Title _____
If corporation, give official title.  If owner or partner, state which.


1540 West Fountainhead Parkway
Address

Tempe                                          AZ     85282
City                                           State  Zip Code

---

If Guarantor is a partnership, enter:
Partners' names                          Home addresses

# Security Agreement

For Business Loans other than Inventory Loans in all States (except Texas) by The CIT Group/Equipment Financing, Inc. or Dealer. In Louisiana, form 5-SA-2305 must accompany this Agreement.

**1. Grant of Security Interest; Description of Collateral.**

Debtor grants to Secured Party a security interest in the property described below, along with all present and future attachments and accessories thereto and replacements and proceeds thereof, including amounts payable under any insurance policy, all hereinafter referred to collectively as "Collateral": (Describe Collateral fully including make, kind of unit, model and serial numbers and any other pertinent information.)

ALL FURNITURE, FIXTURES, EQUIPMENT, MACHINERY, GENERAL INTANGIBLES, INVENTORY, ACCOUNTS AND ALL OTHER PERSONAL PROPERTY RELATING IN WHOLE OR IN PART TO THE FOREGOING, NOW OWNED OR HEREAFTER ACQUIRED BY THE DEBTOR INCLUDING ALL ADDITIONS, ATTACHMENTS, SUBSTITUTIONS, REPLACEMENTS, ACCESSIONS AND ACCESSORIES AND ALL PROCEEDS THEREOF INCLUDING, BUT NOT LIMITED TO, AMOUNTS PAYABLE UNDER ANY INSURANCE POLICY. THE FOREGOING IS PRESENTLY LOCATED AT (30 ROCKEFELLER PLAZA, NEW YORK, NY  10112 AND PC#339432).

**2. What Obligations the Collateral Secures.**

**Each item of the Collateral shall secure not only the specific amount which Debtor promises to pay in Paragraph 3 below, but also all other present and future indebtedness or obligations of Debtor to Secured Party of every kind and nature whatsoever.**

**3. Promise to Pay; Terms and Place of Payment.**

Debtor promises to pay Secured Party the total sum of $1,689,651.60*, which represents principal and interest precomputed over the term hereof, payable in 120 (total number) **combined principal and interest payments** as follows:

**Equal Successive Monthly Payments**

$14,080.43* beginning on ___6/4/07___, and the same amount on the same date of each month thereafter until fully paid, provided, however, that the final payment shall be in the amount of the then unpaid balance of principal and interest.

* The interest rate for the referenced Note is 4.15% in excess of the Federal Reserve 10-year Treasury Bill rate (the "Interest Rate"), the final Interest Rate for the Note will not be determined until the time of funding, and will be calculated as noted above. Therefore, Debtor authorizes and grants limited power of attorney to The CIT Group/Equipment Financing, Inc. to insert the specific Interest Rate and monthly payment amounts calculated at the specific Interest Rate into the referenced Note at the time of funding.

Payment shall be made at the address of Secured Party shown herein or such other place as Secured Party may designate from time to time.

**4. Use and Location of Collateral.**

Debtor warrants and agrees that the Collateral is to be used primarily for:
☒ business or commercial purposes (other than agricultural),
☐ agricultural purposes (see definition on the final page), or
☐ both agricultural and business or commercial purposes.

| Location: | 30 ROCKEFELLER PLAZA | NEW YORK | NEW YORK | NY | 10112 |
|---|---|---|---|---|---|
| | Address | City | County | State | Zip Code |

Debtor and Secured Party agree that regardless of the manner of affixation, the Collateral shall remain personal property and not become part of the real estate. Debtor agrees to keep the Collateral at the location set forth above and will notify Secured Party promptly in writing of any change in the location of the Collateral within such State, but will not remove the Collateral from such State without the prior written consent of Secured Party (except that in the State of Pennsylvania, the Collateral will not be moved from the above location without such prior written consent).

**5. Late Charges and Other Fees.**

Any payment not made when due shall, at the option of Secured Party, bear late charges thereon calculated at the rate of 1 1/2% per month, but in no event greater than the highest rate permitted by relevant law. Debtor shall be responsible for and pay to Secured Party a returned check fee, not to exceed the maximum permitted by law, which fee will be equal to the sum of (i) the actual bank charges incurred by Secured Party plus (ii) all other actual costs and expenses incurred by Secured Party. The returned check fee is payable upon demand as indebtedness secured by the Collateral under this Security Agreement.

**6.  Debtor's Warranties and Representations.**

Debtor warrants and represents:

(a)  that Debtor is justly indebted to Secured Party for the full amount of the indebtedness described in Paragraph 3;

(b)  that, except for the security interest granted hereby, the Collateral is free from and will be kept free from all liens, claims, security interests and encumbrances;

(c)  that no financing statement covering the Collateral or any proceeds thereof is on file in favor of anyone other than Secured Party, but if such other financing statement is on file, it will be terminated or subordinated;

(d)  that all information supplied and statements made by Debtor in any financial, credit or accounting statement or application for credit prior to, contemporaneously with or subsequent to the execution of this Security Agreement with respect to this transaction are and shall be true, correct, valid and genuine;

(e)  that Debtor has full authority to enter into this Security Agreement and in so doing it is not violating its charter or by-laws, any law or regulation or agreement with third parties, and it has taken all such action as may be necessary or appropriate to make this Security Agreement binding upon it; and

(f)  if Debtor is an organization, Debtor (a) is the type of organization, (b) is organized under the laws of the jurisdiction, (c) has its chief executive office, and (d) if it is a "registered organization" as defined in Article 9 of the Uniform Commercial Code (i.e., organized solely under the laws of a single State and as to which the State must maintain a public record showing the organization to have been organized), has the organizational identification number (or, if none, has been assigned no such number by the State of organization), all as set forth under Debtor's name (which is its exact and complete legal name) at the signature line of this Security Agreement. If Debtor is an individual, Debtor's exact and complete legal name and principal residence are as set forth at and under Debtor's name at the signature line of this Security Agreement. Debtor agrees to notify Secured Party immediately in the event of a change in any of the foregoing facts and information.

**7.  Debtor's Agreements.**

Debtor agrees:

(a)  to defend at Debtor's own cost any action, proceeding, or claim affecting the Collateral;

(b)  to pay reasonable attorneys' fees (at least 15% of the unpaid balance if not prohibited by law) and other expenses incurred by Secured Party in enforcing its rights against Debtor under this Security Agreement;

(c)  to pay promptly all taxes, assessments, license fees and other public or private charges when levied or assessed against the Collateral or this Security Agreement; and this obligation shall survive the termination of this Security Agreement;

(d)  that, if a certificate of title is required or permitted by law, Debtor shall obtain such certificate with respect to the Collateral, showing the security interest of Secured Party thereon and in any event do everything necessary or expedient to preserve or perfect the security interest of Secured Party;

(e)  that Debtor will not misuse, fail to keep in good repair, secrete, or without the prior written consent of Secured Party, sell, rent, lend, encumber or transfer any of the Collateral notwithstanding Secured Party's right to proceeds;

(f)  that Secured Party may enter upon Debtor's premises or wherever the Collateral may be located at any reasonable time to inspect the Collateral and Debtor's books and records pertaining to the Collateral, and Debtor shall assist Secured Party in making such inspection; and

(g)  that the security interest granted by Debtor to Secured Party shall continue effective irrespective of the payment of the amount in Paragraph 3, or in any promissory note executed in connection herewith, so long as there are any obligations of any kind, including obligations under guaranties or assignments, owed by Debtor to Secured Party, provided, however, upon any assignment of this Security Agreement the Assignee shall thereafter be deemed for the purpose of this Paragraph the Secured Party under this Security Agreement.

(h)  upon the request of Secured Party, if any of the Collateral consists of software, to inform Secured Party of the name of the licensor of such software and to provide Secured Party with a copy of the license agreement.

**8.  Insurance and Risk of Loss.**

All risk of loss, damage to or destruction of the Collateral shall at all times be on Debtor. Debtor will procure forthwith and maintain at Debtor's expense insurance against all risks of loss or physical damage to the Collateral for the full insurable value thereof for the life of this Security Agreement plus breach of warranty insurance and such other insurance thereon in amounts and against such risks as Secured Party may specify, and shall promptly deliver each policy to Secured Party with a standard long-form mortgagee endorsement attached thereto showing loss payable to Secured Party; and providing Secured Party with not less than 30 days written notice of cancellation; each such policy shall be in form, terms and amount and with insurance carriers satisfactory to Secured Party; Secured Party's acceptance of policies in lesser amounts or risks shall not be a waiver of Debtor's foregoing obligations. As to Secured Party's interest in such policy, no act or omission of Debtor or any of its officers, agents, employees or representatives shall affect the obligations of the insurer to pay the full amount of any loss.

Debtor hereby assigns to Secured Party any monies which may become payable under any such policy of insurance and irrevocably constitutes and appoints Secured Party as Debtor's attorney in fact (a) to hold each original insurance policy, (b) to make, settle and adjust claims under each policy of insurance, (c) to make claims for any monies which may become payable under such and other insurance on the Collateral including returned or unearned premiums and (d) to endorse Debtor's name on any check, draft or other instruments received in payment of claims or returned or unearned premiums under each policy and to apply the funds to the payment of the indebtedness owing to Secured Party; provided, however, Secured Party is under no obligation to do any of the foregoing.

Should Debtor fail to furnish such insurance policy to Secured Party, or to maintain such policy in full force, or to pay any premium in whole or in part relating thereto, then Secured Party, without waiving or releasing any default or obligation by Debtor, may (but shall be under no obligation to) obtain and maintain insurance and pay the premium and any administrative costs therefor on behalf of Debtor and charge the premium and any administrative costs to Debtor's indebtedness under this Security Agreement. The full amount of any such premium and any administrative costs paid by Secured Party shall be payable by Debtor upon demand, and failure to pay same shall constitute an event of default under this Security Agreement.

## 9.  Events of Default; Acceleration.

A very important element of this Security Agreement is that Debtor makes all its payments promptly as agreed and that the Collateral continue to be in good condition and adequate security for the indebtedness. The following are events of default under this Security Agreement which will allow Secured Party to take such action under this Paragraph and under Paragraph 10 as it deems necessary:

(a)  any of Debtor's obligations to Secured Party under any agreement with Secured Party is not paid promptly when due;

(b)  Debtor breaches any warranty or provision hereof, or of any note or of any other instrument or agreement delivered by Debtor to Secured Party in connection with this or any other transaction;

(c)  Debtor dies, becomes insolvent or ceases to do business as a going concern;

(d)  it is determined that Debtor has given Secured Party materially misleading information regarding its financial condition;

(e)  any of the Collateral is lost or destroyed;

(f)  a petition or complaint in bankruptcy or for arrangement or reorganization or for relief under any insolvency law is filed by or against Debtor or Debtor admits its inability to pay its debts as they mature;

(g)  property of Debtor is attached or a receiver is appointed for Debtor;

(h)  whenever Secured Party in good faith believes the prospect of payment or performance is impaired or in good faith believes the Collateral is insecure;

(i)  any guarantor, surety or endorser for Debtor dies or defaults in any obligation or liability to Secured Party or any guaranty obtained in connection with this transaction is terminated or breached; or

(j)  a third party takes any action to foreclose on, obtain possession or control of, collect, sell or otherwise dispose of ,or exercise any rights with respect to, any of the Collateral without the express written consent of Secured Party.

**If Debtor shall be in default hereunder,** the indebtedness herein described and all other indebtedness then owing by Debtor to Secured Party under this or any other present or future agreement (collectively, the "Indebtedness") shall, if Secured Party shall so elect, become immediately due and payable and the unpaid principal balance of the indebtedness described in Paragraph 3, or in any promissory note executed in connection herewith, shall bear interest at the rate of 18% per annum (but in no event greater than the highest rate permitted by relevant law) until paid in full. In no event shall the Debtor, upon demand by Secured Party for payment of the Indebtedness, by acceleration of the maturity thereof or otherwise, be obligated to pay any interest in excess of the amount permitted by law. Any acceleration of Indebtedness, if elected by Secured Party, shall be subject to all applicable laws, including laws relating to rebates and refunds of unearned charges.

## 10. Secured Party's Remedies After Default; Consent to Enter Premises.

**Upon Debtor's default and at any time thereafter, Secured Party shall have all the rights and remedies of a secured party under the Uniform Commercial Code and any other applicable laws, including the right to any deficiency remaining after disposition of the Collateral for which Debtor hereby agrees to remain fully liable. Debtor agrees that Secured Party, by itself or its agent, may without notice to any person and without judicial process of any kind, enter**

**into any premises or upon any land owned, leased or otherwise under the real or apparent control of Debtor or any agent of Debtor where the Collateral may be or where Secured Party believes the Collateral may be, and disassemble, render unusable and/or repossess all or any item of the Collateral, disconnecting and separating all Collateral from any other property.** Debtor expressly waives all further rights to possession of the Collateral after default and all claims for injuries suffered through or loss caused by such entering and/or repossession. Secured Party may require Debtor to assemble the Collateral and return it to Secured Party at a place to be designated by Secured Party which is reasonably convenient to both parties.

Secured Party may sell or lease the Collateral at a time and location of its choosing provided that the Secured Party acts in good faith and in a commercially reasonable manner. Secured Party will give Debtor reasonable notice of the time and place of any public sale of the Collateral or of the time after which any private sale or any other intended disposition of the Collateral is to be made. Unless otherwise provided by law, the requirement of reasonable notice shall be met if such notice is mailed, postage prepaid, to the address of Debtor shown herein at least ten days before the time of the sale or disposition. Expenses of retaking, holding, preparing for sale, selling and the like shall include reasonable attorneys' fees and other legal expenses. Debtor understands that Secured Party's rights are cumulative and not alternative.

## 11. Waiver of Defaults; Agreement Inclusive.

Secured Party may in its sole discretion waive a default, or cure, at Debtor's expense, a default. Any such waiver in a particular instance or of a particular default shall not be a waiver of other defaults or the same kind of default at another time. No modification or change in this Security Agreement or any related note, instrument or agreement shall bind Secured Party unless in writing signed by Secured Party. No oral agreement shall be binding.

## 12. Financing Statements; Certain Expenses.

Debtor authorizes Secured Party to file a financing statement with respect to the Collateral and ratifies the filing by Secured Party of any such financing statements previously filed. At the request of Secured Party, Debtor will execute any, agreements or documents, in form satisfactory to Secured Party which Secured Party may deem necessary or advisable to establish and maintain a perfected security interest in the Collateral, and will pay the cost of filing or recording the same in all public offices deemed necessary or advisable by Secured Party. Debtor also agrees to pay all costs and expenses incurred by Secured Party in conducting UCC, tax or other lien searches against the Debtor or the Collateral and such other fees as may be agreed.

## 13. Waiver of Defenses Acknowledgment.

If Secured Party assigns this Security Agreement to a third party ("Assignee"), then after such assignment:

(a) Debtor will make all payments directly to such Assignee at such place as Assignee may from time to time designate in writing;

(b) Debtor agrees that it will settle all claims, defenses, setoffs and counterclaims it may have against Secured Party directly with Secured Party and will not set up any such claim, defense, setoff or counterclaim against Assignee, Secured Party hereby agreeing to remain responsible therefor;

(c) Secured Party shall not be Assignee's agent for any purpose and shall have no authority to change or modify this Security Agreement or any related document or instrument; and

(d) Assignee shall have all of the rights and remedies of Secured Party hereunder but none of Secured Party's obligations.

## 14. Miscellaneous.

Debtor waives all exemptions. Secured Party may correct patent errors herein and fill in such blanks as serial numbers, date of first payment and the like. Any provisions hereof contrary to, prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted herefrom, but shall not invalidate the remaining provisions hereof.

Except as otherwise provided herein or by applicable law, the Debtor shall have no right to prepay the indebtedness described in Paragraph 3, or in any promissory note executed in connection with this Security Agreement. Debtor and Secured Party each hereby waive any right to a trial by jury in any action or proceeding with respect to, in connection with, or arising out of this Security Agreement, or any note or document delivered pursuant to this Security Agreement. **Debtor acknowledges receipt of a true copy and waives acceptance hereof.** If Debtor is a corporation, this Security Agreement is executed pursuant to authority of its Board of Directors. Except where the context otherwise requires, "Debtor" and "Secured Party" include the heirs, executors or administrators, successors or assigns of those parties but nothing herein shall authorize Debtor to assign this Security Agreement or its rights in and to the Collateral. If more than one Debtor executes this Security Agreement, their obligations under this Security Agreement shall be joint and several.

If at any time this transaction would be usurious under applicable law, then regardless of any provision contained in this Security Agreement or in any other agreement made in connection with this transaction, it is agreed that:

(a) the total of all consideration which constitutes interest under applicable law that is contracted for, charged or received upon this Security Agreement or any such other agreement shall under no circumstances exceed the maximum rate of interest authorized by applicable law and any excess shall be credited to the Debtor; and

(b) if Secured Party elects to accelerate the maturity of, or if Secured Party permits Debtor to prepay the Indebtedness, any amounts which because of such action would constitute interest may never include more than the maximum rate of interest authorized by applicable law, and any excess interest, if any, provided for in this Security Agreement or otherwise, shall be credited to Debtor automatically as of the date of acceleration or prepayment.

**15. Special Provisions. (See Special Provisions Instructions.)**

**A.    Cross-Default/Store Closure Provision:**
Debtor and Secured Party agree that Section 9 of the Security Agreement, "Events of Default; Acceleration", is hereby amended by (i) deleting the period at the end of subsection (j) thereof and inserting a semi-colon in lieu thereof; and (ii) inserting the following new subsections (k) and (l ) after existing subsection (j) thereof:

"(k)there occurs a breach by Debtor or there occurs a default or event of default (as such terms are defined therein) or there occurs an event which with the giving of notice or passage of time, or both, would constitute a default or an event of default under any presently or hereafter existing loan agreement, lease agreement, financing arrangement, indenture, promissory note, guaranty or any other document, agreement or instrument evidencing or securing indebtedness or obligations of Debtor (collectively, "Agreements") with or to The CIT Group/Equipment Financing, Inc. (or any successor thereto), or under any successor Agreement which refinances the indebtedness or obligations evidenced by any of the aforesaid Agreements or replaces any of the aforesaid Agreements."

"(l)" the Store is closed or the Debtor ceases to conduct business at the Store's location. In such event, the Debtor may propose a substitution of a different store or a new location, then Secured Party will consider that request and may approve the transfer of debt, at its sole discretion.

**B.**    Debtor must continually remain in good standing with Dunkin' Brands, Inc. and remain current on any Dunkin Brand fees and costs, including without limitation, franchise fees.

**C.**    Debtor further warrants and represents that its indebtedness to Secured Party shall be senior to all of its other indebtedness, including management fees, and that such other debt shall be subordinate to the indebtedness owed to Secured Party.

**D.    COVENANT REQUIREMENTS:**

**REPORTING COVENANTS**
Debtor covenants and agrees that during the term of this agreement, it will provide to Secured Party:
Annually, within 120 days of Debtor's fiscal year end, a balance sheet and income statement of Debtor, prepared in accordance with generally accepted accounting principles consistently applied and signed by independent certified public accountants selected by debtor and acceptable to CIT.

Send to the attention of: Credit Compliance Department
The CIT Group/Equipment Financing, Inc.
1540 W. Fountainhead Pkwy.
Tempe, AZ 85282

**PrePay Provision**
If this Security Agreement is prepaid prior to the date provided for repayment, the Debtor agrees to pay the following fees:
During the first loan year – NO PREPAYMENT ALLOWED; during the second loan year – 4% of the then unpaid balance; during the third loan year – 3% of the then unpaid balance; during the fourth loan year – 2% of the then unpaid balance; during the fifth, sixth and seventh loan years – 1% of the then unpaid balance; prepayment will be allowed thereafter with no prepayment fee assessed.

Dated: _4/30/07_

**Debtor:**

BARTHOLOMEW FOODS IV, CORP.

By _____    Title _____President_____
If corporation, have signed by President, Vice President or Treasurer, and give official title.
If owner or partner, state which.

30 ROCKEFELLER PLAZA
Address

| NEW YORK | NY | 10112 |
|---|---|---|
| City | State | Zip Code |

If an organization, Type of organization: _____ *Corporation* _____

If an individual, Principal residence: _____

Jurisdiction of organization: _____ *NY* _____

Organizational identification Number (or "None"): _____

Location of chief executive office: *50 Broadway Suite #800  New York, NY 10004*

**Secured Party:**

THE CIT GROUP/EQUIPMENT FINANCING, INC. _____
Name of individual, corporation or partnership.

By _____ *S. Schriver* _____ Title _____ *Agent* _____
If corporation, give official title . If owner or partner, state which.

By_____ Title_____

1540 WEST FOUNTAINHEAD PARKWAY _____
Address

| TEMPE | AZ | 85282 |
|-------|-----|----------|
| City  | State | Zip Code |

If Debtor is a partnership, enter:
Partners' names                    Home addresses

**SPECIAL PROVISIONS INSTRUCTIONS** - The notations to be entered in the Special Provisions section of this document for use in **ALABAMA, FLORIDA, GEORGIA, IDAHO, NEVADA, NEW HAMPSHIRE, OREGON, SOUTH DAKOTA and WISCONSIN** are shown in the applicable State pages of the Loans and Motor Vehicles Manual.

**NOTICE:** Do not use this form for transactions for personal, family or household purposes. For agricultural and other transactions subject to Federal or State regulations, consult legal counsel to determine documentation requirements.

**Agricultural purposes** generally means farming, including dairy farming, but it also includes the transportation, harvesting, and processing of farm, dairy, or forest products if what is transported, harvested, or processed is farm, dairy, or forest products

# EXHIBIT D

EX-99.1 2 e27687ex99_1.htm PRESS RELEASE

**Exhibit 99.1**



<u>FOR IMMEDIATE RELEASE</u>



| **Media** | **Investors** |
|---|---|
| Susan Stanley | Emily Janowsky |
| Wells Fargo | Wells Fargo |
| 415-947-3994 | 415-396-4496 |
| | |
| C. Curtis Ritter | Steve Klimas |
| CIT | CIT |
| 212-461-7711 | 973-535-3769 |

## WELLS FARGO TO ACQUIRE CIT'S CONSTRUCTION UNIT

**SAN FRANCISCO and NEW YORK,** June 21, 2007 — Wells Fargo & Company (NYSE: WFC) and CIT Group Inc. (NYSE: CIT) today signed a purchase agreement for Wells Fargo to acquire CIT Construction, the U.S. construction lending business unit of CIT. CIT Construction had $2.4 billion in assets and 235 employees as of March 31, 2007. Terms of the agreement were not disclosed. The acquisition is expected to be completed by the end of this month.

Headquartered in Tempe, Arizona, CIT Construction has provided commercial financing to the construction industry since 1938. It serves contractors who build and repair infrastructure, as well as equipment distributors/dealers that sell and rent construction equipment throughout the U.S. It will operate as a division of Wells Fargo Equipment Finance, Inc.

"Consistent with our vision to satisfy all our customers' financial needs, CIT Construction significantly expands our equipment finance lending capabilities and brings us opportunities to serve our customers even better," said Tim Sloan, group head of Wells Fargo's Commercial Banking, Real Estate and Specialized Financial Services Group. "We'll be able to offer Wells Fargo's full suite of products and services to CIT Construction's customers. This transaction supports Wells Fargo's long-term strategy to expand a core industry important to the growth of Wells Fargo Equipment Finance,"

"Our decision to exit this long-standing CIT business reflects our commitment to increasing shareholder value through proactive portfolio management as we look to redeploy capital to other high growth areas of our business," said Walter J. Owens, president of CIT's Corporate Finance Group.

CIT Construction originates and services senior secured loans collateralized by a wide range of high-quality construction equipment. It is one of the largest non-captive lenders in the industry with long-

3

standing relationships with most of the industry's leading participants. Its top 50 clients have been with the company an average of 19 years, and its executive management team averages 26 years of experience and 19 years with CIT Construction.

"This transaction complements Wells Fargo Equipment Finance's strategy of providing capital to meet the needs of customers, ranging from middle market contractors to large manufacturers, in a core U.S. industry," said John McQueen, head of Wells Fargo Equipment Finance, Inc. "CIT Construction is recognized as an industry leader. The team that will be joining us is experienced, passionate and committed to the construction industry. We look forward to building on its success by providing additional products and services for both our customers."

"Our commitment to providing our customers with the same quality service they have come to expect will be seamless as a result of this transaction," said Ron Riecks, president of CIT Construction. "Our team is excited to join the Wells Fargo family and build upon our financing record of success."

**About Wells Fargo Equipment Finance, Inc.**
Wells Fargo Equipment Finance, Inc., a wholly owned subsidiary of Wells Fargo Bank, N.A., has a portfolio that exceeds $9 billion, and serves more than 26,000 customers in the U.S. and Canada.

**About Wells Fargo & Company**
Wells Fargo & Company is a diversified financial services company with $486 billion in assets, providing banking, insurance, investments, mortgage and consumer finance through more than 6,000 stores and the internet (wellsfargo.com) across North America and internationally. Wells Fargo Bank, N.A. is the only bank in the U.S., and one of only two banks worldwide, to have the highest credit rating from both Moody's Investors Service, "Aaa," and Standard & Poor's Ratings Services, "AAA."

**About CIT**
CIT Group Inc. (NYSE: CIT), a leading global commercial and consumer finance company, provides clients with financing and leasing products and advisory services. Founded in 1908, CIT has approximately $80 billion in managed assets and possesses the financial resources, industry expertise and product knowledge to serve the needs of clients across approximately 30 industries worldwide. CIT, a Fortune 500 company and a member of the S&P 500 Index, holds leading positions in vendor financing, factoring, equipment and transportation financing, Small Business Administration loans, and asset-based lending. With its global headquarters in New York City, CIT has approximately 7,500 employees in locations throughout North America, Europe, Latin America and Asia Pacific. www.cit.com

# # #

4

 



# Welcome to the

# &

# Franchise Finance Site

Dunkin' Brands and CIT have created a unique alliance to provide franchisees with flexible and affordable financing products to fuel their growth plans.

This electronic overview shows you the many benefits of working with CIT and DBI Alliance, and provides helpful information to assist in the financing process.

**Call CIT Reps for a Customized Solution!**



"FOOD FOR THOUGHT"

HOME    BRANDS ALLIANCE    CIT?    MAKES SENSE FOR YOU?    DOCUMENTS    CIT

 



**Two great organizations teaming so CIT can provide the best possible finance solution for our franchisees.**

Over 50 years ago, CIT financed the first Dunkin' store and the relationship has continued to flourish since then. Each year, CIT provides millions of dollars in loans to Dunkin' Brands franchisees to help them grow their businesses; in fact, to date, CIT has lent over $400 million in aggregate to the Dunkin' Brands franchise family.

Now, CIT and Dunkin' Brands have united so that CIT can provide you with some of the most innovative and customized finance solutions.

This Alliance brings together over 90 years of lending and 100 years of Quick Service Restaurant ("QSR") expertise.

CIT's experience in many industries makes them the right choice when you need customized franchise financing solutions. CIT will put together a customized financing proposal that fits your needs and

**"FOOD FOR THOUGHT"**

HOME          BRANDS ALLIANCE          CIT?          MAKES SENSE FOR YOU?          DOCUMENTS          CIT

**CIT Vendor Finance**
Diversified Industries

**Headquarters**
1540 West Fountainhead Parkway
Tempe, AZ 85282-1839

www.cit.com

# A Dunkin' Brands Preferred Lender

## Dunkin' Brands Preferred Finance Program

### CIT 40 Years and Running with Dunkin'

### Program Highlights
- National coverage
- Competitive rates and structures
- Easy documentation
- Easy application process
- Conventional and SBA lending available

### CIT Vendor Finance, Diversified Industries
- For qualified operators, advance rates from 75% to 90% of leased locations, up to 10 years.

### CIT Small Business Lending
- Terms up to 25 years, including real estate; up to 90%

### About CIT
CIT Group Inc. (NYSE: CIT), a leading global commercial and consumer finance company, provides clients with financing and leasing products and advisory services. Founded in 1908, CIT has more than $74 billion in managed assets and possesses the financial resources, industry expertise and product knowledge to serve the needs of clients across approximately 30 industries worldwide. CIT, a Fortune 500 company and a member of the S&P 500 Index, holds leading positions in vendor financing, factoring, equipment and transportation financing, Small Business Administration loans, and asset-based lending. With its global headquarters in New York City, CIT has more than 7,300 employees in locations throughout North America, Europe, Latin America, and Asia Pacific.

For more information, please contact:

**Harold Ray**
tel: 770-263-5910
fax: 800-591-5006
email: harold.ray@cit.com

**Richard W. Talmon Jr.**
tel: 800-553-8778  ext. 1834
fax: 800-591-5006
email: richard.talmon@cit.com

© 2007 CIT Group Inc. CIT and the CIT logo are registered service marks of CIT Group Inc. Dunkin' Donuts trademarks and logos are registered trademarks of DD IP Holder LLC, and are used with permission.

June 22, 2007

Dear Franchisees:

We are excited to announce a unique financing alliance with CIT — a lender that has been providing financing to Dunkin' Brands franchisees for more than 50 years — to offer flexible, convenient and competitive financing options to franchisees of *every size* in *all markets*.

While we will maintain our current list of approved lenders, this new alliance will afford you many special benefits that are unavailable elsewhere:

*    **Access to capital**: The alliance provides access to financing in newer markets, where banks are reluctant to lend.

*    **Exceptional customer service**: CIT will have a 20-person team working exclusively on loans for Dunkin' Brands franchisees.

*    **Recouped costs**: At our request, instead of paying Dunkin' Brands a percentage of each loan, CIT will return that amount to you in the form of a one-time credit. This payment is contingent upon the overall success of the Dunkin' Brands loan portfolio and could equal as much as .65 percent of the loan amount. More of the details of this arrangement are provided in the attached Frequently Asked Questions (FAQ) document.

*    **Single-source financing**: You can use CIT's financing for equipment, real estate, leaseholds, new construction, acquisitions, remodels and more.

*    **Clear, "surprise-free" finance agreements**: There are no exorbitant costs or hidden terms/restrictions.

All credit approval and pricing decisions will ultimately reside with CIT. The loans in the alliance will not be guaranteed by Dunkin' Brands. As mentioned above, this is not an exclusive agreement. Dunkin' Brands Inc. will maintain our relationships with our current group of approved lenders in addition to the alliance, which means you are free to seek other financing options.

Although Dunkin' Brands will not have credit approval or decision-making authority, the alliance will be governed by an Executive Committee and an Advisory Committee comprised equally of CIT and Dunkin' Brands executives.

**Program Roll-out**
You may start taking advantage of this program immediately. To begin your application process, contact CIT Program Manager Harold Ray, Jr. at (770) 263-5910 or harold.ray@cit.com.

**For More Information**
As stated above, an FAQ document is attached.

Links to the alliance web site — www.dunkin-citfinance.com — will be published on both the Dunkin' Donuts and Baskin-Robbins franchising web sites as well as at www.franchiseecentral.com.

All non-application-related questions regarding the alliance should be directed to Kevin Boylen in the Dunkin' Brands Treasury Department at (781) 737-3101 or to financingquestions@dunkinbrands.com.

Sincerely,

Kate Lavelle

**CIT Vendor Finance**
Diversified Industries

 

**Headquarters**

1540 West Fountainhead Parkway
Tempe, AZ 85282-1839

www.cit.com

# A Dunkin' Brands Preferred Lender

# Dunkin' Brands Preferred Finance Program

### CIT 40 Years and Running with Dunkin'

### Program Highlights
- National coverage
- Competitive rates and structures
- Easy documentation
- Easy application process
- Conventional and SBA lending available

### CIT Vendor Finance, Diversified Industries
- For qualified operators, advance rates from 75% to 90% of leased locations, up to 10 years.

### CIT Small Business Lending
- Terms up to 25 years, including real estate; up to 90%

### About CIT

CIT Group Inc. (NYSE: CIT), a leading global commercial and consumer finance company, provides clients with financing and leasing products and advisory services. Founded in 1908, CIT has more than $74 billion in managed assets and possesses the financial resources, industry expertise and product knowledge to serve the needs of clients across approximately 30 industries worldwide. CIT, a Fortune 500 company and a member of the S&P 500 Index, holds leading positions in vendor financing, factoring, equipment and transportation financing, Small Business Administration loans, and asset-based lending. With its global headquarters in New York City, CIT has more than 7,300 employees in locations throughout North America, Europe, Latin America, and Asia Pacific.

For more information, please contact:

**Harold Ray**
tel: 770-263-5910
fax: 800-591-5006
email: harold.ray@cit.com

**Richard W. Talmon Jr.**
tel: 800-553-8778 ext. 1834
fax: 800-591-5006
email: richard.talmon@cit.com

© 2007 CIT Group Inc. CIT and the CIT logo are registered service marks of CIT Group Inc. Dunkin' Donuts trademarks and logos are registered trademarks of DD IP Holder LLC, and are used with permission.

 **DUNKIN' DONUTS CREDIT APPLICATION**

| Full Legal Name of Business (Use the Name as it should appear on the Loan) | | Federal Tax I.D. # |
|---|---|---|
| President | | Vice President |
| Treasurer | | Secretary |

| Business Address: | Street | City | | State | Zip Code |
|---|---|---|---|---|---|
| Store Location: | Street | City | | State | Zip Code |

| Contact Name | Business Telephone | Business Fax | Home Telephone | PC# |
|---|---|---|---|---|

**BUSINESS TYPE:**

❑ Incorporated  ❑ S-Corporation  ❑ Partnership  ❑ Proprietorship
❑ Limited Liability Company under laws of _____(state)

Date established as this Business Type: _____

**PLEASE CIRCLE ALL THAT APPLY:**

Brand: Dunkin' Donuts     Combo (Dunkin' Donuts/Baskin Robbins)

Transaction Type: New Shop     Shop Purchase     Remodel     Other (describe):

**TERM REQUESTED:**

❑ 24 months  ❑ 36 months  ❑ 48 months  ❑ 60 months  ❑ 72 months  ❑ 84 months  ❑ Other

**FINANCIAL INFORMATION REQUESTED:**

Please check off each box as you complete them.

❑ This fully completed credit application.

❑ Signed personal financial statement (PFS) for each borrower and guarantor (not more than three months old).

❑ Personal federal tax returns for the most recent 2 years for each borrower and guarantor.

❑ Financial statements for most recent 2 years of all existing stores and for stores being acquired (under this application) prepared by an accountant (include interim statements if year end is more than six months old).

❑ Federal tax returns for the most recent 2 years for all your existing stores and for stores being acquired (under this application).

❑ Documentation fee check for $500 made payable to The CIT Group.

❑ 5 year proforma

❑ 1 page Business Plan

❑ Please return all required documentation including this application to:

| | |
|---|---|
| Harold E. Ray, Jr. | Richard Talmon |
| Vice President | Program Manager |
| CIT, Vendor Finance, | CIT, Vendor Finance, |
| - Diversified Industries | - Diversified Industries |
| 824 Ivy Cove | 1540 W Fountainhead Pkwy |
| Norcross, GA 30071 | Tempe, AZ 85282 |
| 770-263-5910 (P) | 800-553-8778 x1834 or 480-784-1834 (P) |
| 800-514-2488 (F) | 800-591-5006 (F) |

 **DUNKIN' DONUTS CREDIT APPLICATION**

## PERSONAL INFORMATION:

| Name | Home Address Street | City | State | Zip Code | Social Security Number | Percentage Ownership | U.S. Citizen? |
|------|------|------|-------|----------|------------------------|---------------------|---------------|
| (a) | | | | | | | Y / N |
| (b) | | | | | | | Y / N |
| (c) | | | | | | | Y / N |
| (d) | | | | | | | Y / N |

## PERSONAL BANK INFORMATION:

| Name of Financial Institution | Account Number | Type of Account (i.e. checking, savings, personal loan, mortgage, credit line, etc.) | Bank Contact/Officer & Phone Number |
|------|------|------|------|
| (a) | | | |
| (b) | | | |
| (c) | | | |
| (d) | | | |

## BUSINESS BANKING SUMMARY:

| Name of Financial Institution | Account Number | Type of Account (i.e. checking, savings, personal loan, mortgage, credit line, etc.) | Bank Contact/Officer & Phone Number |
|------|------|------|------|
| (a) | | | |
| (b) | | | |
| (c) | | | |
| (d) | | | |

## FRANCHISE INFORMATION: If more than 8 stores please indicate # of Dunkin' Donuts Stores_____ or # of Combo Stores_____

| Dunkin' Donuts/ Combo | Shop Location City & State only | Profit Center # | Date Opened or Acquired | If Financed, provide Lending Institution Name(s) | Current Outstanding Debt Balance | Monthly Payment Amt. |
|------|------|------|------|------|------|------|
| | | | | | $ | $ |
| | | | | | $ | $ |
| | | | | | $ | $ |
| | | | | | $ | $ |
| | | | | | $ | $ |
| | | | | | $ | $ |
| | | | | | $ | $ |
| | | | | | $ | $ |



# DUNKIN' DONUTS CREDIT APPLICATION

## PROJECT INFORMATION:

Total Project Cost:

| | |
|---|---|
| Building | $ _____ |
| Equipment | _____ |
| Leasehold Improvements | _____ |
| Franchise Fee | _____ |
| Site Development Fee | _____ |
| Miscellaneous* | _____ |
| Total Project Cost | $ _____ |

Amount Requested To Finance:

| | |
|---|---|
| Building | $ _____ |
| Equipment | _____ |
| Leasehold Improvements | _____ |
| Total Amount Requested | $ _____ |

*Please list all miscellaneous items in the box below:

[ box ]

## PROJECT DESCRIPTION:

(1) Is the site a free standing or strip center location? If strip center, is it in-line or end-cap?   _____

(2) What is the square footage of the site (estimate, if exact figure unkown)? Retail/Backroom =   _____ / _____

(3) Will the shop have a drive-thru window?   _____

(4) In the local trade area, who are the primary competitors?   _____

(5) Describe the demographics of the area (i.e. urban/rural, commercial/residential).   _____

(6) What type of roadway is the site on (i.e. major highway, side street, intersection)?   _____

## LANDLORD & LEASE SUMMARY:

| Name of Landlord and/or Realty Management Company | Landlord Contact Name | Landlord Telephone Number ( ) |
|---|---|---|
| Date Lease To Begin | Date Of Lease Termination | Renewal Clause |
| Payment Terms | Comments (any additional information) | |

## INSURANCE SUMMARY:

| Insurance Company | Agents Name | Agents Telephone Number ( ) |
|---|---|---|
| Policy Number | Amount of Policy Coverage | Cancellation Notice |
| Effective Date | Expiration Date | Comments |

## ACCOUNTANT REFERENCE:

| Accountants Name & Firm Name | Address | Telephone Number ( ) |
|---|---|---|

 **DUNKIN' DONUTS CREDIT APPLICATION**

## AUTHORIZATION FOR DISCLOSURE OF CREDIT INFORMATION:

I/We authorize The CIT Group, Inc. ("CIT") by and through one or more of CIT's subsidiaries to make whatever credit inquiries that it deems necessary in connection with this lease/loan application. I/We authorize and instruct any bank, trade reference, bonding company to compile and furnish to CIT, any information that it may have in response to such credit inquiries. I/We agree that such information, along with this application, shall remain the property of CIT whether or not the lease/loan application is approved. I hereby represent to The CIT Group that such information is true, correct and complete. A photostatic copy of this authorization shall be as valid as the original. This document's authorization will expire one year from the signature date.

If your application for business credit is denied, you have the right to a written statement of the specific reasons for denial. To obtain the statement, contact Credit Operations, The CIT Group/Equipment Financing, 1540 W Fountainhead Parkway, Tempe, AZ 85282, or call (800) 553-8778 x9591 within 60 days from the date you are notified of our decision. We will send you a written statement of the reasons for the denial within 30 days of receiving your request for the statement.

> **NOTICE:**
> The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract), because all or part of the applicant's income derives from any public assistance program, or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this credit or is the Federal Trade Commission, Equal Credit Opportunity, Washington, D.C. 20508.

Individually

By_____ Address_____ SSN_____

(Print name):_____ Date:_____

By_____ Address_____ SSN_____

(Print name):_____ Date:_____

By_____ Address_____ SSN_____

(Print name):_____ Date:_____

By_____ Address_____ SSN_____

(Print name):_____ Date:_____

 **DUNKIN' DONUTS CREDIT APPLICATION**

## AUTHORIZATION TO RELEASE FINANCIAL INFORMATION:

**Authorization to Obtain Financial Information**

I/We authorize Dunkin' Brands, Inc. ("DBI") to release to The CIT Group, Inc. ("CIT") by and through one or more of CIT's subsidiaries any information DBI may have that is responsive to whatever financial inquiries that CIT deems necessary in connection with this lease/loan application. The undersigned and CIT acknowledge that (i) the information that DBI provides is unaudited and unverified and (ii) DBI is not liable for any inaccuracies or omissions contained in the information it provides.

I/We agree that such information, along with this application, shall remain the property of CIT whether or not the lease/loan application is approved.

The person named below is the duly appointed _____ of the Company named below and is authorized to execute and deliver the Company's consent with regard to this authorization.

_____
Company Name

PC#(s)_____
   (Use SDA # if no PC #'s are established)

By_____Title_____

(Print name):_____Date_____

This document's authorization will expire one year from the signature date.

The Company named above agrees to indemnify and hold DBI harmless from and against any claims in connection with any and all information delivered to CIT pursuant to or in connection with this authorization.

DBI will not provide any credit reports.

   

Dunkin' Donuts trademarks and logos are registered trademarks of DD IP Holder LLC, and are used with permission.
2007 CIT Group Inc. CIT and CIT logo are registered service marks of CIT Group Inc.





## The Benefits to You!

The Alliance can provide financial solutions suited for all aspects of your business.

- Superior Customer Service
- Creative and Flexible Finance Options
- Competitive Rates.

## Types of financing available

You can choose from the following financing options:

- Equipment & Leasehold Financing
- Acquisition Financing
- Refinancing of Existing Debt

**"FOOD FOR THOUGHT"**

| HOME | BRANDS ALLIANCE | CIT? | MAKES SENSE FOR YOU? | DOCUMENTS | CIT |

   



Typical financing packages include:

## Leased Locations for New Developments & Acquisition

- Restaurant Equipment
- Leaseholds
- Initial Franchise Fee
- Possible Site Improvements
- Working Capital (for Small Business Lending Transactions)

## Acquisition, New Construction & Remodels

- Restaurant Equipment
- Leaseholds

"FOOD FOR THOUGHT"

HOME          BRANDS ALLIANCE          CIT?          MAKES SENSE FOR YOU?          DOCUMENTS          CIT

  



## The Benefits to You!

The Alliance can provide financial solutions suited for all aspects of your business.

- Superior Customer Service
- Creative and Flexible Finance Options
- Competitive Rates.

## Types of financing available

You can choose from the following financing options:

- Equipment & Leasehold Financing
- Acquisition Financing
- Refinancing of Existing Debt

**"FOOD FOR THOUGHT"**

**HOME**          **BRANDS ALLIANCE**          **CIT?**          **MAKES SENSE FOR YOU?**          **DOCUMENTS**          **CIT**

 





## Types of financing available

You can choose from the following financing options:

- Equipment & Leasehold Financing

- Acquisition Financing

- Refinancing of Existing Debt

- Real Estate Financing

- Turnkey Financing (Land, Building & FF&E)

- Ground Lease Financing

- Small Business Lending

- Development Lines

- Loans

"FOOD FOR THOUGHT"

HOME        BRANDS ALLIANCE        CIT?        MAKES SENSE FOR YOU?        DOCUMENTS        CIT



## 100 YEARS OF SERVICE TO BUILD ON

CIT has always understood that companies need more than capital to succeed. Service excellence and a commitment to working with our clients through all business cycles has been integral to our success. Increasingly, providing superb service has meant a commitment to being closer to our customers no matter where they do business. This year we opened two new offices in Asia, a global vendor servicing center in Shanghai and an aerospace office in Singapore, further deepening our relationships in that region. These offices reflect our commitment to deploying our expertise around the world.

Service has been the foundation on which CIT has built a 50+ year partnership with Dunkin' Donuts. Over the years we have provided more than $2 billion in financing to its franchisees, allowing Dunkin' Donuts to become one of the leading purveyors of coffee and donuts in the U.S., with an expanded footprint in previously underserved areas. By providing outstanding service and simplifying the often complex franchise finance process, CIT has built long-standing relationships with Dunkin' Donuts franchisees, helping them to achieve their entrepreneurial dreams.

04.

June 25, 2007 08:00 AM Eastern Daylight Time

**CIT and Dunkin' Brands Expand Strategic Financing Alliance**

**CIT's Global Vendor Financing Structure Designed To Increase Dunkin' Brands Franchisee Growth and Profitability**

NEW YORK & CANTON, Mass.--(BUSINESS WIRE)--Building upon their existing 50-year relationship, CIT Group Inc. (NYSE: CIT), a leading global provider of commercial and consumer finance solutions, and Dunkin' Brands, Inc., a premier quick service restaurant franchisor with a leading position in the coffee, bakery, and ice cream segments, today announced a strategic financing alliance. Under the terms of the new program, Dunkin' Brands franchisees will have access to CIT financing in all new and existing markets throughout the U.S.

The program, which will be administered through CIT Vendor Finance, Diversified Industries and CIT Small Business Lending, will offer franchisees flexible financial product solutions suited for all aspects of the franchise network. Franchisees will be supported by CIT's dedicated sales, underwriting, documentation, and portfolio teams, who are experienced in lending to Dunkin' Brands franchisees.

"CIT's 50-year financing relationship with Dunkin' Brands is one of the longest and significant in our nearly 100-year history," said Thomas B. Hallman, CIT Vice Chairman, Specialty Finance. "This new alliance builds upon our existing relationship and will play an important role in supporting Dunkin' Brands strategic growth initiatives across the United States and around the world."

Kate Lavelle, Dunkin' Brands Chief Financial Officer, said, "We are excited to formalize our long-standing relationship with CIT, an organization that has clearly demonstrated a strong understanding of Dunkin' Brands' business strategy, as well as our franchisees' needs. This alliance with CIT will enable our franchisees to achieve their growth objectives, whether they are looking to open new stores, enter new markets, or upgrade their existing stores."

About CIT Vendor Finance

CIT Vendor Finance is a global leader in financing solutions that drive incremental revenues for manufacturers, distributors and other intermediaries. It provides customized financing solutions to customers in more than 30 countries, supporting a wide variety of industries, including health care, industrial equipment and technology.

About CIT

CIT Group Inc. (NYSE: CIT), a leading commercial and consumer finance company, provides clients with financing and leasing products and advisory services. Founded in 1908, CIT has approximately $80 billion in managed assets and possesses the financial resources, industry expertise and product knowledge to serve the needs of clients across approximately 30 industries worldwide. CIT, a Fortune 500 company and a member of the S&P 500 Index, holds leading positions in vendor financing, factoring, equipment and transportation financing, Small Business Administration loans and asset-based lending. With its global headquarters in New York City, CIT has approximately 7,500 employees in locations throughout North America, Europe, Latin America and Asia Pacific. http://www.cit.com/

About Dunkin' Brands

With more than 13,000 franchises in 50 countries worldwide, Dunkin' Brands, Inc. is renowned for its leadership in the quick quality restaurant category. There were 7,123 Dunkin' Donuts restaurants, 5,838 Baskin-Robbins restaurants and 280 Togo's restaurants with system-wide sales of $6.4 billion at the end of 2006. Dunkin' Brands, Inc. is headquartered in Canton, Massachusetts. http://www.dunkinbrands.com/

**Contacts**

CIT Group Inc.
Media Relations:
C. Curtis Ritter, 212-461-7711
Director of External Communications & Media Relations
Curt.Ritter@CIT.com
or
Mary Flynn, 212-461-7860
Director of Media Relations



Mary.Flynn@CIT.com
or
CIT Investor Relations:
Steve Klimas, 973-535-3769
Vice President
Steve.Klimas@CIT.com
or
Dunkin' Brands Media Relations:
Michelle King, 781-737-3585
michelle.king@dunkinbrands.com



Back to Top





# Press Room

Did you Know?

# Press Room

## Press Releases

March 20, 2008
Dunkin' Brands Names Cicely Simpson Director, Federal & State Government Affairs (.pdf)

January 17, 2008
Dunkin' Brands Names Cirabel Lardizábal Olson Senior Director, Community Relations & Multicultural Initiatives (.pdf)

January 16, 2008
Dunkin' Brands Names Global Brand Leaders for Dunkin' Donuts and Baskin-Robbins (.pdf)

December 3, 2007
Mainsail Partners Acquires Togo's from Dunkin' Brands, Inc. (.pdf)

November 30, 2007
Dunkin' Brands Community Foundation Awards $700,000 in Grants to Emergency Response Organizations (.pdf)

November 8, 2007
Dunkin' Brands, Inc. Honors Its Best and Brightest From Around the World (.pdf)

September 4, 2007
Dunkin' Brands Names Restaurant Industry Veteran Stephen J. Caldeira Executive Vice President, Global Communications and Chief Public Affairs Officer (.pdf)

August 27, 2007
Dunkin' Brands Announces Zero Grams Trans Fat Menu To Be Available Nationwide By October 15 (.pdf)

August 15, 2007
Dunkin' Brands Establishes Nutrition Advisory Board of Notable Industry Experts (.pdf)

May 22, 2007
Jon Luther Honored with Prestigious Gold Plate Award (.pdf)

May 18, 2007
Dunkin' Donuts Receives MenuMasters Flame of Innovation Award (.pdf)

March 8, 2007
Dunkin' Donuts "Whips Up" Deal With Daytime TV Host Rachael Ray (.pdf)

February 28, 2007
Dunkin' Brands and Procter & Gamble Sign Agreement to Bring Dunkin' Donuts Packaged Coffee to Retail Outlets Nationwide (.pdf)

January 17, 2007
Dunkin' Brands Outlines Plans to Expand Dunkin' Donuts' Presence into the Asian Market (.pdf)

October 20, 2006
Dunkin' Brands to Divest Togo's (.pdf)

June 9, 2006
Dunkin' Brands Appoints New Brand Officers for Dunkin' Donuts and Togo's (.pdf)

March 30, 2006
Dunkin' Brands Launches New Charitable Foundation (.pdf)

March 1, 2006
Bain Capital, The Carlyle Group and Thomas H. Lee Partners Complete Acquisition of Dunkin' Brands (.pdf)

December 12, 2005
Dunkin' Brands to Work With New Private Equity Owners to Continue Aggressive Growth Plans (.pdf)

November 11, 2005
The Sweet Taste of Victory: Dunkin' Brands is Proud to Announce Executive Pastry Chef Christopher Boos to Head the US Team in the World Pastry Cup 2007 (.pdf)

November 1, 2005
Dunkin' Brands Names Stan Frankenhaler as its First Executive Chef / Director of Culinary Development (.pdf)

January 8, 2004
Dunkin' Brands Delivers Strong Performance for the First Half of the 2004 Fiscal Year (.pdf)

January 8, 2004
It's No Surprise: Dunkin' Donuts Coffee Recognized as Best Coffee in America by NBC's Today Show (.pdf)

November 3, 2003
Allied Domecq Quick Service Restaurants to Locate New Headquarters in Canton, Mass (.pdf)

October 22, 2003
Dunkin' Donuts, Baskin-Robbins and Togo's, Contribute to Allied Domecq PLC's Results with Operating Profits Up 7% (.pdf)

October 7, 2003
Restaurant Pioneer Unveils New Dining Experience at Prototype Store Creating New Industry Category. (.pdf)

September 17, 2003
Allied Domecq Quick Service Restaurants Names Executive Team to Lead Newly Restructured Organization. (.pdf)

Site Map    Contact Us    Privacy Policy

© 2007. DD IP Holder LLC and BR IP Holder LLC.
All rights reserved. The Dunkin' Donuts and Baskin-Robbins trademarks, trade names, designs, logos, service marks, and related marks are registered trademarks of DD IP Holder LLC and BR IP Holder LLC, respectively.

# Bain Capital, The Carlyle Group and Thomas H. Lee Partners Complete Acquisition of Dunkin' Brands

### CEO Luther to Chair Board of Directors; Independent Company to Pursue Expansion Strategy

CANTON, Mass. (March 1, 2006) – A consortium of global private equity firms consisting of Bain Capital Partners LLC, The Carlyle Group and Thomas H. Lee Partners LP today completed the acquisition of Dunkin' Brands Inc. from Pernod Ricard SA for $2.425 billion in cash. Dunkin' Brands announced on December 12, 2005 that it had reached a definitive agreement to be acquired by the consortium.

Jon L. Luther, Chief Executive Officer of Dunkin' Brands, has been appointed Chairman of the newly formed Board of Directors, and Will Kussell, Chief Operating Officer of the company, will also serve on the Board. Bain Capital, The Carlyle Group and Thomas H. Lee Partners will each have three board seats.

"This is an exciting time for Dunkin' Brands, and we are pleased to have such experienced partners to help us execute our strategy of aggressive expansion for our three proven brands," said Luther. "With strong consumer loyalty, excellent franchisee relationships and an outstanding management team already in place, Dunkin' Brands is well-positioned for tremendous growth. We are driven by a passion to raise the bar on the quality and variety of food and beverages available in the quick service industry and change expectations about what is possible in a quick meal on the go."

"As an independent company with new owners committed to providing the resources needed to support its growth plan, we believe Dunkin' Brands is ideally situated to execute its strategy across the Dunkin' Donuts, Togo's and Baskin-Robbins brands and geographies," the consortium members said in a statement.

### 

**About Dunkin' Brands**
Dunkin' Brands, Inc., headquartered in Canton, Massachusetts, franchises more than 12,000 Dunkin' Donuts, Baskin-Robbins and Togo's shops worldwide. With over 143 years of combined franchising experience, Dunkin' Brands mission is to thrill customers, enrich stakeholders and build powerful brands. Dunkin' Brands is also a pioneer in developing and practicing a complementary day part strategy, which combines two or three of its brands under one roof. For more information, visit www.dunkinbrands.com.

(more)

Page 2/closing

**About Dunkin' Donuts**
Founded in 1950, today Dunkin' Donuts is the number one retailer of coffee-by-the-cup in America, selling 2.7 million cups a day, nearly one billion cups a year. Dunkin' Donuts is also the largest coffee and baked goods chain in the world and sells more donuts, coffee, and bagels than any other quick service restaurant in America. Dunkin' Donuts has more than 6,500 shops in 29 countries worldwide. Based in Canton, Massachusetts, Dunkin' Donuts is a subsidiary of Dunkin' Brands, Inc. For more information, visit www.DunkinDonuts.com.

**About Baskin-Robbins**
Today, Baskin-Robbins is the world's largest chain of ice cream specialty shops that creates and markets its innovative, high-quality premium ice cream, specialty frozen desserts and beverages in more than 5,600 retail shops around the globe. Baskin-Robbins was founded by two ice cream enthusiasts whose passion led to the creation of more than 1,000 ice cream flavors and a wide variety of delicious treats. Headquartered in Canton, Mass., Baskin-Robbins is part of Dunkin' Brands, Inc. For more information, visit www.BaskinRobbins.com.

**About Togo's**
Togo's is a strong California brand, and has earned this distinction by providing high-quality, great tasting sandwiches for over 35 years. Togo's Subs was established in 1968 near the San Jose State University campus in California. In 1971, a former student by the name of Mike Cobler purchased the store, upgraded the menu, and changed the name to Togo's Eatery. A student himself, Cobler projected the type of food he liked into his business: freshly prepared, wholesome sandwiches with generous portions. There are now over 400 stores in the U.S., where nearly 164,000 Togo's sandwiches are served every day. Togo's loves its customers and is committed to providing them with sandwich creations, vegetarian selections, soups, and salads that offer "big taste in every bite." For more information, visit www.togos.com.

**About Bain Capital**
Bain Capital (www.baincapital.com) is a global private investment firm that manages several pools of capital including private equity, venture capital, public equity and leveraged debt assets with more than $27 billion in assets under management. Since its inception in 1984, Bain Capital has made private equity investments and add-on acquisitions in over 230 companies around the world, including quick service restaurant companies Domino's Pizza and Burger King, and retailers Toys "R" Us, Dollarama and Staples. Headquartered in Boston, Bain Capital has offices in New York, London, Munich, Hong Kong, Tokyo and Shanghai.

(more)

Page 3/closing

## About The Carlyle Group

The Carlyle Group is a global private equity firm with $35 billion under management. Carlyle invests in buyouts, venture capital, real estate and leveraged finance in Asia, Europe and North America, focusing on aerospace & defense, automotive & transportation, consumer & retail, energy & power, healthcare, industrial, technology & business services and telecommunications & media. Since 1987, the firm has invested $14.9 billion of equity in 439 transactions for a total purchase price of $51.9 billion. The Carlyle Group employs more than 630 people in 15 countries. In the aggregate, Carlyle portfolio companies have more than $40 billion in revenue and employ more than 370,000 people around the world. Visit www.carlyle.com for additional information.

## About Thomas H. Lee Partners, L.P.

Thomas H. Lee Partners, L.P. is a Boston-based private equity firm focused on identifying and acquiring substantial ownership positions in growth companies. Founded in 1974, Thomas H. Lee Partners currently manages approximately $12 billion of committed capital, including its most recent fund, the $6.1 billion Thomas H. Lee Equity Fund V. The firm has acquired over 100 companies with aggregate purchase price of $75 billion. Notable transactions sponsored by the firm include: Fisher Scientific International, General Nutrition Centers, Houghton Mifflin, Michael Foods, Nortek, ProSiebenSat.1, Rayovac, Simmons Company, Snapple Beverage, TransWestern Publishing, Warner Chilcott, and Warner Music Group.

**Contacts:**

Michelle King
Dunkin' Brands
office: 781-737-3585
michelle.king@dunkinbrands.com

| Alex Stanton | Chris Ullman | Greg Miller |
|---|---|---|
| (for Bain Capital) | The Carlyle Group | (for Thomas H. Lee Partners) |
| office: 212-780-0701 | office: 202-729-5450 | office: 203-221-2790 |
| alex@stantoncrenshaw.com | christopher.ullman@carlyle.com | gmiller@mdgpr.com |

## KUSHNICK & ASSOCIATES, P.C.

ATTORNEYS AT LAW
445 BROAD HOLLOW ROAD • SUITE 124
MELVILLE, NEW YORK 11747
TEL: (631) 752-7100
FAX: (631) 777-7732

LAWRENCE A. KUSHNICK
CRAIG H. HANDLER
VINCENT T. PALLACI
LIDIA D. SZCZEPANOWSKI

LEGAL ASSISTANT
MARY E. McNULTY

April 22, 2008

**Via Facsimile and E-mail**
David Worthen, Esq.
Gray, Plant, Mooty, Mooty & Bennett, P.A.
2600 Virginia Avenue N.W., Suite 1111
Washington, DC 20037

>           Re:    **Dunkin' Donuts, et al. v. Inner City Dough, et als.**
>                  **S.D.N.Y.    08-CV-00217(RWS)**

Dear Mr. Worthen:

Please be advised that in connection with tomorrow's scheduled hearing on the plaintiffs' application for a preliminary injunction, the defendants intend to offer the following documents into evidence:

1.     All documents marked as exhibits during the depositions of Mark Merriman, Adolophe Lopz, Ray Dooley, Kevin Godfrey, Richard W. Talmon, Jack Laudermilk and Craig McKenzie.

2.     All available transcripts of the depositions of Mark Merriman, Adolophe Lopez, Ray Dooley, Kevin Godfrey, Richard W. Talmon, Jack Laudermilk and Craig McKenzie.

3.     All documents produced to date by CIT Group, Inc. numbered 1 through 1693.*

4.     Printout of entirety of website www.dunkin-citfinance.com.*

5.     Current Dunkin' Donuts UFOC as well as Dunkin' Donuts UFOC for 2005, 2006 and 2007.

6.      June 25, 2007 CIT - Dunkin' Brands strategic alliance agreement.

7.      CIT Equipment collateral 2006 monthly service reports.*

8.      CIT Group, Inc. Q1 Earnings Release dated April 17, 2008.*

9.      CIT Group, Inc. Q3 Earnings Release dated October 17, 2008.*

10.     CIT Group, Inc. Earnings reports dated July 18, 2007, April 18, 2007 and
        January 17, 2007.*

11.     Dunkin' Brands Press Release Index for period of September 17, 2003
        through March 20, 2008.*

12.     Dunkin' Brands Press Release dated September 12, 2005 re:
        Bain/Carlyle/Lee.*

13.     Dunkin' Brands Press Release dated March 1, 2006 re: Bain/Carlyle/Lee.*

14.     CIT Press Release dated June 25, 2007 re: Dunkin' Brands strategic
        alliance.*

15.     CIT/Dunkin' Case Study.*

16.     Video: CIT Behind the Scenes with Jon Luther.*

17.     CIT Form 8-K dated June 21, 2007.*

18.     Wells Fargo Press Release dated June 21, 2007 re: acquisition of CIT*

19.     Description of CIT Equipment Finance.*

20.     CIT Small Business Lending Perspectives.*

21.     CIT Form 8-K dated June 20, 2007.*


        This letter is written without waiver of rights and defendants reserve their right to
amend this list up to and including the time of hearing.

        In addition, we will rely upon our cross-examination of the plaintiffs' witnesses
and reserve our right to call Djenane Bartholomew and Nancy Davis to give direct or
rebuttal testimony.

Should you have any questions, please do not hesitate to contact me.

Very truly yours,

LAWRENCE A. KUSHNICK

\*       These documents are attached hereto in PDF form

CC:    Brian St. James, Esq.
       Djenane Bartholomew
       Carl B. Lisa, Jr., Esq.

Home    About CIT    Products & Services    CIT Worldwide    Careers    Inve

Language  English



# [CIT: Behind the Business - Dunkin Brands]

The fifth installment of CIT: BEHIND THE BUSINESS, hosted by notable business strategist journalist Andrew Shapiro, features an interview with Jon L. Luther, chairman and CEO of D Brands.

A veteran of the food-service industry, Jon is a proven leader at creative brand developmen satisfying consumers who seek quality, convenience, and value in a quick service restauran setting. In 2005, Jon was the recipient of the Nation's Restaurant News Golden Chain awarc 2006, he received the Chain Leadership award from Chain Leader magazine.

**ABOUT CIT**
Our Mission
CIT Businesses
Corporate Governance
CIT Leadership
Corporate Giving
Centennial
Corporate Citizenship

Capital Redefined
**[CIT: Behind The Business - Dunkin' Brands]**
M&A In Challenging Times
The CIT U.S. Middle Market Outlook 2007
Podcast Series: 5 Minute Capital
The Deal White Papers

Case Studies
CIT Speakers Bureau



Getting Started in The Restaurant Business

◄◄  ▶  ▶▶ ┃                                        ◀))

**Embed this video:**   <object classid = "clsid:D2!

**Jon L. Luther Video**

**Part 1**
**Getting Started in the Restaurant Business**

**Part 2**
**Importance of Continuous Learning**

**Part 3**
**Popeyes: Beyond Fried Chicken**

–––––––
**Video Podcast Dunkin Brands Video**

**Audio Podcast Dunkin Brands Audio**

## ABOUT JON L. LUTHER
Jon L. Luther was named chief executive officer of Dunkin' Brands in January 2003 and chairman in March 2006. A veteran of the food-service industry, Jon is a proven leader at creative brand development and at satisfying consumers who seek



quality, convenience, and value in a quick service restaurant setting. From February 1997 until December 2002, Jon was president of Popeyes Chicken & Biscuits, a division of AFC Enterprises. During his term, the company's store count grew 67 percent to 1,672 units, while average annual unit volume grew to over $1 million, the highest in the chicken QSR category. With Jon at the helm, Popeyes won industry awards for menu strategy, store re-design, and customer satisfaction.

**Jon Luther - Full Bio**

©2008 CIT Group Inc. All rights reserved.

Terms of Use | Privacy Policy |

CIT Equipment Finance



CIT Equipment Finance
125 Fifth Avenue
New York, NY 10011
(212) 771-9525

1300 West Havard Street – Building C
Tempe, AZ 85283

www.cit.com

# Equipment financing solutions



CIT Equipment Finance is a leading provider of equipment financing solutions for middle market companies in a wide range of industries. We have nearly a century of experience in developing innovative financial products and services that are flexible, affordable and tailored to our customers' specific needs.

Our experienced sales and underwriting professionals team with companies to structure transactions that envelop unique requirements and industry characteristics. Designing specific solutions that take into consideration business cycles, seasonal needs, specialized equipment requirements and other factors, allows CIT Equipment Finance to provide a sophisticated solution that adds value to our customers' businesses.

## Custom products and services

CIT Equipment Finance specializes in providing equipment loans and leases for transactions ranging in size from $3 million to $50 million and more. We offer flexible terms of three to 10 years or more, with advance rates of up to 100%. Our products and services include

- New and used equipment loans and leases
- Equipment refinancing arrangements
- Sale-leaseback arrangements
- Turnkey financing for land, buildings and equipment
- Senior term debt financing
- Lease lines of credit for equipment capital expenditures

## Advantages

- With equipment acquisition financing or a leasing plan, companies can take possession of equipment and put it to work for them very quickly, while preserving working capital for other priorities

- With a secured loan, companies can take advantage of the equity in their existing equipment, or use newly-purchased equipment as collateral

- A revolving line of credit enables companies to improve their cash flow, increase their bonding capacity, and restructure their debt according to their current and future requirements

- Certain lease structures can provide companies with the ability to reduce their initial investment and monthly payments, with the possibility of taking advantage of some tax benefits

- CIT provides wholesale, fleet rental and retail financing programs tailored to the needs of individual dealers

- Companies can make use of existing assets through a sale-leaseback program that provides funds to obtain new equipment

- Companies can negotiate a specialized loan program incorporating low/high, high/low, seasonal or even "skip" payments if their workload varies over time

- Companies have the option of either fixed or floating rates, and "lock into" these rates for the term of the loan or "float" with any of a number of published rates

- Companies can count on CIT to give them expert advice as well as fast, reliable service and work with them throughout the life of their loan

## Solutions for a wide range of industries

We focus on meeting the domestic and international needs of U.S.-based middle market companies in a variety of industries, including:

- Distribution
- Food processing
- Graphic arts/printing
- Machine tools
- Manufacturing
- Materials handling
- Maritime
- Mining
- Oil and gas
- Packaging
- Plastics
- Pulp & paper
- Supermarkets/convenience stores
- Textiles
- Trade & service
- Utilities

## About CIT

CIT (NYSE: CIT) is a global commercial finance company that provides financial products and advisory services to more than one million customers in over 50 countries across 30 industries. A leader in middle market financing, CIT has more than $80 billion in managed assets and provides financial solutions for more than half of the Fortune 1000. A member of the S&P 500 and Fortune 500, it maintains leading positions in asset-based, cash flow and Small Business Administration lending, equipment leasing, vendor financing and factoring. The CIT brand platform, Capital Redefined, articulates its value proposition of providing its customers with the relationship, intellectual and financial capital to yield infinite possibilities. Founded in 1908, CIT is celebrating its Centennial throughout 2008.

www.cit.com

## Contact

Jay DesMarteau – Executive Vice President
212-771-9533. Jay.DesMarteau@cit.com




Securities and investment banking services offered through CIT Capital Securities LLC, an affiliate of CIT.

© 2008 CIT Group Inc. CIT and the CIT logo are registered service marks of CIT Group Inc. 02/08





# Small Business
# Perspectives

**CIT**
Small Business Lending Corporation

# President's Letter



March 2008

Perspective.

As we launch the premier edition of our newsletter, I found myself wondering about how important perspective is in today's business world. With credit less available and more expensive, doing business in the current environment is more challenging than ever. Despite this, I believe there are solid prospects for small businesses ahead in 2008. I say this because every challenge presents an opportunity and no one has better perspective regarding those opportunities than small business entrepreneurs.

At CIT, we value this perspective – as well as our relationships with these small business owners – and we will continue to partner with them through all economic cycles crafting solutions to ensure their success. Small business is a key driver of our economy and CIT remains steadfast in our commitment to provide the capital and advisory services these entrepreneurs need in order to grow and expand their businesses.

CIT Small Business Lending has been the nation's premier 7 (a) volume lender to small business entrepreneurs for eight consecutive years. We are also the leading financing partner to women, veteran, and minority-owned businesses – a distinction I am very proud of.

So, welcome to Small Business Perspectives. Together, let's explore the opportunities that lie before us in features such as Growth Factory, The Economy, and On the Hill. Hopefully you will find the information between these covers helpful and, who knows...? It just might change your perspective on things.

Sincerely,

Chris Reilly

# News Briefs



### I Want It: Predictive Selling Technology Filters Down to Small Businesses

One of the more advanced online selling applications is making its way into the small business marketplace.

Amazon.com was the first to use a selling system that predicts what consumers want, and then offer it to them. After a customer goes to the site and does a search on a specific topic, the search information is recorded and used to make product recommendations. The recommendations are displayed to the customers during their next visit.

New technology companies, such as Aggregate Knowledge (aggregateknowledge.com), ChoiceStream (choicestream.com), and CleverSet (cleverset.com), have begun to sell such systems to smaller online retailers. The tech companies' products not only look at what a consumer searched for, but also at the products' characteristics, such as genre, rating, and price, and link to items that share those categorizations. It gets more complex than that. For example, for movies, books, or music, the system considers the writers, directors, or performers who were involved, and makes relevant product suggestions.

Those big online retailers don't have to look so big anymore.

### Subprime Fallout Hits Small Business Owners

In economic terms, the collapse of the subprime mortgage market was akin to a nuclear meltdown. Companies literally evaporated in days. The entire operational paradigm in the mortgage market seemed to undergo a complete change.

So what are the effects on the general small business market? Considering that 30% of small business owners have used home-based loans to fund their businesses, according to one recent study, the effects could be notable.

Another study, done by Middle Tennessee State University, found that more than 18% of Tennessee's small business owners used home equity loans as their startup capital, and that home equity loans covered an average of 43% of startup funding for owners that resorted to such loans.

There are other indicators. A third quarter 2007 Discover Small Business Watch survey found that 35% of owners say turmoil in the housing market has had a "substantial impact" on their businesses.

But with the housing market faltering, business owners who turn to residential mortgages for commercial credit may find it more difficult to qualify for a home equity loan. Already, credit terms are tightening with applicants requiring higher credit scores to qualify for home loans, while the average percent of a house's value that lenders are willing to lend against (known as the loan-to-value ratio, or LTV) is on the decline.

### New Online Forum for Eco-Friendly Business Networking

Green is the new black for small businesses.

More small businesses are trying to be eco-friendly, both for the environment's sake and to attract more customers, but they lack the ability to work with or even find like-minded businesses.

But a new web site is offering such businesses the opportunity to network with one another, fostering growth and a chance to reach out to more consumers.

Enter The Green Chamber (thegreenchamber.org), an online business forum for companies that are seeking compatible firms for networking, joint ventures, advice for start-ups, and market research. Launched last July, the nonprofit organization stemmed from an idea shared by Jon Anderson, founder of The Urban Land Preservation Fund of America, and Willi Paul, a sustainable-business consultant from California. The organization charges dues based on the size of the company, encouraging small businesses to join.

The Green Chamber already has approximately 200 members, according to Anderson and Paul, and that number seems to be growing as earth-friendly business owners seek to build partnerships and further expand their businesses.

Mother Earth must be pleased.

3

Feature

# The Leading Edge of Franchising Today



**Jim Parker hadn't heard of It's a Grind Coffeehouse three years ago when he was sitting with $1.5 million in liquid assets to invest in a franchise, but that didn't stop this former engineer from jumping into a beverage segment that's since taken off, thanks to companies like Starbucks and Seattle's Best.**

Before sinking his and a partner's cash and time into the franchise, Parker says he "looked at thousands of different options," including Peet's Coffee & Tea. Some initial investments were too high for his taste, and other options wouldn't have allowed him to spend much time with his two young children.

A few months into the business venture, Parker says he was asking himself why he left a six-figure career for entrepreneurship. Becoming a manager of minimum-wage workers (versus the $100,000+ earners he oversaw in his past position) was a key challenge for Parker, whose firm broke even on the day it opened and "never looked back."

With high gas prices and overall uneasiness about the economy taking their toll on many companies' profits these days, Parker's sales have been growing steadily since 2004. "Franchisees that I talk to are dealing with economic issues right now because not as many people are going out and spending money, but things have stayed pretty steady here." Parker says. "We're in a good place."

With a long history of helping entrepreneurial types segue into the business world with more support than they would get on their own, franchising holds a prominent place in the American business world. Defined as an arrangement by which an owner (also known as a "franchisor") distributes products or services through affiliated dealers ("franchisees"), the concept centers on the granting of licensed privileges to independent owners. Franchisees, in turn, receive business assistance, training, merchandising, marketing, and other support from franchisors.

In its most recent economic impact report, the International Franchise Association (IFA) found that 767,483 franchised businesses were operating in the U.S., providing more than 9.7 million jobs with a combined

$229.1 billion payroll. Franchised businesses accounted for 7.4% of all private sector jobs, 5% of all private sector payrolls, and 3.9% of all private sector output, according to the Washington, D.C.-based trade group.

IFA spokesman Terry Hill says 900 new franchise concepts were started between 2003 and 2005 — a significant number, considering that there are only about 2,500 total franchise concepts on the organization's radar screen. Many of the new entrants are focused on the U.S.'s changing demographics, often catering to the aging Baby Boomer population in need of childcare and educational services for their kids and elder care for their parents.

"Baby boomer entrepreneurs are responding to their generation's needs," says Lori Kiser-Block, president at Eden Prairie, Minn.-based FranChoice, a franchise-matching consultancy. Providers of kids' birthday party services, fitness centers for children, and educational firms are especially hot right now, as are convenient health and fitness-related concepts, such as weight-loss centers and 24-hour gyms accessible via scanned key fobs.

Still, old standbys like Subway and Dunkin' Donuts continue to dominate the franchising ranks. "In many areas of the business world, franchising is still in its infancy," she says. "As it grows, those standard brands will become more popular than ever because they're sturdy, viable, and they have the confidence of the consumer. I don't think we'll see that change."

That's music to the ears of Mark Roden, president at Phoenix-based Desert Subway Inc., which has 48 Subway restaurants in the state. Roden opened the first one in 1988 after working in the supermarket industry, and over the years has seen his fair share of franchising ups and downs. The challenges start with the franchising agreements themselves, which he calls "very one-sided in favor of the franchisor," particularly when it comes to protecting the franchise and the brand.



4

# Feature



-----Agreements for upstart franchisees can be particularly onerous. "It's buyer beware, because not only are you investing a great deal of your money in a relatively unproven product or service, but you've also got little recourse when you buy into something that's not successful through no fault of your own," Roden says.

Franchising isn't limited to big brands. In fact, many of the initial Uniform Franchise Offering Circulars (UFOCs) that Tim Pickwell, partner at San Diego law firm Tim Pickwell and Associates, handles these days are for unusual business concepts, such as one that shrink-wraps very large objects and another that leases small-batch concrete loaders for job sites. (UFOCs are required in all 50 states and include the franchise agreement, items of the trade, officers, fees, and costs, among other things.)

With franchising experience that includes stints with Jack in the Box Inc. and Century 21, Pickwell says he's consistently surprised by "how many business concepts cross my desk that I never would have considered franchiseable." Does that mean that all those ideas are viable? Hardly, says Pickwell, who is consistently leery of food franchises with limited "day parts" (breakfast, lunch and/or dinner), which wind up generating a low volume of sales.

At the other end of the spectrum are those franchise companies devoted to helping Americans shed weight. Among them is Jenny Craig, for which Dick Herring, managing partner with Central New York Weight Loss LLC, currently owns eight franchises in upstate New York. Herring started franchising in 2004, and says the hardest part was negotiating the leases on the six existing, corporate-owned centers that he took over.

"Normally you wouldn't have to deal with that as a franchisee, and we spent a large chunk of time on it," he says.

Franchising can also be restrictive in some ways, as Scott Snoyer, owner of Snoyer Signs LLC, has learned during his 13 years as a Fast Signs franchisee in Antioch, Tenn. Having invested in digital printing equipment back in 1999, before many of his competitors did, Snoyer says he's been able to set his business apart from other Fast Signs locations — sort of.

"One of the hardest things about a franchise is the common name, because in reality everyone runs their businesses differently," says Snoyer, whose company sales have grown 20% to 40% annually since 2001. "We have above-average capabilities here, and if someone does business with us, it's likely that they'll walk into another Fast Signs in a different city and be disappointed. It's not like McDonald's, where a quarter-pounder is the same everywhere."

When it comes to franchising, financing tends to trip entrepreneurs up more than anything else, says Kiser-Block. "People need to go into this with the right amount of working capital," she says. While there's no set formula to follow, Kiser-Block advises franchisees to come up with a realistic picture of their own day-to-day living expenses, and factor in how much it will cost to run the business for two years until it reaches (hopefully) the breakeven point.

Aside from the upfront costs, a franchise concept requires a certain level of entrepreneurial spirit combined with a desire to work hard to build equity in a viable business, says Pickwell. "There are a lot of individuals out there working in fruitless, unrewarding jobs in Corporate America, and franchising provides a way for them to build something for themselves," he says. "Combine that with a good brand or concept, and you wind up with a very powerful force."

## Top 10 Franchises for 2007

Every year, *Entrepreneur* magazine ranks the top 500 franchises in the nation. Here are the top 10 for 2007:

1.   Subway
2.   Dunkin' Donuts
3.   Jackson Hewitt Tax Service
4.   7-Eleven Inc.
5.   The UPS Store/Mail Boxes Etc.
6.   Domino's Pizza LLC
7.   Jiffy Lube International Inc.
8.   Sonic Drive-In Restaurants
9.   McDonald's
10.  Papa John's International Inc.

Financing

# SBA Overhauls
# Disaster Lending Program



**Hurricane Katrina may have devastated New Orleans and its surroundings, but the storm also flooded the Small Business Administration (SBA) with criticism over its disaster lending programs. Nothing seemed to go as it should have. Customer service was patchy at best, and loan applications were caught in seemingly interminable backlogs, but the SBA has taken action, and small business owners should take notice.**

The SBA's new disaster recovery plan, submitted to Congress last summer, personalizes the disaster loan process with case manager assignments and boosts office space, technology, staffing and private sector involvement to better support disaster victims.

"Giving everyone a case manager helps us help the borrower through the process," SBA Administrator Steven Preston tells *Small Business Perspectives*. "It's more compassionate, but it's also more efficient. We're more likely to get things right the first time."

Previously, individual staff members worked on their parts of the application in isolation before passing files to the next person in the process. There was insufficient communication on the "production line" and no accountability to borrowers, Preston says. No longer. Each borrower now will get a case manager, who will be the primary point of contact from application to loan disbursement.

Since Katrina, the agency also has upgraded its Disaster Credit Management System to handle 8,000 simultaneous users, quadrupling the peak usage capacity available during the 2005 Gulf Coast disaster. It has doubled its loan processing and disbursement capacity in its Fort Worth, Texas, center and bolstered backup capacity in Sacramento, Calif., to support 500,000 disaster loan applications. The SBA has also awarded unprecedented private sector contracts for disaster loan processing and closing support.

Today, the SBA says that there are more and better-trained reservists, many who can be called to duty within 48 hours. The field-assessment teams are better equipped. They have tablets to input information electronically and the agency is beginning to make more extensive use of aerial assessments as well.

Preston says internal performance metrics and borrower and employee comments indicate that the improvements have led to faster response times, reduced error rates and better customer support. On some occasions, loan approvals have been turned around in less than a week once all of the borrower's documentation has been received.

Such service was unheard of in 2005 when the SBA lacked the manpower and information technology to respond effectively to the more than 422,000 emergency loan applications from Gulf Coast storm victims. The flood of applications was the largest in SBA history; the previous record of about 250,000 applications in the wake of the Northridge, Calif., earthquake in 1994.

Ultimately, the agency approved close to 120,000 Katrina disaster loans, totaling $6.89 billion. Roughly $5.9 billion has been disbursed to date.

Many would-be borrowers were disheartened by the cumbersome paperwork, slow response times, and lack of basic empathy from the SBA at the time. Instead, they took out higher-interest bank loans, racked up credit card debt, or cashed out retirement accounts to stay afloat.

"This was supposedly a disaster loan process, but they didn't take into account that there had been a disaster," says W. Anthony Patton, president of EBONetworks, a New Orleans diversity media, marketing and recruiting firm. "It was an absolute nightmare," who called applying for a disaster loan "like writing a dissertation." Patton applied for a loan, but was turned down, because his year-over-year revenue figures were lower, he says.

Two years after the storms, the agency still is making amends and has given Gulf Coast storm victims a second chance to obtain emergency assistance. It reopened the Economic Injury Disaster Loan Program and small businesses in the Gulf Coast who missed last July's deadline and gave them until December 31 to apply. The agency also is allowing victims whose disaster loans were cancelled without prior notice by the agency to request reinstatement by Jan. 31, 2008.

Growth Factory

# Grassroots Marketing, Internet Style



**Ibex Bicycles owner Jack Ailion takes a grassroots approach to promoting his bicycle brand, one that offers lessons for small business owners beyond the cycling world. He frequents bicycling bulletin boards like MTBR.com, providing general advice on maintenance and trails, and even technical support. He will go as far as to recommend other brands, if an Ibex does not fit the buyer's needs.**

Ailion's looming presence online has paid off. Loyal Ibex owners have their own section on MTBR.com, a popular mountain biking site, and Ibex owners will frequently endorse Ibex to other potential buyers. Ailion's approach is smart, considering that more than 66% of internet users do research online before making retail purchases, according to Forrester Research. The Ibex site gets a steady stream of referrals, which convert into a significant number of sales. Ailion won't quote exact figures, but he says internet promotion has helped him sell as many bikes as he can build. It's also helped the company grow a steady 25% annually for the past few years.

"The web just makes it easier for a small company to shoulder past bigger companies to get in front of discerning buyers," Ailion says.

Ailion, who started his 12-man Alpharetta, Ga.-based company in 2002, has bypassed the traditional retail channel entirely, only selling bikes via the web. Ibex advertising is also done mostly online via banner ads on popular bicycling web sites. Overall, Ailion's strategy is simple, effective, and cheap. He has turned himself into an informational resource. He has also become a part of a large online bicycling community and is seen as a peer, thus a credible source. He can be found day and night participating in conversations about his old car (a race-tuned Miata) or favorite beer (John Courage Amber).

Participation is something marketing pros say small companies can do to increase visibility. In the past, they would recommend participating in community events and clubs, and being active in local chambers of commerce. Today, the internet has developed into

the world's largest community. And like the real world, it can be segmented and the niches accessed first-hand.

But promoting a product blindly can also backlash. Anonymous, self-serving remarks can incur the wrath of regular bulletin board members. Paul Glen, a management consultant from Los Angeles, says that there is a fine line between being a part of the community and schilling.

"Netizens are smart," he said. "They don't want to be tricked. If you come out of the blue and suddenly start promoting an unknown brand, they are obviously going to get suspicious. Companies need to maintain transparency. They also have to do more than just sell. They have to provide a useful service."

Warner Brothers Records got boycotted a few years ago after company employees started to send new releases to MP3 blogs for review. Employees then secretly posted numerous positive remarks in the comment sections, which stood out because they sounded more like teens gushing than thoughtful remarks made by adult music fans. "I never heard these guys before, but they're awesome," read one of the comments.

The editors of the blogs tracked all of the posts back to Warner Brothers and the comments were stricken. After the editors outed Warner Brothers, word spread quickly online. And then, even worse, mainstream media reporters picked up on the story, including a feature in *The New York Times*, and Warner Brothers had a full-scale PR debacle on its hands.

"It's like the real world," Glen says. "If you walk into a social gathering of accountants and immediately try to sell them calculators, what do you think will happen?"



7

The Economy

# Recession Tops List of Economic Concerns



**The market tumult of 2007 has pushed economics to the forefront, and a look at the current state of economic affairs reveals a bittersweet mix of trends. Consumer spending is slowing and pessimism is rising due to capital market volatility, higher energy prices, and the slumping housing market.**

And while these trends are national in scope, they matter to small business owners.

"Even though a small business is getting its sales from a tiny area, they are impacted by the larger economy and should be paying attention to what's going on there," says William Dunkelberg, chief economist of the National Federation of Independent Business and a professor at the Fox School of Business at Temple University in Philadelphia.

Among the major economic issues facing small businesses this year, consumer spending is at the top of the list.

The biggest trend affecting small business owners, consumer spending for the remainder of the year will largely depend on overall public sentiment. Economists see pessimism rising as higher energy costs and negative news about the stock market continue to make headlines. But the key is whether that increasing pessimism affects how people spend their money.

"The odd thing is that consumer sentiment is lower that it was in previous years, yet people continue to spend," says Chad Moutray, chief economist at the Office of Advocacy of the Small Business Administration. "If consumers stop spending, that's the real threat."

And the threat is looming. Same-store retail sales, a key consumer-spending indicatorhad their worst showing in five years in January. Overall. sales were up 0.3% in the first month of 2008. An increase of at least 3% in same-store sales is a good indication of healthy consumer spending, according to analysts.

In 2008, Kevin Feltes at the Levy Forecasting Center, an economics consultancy based in Mount Kisco,

N.Y.. sees the economy "going south" from where it stands now, barring any financial surprises. Additionally, the chance for recession is higher.

"We are expecting to see things go south from where they are now, barring any financial surprises." Feltes said. "And, it is our general belief that if we do get into a recession in the next 12 months, it's quite likely to be a pretty ugly one."

What could be worse than a recession? How about coupling an economic downturn with higher taxes.

With the election looming, most experts agree that the majority of federal tax and compliance policies will remain stable. Lawyer and author Cliff Ennico sees a growing push for legislation that will give the Internal Revenue Service more authority to collect taxes that business owners already owe.

Ennico sees the self-employed as a big target for the IRS, especially those making more than $200,000 a year and are engaged in e-commerce activities.

"The IRS will be focusing on those engaging in e-commerce, in particular. as they know people aren't reporting as they should," says Ennico, who has authored several small business handbooks.

One area where the proceeds from higher taxes could go is health insurance.

The push for comprehensive health insurance for all working adults has a looming impact for small business owners. It's a hot election topic at both the state and federal levels and could become an economic issue for businesses. The fiscal burden on business owners. coupled with the possible residual effect on hiring, are seen as affecting small business owners.

"The health insurance issue is a big risk," Dunkelberg says. "Everybody thinks it's a good idea and that it will have no impact on hiring. There's not an infinite amount of money out there for employers to pay this out of. It's not a free lunch."

On the Hill

# Legislation Aims to Lower SBA Loan Fees

**Congress is mulling legislation that would slash the Small Business Administration's (SBA) lender and borrower fees.**

**The House's Small Business Lending Improvements Act of 2007 proposes to cut fees associated with SBA-backed loans, as well as to introduce new programs aimed to boost funding for veterans, businesses in rural areas, and healthcare providers in underserved communities.**

Conference committees were scheduled to debate House and Senate versions of the bill at the end of 2007.

The House bill includes $80 million in appropriations for the 7(a) program, which would cut fees by an average of $800 per loan. The Senate version excludes appropriations, arguing that such funding is scarce and the Bush administration does not support appropriations for the 7(a) program. Instead, the Senate bill increases the maximum loan size to $3 million, and the maximum guaranteed portion to $2.25 million.

Critics of the current 7(a) program say that borrower fees have doubled since 2005, and the average loan size has shrunk 38% to $148,767 in fiscal year 2006 from $240,437 in fiscal year 2000.

However, SBA spokesman Mike Stamler contends that those figures tell a story of increased access to capital for small businesses. Starting in October 2004, the SBA turned to a zero-subsidy model in which lender and borrower fees pay for all of the program's costs. Under this model, Stamler points out, 97,290 7(a) loans — worth $14.52 billion — were originated, compared with 42,748 loans — totaling $10.52 billion — in 2000.

While fee doubling has gotten plenty of press, 7(a) borrower fees have held steady at about 2% since 1985, Stamler added. The only exception was an 18-month period in which fees were halved to boost the struggling post-Sept. 11 economy.

"Critics are focusing on a narrow event when temporarily reduced fees returned to their prior levels," Stamler says of the doubling of 7(a) fees. "They're not telling you they returned to the same level they used to be at before they were cut in half."

In an interview last year, SBA Administrator Steven Preston argued that subsidies are problematic since once the subsidy is used up, lending grinds to a halt. Under zero subsidy, the market — not the administration — dictates SBA lending parameters. "We don't want to be calling up our lenders in November when they have hundreds of loan officers out there making loans to small businesses and tell them to stop the activity for the rest of the year because we've run out of money," Preston said.



Case Study

# Primrose School Franchising Company



**Founded in 1982 by Paul and Marcy Erwin, Primrose Schools revolutionized the concept of childcare, making education a key part of the curriculum. They offer private, curriculum-based pre-school and after-school programs for children between the ages of 6 weeks and 5 years old and after-school programs for children ages five to 12.**

By the end of 2006 Primrose had awarded its 200th franchise. As of today, Primrose has 203 schools under franchise across 15 states. Under the leadership of President and Chief Executive Jo Kirchner and Jim Steger, vice president of Franchising and Brand Consistency, Primrose is forecasted to grow at a rate of 25 to 28 new schools per year.

CIT's success with Primrose has been driven by the proactive partnership to provide cutting edge financing programs to primrose's franchisees allowing it to meet and exceed expansion plans. Since the initial meeting in 1993, CIT and its predecessors have provided in excess of $300 million in franchisee financing, touching more than 150 schools across 15 states. CIT has proven to be a reliable partner in helping Primrose achieve its goals and the company is well positioned to meet its future needs.

It was critical that CIT truly understand Primrose's growth goals and share in its vision for attaining them.

### Testimonial from Jo Kirchner, President and CEO of Primrose School Franchising Company:

"This year, as we celebrate our 25[th] Anniversary, Primrose Schools is keenly aware that it's past and future successes are made possible through key strategic business partnerships such as the one with CIT. CIT, through the dedication and commitment of it's staff and the leadership of John Teat, has taken the time to truly understand our business needs and those of our franchise owners, and as a result, has been successful in developing creative financial solutions that has allowed them to not only enter the business, but also grow and expand with it over the years. Our marketshare and brand leadership position in the industry has certainly been strongly influenced by CIT's role with Primrose schools. Long-term relationships built on mutual respect, trust, and productivity are certainly hard to find in today's business setting, and we are thankful to have built that kind of relationship with CIT. We look forward to a bright and rewarding future with CIT."

● In 1995, CIT established a national loan program for Primrose that would enable the company to expand outside of Georgia. It was critical that CIT not only assist Primrose in providing financing programs for its franchisees, but establish vendor relationships so that CIT was more than just a lender. CIT became Primrose's 'one-stop shop' by providing a vendor network that included childcare industry appraisers, commercial real estate brokers, contractors, and interim-lender banks.

● In 1995, CIT funded the first Primrose School in Texas. At that time the prototype was a 136-student facility, in a building of approximately 8600 sq. ft., cost $1.5 million. As of 2006, the new facilities are 10,108 sq. ft., licensed for 186 students, and cost an average of $3.3 million.

● In the challenging times of SBA shortfalls, CIT modified the Primrose National Loan Program eight times in one year. To date, CIT has never had to delay a closing due to lender funding issues.

● As of 5/1/07, CIT has financed 158 schools nationally for Primrose franchisees.

● CIT has established two new loan programs for Primrose in the past year as a result of challenges facing its expansion plans. Those products include a 'land only' program and a 'lease to purchase' program.



# Take a look at some of our noteworthy transactions...

---

**Peter Floersch and Greg Miler**
**Engineered Network Systems Inc.**

## $1,600,000

Minneapolis, MN

**CIT**

---

**Laurie & Mike Coughlin**
**The Cat Practice**

## $1,400,000

Chicago, IL

**CIT**

---

**Dan Farrington**
**Sunrise Medical Consultants**

## $1,340,000

Portland, OR

**CIT**

---

**Golden Corral**

## $1,200,000

Florida

**CIT**

---

**Harry Lucrezi**
**RBS Business Solutions, LLC**

## $774,000

Houston, TX

**CIT**

---

**Dunkin' Donuts**

## $740,000

New Jersey

**CIT**

FINANCIAL ASSESSMENT: PRIMROSE SCHOOL FRANCHISING COMPANY

# NOT ALL GROWTH CAN BE MEASURED IN DOLLARS AND CENTS.



NET INCOME          REVENUE          DISCOVERY

**Innovative childcare requires an equally innovative approach to business.**
So when Primrose Schools wanted to expand their revolutionary franchise of preschools, they came to CIT Small Business Lending. We became their strategic partner and offered creative financial solutions and advice that matched their vision and evolving needs. Our industry relationships and expertise were instrumental in the successful sale of Primrose last year. Thanks to CIT, Primrose now offers its progressive teaching methodology at over 150 preschools across America. CIT Small Business Lending has become the #1 SBA lender in the U.S. by spotting potential and forging partnerships just like this one. **To find out more, visit cit.com.**



CAPITAL REDEFINED™

CORPORATE FINANCE       TRADE FINANCE       TRANSPORTATION FINANCE       VENDOR FINANCE       CONSUMER FINANCE

©2007 CIT Group Inc., the CIT logo, and "Capital Redefined" are service marks or registered service marks of CIT Group Inc.





# Small Business
# Perspectives

**CIT**
Small Business Lending Corporation

# President's Letter



March 2008

Perspective.

As we launch the premier edition of our newsletter, I found myself wondering about how important perspective is in today's business world. With credit less available and more expensive, doing business in the current environment is more challenging than ever. Despite this, I believe there are solid prospects for small businesses ahead in 2008. I say this because every challenge presents an opportunity and no one has better perspective regarding those opportunities than small business entrepreneurs.

At CIT, we value this perspective – as well as our relationships with these small business owners – and we will continue to partner with them through all economic cycles crafting solutions to ensure their success. Small business is a key driver of our economy and CIT remains steadfast in our commitment to provide the capital and advisory services these entrepreneurs need in order to grow and expand their businesses.

CIT Small Business Lending has been the nation's premier 7 (a) volume lender to small business entrepreneurs for eight consecutive years. We are also the leading financing partner to women, veteran, and minority-owned businesses – a distinction I am very proud of.

So, welcome to Small Business Perspectives. Together, let's explore the opportunities that lie before us in features such as Growth Factory, The Economy, and On the Hill. Hopefully you will find the information between these covers helpful and, who knows...? It just might change your perspective on things.

Sincerely,

Chris Reilly

2

# News Briefs



### I Want It: Predictive Selling Technology Filters Down to Small Businesses

One of the more advanced online selling applications is making its way into the small business marketplace.

Amazon.com was the first to use a selling system that predicts what consumers want, and then offer it to them. After a customer goes to the site and does a search on a specific topic, the search information is recorded and used to make product recommendations. The recommendations are displayed to the customers during their next visit.

New technology companies, such as Aggregate Knowledge (aggregateknowledge.com), ChoiceStream (choicestream.com), and CleverSet (cleverset.com), have begun to sell such systems to smaller online retailers. The tech companies' products not only look at what a consumer searched for, but also at the products' characteristics, such as genre, rating, and price, and link to items that share those categorizations. It gets more complex than that. For example, for movies, books, or music, the system considers the writers, directors, or performers who were involved, and makes relevant product suggestions.

Those big online retailers don't have to look so big anymore.

### Subprime Fallout Hits Small Business Owners

In economic terms, the collapse of the subprime mortgage market was akin to a nuclear meltdown. Companies literally evaporated in days. The entire operational paradigm in the mortgage market seemed to undergo a complete change.

So what are the effects on the general small business market? Considering that 30% of small business owners have used home-based loans to fund their businesses, according to one recent study, the effects could be notable.

Another study, done by Middle Tennessee State University, found that more than 18% of Tennessee's small business owners used home equity loans as their startup capital, and that home equity loans covered an average of 43% of startup funding for owners that resorted to such loans.

There are other indicators. A third quarter 2007 Discover Small Business Watch survey found that 35% of owners say turmoil in the housing market has had a "substantial impact" on their businesses.

But with the housing market faltering, business owners who turn to residential mortgages for commercial credit may find it more difficult to qualify for a home equity loan. Already, credit terms are tightening with applicants requiring higher credit scores to qualify for home loans, while the average percent of a house's value that lenders are willing to lend against (known as the loan-to-value ratio, or LTV) is on the decline.

### New Online Forum for Eco-Friendly Business Networking

Green is the new black for small businesses.

More small businesses are trying to be eco-friendly, both for the environment's sake and to attract more customers, but they lack the ability to work with or even find like-minded businesses.

But a new web site is offering such businesses the opportunity to network with one another, fostering growth and a chance to reach out to more consumers.

Enter The Green Chamber (thegreenchamber.org), an online business forum for companies that are seeking compatible firms for networking, joint ventures, advice for start-ups, and market research. Launched last July, the nonprofit organization stemmed from an idea shared by Jon Anderson, founder of The Urban Land Preservation Fund of America, and Willi Paul, a sustainable-business consultant from California. The organization charges dues based on the size of the company, encouraging small businesses to join.

The Green Chamber already has approximately 200 members, according to Anderson and Paul, and that number seems to be growing as earth-friendly business owners seek to build partnerships and further expand their businesses.

Mother Earth must be pleased.

3

Feature



# The Leading Edge of Franchising Today

**Jim Parker hadn't heard of It's a Grind Coffeehouse three years ago when he was sitting with $1.5 million in liquid assets to invest in a franchise, but that didn't stop this former engineer from jumping into a beverage segment that's since taken off, thanks to companies like Starbucks and Seattle's Best.**

Before sinking his and a partner's cash and time into the franchise, Parker says he "looked at thousands of different options," including Peet's Coffee & Tea. Some initial investments were too high for his taste, and other options wouldn't have allowed him to spend much time with his two young children.

A few months into the business venture, Parker says he was asking himself why he left a six-figure career for entrepreneurship. Becoming a manager of minimum-wage workers (versus the $100,000+ earners he oversaw in his past position) was a key challenge for Parker, whose firm broke even on the day it opened and "never looked back."

With high gas prices and overall uneasiness about the economy taking their toll on many companies' profits these days, Parker's sales have been growing steadily since 2004. "Franchisees that I talk to are dealing with economic issues right now because not as many people are going out and spending money, but things have stayed pretty steady here," Parker says. "We're in a good place."

With a long history of helping entrepreneurial types segue into the business world with more support than they would get on their own, franchising holds a prominent place in the American business world. Defined as an arrangement by which an owner (also known as a "franchisor") distributes products or services through affiliated dealers ("franchisees"), the concept centers on the granting of licensed privileges to independent owners. Franchisees, in turn, receive business assistance, training, merchandising, marketing, and other support from franchisors.

In its most recent economic impact report, the International Franchise Association (IFA) found that 767,483 franchised businesses were found in the U.S., providing more than 9.7 million jobs with a combined

$229.1 billion payroll. Franchised businesses accounted for 7.4% of all private sector jobs, 5% of all private sector payrolls, and 3.9% of all private sector output, according to the Washington, D.C.-based trade group.

IFA spokesman Terry Hill says 900 new franchise concepts were started between 2003 and 2005 — a significant number, considering that there are only about 2,500 total franchise concepts on the organization's radar screen. Many of the new entrants are focused on the U.S.'s changing demographics, often catering to the aging Baby Boomer population in need of childcare and educational services for their kids and elder care for their parents.

"Baby boomer entrepreneurs are responding to their generation's needs," says Lori Kiser-Block, president at Eden Prairie, Minn.-based FranChoice, a franchise-matching consultancy. Providers of kids' birthday party services, fitness centers for children, and educational firms are especially hot right now, as are convenient health and fitness-related concepts, such as weight-loss centers and 24-hour gyms accessible via scanned key fobs.

Still, old standbys like Subway and Dunkin' Donuts continue to dominate the franchising ranks. "In many areas of the business world, franchising is still in its infancy," she says. "As it grows, those standard brands will become more popular than ever because they're sturdy, viable, and they have the confidence of the consumer. I don't think we'll see that change."

That's music to the ears of Mark Roden, president at Phoenix-based Desert Subway Inc., which has 48 Subway restaurants in the state. Roden opened the first one in 1988 after working in the supermarket industry, and over the years has seen his fair share of franchising ups and downs. The challenges start with the franchising agreements themselves, which he calls "very one-sided in favor of the franchisor," particularly when it comes to protecting the franchise and the brand.



Feature



-----Agreements for upstart franchisees can be particularly onerous. "It's buyer beware, because not only are you investing a great deal of your money in a relatively unproven product or service, but you've also got little recourse when you buy into something that's not successful through no fault of your own," Roden says.

Franchising isn't limited to big brands. In fact, many of the initial Uniform Franchise Offering Circulars (UFOCs) that Tim Pickwell, partner at San Diego law firm Tim Pickwell and Associates, handles these days are for unusual business concepts, such as one that shrink-wraps very large objects and another that leases small-batch concrete loaders for job sites. (UFOCs are required in all 50 states and include the franchise agreement, items of the trade, officers, fees, and costs, among other things.)

With franchising experience that includes stints with Jack in the Box Inc. and Century 21, Pickwell says he's consistently surprised by "how many business concepts cross my desk that I never would have considered franchiseable." Does that mean that all those ideas are viable? Hardly, says Pickwell, who is consistently leery of food franchises with limited "day parts" (breakfast, lunch and/or dinner), which wind up generating a low volume of sales.

At the other end of the spectrum are those franchise companies devoted to helping Americans shed weight. Among them is Jenny Craig, for which Dick Herring, managing partner with Central New York Weight Loss LLC, currently owns eight franchises in upstate New York. Herring started franchising in 2004, and says the hardest part was negotiating the leases on the six existing, corporate-owned centers that he took over.

"Normally you wouldn't have to deal with that as a franchisee, and we spent a large chunk of time on it," he says.

Franchising can also be restrictive in some ways, as Scott Snoyer, owner of Snoyer Signs LLC, has learned during his 13 years as a Fast Signs franchisee in Antioch, Tenn. Having invested in digital printing equipment back in 1999, before many of his competitors did, Snoyer says he's been able to set his business apart from other Fast Signs locations — sort of.

"One of the hardest things about a franchise is the common name, because in reality everyone runs their businesses differently," says Snoyer, whose company sales have grown 20% to 40% annually since 2001. "We have above-average capabilities here, and if someone does business with us, it's likely that they'll walk into another Fast Signs in a different city and be disappointed. It's not like McDonald's, where a quarter-pounder is the same everywhere."

When it comes to franchising, financing tends to trip entrepreneurs up more than anything else, says Kiser-Block. "People need to go into this with the right amount of working capital," she says. While there's no set formula to follow, Kiser-Block advises franchisees to come up with a realistic picture of their own day-to-day living expenses, and factor in how much it will cost to run the business for two years until it reaches (hopefully) the breakeven point.

Aside from the upfront costs, a franchise concept requires a certain level of entrepreneurial spirit combined with a desire to work hard to build equity in a viable business, says Pickwell. "There are a lot of individuals out there working in fruitless, unrewarding jobs in Corporate America, and franchising provides a way for them to build something for themselves," he says. "Combine that with a good brand or concept, and you wind up with a very powerful force."

## Top 10 Franchises for 2007

Every year, *Entrepreneur* magazine ranks the top 500 franchises in the nation. Here are the top 10 for 2007:

1.  Subway
2.  Dunkin' Donuts
3.  Jackson Hewitt Tax Service
4.  7-Eleven Inc.
5.  The UPS Store/Mail Boxes Etc.
6.  Domino's Pizza LLC
7.  Jiffy Lube International Inc.
8.  Sonic Drive-In Restaurants
9.  McDonald's
10. Papa John's International Inc.

Financing

# SBA Overhauls
# Disaster Lending Program



**Hurricane Katrina may have devastated New Orleans and its surroundings, but the storm also flooded the Small Business Administration (SBA) with criticism over its disaster lending programs. Nothing seemed to go as it should have. Customer service was patchy at best, and loan applications were caught in seemingly interminable backlogs, but the SBA has taken action, and small business owners should take notice.**

The SBA's new disaster recovery plan, submitted to Congress last summer, personalizes the disaster loan process with case manager assignments and boosts office space, technology, staffing and private sector involvement to better support disaster victims.

"Giving everyone a case manager helps us help the borrower through the process," SBA Administrator Steven Preston tells *Small Business Perspectives*. "It's more compassionate, but it's also more efficient. We're more likely to get things right the first time."

Previously, individual staff members worked on their parts of the application in isolation before passing files to the next person in the process. There was insufficient communication on the "production line" and no accountability to borrowers, Preston says. No longer. Each borrower now will get a case manager, who will be the primary point of contact from application to loan disbursement.

Since Katrina, the agency also has upgraded its Disaster Credit Management System to handle 8,000 simultaneous users, quadrupling the peak usage capacity available during the 2005 Gulf Coast disaster. It has doubled its loan processing and disbursement capacity in its Fort Worth, Texas, center and bolstered backup capacity in Sacramento, Calif., to support 500,000 disaster loan applications. The SBA has also awarded unprecedented private sector contracts for disaster loan processing and closing support.

Today, the SBA says that there are more and better-trained reservists, many who can be called to duty within 48 hours. The field-assessment teams are better equipped. They have tablets to input information electronically and the agency is beginning to make more extensive use of aerial assessments as well.

Preston says internal performance metrics and borrower and employee comments indicate that the improvements have led to faster response times, reduced error rates and better customer support. On some occasions, loan approvals have been turned around in less than a week once all of the borrower's documentation has been received.

Such service was unheard of in 2005 when the SBA lacked the manpower and information technology to respond effectively to the more than 422,000 emergency loan applications from Gulf Coast storm victims. The flood of applications was the largest in SBA history; the previous record of about 250,000 applications in the wake of the Northridge, Calif., earthquake in 1994.

Ultimately, the agency approved close to 120,000 Katrina disaster loans, totaling $6.89 billion. Roughly $5.9 billion has been disbursed to date.

Many would-be borrowers were disheartened by the cumbersome paperwork, slow response times, and lack of basic empathy from the SBA at the time. Instead, they took out higher-interest bank loans, racked up credit card debt, or cashed out retirement accounts to stay afloat.

"This was supposedly a disaster loan process, but they didn't take into account that there had been a disaster," says W. Anthony Patton, president of EBONetworks, a New Orleans diversity media, marketing and recruiting firm. "It was an absolute nightmare," who called applying for a disaster loan "like writing a dissertation." Patton applied for a loan, but was turned down, because his year-over-year revenue figures were lower, he says.

Two years after the storms, the agency still is making amends and has given Gulf Coast storm victims a second chance to obtain emergency assistance. It reopened the Economic Injury Disaster Loan Program and small businesses in the Gulf Coast who missed last July's deadline and gave them until December 31 to apply. The agency also is allowing victims whose disaster loans were cancelled without prior notice by the agency to request reinstatement by Jan. 31, 2008.

Growth Factory

# Grassroots Marketing, Internet Style



**Ibex Bicycles owner Jack Ailion takes a grassroots approach to promoting his bicycle brand, one that offers lessons for small business owners beyond the cycling world. He frequents bicycling bulletin boards like MTBR.com, providing general advice on maintenance and trails, and even technical support. He will go as far as to recommend other brands, if an Ibex does not fit the buyer's needs.**

Ailion's looming presence online has paid off. Loyal Ibex owners have their own section on MTBR.com, a popular mountain biking site, and Ibex owners will frequently endorse Ibex to other potential buyers. Ailion's approach is smart, considering that more than 66% of internet users do research online before making retail purchases, according to Forrester Research. The Ibex site gets a steady stream of referrals, which convert into a significant number of sales. Ailion won't quote exact figures, but he says internet promotion has helped him sell as many bikes as he can build. It's also helped the company grow a steady 25% annually for the past few years.

"The web just makes it easier for a small company to shoulder past bigger companies to get in front of discerning buyers." Ailion says.

Ailion, who started his 12-man Alpharetta, Ga.-based company in 2002, has bypassed the traditional retail channel entirely, only selling bikes via the web. Ibex advertising is also done mostly online via banner ads on popular bicycling web sites. Overall, Ailion's strategy is simple, effective, and cheap. He has turned himself into an informational resource. He has also become a part of a large online bicycling community and is seen as a peer, thus a credible source. He can be found day and night participating in conversations about his old car (a race-tuned Miata) or favorite beer (John Courage Amber).

Participation is something marketing pros say small companies can do to increase visibility. In the past, they would recommend participating in community events and clubs, and being active in local chambers of commerce. Today, the internet has developed into

the world's largest community. And like the real world, it can be segmented and the niches accessed first-hand.

But promoting a product blindly can also backlash. Anonymous, self-serving remarks can incur the wrath of regular bulletin board members. Paul Glen, a management consultant from Los Angeles, says that there is a fine line between being a part of the community and schilling.

"Netizens are smart," he said. "They don't want to be tricked. If you come out of the blue and suddenly start promoting an unknown brand, they are obviously going to get suspicious. Companies need to maintain transparency. They also have to do more than just sell. They have to provide a useful service."

Warner Brothers Records got boycotted a few years ago after company employees started to send new releases to MP3 blogs for review. Employees then secretly posted numerous positive remarks in the comment sections, which stood out because they sounded more like teens gushing than thoughtful remarks made by adult music fans. "I never heard these guys before, but they're awesome," read one of the comments.

The editors of the blogs tracked all of the posts back to Warner Brothers and the comments were stricken. After the editors outed Warner Brothers, word spread quickly online. And then, even worse, mainstream media reporters picked up on the story, including a feature in *The New York Times*, and Warner Brothers had a full-scale PR debacle on its hands.

"It's like the real world," Glen says. "If you walk into a social gathering of accountants and immediately try to sell them calculators, what do you think will happen?"



7

The Economy

# Recession Tops List of Economic Concerns



**The market tumult of 2007 has pushed economics to the forefront, and a look at the current state of economic affairs reveals a bittersweet mix of trends. Consumer spending is slowing and pessimism is rising due to capital market volatility, higher energy prices, and the slumping housing market.**

And while these trends are national in scope, they matter to small business owners.

"Even though a small business is getting its sales from a tiny area, they are impacted by the larger economy and should be paying attention to what's going on there," says William Dunkelberg, chief economist of the National Federation of Independent Business and a professor at the Fox School of Business at Temple University in Philadelphia.

Among the major economic issues facing small businesses this year, consumer spending is at the top of the list.

The biggest trend affecting small business owners, consumer spending for the remainder of the year will largely depend on overall public sentiment. Economists see pessimism rising as higher energy costs and negative news about the stock market continue to make headlines. But the key is whether that increasing pessimism affects how people spend their money.

"The odd thing is that consumer sentiment is lower that it was in previous years, yet people continue to spend," says Chad Moutray, chief economist at the Office of Advocacy of the Small Business Administration. "If consumers stop spending, that's the real threat."

And the threat is looming. Same-store retail sales, a key consumer-spending indicatorhad their worst showing in five years in January. Overall, sales were up 0.3% in the first month of 2008. An increase of at least 3% in same-store sales is a good indication of healthy consumer spending, according to analysts.

In 2008, Kevin Feltes at the Levy Forecasting Center, an economics consultancy based in Mount Kisco,

N.Y., sees the economy "going south" from where it stands now, barring any financial surprises. Additionally, the chance for recession is higher.

"We are expecting to see things go south from where they are now, barring any financial surprises," Feltes said. "And, it is our general belief that if we do get into a recession in the next 12 months, it's quite likely to be a pretty ugly one."

What could be worse than a recession? How about coupling an economic downturn with higher taxes.

With the election looming, most experts agree that the majority of federal tax and compliance policies will remain stable. Lawyer and author Cliff Ennico sees a growing push for legislation that will give the Internal Revenue Service more authority to collect taxes that business owners already owe.

Ennico sees the self-employed as a big target for the IRS, especially those making more than $200,000 a year and are engaged in e-commerce activities.

"The IRS will be focusing on those engaging in e-commerce, in particular, as they know people aren't reporting as they should," says Ennico, who has authored several small business handbooks.

One area where the proceeds from higher taxes could go is health insurance.

The push for comprehensive health insurance for all working adults has a looming impact for small business owners. It's a hot election topic at both the state and federal levels and could become an economic issue for businesses. The fiscal burden on business owners, coupled with the possible residual effect on hiring, are seen as affecting small business owners.

"The health insurance issue is a big risk," Dunkelberg says. "Everybody thinks it's a good idea and that it will have no impact on hiring. There's not an infinite amount of money out there for employers to pay this out of. It's not a free lunch."

On the Hill



# Legislation Aims to Lower SBA Loan Fees

**Congress is mulling legislation that would slash the Small Business Administration's (SBA) lender and borrower fees.**

**The House's Small Business Lending Improvements Act of 2007 proposes to cut fees associated with SBA-backed loans, as well as to introduce new programs aimed to boost funding for veterans, businesses in rural areas, and healthcare providers in underserved communities.**

Conference committees were scheduled to debate House and Senate versions of the bill at the end of 2007.

The House bill includes $80 million in appropriations for the 7(a) program, which would cut fees by an average of $800 per loan. The Senate version excludes appropriations, arguing that such funding is scarce and the Bush administration does not support appropriations for the 7(a) program. Instead, the Senate bill increases the maximum loan size to $3 million, and the maximum guaranteed portion to $2.25 million.

Critics of the current 7(a) program say that borrower fees have doubled since 2005, and the average loan size has shrunk 38% to $148,767 in fiscal year 2006 from $240,437 in fiscal year 2000.

However, SBA spokesman Mike Stamler contends that those figures tell a story of increased access to capital for small businesses. Starting in October 2004, the SBA turned to a zero-subsidy model in which lender and borrower fees pay for all of the program's costs. Under this model, Stamler points out, 97,290 7(a) loans — worth $14.52 billion — were originated, compared with 42,748 loans — totaling $10.52 billion — in 2000.

While fee doubling has gotten plenty of press, 7(a) borrower fees have held steady at about 2% since 1985, Stamler added. The only exception was an 18-month period in which fees were halved to boost the struggling post-Sept. 11 economy.

"Critics are focusing on a narrow event when temporarily reduced fees returned to their prior levels," Stamler says of the doubling of 7(a) fees. "They're not telling you they returned to the same level they used to be at before they were cut in half."

In an interview last year, SBA Administrator Steven Preston argued that subsidies are problematic since once the subsidy is used up, lending grinds to a halt. Under zero subsidy, the market — not the administration — dictates SBA lending parameters. "We don't want to be calling up our lenders in November when they have hundreds of loan officers out there making loans to small businesses and tell them to stop the activity for the rest of the year because we've run out of money," Preston said.



9

Case Study



# Primrose School Franchising Company

**Founded in 1982 by Paul and Marcy Erwin, Primrose Schools revolutionized the concept of childcare, making education a key part of the curriculum. They offer private, curriculum-based pre-school and after-school programs for children between the ages of 6 weeks and 5 years old and after-school programs for children ages five to 12.**

By the end of 2006 Primrose had awarded its 200th franchise. As of today, Primrose has 203 schools under franchise across 15 states. Under the leadership of President and Chief Executive Jo Kirchner and Jim Steger, vice president of Franchising and Brand Consistency, Primrose is forecasted to grow at a rate of 25 to 28 new schools per year.

CIT's success with Primrose has been driven by the proactive partnership to provide cutting edge financing programs to primrose's franchisees allowing it to meet and exceed expansion plans. Since the initial meeting in 1993, CIT and its predecessors have provided in excess of $300 million in franchisee financing, touching more than 150 schools across 15 states. CIT has proven to be a reliable partner in helping Primrose achieve its goals and the company is well positioned to meet its future needs.

It was critical that CIT truly understand Primrose's growth goals and share in its vision for attaining them.

### Testimonial from Jo Kirchner, President and CEO of Primrose School Franchising Company:

"This year, as we celebrate our 25th Anniversary, Primrose Schools is keenly aware that it's past and future successes are made possible through key strategic business partnerships such as the one with CIT. CIT, through the dedication and commitment of it's staff and the leadership of John Teat, has taken the time to truly understand our business needs and those of our franchise owners, and as a result, has been successful in developing creative financial solutions that has allowed them to not only enter the business, but also grow and expand with it over the years. Our marketshare and brand leadership position in the industry has certainly been strongly influenced by CIT's role with Primrose schools. Long-term relationships built on mutual respect, trust, and productivity are certainly hard to find in today's business setting, and we are thankful to have built that kind of relationship with CIT. We look forward to a bright and rewarding future with CIT."

● In 1995, CIT established a national loan program for Primrose that would enable the company to expand outside of Georgia. It was critical that CIT not only assist Primrose in providing financing programs for its franchisees, but establish vendor relationships so that CIT was more than just a lender. CIT became Primrose's 'one-stop shop' by providing a vendor network that included childcare industry appraisers, commercial real estate brokers, contractors, and interim-lender banks.

● In 1995, CIT funded the first Primrose School in Texas. At that time the prototype was a 136-student facility, in a building of approximately 8600 sq. ft., cost $1.5 million. As of 2006, the new facilities are 10,108 sq. ft., licensed for 186 students, and cost an average of $3.3 million.

● In the challenging times of SBA shortfalls, CIT modified the Primrose National Loan Program eight times in one year. To date, CIT has never had to delay a closing due to lender funding issues.

● As of 5/1/07, CIT has financed 158 schools nationally for Primrose franchisees.

● CIT has established two new loan programs for Primrose in the past year as a result of challenges facing its expansion plans. Those products include a 'land only' program and a 'lease to purchase' program.



# Take a look at some of our noteworthy transactions...

**Peter Floersch and Greg Miler**
**Engineered Network Systems Inc.**

## $1,600,000

Minneapolis, MN



---

**Laurie & Mike Coughlin**
**The Cat Practice**

## $1,400,000

Chicago, IL

---

**Dan Farrington**
**Sunrise Medical Consultants**

## $1,340,000

Portland, OR

---

**Golden Corral**

## $1,200,000

Florida

---

**Harry Lucrezi**
**RBS Business Solutions, LLC**

## $774,000

Houston, TX

---

**Dunkin' Donuts**

## $740,000

New Jersey

FINANCIAL ASSESSMENT: PRIMROSE SCHOOL FRANCHISING COMPANY

# NOT ALL GROWTH CAN BE MEASURED IN DOLLARS AND CENTS.



NET INCOME          REVENUE          DISCOVERY

**Innovative childcare requires an equally innovative approach to business.** So when Primrose Schools wanted to expand their revolutionary franchise of preschools, they came to CIT Small Business Lending. We became their strategic partner and offered creative financial solutions and advice that matched their vision and evolving needs. Our industry relationships and expertise were instrumental in the successful sale of Primrose last year. Thanks to CIT, Primrose now offers its progressive teaching methodology at over 150 preschools across America. CIT Small Business Lending has become the #1 SBA lender in the U.S. by spotting potential and forging partnerships just like this one. **To find out more, visit cit.com.**



CORPORATE FINANCE      TRADE FINANCE      TRANSPORTATION FINANCE      VENDOR FINANCE      CONSUMER FINANCE

©2007 CIT Group Inc., the CIT logo, and "Capital Redefined" are service marks or registered service marks of CIT Group Inc.

| | Determination Date: | | 02/15/08 |
| --- | --- | --- | --- |
| | Collection Period: | 01/01/08 | 01/31/08 |
| | Record Date: | | 02/19/08 |
| | Payment Date: | | 02/20/08 |

**I. AVAILABLE FUNDS**

**A. Collections**

| | | | | |
| --- | --- | --- | --- | --- |
| a. | Scheduled Payments Received | | $ | 21,980,853.09 |
| b. | Liquidation Proceeds Allocated to Owner Trust | | | 720,196.54 |
| c. | Prepayments on Contracts | | | 1,542,653.63 |
| d. | Payments on Purchased Contracts | | | 0.00 |
| e. | Proceeds of Clean-up Call | | | 0.00 |
| f. | Investment Earnings on Collection Account | | | 0.00 |
| | | **Total Collections** | $ | 24,243,703.26 |

**B. Determination of Available Funds**

| | | | | |
| --- | --- | --- | --- | --- |
| a. | Total Collections | | $ | 24,243,703.26 |
| b. | Servicer Advances | | | 3,750,888.75 |
| c. | Recoveries of prior Servicer Advances | | | (2,379,560.36) |
| d. | Withdrawal from Reserve Account | | | 539,974.24 |
| | | **Total Available Funds =** | $ | 26,155,005.89 |

**II. DISTRIBUTION AMOUNTS**

**A. COLLECTION ACCOUNT DISTRIBUTION**

| | | | |
| --- | --- | --- | --- |
| 1 | Servicing Fee | | 242,993.39 |
| 2 | Class A-1 Note Interest Distribution | 0.00 | |
| | Class A-1 Note Principal Distribution | 0.00 | |
| | Aggregate Class A-1 distribution | | 0.00 |
| 3 | Class A-2 Note Interest Distribution | 333,726.81 | |
| | Class A-2 Note Principal Distribution | 22,315,838.55 | |
| | Aggregate Class A-2 distribution | | 22,649,565.36 |
| 4 | Class A-3 Note Interest Distribution | 760,500.00 | |
| | Class A-3 Note Principal Distribution | 0.00 | |
| | Aggregate Class A-3 distribution | | 760,500.00 |
| 5 | Class A-4 Note Interest Distribution | 423,038.50 | |
| | Class A-4 Note Principal Distribution | 0.00 | |
| | Aggregate Class A-4 distribution | | 423,038.50 |
| 6 | Class B Note Interest Distribution | 38,198.56 | |
| | Class B Note Principal Distribution | 545,767.79 | |
| | Aggregate Class B distribution | | 583,966.35 |
| 7 | Class C Note Interest Distribution | 47,132.62 | |
| | Class C Note Principal Distribution | 667,049.52 | |
| | Aggregate Class C distribution | | 714,182.14 |
| 8 | Class D Note Interest Distribution | 53,069.76 | |
| | Class D Note Principal Distribution | 727,690.39 | |
| | Aggregate Class D distribution | | 780,760.15 |
| 9 | Deposit to the Reserve Account | | 0.00 |
| 10 | Trustee Expenses | | 0.00 |
| 11 | Remainder to the holder of the equity certificate | | 0.00 |

| | | | |
| --- | --- | --- | --- |
| | **Collection Account Distributions =** | | 26,155,005.89 |

| | | | |
| --- | --- | --- | --- |
| **B. INCORRECT DEPOSITS TO BE RETURNED TO CIT** | **Collection Account Distributions =** | | 0.00 |

III.  INFORMATION REGARDING DISTRIBUTIONS ON THE SECURITIES

| | Distribution Amounts | Class A-1 Notes | Class A-2 Notes | Class A-3 Notes | Class A-4 Notes |
|---|---|---|---|---|---|
| 1 | Interest Due | 0.00 | 333,726.81 | 760,500.00 | 423,038.50 |
| 2 | Interest Paid | 0.00 | 333,726.81 | 760,500.00 | 423,038.50 |
| 3. | Interest Shortfall ((1) minus (2)) | 0.00 | 0.00 | 0.00 | 0.00 |
| 4 | Principal Paid | 0.00 | 22,315,838.55 | 0.00 | 0.00 |
| 5. | Total Distribution Amount ((2) plus (4)) | 0.00 | 22,649,565.36 | 760,500.00 | 423,038.50 |

| | Distribution Amounts | Class B Notes | Class C Notes | Class D Notes | Total Offered Notes |
|---|---|---|---|---|---|
| 1. | Interest Due | 38,198.56 | 47,132.62 | 53,069.76 | 1,655,666.25 |
| 2. | Interest Paid | 38,198.56 | 47,132.62 | 53,069.76 | 1,655,666.25 |
| 3 | Interest Shortfall ((1) minus (2)) | 0.00 | 0.00 | 0.00 | 0.00 |
| 4. | Principal Paid | 545,767.79 | 667,049.52 | 727,690.39 | 24,256,346.25 |
| 5 | Total Distribution Amount ((2) plus (4)) | 583,966.35 | 714,182.14 | 780,760.15 | 25,912,012.50 |

IV.  Information Regarding the Securities

A  Summary of Balance Information

| Class | Applicable Coupon Rate | Principal Balance Feb-08 Payment Date | Class Factor Feb-08 Payment Date | Principal Balance Jan-08 Payment Date | Class Factor Jan-08 Payment Date |
|---|---|---|---|---|---|
| a. | Class A-1 Notes | 5.34435% | 0.00 | 0.00000 | 0.00 | 0.00000 |
| b. | Class A-2 Notes | 5.1900% | 54,846,429.11 | 0.38088 | 77,162,267.66 | 0.53585 |
| c. | Class A-3 Notes | 5.0700% | 180,000,000.00 | 1.00000 | 180,000,000.00 | 1.00000 |
| d. | Class A-4 Notes | 5.0500% | 100,524,000.00 | 1.00000 | 100,524,000.00 | 1.00000 |
| e. | Class B Notes | 5.2400% | 8,201,994.19 | 0.49146 | 8,747,761.98 | 0.52416 |
| f. | Class C Notes | 5.2900% | 10,024,659.57 | 0.49148 | 10,691,709.09 | 0.52418 |
| g. | Class D Notes | 5.4600% | 10,935,992.25 | 0.49119 | 11,663,682.64 | 0.52388 |
| h. | Total Offered Notes | | 364,533,075.12 | | 388,789,421.37 | |

B  Other Information

| Class | Scheduled Principal Balance Feb-08 Payment Date | Scheduled Principal Balance Jan-08 Payment Date |
|---|---|---|
| Class A-1 Notes | 0.00 | 0.00 |

| Class | Class Percentage | Target Principal Balance Feb-08 Payment Date | Class Floor Feb-08 Payment Date | Target Principal Amount Jan-08 Payment Date | Class Floor Jan-08 Payment Date |
|---|---|---|---|---|---|
| Class A | 92.00% | 335,370,429.11 | | 357,686,267.66 | |
| Class B | 2.25% | 8,201,994.19 | 0.00 | 8,747,761.98 | 0.00 |
| Class C | 2.75% | 10,024,659.57 | 0.00 | 10,691,709.09 | 0.00 |
| Class D | 3.00% | 10,935,992.25 | 0.00 | 11,663,682.64 | 0.00 |

**V. PRINCIPAL**

**A. MONTHLY PRINCIPAL AMOUNT**

| | | |
|---|---|---:|
| 1. | Principal Balance of Notes and Equity Certificates (End of Prior Collection Period) | 388,789,421.37 |
| 2. | Contract Pool Principal Balance (End of Collection Period) | 364,533,075.12 |
| | Total monthly principal amount | 24,256,346.25 |

**B. PRINCIPAL BREAKDOWN**

| | | No. of Accounts | |
|---|---|---:|---:|
| 1 | Scheduled Principal | 44,745 | 21,387,584.72 |
| 2 | Prepaid Contracts | 673 | 1,535,998.75 |
| 3. | Defaulted Contracts | 229 | 1,332,762.78 |
| 4 | Contracts purchased by CIT Financial USA, Inc. | 0 | 0.00 |
| | Total Principal Breakdown | 45,647 | 24,256,346.25 |

**VI. CONTRACT POOL DATA**

**A. CONTRACT POOL CHARACTERISTICS**

| | | Original Pool | Feb-08 Payment Date | Jan-08 Payment Date |
|---|---|---:|---:|---:|
| 1. | a. Contract Pool Balance | 741,874,115.90 | 364,533,075.12 | 388,789,421.37 |
| | b. No of Contracts | 51,828 | 44,745 | 45,647 |
| | c. Pool Factor | 1.0000 | 0.4914 | 0.5241 |
| 2 | Weighted Average Remaining Term | 37.50 | 26.19 | 26.64 |
| 3. | Weighted Average Original Term | 43.90 | | |

**B. DELINQUENCY INFORMATION**

| | % of Contracts | % of Aggregate Required Payoff Amount | No. Of Accounts | Aggregate Required Payoff Amounts |
|---|---:|---:|---:|---:|
| 1. Current | 94.36% | 94.57% | 42,223 | 352,203,461.01 |
| 31-60 days | 2.43% | 2.03% | 1,089 | 7,572,408.17 |
| 61-90 days | 1.24% | 0.94% | 557 | 3,482,334.25 |
| 91-120 days | 0.89% | 1.70% | 397 | 6,342,403.88 |
| 121-150 days | 0.61% | 0.43% | 272 | 1,588,402.44 |
| 151-180 days | 0.46% | 0.33% | 207 | 1,244,981.71 |
| 180+days (1) | 0.00% | 0.00% | 0 | 0.00 |
| Total Delinquency | 100.00% | 100.00% | 44,745 | 372,433,991.46 |

2. Delinquent Scheduled Payments:

| | |
|---|---:|
| Beginning of Collection Period | 6,529,587.95 |
| End of Collection Period | 7,900,916.34 |
| Change in Delinquent Scheduled Payments | 1,371,328.39 |

(1) Accounts that are more than 180 days past due constitute defaulted contracts and are included under "Defaulted Contract Information" in Section VI C below

**C. DEFAULTED CONTRACT INFORMATION**

| | | |
|---|---|---:|
| 1. | Aggregate Contract Balance on Defaulted Contracts | 1,332,762.78 |
| 2 | Liquidation Proceeds (or other cash collections on Defaulted contracts) received | 720,196.54 |
| | Current period reported net losses | 612,566.24 |
| 3. | Cumulative Reported Net Losses | 6,569,553.86 |
| 4. | Cumulative Net Loss Ratio | 0.8855% |
| 5. | Cumulative Net Loss Trigger | 3.2500% |

**VII. MISCELLANEOUS INFORMATION**

**A. SERVICER ADVANCE BALANCE**

| | | |
|---|---|---:|
| 1 | Opening Servicer Advance Balance | 6,529,587.95 |
| 2. | Current Period Servicer Advance | 3,750,888.75 |
| 3. | Recoveries of prior Servicer Advances | (2,379,560.36) |
| 4 | Ending Servicer Advance Balance | 7,900,916.34 |
| 5 | Unreimbursed Servicer Advances | 0.00 |

| | | |
|---|---|---:|
| 1. | Opening Reserve Account | 28,187,233.05 |
| 2. | Deposit from the Collection Account | 0.00 |
| 3. | Withdrawals from the Reserve Account | (539,974.24) |
| 4. | Investment Earnings | 111,586.26 |
| 5. | Investment Earnings Distributions to the Depositor | (111,586.26) |
| 6. | Remaining available amount | 27,647,258.81 |
| 7. | Specified Reserve Account Balance | 26,428,647.95 |
| 8. | Reserve Account Surplus/(Shortfall) | 1,218,610.86 |
| 9. | Distribution of Reserve Account Surplus to the Depositor | (1,218,610.86) |
| 10. | Ending Reserve Account Balance | 26,428,647.95 |
| 11. | Reserve Account deficiency | 0.00 |
| 12. | Reserve Account Floor | 22,256,223.48 |

## C. OTHER RELATED INFORMATION

| | | | |
|---|---|---:|---:|
| 1. | Discount Rate | 5.8860% | |
| 2. | Life to Date Prepayment (CPR) | 5.77% | |
| 3. | Life to Date Substitutions: | | |
| | a. Prepayments | 0.00 | |
| | b. Defaults | 0.00 | |
| 4 | If applicable, Material Changes in how delinquency, charge-offs and uncollectibles are determined: | | N/A |
| 5. | Any material modification, extensions or waivers to pool asset terms, fees, penalties or payments: | | N/A |
| 6. | Any material breaches of pool assets representations or warranties or transaction covenants: | | |
| 7 | Information regarding pool asset substitutions and repurchase: | | 0.00 |
| 8. | Material changes in the solicitation, credit-granting, underwriting, origination, acquisition or pool selection criteria or procedures used to originate, acquire, or select new pool assets: | | N/A |

**D1. Statement of Priority of Distributions Prior to an Event of Default or the Cumulative Net Loss Trigger is Exceeded**

1. Unreimbursed Servicer Advances;
2. Servicing Fee;
3. a. Class A-1 Note Interest Distribution
   b. Class A-2 Note Interest Distribution
   c. Class A-3 Note Interest Distribution
   d. Class A-4 Note Interest Distribution;
4. Class B Note Interest Distribution;
5. Class C Note Interest Distribution;
6. Class D Note Interest Distribution;
7. Class A-1 Note Principal Distribution;
8. Class A-2 Note Principal Distribution;
9. Class A-3 Note Principal Distribution;
10. Class A-4 Note Principal Distribution;
11. Class B Note Principal Distribution;
12. Class C Note Principal Distribution;
13. Class D Note Principal Distribution;
14. Class A-1 Note Reallocated Principal Distribution
15. Class A-2 Note Reallocated Principal Distribution;
16. Class A-3 Note Reallocated Principal Distribution;
17. Class A-4 Note Reallocated Principal Distribution;
18. Class B Note Reallocated Principal Distribution;
19. Class C Note Reallocated Principal Distribution;
20. Class D Note Reallocated Principal Distribution;
21. Deposit to the Reserve Account;
22. Any amounts owing to the Trustees; and
23. Remainder to the holder of the equity certificate.

**D2. Statement of Priority of Distributions After an Event of Default or the Cumulative Net Loss Trigger is Exceeded**

1. Unreimbursed Servicer Advances;
2. Servicing Fee;
3. a. Class A-1 Note Interest Distribution
   b. Class A-2 Note Interest Distribution
   c. Class A-3 Note Interest Distribution
   d. Class A-4 Note Interest Distribution;
4. Class B Note Interest Distribution;
5. Class C Note Interest Distribution;
6. Class D Note Interest Distribution;
7. Class A-1 Note Principal Distribution;
8. Class A-2 Note Principal Distribution;
9. Class A-3 Note Principal Distribution;
10. Class A-4 Note Principal Distribution;
11. Class B Note Principal Distribution;
12. Class C Note Principal Distribution;
13. Class D Note Principal Distribution;
14. Deposit to the Reserve Account;
15. Any amounts owing to the Trustees; and
16. Remainder to the holder of the equity certificate

## E. DELINQUENCY, NET LOSSES AND CPR HISTORY

| Collection Periods | % of Aggregate Required Payoff Amounts 31-60 Days Past Due | % of Aggregate Required Payoff Amounts 61-90 Days Past Due | % of Aggregate Required Payoff Amounts 91-120 Days Past Due | % of Aggregate Required Payoff Amounts 121-150 Days Past Due | % of (2) Aggregate Required Payoff Amounts 151-180 Days Past Due |
|---|---|---|---|---|---|
| 01/31/08 | 2.03% | 0.94% | 1.70% | 0.43% | 0.33% |
| 12/31/07 | 2.64% | 1.88% | 0.60% | 0.43% | 0.58% |
| 11/30/07 | 3.01% | 0.88% | 0.54% | 0.60% | 0.29% |
| 10/31/07 | 1.89% | 0.86% | 0.62% | 0.38% | 0.23% |
| 09/30/07 | 1.93% | 0.89% | 0.49% | 0.26% | 0.21% |
| 08/31/07 | 1.84% | 0.68% | 0.33% | 0.43% | 0.17% |
| 07/31/07 | 1.57% | 0.65% | 0.60% | 0.21% | 0.16% |
| 06/30/07 | 1.38% | 0.75% | 0.27% | 0.21% | 0.38% |
| 05/31/07 | 2.29% | 0.53% | 0.28% | 0.19% | 0.32% |
| 04/30/07 | 1.53% | 0.61% | 0.29% | 0.37% | 0.22% |
| 03/31/07 | 2.11% | 0.53% | 0.43% | 0.25% | 0.26% |
| 02/28/07 | 2.31% | 0.75% | 0.28% | 0.30% | 0.07% |
| 01/31/07 | 1.61% | 0.47% | 0.43% | 0.08% | 0.00% |
| 12/31/06 | 1.71% | 0.74% | 0.14% | 0.00% | 0.00% |
| 11/30/06 | 2.04% | 0.20% | 0.00% | 0.00% | 0.00% |
| 10/31/06 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

| Collection Month | Monthly Net Loss Percentage | Monthly Net Losses | LTD CPR |
|---|---|---|---|
| January-08 | 0.083% | 612,566.24 | 5.77% |
| December-07 | 0.084% | 620,685.09 | 5.68% |
| November-07 | 0.074% | 547,661.60 | 5.70% |
| October-07 | 0.055% | 411,055.00 | 5.72% |
| September-07 | 0.066% | 486,845.26 | 5.97% |
| August-07 | 0.057% | 425,928.49 | 5.87% |
| July-07 | 0.083% | 616,390.92 | 6.17% |
| June-07 | 0.174% | 1,287,818.86 | 6.05% |
| May-07 | 0.044% | 324,817.82 | 5.91% |
| April-07 | 0.060% | 448,110.11 | 6.08% |
| March-07 | 0.034% | 255,354.30 | 6.51% |
| February-07 | 0.012% | 86,962.55 | 6.59% |
| January-07 | 0.050% | 368,166.66 | 8.02% |
| December-06 | 0.010% | 77,190.96 | 8.74% |
| November-06 | 0.000% | 0.00 | 10.64% |
| October-06 | 0.000% | 0.00 | 13.91% |

(2) Accounts that are more than 180 days past due constitute defaulted contracts and are included under "Defaulted Contract Information" in Section VI.C above

| Coll. Period | Portfolio Name | CPB ($) | RPA ($) | Scheduled Gross Losses ($) | Cumulative Net Losses ($) | Portfolio Gross Losses % | Cum. Net Losses % | LTD CPR |
|---|---|---|---|---|---|---|---|---|
| 01/31/08 | Avaya Portfolio | $ 76,819,535.92 | $ 77,612,948.01 | $ 1,411,638.94 | $ 1,171,802.06 | 1.01% | 0.84% | 4.26% |
| 01/31/08 | DFS Portfolio | 147,097,845.29 | 152,319,521.20 | 7,527,271.11 | 0.00 | 2.13% | 0.00% | 5.35% |
| 01/31/08 | Other | 140,615,693.91 | 142,501,522.25 | 6,000,911.32 | 5,397,751.80 | 2.40% | 2.16% | 7.01% |
| | Totals | 364,533,075.12 | 372,433,991.46 | 14,939,821.37 | 6,569,553.86 | 2.014% | 0.8855% | 5.77% |

| Coll. Period | Portfolio Name | Delq. Current % | Delq 31-60 % | Delq 61-90 % | Delq 91-120 % | Delq 121-150 % | Delq 151-180 % | Delq 180+ % |
|---|---|---|---|---|---|---|---|---|
| 01/31/08 | Avaya Portfolio | 97.47% | 1.03% | 0.45% | 0.77% | 0.27% | 0.02% | 0.00% |
| 01/31/08 | DFS Portfolio | 94.38% | 1.55% | 0.82% | 2.63% | 0.38% | 0.25% | 0.00% |
| 01/31/08 | Other | 93.19% | 3.09% | 1.33% | 1.22% | 0.56% | 0.60% | 0.00% |
| | Totals | 94.57% | 2.03% | 0.94% | 1.70% | 0.43% | 0.33% | 0.00% |

| Coll. Period | Portfolio Name | Delq. Current | No. of Delq Current | Delq 31-60 | No. of Delq 31-60 | Delq 61-90 | No. of Delq 61-90 | Delq 91-120 | No. of Delq 91-120 | Delq 121-150 | No. of Delq 121-150 | Delq 151-180 | No. of Delq 151-180 | Delq 180+ | No. of Delq 180+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/31/08 | Avaya Portfolio | $ 75,648,104.80 | 3,860 | $ 796,322.74 | 108 | $ 346,154.93 | 44 | $ 597,403.51 | 40 | $212,744.74 | 18 | $12,217.29 | 4 | $0.00 | 0 |
| 01/31/08 | DFS Portfolio | 143,762,145.10 | 26,085 | 2,367,133.39 | 548 | 1,243,038.97 | 336 | 3,999,415.98 | 237 | 573,731.51 | 174 | 374,056.25 | 128 | 0.00 | 0 |
| 01/31/08 | Other | 132,793,211.11 | 12,278 | 4,408,952.04 | 433 | 1,893,140.35 | 177 | 1,745,584.39 | 120 | 801,926.19 | 80 | 858,708.17 | 75 | 0.00 | 0 |
| | Totals | 352,203,461.01 | 42,223 | 7,572,408.17 | 1,089 | 3,482,334.25 | 557 | 6,342,403.88 | 397 | 1,588,402.44 | 272 | 1,244,981.71 | 207 | 0.00 | 0 |

Monthly Servicing Report

| | | Determination Date: | | 03/18/08 |
|---|---|---|---|---|
| | | Collection Period: | 02/01/08 | 02/29/08 |
| | | Record Date: | | 03/19/08 |
| | | Payment Date: | | 03/20/08 |

**I. AVAILABLE FUNDS**

**A. Collections**

| | | | | |
|---|---|---|---|---|
| a. | Scheduled Payments Received | | $ | 21,260,103.58 |
| b. | Liquidation Proceeds Allocated to Owner Trust | | | 465,165.06 |
| c. | Prepayments on Contracts | | | 1,278,499.80 |
| d. | Payments on Purchased Contracts | | | 0.00 |
| e. | Proceeds of Clean-up Call | | | 0.00 |
| f. | Investment Earnings on Collection Account | | | 0.00 |

| | Total Collections | $ | 23,003,768.44 |
|---|---|---|---|

**B. Determination of Available Funds**

| | | | | |
|---|---|---|---|---|
| a. | Total Collections | | $ | 23,003,768.44 |
| b. | Servicer Advances | | | 1,726,124.48 |
| c. | Recoveries of prior Servicer Advances | | | (3,666,088.03) |
| d. | Withdrawal from Reserve Account | | | 909,012.64 |

| | Total Available Funds = | $ | 21,972,817.53 |
|---|---|---|---|

**II. DISTRIBUTION AMOUNTS**

**A. COLLECTION ACCOUNT DISTRIBUTION**

| | | | |
|---|---|---|---|
| 1 | Servicing Fee | | 227,833.17 |
| 2. | Class A-1 Note Interest Distribution | 0.00 | |
| | Class A-1 Note Principal Distribution | 0.00 | |
| | Aggregate Class A-1 distribution | | 0.00 |
| 3. | Class A-2 Note Interest Distribution | 237,210.81 | |
| | Class A-2 Note Principal Distribution | 18,578,911.37 | |
| | Aggregate Class A-2 distribution | | 18,816,122.18 |
| 4 | Class A-3 Note Interest Distribution | 760,500.00 | |
| | Class A-3 Note Principal Distribution | 0.00 | |
| | Aggregate Class A-3 distribution | | 760,500.00 |
| 5. | Class A-4 Note Interest Distribution | 423,038.50 | |
| | Class A-4 Note Principal Distribution | 0.00 | |
| | Aggregate Class A-4 distribution | | 423,038.50 |
| 6 | Class B Note Interest Distribution | 35,815.37 | |
| | Class B Note Principal Distribution | 454,375.55 | |
| | Aggregate Class B distribution | | 490,190.92 |
| 7. | Class C Note Interest Distribution | 44,192.04 | |
| | Class C Note Principal Distribution | 555,347.89 | |
| | Aggregate Class C distribution | | 599,539.93 |
| 8. | Class D Note Interest Distribution | 49,758.76 | |
| | Class D Note Principal Distribution | 605,834.07 | |
| | Aggregate Class D distribution | | 655,592.83 |
| 9. | Deposit to the Reserve Account | | 0.00 |
| 10. | Trustee Expenses | | 0.00 |
| 11 | Remainder to the holder of the equity certificate | | 0.00 |

| | Collection Account Distributions = | 21,972,817.53 |
|---|---|---|

| **B. INCORRECT DEPOSITS TO BE RETURNED TO CIT** | Collection Account Distributions = | 0.00 |
|---|---|---|

III.   INFORMATION REGARDING DISTRIBUTIONS ON THE SECURITIES

| Distribution Amounts | Class A-1 Notes | Class A-2 Notes | Class A-3 Notes | Class A-4 Notes |
|---|---|---|---|---|
| 1.  Interest Due | 0.00 | 237,210.81 | 760,500.00 | 423,038.50 |
| 2.  Interest Paid | 0.00 | 237,210.81 | 760,500.00 | 423,038.50 |
| 3.  Interest Shortfall ((1) minus (2)) | 0.00 | 0.00 | 0.00 | 0.00 |
| 4.  Principal Paid | 0.00 | 18,578,911.37 | 0.00 | 0.00 |
| 5.  Total Distribution Amount ((2) plus (4)) | 0.00 | 18,816,122.18 | 760,500.00 | 423,038.50 |

| Distribution Amounts | Class B Notes | Class C Notes | Class D Notes | Total Offered Notes |
|---|---|---|---|---|
| 1.  Interest Due | 35,815.37 | 44,192.04 | 49,758.76 | 1,550,515.48 |
| 2.  Interest Paid | 35,815.37 | 44,192.04 | 49,758.76 | 1,550,515.48 |
| 3.  Interest Shortfall ((1) minus (2)) | 0.00 | 0.00 | 0.00 | 0.00 |
| 4.  Principal Paid | 454,375.55 | 555,347.89 | 605,834.07 | 20,194,468.88 |
| 5.  Total Distribution Amount ((2) plus (4)) | 490,190.92 | 599,539.93 | 655,592.83 | 21,744,984.36 |

IV.  Information Regarding the Securities

A  Summary of Balance Information

| Class | Applicable Coupon Rate | Principal Balance Mar-08 Payment Date | Class Factor Mar-08 Payment Date | Principal Balance Feb-08 Payment Date | Class Factor Feb-08 Payment Date |
|---|---|---|---|---|---|
| a.  Class A-1 Notes | 5.34435% | 0.00 | 0.00000 | 0.00 | 0.00000 |
| b.  Class A-2 Notes | 5.1900% | 36,267,517.74 | 0.25186 | 54,846,429.11 | 0.38088 |
| c.  Class A-3 Notes | 5.0700% | 180,000,000.00 | 1.00000 | 180,000,000.00 | 1.00000 |
| d.  Class A-4 Notes | 5.0500% | 100,524,000.00 | 1.00000 | 100,524,000.00 | 1.00000 |
| e.  Class B Notes | 5.2400% | 7,747,618.64 | 0.46424 | 8,201,994.19 | 0.49146 |
| f.  Class C Notes | 5.2900% | 9,469,311.68 | 0.46425 | 10,024,659.57 | 0.49148 |
| g.  Class D Notes | 5.4600% | 10,330,158.18 | 0.46398 | 10,935,992.25 | 0.49119 |
| h.  Total Offered Notes | | 344,338,606.24 | | 364,533,075.12 | |

B  Other Information

| Class | Scheduled Principal Balance Mar-08 Payment Date | Scheduled Principal Balance Feb-08 Payment Date |
|---|---|---|
| Class A-1 Notes | 0.00 | 0.00 |

| Class | Class Percentage | Target Principal Balance Mar-08 Payment Date | Class Floor Mar-08 Payment Date | Target Principal Amount Feb-08 Payment Date | Class Floor Feb-08 Payment Date |
|---|---|---|---|---|---|
| Class A | 92.00% | 316,791,517.74 | | 335,370,429.11 | |
| Class B | 2.25% | 7,747,618.64 | 0.00 | 8,201,994.19 | 0.00 |
| Class C | 2.75% | 9,469,311.67 | 0.00 | 10,024,659.57 | 0.00 |
| Class D | 3.00% | 10,330,158.19 | 0.00 | 10,935,992.25 | 0.00 |

**V. PRINCIPAL**

**A. MONTHLY PRINCIPAL AMOUNT**

| | | |
|---|---|---|
| 1. | Principal Balance of Notes and Equity Certificates (End of Prior Collection Period) | 364,533,075.12 |
| 2. | Contract Pool Principal Balance (End of Collection Period) | 344,338,606.24 |
| | Total monthly principal amount | 20,194,468.88 |

**B. PRINCIPAL BREAKDOWN**

| | | No. of Accounts | |
|---|---|---|---|
| 1. | Scheduled Principal | 43,274 | 17,445,170.47 |
| 2. | Prepaid Contracts | 1,239 | 1,272,836.97 |
| 3. | Defaulted Contracts | 236 | 1,476,461.44 |
| 4. | Contracts purchased by CIT Financial USA, Inc. | 0 | 0.00 |
| | Total Principal Breakdown | 44,749 | 20,194,468.88 |

**VI. CONTRACT POOL DATA**

**A. CONTRACT POOL CHARACTERISTICS**

| | | Original Pool | Mar-08 Payment Date | Feb-08 Payment Date |
|---|---|---|---|---|
| 1. | a. Contract Pool Balance | 741,874,115.90 | 344,338,606.24 | 364,533,075.12 |
| | b. No of Contracts | 51,828 | 43,274 | 44,745 |
| | c. Pool Factor | 1.0000 | 0.4641 | 0.4914 |
| 2. | Weighted Average Remaining Term | 37.50 | 25.59 | 26.19 |
| 3. | Weighted Average Original Term | 43.90 | | |

**B. DELINQUENCY INFORMATION**

| | | % of Contracts | % of Aggregate Required Payoff Amount | No. Of Accounts | Aggregate Required Payoff Amounts |
|---|---|---|---|---|---|
| 1. | Current | 94.47% | 95.02% | 40,880 | 332,857,089.41 |
| | 31-60 days | 2.29% | 2.26% | 993 | 7,911,270.14 |
| | 61-90 days | 1.20% | 0.93% | 518 | 3,257,914.92 |
| | 91-120 days | 0.81% | 0.48% | 350 | 1,689,412.46 |
| | 121-150 days | 0.69% | 0.94% | 298 | 3,309,344.99 |
| | 151-180 days | 0.54% | 0.36% | 235 | 1,274,527.11 |
| | 180+days (1) | 0.00% | 0.00% | 0 | 0.00 |
| | Total Delinquency | 100.00% | 100.00% | 43,274 | 350,299,559.03 |

2. Delinquent Scheduled Payments:

| | |
|---|---|
| Beginning of Collection Period | 7,900,916.34 |
| End of Collection Period | 5,960,952.79 |
| Change in Delinquent Scheduled Payments | (1,939,963.55) |

(1) Accounts that are more than 180 days past due constitute defaulted contracts and are included under "Defaulted Contract Information" in Section VI C below

**C. DEFAULTED CONTRACT INFORMATION**

| | | |
|---|---|---|
| 1. | Aggregate Contract Balance on Defaulted Contracts | 1,476,461.44 |
| 2. | Liquidation Proceeds (or other cash collections on Defaulted contracts) received | 465,165.06 |
| | Current period reported net losses | 1,011,296.38 |
| 3. | Cumulative Reported Net Losses | 7,580,850.24 |
| 4. | Cumulative Net Loss Ratio | 1.0219% |
| 5. | Cummlative Net Loss Trigger | 3.2500% |

**VII. MISCELLANEOUS INFORMATION**

**A. SERVICER ADVANCE BALANCE**

| | | |
|---|---|---|
| 1. | Opening Servicer Advance Balance | 7,900,916.34 |
| 2. | Current Period Servicer Advance | 1,726,124.48 |
| 3. | Recoveries of prior Servicer Advances | (3,666,088.03) |
| 4. | Ending Servicer Advance Balance | 5,960,952.79 |
| 5. | Unreimbursed Servicer Advances | 0.00 |

**B. RESERVE ACCOUNT**

| | | |
|---|---|---:|
| 1. | Opening Reserve Account | 26,428,647.95 |
| 2. | Deposit from the Collection Account | 0.00 |
| 3. | Withdrawals from the Reserve Account | (909,012.64) |
| 4 | Investment Earnings | 81,968.42 |
| 5. | Investment Earnings Distributions to the Depositor | (81,968.42) |
| 6. | Remaining available amount | 25,519,635.31 |
| 7. | Specified Reserve Account Balance | 24,964,548.95 |
| 8. | Reserve Account Surplus/(Shortfall) | 555,086.36 |
| 9. | Distribution of Reserve Account Surplus to the Depositor | (555,086.36) |
| 10 | Ending Reserve Account Balance | 24,964,548.95 |
| 11. | Reserve Account deficiency | 0.00 |
| 12. | Reserve Account Floor | 22,256,223.48 |

**C. OTHER RELATED INFORMATION**

| | | | |
|---|---|---:|---:|
| 1. | Discount Rate | 5.8860% | |
| 2. | Life to Date Prepayment (CPR) | 5.91% | |
| 3. | Life to Date Substitutions. | | |
| | a. Prepayments | 0.00 | |
| | b. Defaults | 0.00 | |
| 4. | If applicable, Material Changes in how delinquency, charge-offs and uncollectibles are determined: | | N/A |
| 5 | Any material modification, extensions or waivers to pool asset terms, fees, penalties or payments: | | N/A |
| 6. | Any material breaches of pool assets representations or warranties or transaction covenants: | | |
| 7. | Information regarding pool asset substitutions and repurchase: | | 0.00 |
| 8. | Material changes in the solicitation, credit-granting, underwriting, origination, acquisition or pool selection criteria or procedures used to originate, acquire, or select new pool assets: | | N/A |

**D1. Statement of Priority of Distributions Prior to an Event of Default or the Cumulative Net Loss Trigger is Exceeded**

1. Unreimbursed Servicer Advances;
2. Servicing Fee;
3. a. Class A-1 Note Interest Distribution
   b. Class A-2 Note Interest Distribution
   c. Class A-3 Note Interest Distribution
   d. Class A-4 Note Interest Distribution;
4. Class B Note Interest Distribution;
5. Class C Note Interest Distribution;
6. Class D Note Interest Distribution;
7. Class A-1 Note Principal Distribution;
8. Class A-2 Note Principal Distribution;
9. Class A-3 Note Principal Distribution;
10. Class A-4 Note Principal Distribution;
11. Class B Note Principal Distribution;
12. Class C Note Principal Distribution;
13. Class D Note Principal Distribution;
14. Class A-1 Note Reallocated Principal Distribution
15. Class A-2 Note Reallocated Principal Distribution;
16. Class A-3 Note Reallocated Principal Distribution;
17. Class A-4 Note Reallocated Principal Distribution;
18. Class B Note Reallocated Principal Distribution;
19. Class C Note Reallocated Principal Distribution;
20. Class D Note Reallocated Principal Distribution;
21. Deposit to the Reserve Account;
22. Any amounts owing to the Trustees; and
23. Remainder to the holder of the equity certificate.

**D2. Statement of Priority of Distributions After an Event of Default or the Cumulative Net Loss Trigger is Exceeded**

1. Unreimbursed Servicer Advances;
2. Servicing Fee;
3. a. Class A-1 Note Interest Distribution
   b. Class A-2 Note Interest Distribution
   c. Class A-3 Note Interest Distribution
   d. Class A-4 Note Interest Distribution;
4. Class B Note Interest Distribution;
5. Class C Note Interest Distribution;
6. Class D Note Interest Distribution;
7. Class A-1 Note Principal Distribution;
8. Class A-2 Note Principal Distribution;
9. Class A-3 Note Principal Distribution;
10. Class A-4 Note Principal Distribution;
11. Class B Note Principal Distribution;
12. Class C Note Principal Distribution;
13. Class D Note Principal Distribution;
14. Deposit to the Reserve Account;
15. Any amounts owing to the Trustees; and
16. Remainder to the holder of the equity certificate.

**E. DELINQUENCY, NET LOSSES AND CPR HISTORY**

| Collection Periods | % of Aggregate Required Payoff Amounts 31-60 Days Past Due | % of Aggregate Required Payoff Amounts 61-90 Days Past Due | % of Aggregate Required Payoff Amounts 91-120 Days Past Due | % of Aggregate Required Payoff Amounts 121-150 Days Past Due | % of (2) Aggregate Required Payoff Amounts 151-180 Days Past Due |
|---|---|---|---|---|---|
| 02/29/08 | 2.26% | 0.93% | 0.48% | 0.94% | 0.36% |
| 01/31/08 | 2.03% | 0.94% | 1.70% | 0.43% | 0.33% |
| 12/31/07 | 2.64% | 1.88% | 0.60% | 0.43% | 0.58% |
| 11/30/07 | 3.01% | 0.88% | 0.54% | 0.60% | 0.29% |
| 10/31/07 | 1.89% | 0.86% | 0.62% | 0.38% | 0.23% |
| 09/30/07 | 1.93% | 0.89% | 0.49% | 0.26% | 0.21% |
| 08/31/07 | 1.84% | 0.68% | 0.33% | 0.43% | 0.17% |
| 07/31/07 | 1.57% | 0.65% | 0.60% | 0.21% | 0.16% |
| 06/30/07 | 1.38% | 0.75% | 0.27% | 0.21% | 0.38% |
| 05/31/07 | 2.29% | 0.53% | 0.28% | 0.19% | 0.32% |
| 04/30/07 | 1.53% | 0.61% | 0.29% | 0.37% | 0.22% |
| 03/31/07 | 2.11% | 0.53% | 0.43% | 0.25% | 0.26% |
| 02/28/07 | 2.31% | 0.75% | 0.28% | 0.30% | 0.07% |
| 01/31/07 | 1.61% | 0.47% | 0.43% | 0.08% | 0.00% |
| 12/31/06 | 1.71% | 0.74% | 0.14% | 0.00% | 0.00% |
| 11/30/06 | 2.04% | 0.20% | 0.00% | 0.00% | 0.00% |
| 10/31/06 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

| Collection Month | Monthly Net Loss Percentage | Monthly Net Losses | LTD CPR |
|---|---|---|---|
| February-08 | 0.136% | 1,011,296.38 | 5.91% |
| January-08 | 0.083% | 612,566.24 | 5.77% |
| December-07 | 0.084% | 620,685.09 | 5.68% |
| November-07 | 0.074% | 547,661.60 | 5.70% |
| October-07 | 0.055% | 411,055.60 | 5.72% |
| September-07 | 0.066% | 486,845.26 | 5.97% |
| August-07 | 0.057% | 425,928.49 | 5.87% |
| July-07 | 0.083% | 616,390.92 | 6.17% |
| June-07 | 0.174% | 1,287,818.86 | 6.05% |
| May-07 | 0.044% | 324,817.82 | 5.91% |
| April-07 | 0.060% | 448,110.11 | 6.08% |
| March-07 | 0.034% | 255,354.30 | 6.51% |
| February-07 | 0.012% | 86,962.55 | 6.59% |
| January-07 | 0.050% | 368,166.66 | 8.02% |
| December-06 | 0.010% | 77,190.96 | 8.74% |
| November-06 | 0.000% | 0.00 | 10.64% |
| October-06 | 0.000% | 0.00 | 13.91% |

(2) Accounts that are more than 180 days past due constitute defaulted contracts and are included under "Defaulted Contract Information" in Section VI C above

| Coll. Period | Portfolio Name | CPB ($) | RPA ($) | Cumulative Gross Losses ($) | Cumulative Net Losses ($) | Cum. Gross Losses % | Cum. Net Losses % | LTD CPR |
|---|---|---|---|---|---|---|---|---|
| 02/29/08 | Avaya Portfolio | $ 73,947,039.82 | $ 74,662,054.56 | $ 1,506,519.88 | $ 1,254,843.97 | 1.08% | 0.90% | 4.18% |
| 02/29/08 | DFS Portfolio | 136,329,304.59 | 139,825,413.38 | 7,915,763.92 | 0.00 | 2.24% | 0.00% | 5.42% |
| 02/29/08 | Other | 134,062,261.83 | 135,812,091.09 | 6,993,999.01 | 6,326,006.27 | 2.80% | 2.53% | 7.32% |
| | Totals | 344,338,606.24 | 350,299,559.03 | 16,416,282.81 | 7,580,850.24 | 2.213% | 1.0219% | 5.91% |

| Coll. Period | Portfolio Name | Delq. Current % | Delq 31-60 % | Delq 61-90 % | Delq 91-120 % | Delq 121-150 % | Delq 151-180 % | Delq 180+ % |
|---|---|---|---|---|---|---|---|---|
| 02/29/08 | Avaya Portfolio | 97.33% | 1.08% | 0.59% | 0.09% | 0.68% | 0.24% | 0.00% |
| 02/29/08 | DFS Portfolio | 95.01% | 2.30% | 0.81% | 0.44% | 1.15% | 0.29% | 0.00% |
| 02/29/08 | Other | 93.76% | 2.87% | 1.24% | 0.74% | 0.88% | 0.51% | 0.00% |
| | Totals | 95.02% | 2.26% | 0.93% | 0.48% | 0.94% | 0.36% | 0.00% |

| Coll. Period | Portfolio Name | Delq. Current | No. of Delq Current | Delq 31-60 | No. of Delq 31-60 | Delq 61-90 | No. of Delq 61-90 | Delq 91-120 | No. of Delq 91-120 | Delq 121-150 | No. of Delq 121-150 | Delq 151-180 | No. of Delq 151-180 | Delq 180+ | No. of Delq 180+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 02/29/08 | Avaya Portfolio. | $ 72,665,208.95 | 3,652 | $ 806,637.23 | 99 | $ 442,342.64 | 48 | $ 68,166.00 | 21 | $504,150.59 | 20 | $175,549.15 | 9 | $0.00 | 0 |
| 02/29/08 | DFS Portfolio | 132,849,470.84 | 25,145 | 3,209,117.47 | 526 | 1,136,676.89 | 303 | 611,805.06 | 232 | 1,609,011.06 | 194 | 409,332.06 | 158 | 0.00 | 0 |
| 02/29/08 | Other | 127,342,409.62 | 12,083 | 3,895,515.44 | 368 | 1,678,895.39 | 167 | 1,009,441.40 | 97 | 1,196,183.34 | 84 | 689,645.90 | 68 | 0.00 | 0 |
| | Totals | 332,857,089.41 | 40,880 | 7,911,270.14 | 993 | 3,257,914.92 | 518 | 1,689,412.46 | 350 | 3,309,344.99 | 298 | 1,274,527.11 | 235 | 0.00 | 0 |

|  | Determination Date: |  | 04/17/08 |
|---|---|---|---|
|  | Collection Period: | 03/01/08 | 03/31/08 |
|  | Record Date: |  | 04/18/08 |
|  | Payment Date: |  | 04/21/08 |

**I. AVAILABLE FUNDS**

**A. Collections**

| | | | |
|---|---|---|---|
| a. | Scheduled Payments Received | $ | 20,761,029.02 |
| b. | Liquidation Proceeds Allocated to Owner Trust | | 523,013.88 |
| c. | Prepayments on Contracts | | 1,090,551.20 |
| d. | Payments on Purchased Contracts | | 0.00 |
| e. | Proceeds of Clean-up Call | | 0.00 |
| f. | Investment Earnings on Collection Account | | 0.00 |

| | | | |
|---|---|---|---|
| | **Total Collections** | $ | 22,374,594.10 |

**B. Determination of Available Funds**

| | | | |
|---|---|---|---|
| a. | Total Collections | $ | 22,374,594.10 |
| b. | Servicer Advances | | 1,550,294.09 |
| c. | Recoveries of prior Servicer Advances | | (2,601,844.82) |
| d. | Withdrawal from Reserve Account | | 904,504.82 |

| | | | |
|---|---|---|---|
| | **Total Available Funds =** | $ | 22,227,548.19 |

**II. DISTRIBUTION AMOUNTS**

**A. COLLECTION ACCOUNT DISTRIBUTION**

| | | | |
|---|---|---|---|
| 1. | Servicing Fee | | 215,211.63 |
| 2. | Class A-1 Note Interest Distribution | 0.00 | |
| | Class A-1 Note Principal Distribution | 0.00 | |
| | Aggregate Class A-1 distribution | | 0.00 |
| 3. | Class A-2 Note Interest Distribution | 156,857.01 | |
| | Class A-2 Note Principal Distribution | 18,905,414.58 | |
| | Aggregate Class A-2 distribution | | 19,062,271.59 |
| 4. | Class A-3 Note Interest Distribution | 760,500.00 | |
| | Class A-3 Note Principal Distribution | 0.00 | |
| | Aggregate Class A-3 distribution | | 760,500.00 |
| 5. | Class A-4 Note Interest Distribution | 423,038.50 | |
| | Class A-4 Note Principal Distribution | 0.00 | |
| | Aggregate Class A-4 distribution | | 423,038.50 |
| 6. | Class B Note Interest Distribution | 33,831.27 | |
| | Class B Note Principal Distribution | 462,360.68 | |
| | Aggregate Class B distribution | | 496,191.95 |
| 7. | Class C Note Interest Distribution | 41,743.88 | |
| | Class C Note Principal Distribution | 565,107.50 | |
| | Aggregate Class C distribution | | 606,851.38 |
| 8. | Class D Note Interest Distribution | 47,002.22 | |
| | Class D Note Principal Distribution | 616,480.92 | |
| | Aggregate Class D distribution | | 663,483.14 |
| 9. | Deposit to the Reserve Account | | 0.00 |
| 10. | Trustee Expenses | | 0.00 |
| 11. | Remainder to the holder of the equity certificate | | 0.00 |

| | | |
|---|---|---|
| | **Collection Account Distributions =** | 22,227,548.19 |

**B. INCORRECT DEPOSITS TO BE RETURNED TO CIT**          **Collection Account Distributions =**          0.00

III.   INFORMATION REGARDING DISTRIBUTIONS ON THE SECURITIES

| | Distribution Amounts | Class A-1 Notes | Class A-2 Notes | Class A-3 Notes | Class A-4 Notes |
|---|---|---|---|---|---|
| 1. | Interest Due | 0.00 | 156,857.01 | 760,500.00 | 423,038.50 |
| 2. | Interest Paid | 0.00 | 156,857.01 | 760,500.00 | 423,038.50 |
| 3. | Interest Shortfall ((1) minus (2)) | 0.00 | 0.00 | 0.00 | 0.00 |
| 4. | Principal Paid | 0.00 | 18,905,414.58 | 0.00 | 0.00 |
| 5. | Total Distribution Amount ((2) plus (4)) | 0.00 | 19,062,271.59 | 760,500.00 | 423,038.50 |

| | Distribution Amounts | Class B Notes | Class C Notes | Class D Notes | Total Offered Notes |
|---|---|---|---|---|---|
| 1. | Interest Due | 33,831.27 | 41,743.88 | 47,002.22 | 1,462,972.88 |
| 2. | Interest Paid | 33,831.27 | 41,743.88 | 47,002.22 | 1,462,972.88 |
| 3. | Interest Shortfall ((1) minus (2)) | 0.00 | 0.00 | 0.00 | 0.00 |
| 4. | Principal Paid | 462,360.68 | 565,107.50 | 616,480.92 | 20,549,363.68 |
| 5. | Total Distribution Amount ((2) plus (4)) | 496,191.95 | 606,851.38 | 663,483.14 | 22,012,336.56 |

IV.   Information Regarding the Securities

A   Summary of Balance Information

| | Class | Applicable Coupon Rate | Principal Balance Apr-08 Payment Date | Class Factor Apr-08 Payment Date | Principal Balance Mar-08 Payment Date | Class Factor Mar-08 Payment Date |
|---|---|---|---|---|---|---|
| a. | Class A-1 Notes | 5.3435% | 0.00 | 0.00000 | 0.00 | 0.00000 |
| b. | Class A-2 Notes | 5.1900% | 17,362,103.16 | 0.12057 | 36,267,517.74 | 0.25186 |
| c. | Class A-3 Notes | 5.0700% | 180,000,000.00 | 1.00000 | 180,000,000.00 | 1.00000 |
| d. | Class A-4 Notes | 5.0500% | 100,524,000.00 | 1.00000 | 100,524,000.00 | 1.00000 |
| e. | Class B Notes | 5.2400% | 7,285,257.96 | 0.43653 | 7,747,618.64 | 0.46424 |
| f. | Class C Notes | 5.2900% | 8,904,204.18 | 0.43654 | 9,469,311.68 | 0.46425 |
| g. | Class D Notes | 5.4600% | 9,713,677.26 | 0.43629 | 10,330,158.18 | 0.46398 |
| h. | **Total Offered Notes** | | 323,789,242.56 | | 344,338,606.24 | |

B   Other Information

| Class | Scheduled Principal Balance Apr-08 Payment Date | Scheduled Principal Balance Mar-08 Payment Date |
|---|---|---|
| Class A-1 Notes | 0.00 | 0.00 |

| Class | Class Percentage | Target Principal Balance Apr-08 Payment Date | Class Floor Apr-08 Payment Date | Target Principal Amount Mar-08 Payment Date | Class Floor Mar-08 Payment Date |
|---|---|---|---|---|---|
| Class A | 92.00% | 297,886,103.16 | | 316,791,517.74 | |
| Class B | 2.25% | 7,285,257.96 | 0.00 | 7,747,618.64 | 0.00 |
| Class C | 2.75% | 8,904,204.17 | 0.00 | 9,469,311.67 | 0.00 |
| Class D | 3.00% | 9,713,677.28 | 0.00 | 10,330,158.19 | 0.00 |

**V. PRINCIPAL**

**A. MONTHLY PRINCIPAL AMOUNT**

| | | |
|---|---|---:|
| 1 | Principal Balance of Notes and Equity Certificates (End of Prior Collection Period) | 344,338,606.24 |
| 2. | Contract Pool Principal Balance (End of Collection Period) | 323,789,242.56 |
| | Total monthly principal amount | 20,549,363.68 |

**B. PRINCIPAL BREAKDOWN**

| | | No. of Accounts | |
|---|---|---:|---:|
| 1. | Scheduled Principal | 41,447 | 17,896,860.39 |
| 2. | Prepaid Contracts | 1,564 | 1,085,868.88 |
| 3. | Defaulted Contracts | 263 | 1,566,634.41 |
| 4. | Contracts purchased by CIT Financial USA, Inc. | 0 | 0.00 |
| | Total Principal Breakdown | 43,274 | 20,549,363.68 |

**VI. CONTRACT POOL DATA**

**A. CONTRACT POOL CHARACTERISTICS**

| | | Original Pool | Apr-08 Payment Date | Mar-08 Payment Date |
|---|---|---:|---:|---:|
| 1 | a. Contract Pool Balance | 741,874,115.90 | 323,789,242.56 | 344,338,606.24 |
| | b. No of Contracts | 51,828 | 41,447 | 43,274 |
| | c. Pool Factor | 1.0000 | 0.4364 | 0.4641 |
| 2. | Weighted Average Remaining Term | 37.50 | 25.05 | 25.59 |
| 3 | Weighted Average Original Term | 43.90 | | |

**B. DELINQUENCY INFORMATION**

| | | % of Contracts | % of Aggregate Required Payoff Amount | No. Of Accounts | Aggregate Required Payoff Amounts |
|---|---|---:|---:|---:|---:|
| 1. | Current | 94.34% | 95.00% | 39,102 | 312,267,330.40 |
| | 31-60 days | 2.50% | 2.66% | 1,035 | 8,753,058.66 |
| | 61-90 days | 1.12% | 0.98% | 464 | 3,210,348.39 |
| | 91-120 days | 0.82% | 0.61% | 340 | 1,999,084.97 |
| | 121-150 days | 0.64% | 0.32% | 266 | 1,045,752.31 |
| | 151-180 days | 0.58% | 0.43% | 240 | 1,423,069.89 |
| | 180+days (1) | 0.00% | 0.00% | 0 | 0.00 |
| | **Total Delinquency** | 100.00% | 100.00% | 41,447 | 328,698,644.62 |

2. Delinquent Scheduled Payments:

| | |
|---|---:|
| Beginning of Collection Period | 5,960,952.79 |
| End of Collection Period | 4,909,402.06 |
| Change in Delinquent Scheduled Payments | (1,051,550.73) |

(1) Accounts that are more than 180 days past due constitute defaulted contracts and are included under "Defaulted Contract Information" in Section VI C below.

**C. DEFAULTED CONTRACT INFORMATION**

| | | |
|---|---|---:|
| 1 | Aggregate Contract Balance on Defaulted Contracts | 1,566,634.41 |
| 2 | Liquidation Proceeds (or other cash collections on Defaulted contracts) received | 523,013.88 |
| | Current period reported net losses | 1,043,620.53 |
| 3 | Cumulative Reported Net Losses | 8,624,470.77 |
| 4. | Cumulative Net Loss Ratio | 1.1625% |
| 5. | Cumulative Net Loss Trigger | 4.0000% |

**VII. MISCELLANEOUS INFORMATION**

**A. SERVICER ADVANCE BALANCE**

| | | |
|---|---|---:|
| 1 | Opening Servicer Advance Balance | 5,960,952.79 |
| 2 | Current Period Servicer Advance | 1,550,294.09 |
| 3. | Recoveries of prior Servicer Advances | (2,601,844.82) |
| 4. | Ending Servicer Advance Balance | 4,909,402.06 |
| 5 | Unreimbursed Servicer Advances | 0.00 |

| | | |
|---|---|---:|
| 1. | Opening Reserve Account | 24,964,548.95 |
| 2. | Deposit from the Collection Account | 0.00 |
| 3. | Withdrawals from the Reserve Account | (904,504.82) |
| 4. | Investment Earnings | 73,268.70 |
| 5. | Investment Earnings Distributions to the Depositor | (73,268.70) |
| 6. | Remaining available amount | 24,060,044.13 |
| 7. | Specified Reserve Account Balance | 23,474,720.09 |
| 8. | Reserve Account Surplus/(Shortfall) | 585,324.04 |
| 9. | Distribution of Reserve Account Surplus to the Depositor | (585,324.04) |
| 10. | Ending Reserve Account Balance | 23,474,720.09 |
| 11. | Reserve Account deficiency | 0.00 |
| 12. | Reserve Account Floor | 22,256,223.48 |

**C. OTHER RELATED INFORMATION**

| | | | |
|---|---|---|---|
| 1. | Discount Rate | 5.8860% | |
| 2. | Life to Date Prepayment (CPR) | 6.23% | |
| 3. | Life to Date Substitutions: | | |
| | a. Prepayments | 0.00 | |
| | b. Defaults | 0.00 | |
| 4. | If applicable, Material Changes in how delinquency, charge-offs and uncollectibles are determined: | | N/A |
| 5. | Any material modification, extensions or waivers to pool asset terms, fees, penalties or payments: | | N/A |
| 6. | Any material breaches of pool assets representations or warranties or transaction covenants: | | |
| 7. | Information regarding pool asset substitutions and repurchase: | | 0.00 |
| 8. | Material changes in the solicitation, credit-granting, underwriting, origination, acquisition or pool selection criteria or procedures used to originate, acquire, or select new pool assets: | | N/A |

**D1. Statement of Priority of Distributions Prior to an Event of Default or the Cumulative Net Loss Trigger is Exceeded**

1   Unreimbursed Servicer Advances;
2   Servicing Fee;
3   a  Class A-1 Note Interest Distribution
    b  Class A-2 Note Interest Distribution
    c  Class A-3 Note Interest Distribution
    d  Class A-4 Note Interest Distribution;
4   Class B Note Interest Distribution;
5   Class C Note Interest Distribution;
6   Class D Note Interest Distribution;
7   Class A-1 Note Principal Distribution;
8   Class A-2 Note Principal Distribution;
9   Class A-3 Note Principal Distribution;
10  Class A-4 Note Principal Distribution;
11   Class B Note Principal Distribution;
12  Class C Note Principal Distribution;
13  Class D Note Principal Distribution;
14  Class A-1 Note Reallocated Principal Distribution
15  Class A-2 Note Reallocated Principal Distribution;
16  Class A-3 Note Reallocated Principal Distribution;
17  Class A-4 Note Reallocated Principal Distribution;
18   Class B Note Reallocated Principal Distribution;
19  Class C Note Reallocated Principal Distribution;
20  Class D Note Reallocated Principal Distribution;
21  Deposit to the Reserve Account;
22  Any amounts owing to the Trustees; and
23  Remainder to the holder of the equity certificate.

**D2. Statement of Priority of Distributions After an Event of Default or the Cumulative Net Loss Trigger is Exceeded**

1   Unreimbursed Servicer Advances;
2   Servicing Fee;
3   a  Class A-1 Note Interest Distribution
    b  Class A-2 Note Interest Distribution
    c  Class A-3 Note Interest Distribution
    d  Class A-4 Note Interest Distribution;
4   Class B Note Interest Distribution;
5   Class C Note Interest Distribution;
6   Class D Note Interest Distribution;
7   Class A-1 Note Principal Distribution;
8   Class A-2 Note Principal Distribution;
9   Class A-3 Note Principal Distribution;
10  Class A-4 Note Principal Distribution;
11   Class B Note Principal Distribution;
12  Class C Note Principal Distribution;
13  Class D Note Principal Distribution,
14  Deposit to the Reserve Account;
15  Any amounts owing to the Trustees; and
16  Remainder to the holder of the equity certificate.

**E.  DELINQUENCY, NET LOSSES AND CPR HISTORY**

| Collection Periods | % of Aggregate Required Payoff Amounts 31-60 Days Past Due | % of Aggregate Required Payoff Amounts 61-90 Days Past Due | % of Aggregate Required Payoff Amounts 91-120 Days Past Due | % of Aggregate Required Payoff Amounts 121-150 Days Past Due | % of (2) Aggregate Required Payoff Amounts 151-180 Days Past Due |
|---|---|---|---|---|---|
| 03/31/08 | 2.66% | 0.98% | 0.61% | 0.32% | 0.43% |
| 02/29/08 | 2.26% | 0.93% | 0.48% | 0.94% | 0.36% |
| 01/31/08 | 2.03% | 0.94% | 1.70% | 0.43% | 0.33% |
| 12/31/07 | 2.64% | 1.88% | 0.60% | 0.43% | 0.58% |
| 11/30/07 | 3.01% | 0.88% | 0.54% | 0.60% | 0.29% |
| 10/31/07 | 1.89% | 0.86% | 0.62% | 0.38% | 0.23% |
| 09/30/07 | 1.93% | 0.89% | 0.49% | 0.26% | 0.21% |
| 08/31/07 | 1.84% | 0.68% | 0.33% | 0.43% | 0.17% |
| 07/31/07 | 1.57% | 0.65% | 0.60% | 0.21% | 0.16% |
| 06/30/07 | 1.38% | 0.75% | 0.27% | 0.21% | 0.38% |
| 05/31/07 | 2.29% | 0.53% | 0.28% | 0.19% | 0.32% |
| 04/30/07 | 1.53% | 0.61% | 0.29% | 0.37% | 0.22% |
| 03/31/07 | 2.11% | 0.53% | 0.43% | 0.25% | 0.26% |
| 02/28/07 | 2.31% | 0.75% | 0.28% | 0.30% | 0.07% |
| 01/31/07 | 1.61% | 0.47% | 0.43% | 0.08% | 0.00% |
| 12/31/06 | 1.71% | 0.74% | 0.14% | 0.00% | 0.00% |
| 11/30/06 | 2.04% | 0.20% | 0.00% | 0.00% | 0.00% |
| 10/31/06 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

| Collection Month | Monthly Net Loss Percentage | Monthly Net Losses | LTD CPR |
|---|---|---|---|
| March-08 | 0.141% | 1,043,620.53 | 6.23% |
| February-08 | 0.136% | 1,011,296.38 | 5.91% |
| January-08 | 0.083% | 612,566.24 | 5.77% |
| December-07 | 0.084% | 620,685.09 | 5.68% |
| November-07 | 0.074% | 547,661.60 | 5.70% |
| October-07 | 0.055% | 411,055.00 | 5.72% |
| September-07 | 0.066% | 486,845.26 | 5.97% |
| August-07 | 0.057% | 425,928.49 | 5.87% |
| July-07 | 0.083% | 616,390.92 | 6.17% |
| June-07 | 0.174% | 1,287,818.86 | 6.05% |
| May-07 | 0.044% | 324,817.82 | 5.91% |
| April-07 | 0.060% | 448,110.11 | 6.08% |
| March-07 | 0.034% | 255,354.30 | 6.51% |
| February-07 | 0.012% | 86,962.55 | 6.59% |
| January-07 | 0.050% | 368,166.66 | 8.02% |
| December-06 | 0.010% | 77,190.96 | 8.74% |
| November-06 | 0.000% | 0.00 | 10.64% |
| October-06 | 0.000% | 0.00 | 13.91% |

(2) Accounts that are more than 180 days past due constitute defaulted contracts and are included under "Defaulted Contract Information" in Section VI C above

CIT Equipment Collateral 2006-VT2 Statistical Information by Business Units

| Coll. Period | Portfolio Name | CPB ($) | RPA ($) | Period End Gross Losses ($) | Cumulative Losses ($) | Gross Losses % | Cum. Net Losses % | LTD CPR |
|---|---|---|---|---|---|---|---|---|
| 03/31/08 | Avaya Portfolio | $ 71,121,664.16 | $ 71,563,544.55 | $ 1,782,861.23 | $ 1,512,002.72 | 1.28% | 1.09% | 4.30% |
| 03/31/08 | DFS Portfolio | 124,981,537.63 | 127,875,434.18 | 8,322,302.51 | 0.00 | 2.36% | 0.00% | 5.92% |
| 03/31/08 | Other | 127,686,040.77 | 129,259,665.89 | 7,877,753.48 | 7,112,468.05 | 3.15% | 2.84% | 7.55% |
| | Totals | 323,789,242.56 | 328,698,644.62 | 17,982,917.22 | 8,624,470.77 | 2.424% | 1.1625% | 6.23% |

| Coll. Period | Portfolio Name | Delq. Current % | Delq 31-60 % | Delq 61-90 % | Delq 91-120 % | Delq 121-150 % | Delq 151-180 % | Delq 180+ % |
|---|---|---|---|---|---|---|---|---|
| 03/31/08 | Avaya Portfolio | 98.69% | 0.75% | 0.36% | 0.09% | 0.06% | 0.05% | 0.00% |
| 03/31/08 | DFS Portfolio | 94.08% | 3.27% | 1.23% | 0.47% | 0.40% | 0.55% | 0.00% |
| 03/31/08 | Other | 93.87% | 3.12% | 1.06% | 1.03% | 0.38% | 0.52% | 0.00% |
| | Totals | 95.00% | 2.66% | 0.98% | 0.61% | 0.32% | 0.43% | 0.00% |

| Coll. Period | Portfolio Name | Delq. Current | No. of Delq Current | Delq 31-60 | No. of Delq 31-60 | Delq 61-90 | No. of Delq 61-90 | Delq 91-120 | No. of Delq 91-120 | Delq 121-150 | No. of Delq 121-150 | Delq 151-180 | No. of Delq 151-180 | Delq 180+ | No. of Delq 180+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03/31/08 | Avaya Portfolio. | $ 70,624,169.71 | 3,551 | $ 537,799.55 | 84 | $ 260,343.16 | 35 | $ 63,940.48 | 23 | $41,447.94 | 14 | $35,843.71 | 8 | $0.00 | 0 |
| 03/31/08 | DFS Portfolio | 120,304,651.78 | 23,661 | 4,175,991.29 | 566 | 1,577,932.91 | 290 | 598,525.10 | 225 | 508,672.99 | 193 | 709,660.11 | 166 | 0.00 | 0 |
| 03/31/08 | Other | 121,338,508.91 | 11,890 | 4,039,267.82 | 385 | 1,372,072.32 | 139 | 1,336,619.39 | 92 | 495,631.38 | 59 | 677,566.07 | 66 | 0.00 | 0 |
| | Totals | 312,267,330.40 | 39,102 | 8,753,058.66 | 1,035 | 3,210,348.39 | 464 | 1,999,084.97 | 340 | 1,045,752.31 | 266 | 1,423,069.89 | 240 | 0.00 | 0 |



**FOR IMMEDIATE RELEASE**

**CIT REPORTS FIRST QUARTER RESULTS;**
**SIGNIFICANT PROGRESS ON LIQUIDITY PLAN**

*First Quarter Net Loss of $257 Million, $1.35 per share*
*Commercial Businesses earn $0.82 per share excluding Noteworthy Items*
*Credit Loss Reserves Strengthened*
*Quarterly Dividend Reduced to $0.10 per share*

NEW YORK – April 17, 2008 – CIT Group Inc. (NYSE: CIT) today announced a series of actions that demonstrate significant progress on the plans it announced on March 20, 2008 to improve its liquidity position.  These actions include:

- Agreeing to sell $4.6 billion of asset-based loan commitments, of which $1.4 billion is currently drawn;
- Agreeing to sell $770 million of aircraft at a gain of approximately 10%, of which $300 million closed in the first quarter;
- Identifying another $2.0 billion of loan assets that will be either used for a secured financing or sold during the second quarter;
- Funding $335 million of first quarter commercial loan originations through CIT Bank;
- Engaging financial advisors to explore various capital raising initiatives, including the possible issuance of equity securities, and to evaluate strategic alternatives for the Company's $4 billion rail leasing business; and
- The declaration by the Board of Directors of a $0.10 per share quarterly dividend payable on May 30, 2008 to shareholders of record on May 15, 2008.

The combination of these actions, in addition to existing cash balances, materially enhances the Company's liquidity and significantly advances its plan to reduce the size of the balance sheet.

The Company reported a net loss of $257.2 million, or $1.35 per share, for the first quarter of 2008. Commercial segment earnings were more than offset by a combined net loss in our home lending and consumer lending segments, a non-cash charge related to terminated hedges, and severance costs. Net income was $200.6 million, or $1.01 of diluted earnings per share, for the comparable 2007 quarter.

"The prolonged and pervasive dislocation in the capital markets continued to present significant challenges for the financial services sector," said Jeffrey M. Peek, Chairman and CEO. "CIT's core commercial businesses performed well against this turbulent backdrop, with particularly strong results in Transportation and Trade Finance. Our overall loss for the quarter was driven largely by our liquidating consumer businesses. Given the need to continue to bolster our balance sheet and preserve capital, the Board of Directors has made the prudent but difficult decision to reduce the quarterly common stock dividend by 60% to $0.10 per share.

"The liquidity actions we announced today, coupled with the quality and breadth of our portfolio, provide us with increased flexibility to carry out future asset dispositions and evaluate funding and capital raising alternatives in a judicious manner. As we look ahead, it's clear we will operate a smaller, more nimble company that is competitively positioned to take advantage of both economic contractions and

1

expansions. We are a recognized leader in the commercial middle market and remain committed to providing intellectual and financial capital to our customers."

The following table breaks down our reported results between our ongoing commercial businesses, liquidating consumer segments, and other noteworthy items:

| | Net Income / (Loss) | EPS | ROE |
|---|---|---|---|
| **Net loss - reported results** | $ (257.2) | $ (1.35) | -15.8% |
| Home lending and consumer segments | (248.5) | (1.30) | |
| Noteworthy items | (165.6) | (0.87) | |
| Commercial results, including corporate | $ 156.9 | $ 0.82 | 12.1% |

Net income for Commercial Segments and Corporate was $156.9 million, down from $267.9 million in the prior year quarter and $368.8 million last quarter, reflecting lower finance margins, lower other income and higher credit costs.

The noteworthy items in the table above are comprised of the following:
- A lower of cost or market valuation allowance pretax charge of $117.5 million (decrease to EPS of $0.36) on assets held for sale in the Corporate Finance segment, reflecting the agreement to sell $4.6 billion of asset-based lending commitments of which $1.4 billion represents funded receivables that were classified as held for sale at March 31, 2008;
- A $33 million pretax impairment charge (decrease to EPS of $0.11), that should have been recorded concurrently with the 2007 fourth quarter sale of our Dell Financial Services joint venture equity interest, reflecting the repricing of debt cost underlying a securitization conduit vehicle in the Vendor Finance segment; the charge relates to the fourth quarter financial statements, as it was triggered by the buy out of CIT's joint venture equity in the fourth quarter of 2007;
- A pre-tax charge, in Corporate and other, of approximately $148 million related to losses on swaps that hedged the now inactive commercial paper program (decrease to EPS of $0.47) and were previously recorded in Other Comprehensive Income. An offsetting pre-tax gain of approximately $140 million on the termination of a corresponding amount of swaps with essentially offsetting economics was deferred and will be amortized over the remaining life of those terminated swaps;
- Pre-tax charges of $69 million, primarily reflecting costs associated with severance and termination expenses related to approximately 500 employees in corporate and other (decrease to EPS of $0.22); and
- Tax benefits of approximately $56 million relating to applying the projected annual effective tax rate for 2008, including the projected income mix between international and domestic operations (increase to EPS of $0.29).

2

The loss of $248.5 million in the Home Lending and Consumer Segments was primarily driven by $270 million in reserve building during the quarter ($150 million for Home Lending, $120 million for Student Lending), reflecting continued deterioration in the home lending markets and seasoning of the home lending portfolio and reserves for private (non-government guaranteed) loans, principally to students of a pilot training school that filed bankruptcy during the quarter.

**Consolidated Financial Highlights:**

Liquidity, Funding and Capitalization

- The Company has taken significant actions to bolster its liquidity position. We agreed in April to sell $4.6 billion of asset based loans and related commitments ($1.4 billion of loans and $3.2 billion of commitments). We also have agreements to sell $770 million of aircraft, of which $300 million closed in the first quarter. An additional $2.0 billion in assets have been identified to be financed or sold. Finally, the Company is exploring the potential sale of its $4.0 billion railcar leasing business.
- Our total cash position increased to $10.3 billion at quarter end, from $6.8 billion at December 31, 2007. This cash includes $7.0 billion of immediately available cash, $1.4 billion of cash and short-term investments at our Utah bank, $0.6 billion of other cash balances, and $1.3 billion of restricted cash (largely related to securitization transactions).
- During the quarter, we raised approximately $10.6 billion of financing including $7.3 billion from our bank lines, $2.7 billion of asset-backed financing and $0.6 billion of unsecured retail notes. Asset-backed financing, secured by rail assets, middle-market loans, trade finance receivables, student loans and mortgages, included $2.2 billion of on-balance sheet secured borrowings and $0.5 billion of off-balance sheet securitization transactions.
- Principal uses of cash during the quarter included $1.5 billion to pay maturing commercial paper, $1.6 billion to pay maturing debt, $1.7 billion to fund portfolio growth and a $1.0 billion reduction in credit balances to factoring clients.
- We had approximately $50 billion of unencumbered portfolio assets at March 31, 2008, essentially unchanged from December 31, 2007.
- Outstanding commercial paper declined from $2.8 billion at December 2007 to $1.3 billion at March 31, 2008 due to our suspension of the Company's commercial paper program.
- The ratio of total tangible equity to managed assets at March 31, 2008 declined to 8.33% from 8.82% last quarter and is currently below our target of 8.50%. The Company's announced liquidity actions are designed to strengthen the ratio to well above our target.
- In addition, the Company may use the proceeds of any offering of common equity to facilitate the payment of quarterly dividends of approximately $8.0 million on the Company's Series A and Series B preferred stock in June.

Net Finance Revenue

- Net finance revenue was down 11% from last quarter and 10% from last year primarily reflecting lower interest rates and higher borrowing costs. Average earning assets increased 1% over the prior quarter and 9% over last year.
- Net finance revenue as a percentage of average earning assets was 2.35%, down from 2.67% last quarter and 2.83% last year, as interest expense reflected the widening of CIT credit spreads and the cost of maintaining excess cash balances. The net finance revenue comparisons also reflected lower rates of lease renewals on certain operating leases and higher levels of non-accrual assets.

- Operating lease net revenue was 6.76% of average operating leases, down from 7.22% last quarter and 6.82% last year, as softer lease rates and lower utilization in certain car types in our rail business, reflecting the weaker economy, contributed to the decline.

Other Income

- Other income for the quarter as a percentage of total net revenue (net finance revenue plus other income) excluding the items below was 32% versus 29% last quarter and down from 41% in the prior year quarter, principally due to reduced syndication fees and receivable sales gains, consistent with current market conditions.
- The current quarter includes a pre-tax $33 million impairment charge reflecting the repricing of debt costs underlying one of our vendor securitization conduit vehicles. The prior quarter included pre-tax gains of $247 million on the sale of our interest in the DFS joint venture and $21 million on the sale of the U.S. Systems Leasing business.
- Fees and other income declined from the prior quarter on lower joint venture earnings, reflecting the sale of our interest in the DFS joint venture and a mark-to-market charge on an interest rate swap that economically hedges debt related to the student lending portfolio but does not qualify for hedge accounting treatment.
- Factoring commissions were down from last quarter and flat with the prior year on lower factoring volumes and commission rates, consistent with normal seasonal trends.
- Gains on receivable sales and syndication fees were down significantly from last quarter and from the prior year quarter due to lower syndicated loan fees reflecting the significant contraction in the loan syndication market.
- Commercial loan sales and syndication volume was $0.5 billion (10% of commercial origination volume), down from $1.3 billion (17%) in the prior quarter and $1.4 billion (21%) in the prior year quarter. Sales of student loans were also significantly lower, $0.1 billion for the March 2008 quarter, down from about $0.5 billion in each of the prior quarter and prior year quarter. These decreases are a reflection of continued market illiquidity.
- Increased equipment gains reflect the sales of 11 commercial aircraft this quarter, with a total book value of approximately $300 million at approximately a 9% gain ($27 million).

Credit Quality – Commercial

- Overall commercial credit quality remained solid and within expected ranges, although credit metrics weakened from favorable prior period levels.
- Net charge-offs as a percentage of average finance receivables were 0.63% for the commercial businesses, up from 0.43% last quarter and up from 0.16% a year ago reflecting lower recoveries in Transportation Finance and a $22 million charge-off of an energy customer that entered bankruptcy during the quarter.
- 60+ day owned delinquencies for the commercial businesses were 1.70% of finance receivables, up from 1.47% last quarter, primarily due to the addition of several accounts within Corporate Finance.
- Non-performing assets for the commercial businesses were 1.68%, up from 1.15% from last quarter reflecting the addition of two large accounts in Corporate Finance and up from 0.78% last year, reflecting increases in Corporate Finance and Vendor Finance. All non-performing assets are reserved to expected realizable value based on underlying collateral and cash flows.

Credit Quality - Home Lending

- The provision for credit losses totaled $218 million for the quarter, which resulted from a $150 million increase in reserves for credit losses for home loans held for investment ("HFI"), now totaling $400 million. The higher reserves reflects an increase to the loss severity assumptions and higher past due loans, reflecting deterioration in the home lending markets during the quarter.
- Gross charge-offs in the HFI home lending portfolio were $274 million of which approximately $206 million were applied against the previously established valuation discount and the balance reflected in the provision for credit losses.
- The remaining discount on HFI home loans was approximately $410 million at March 31, 2008, including amounts related to the manufactured housing portfolio transferred to held for investment during the quarter. Reserves and remaining discount totaled approximately $1.1 billion on outstanding loans (unpaid contractual principal balance) of $9.4 billion.

Credit Quality – Consumer Segment

- Net charge-offs in the Consumer segment were $30.8 million, up from $24.4 million last quarter as higher charge-offs in the private student loan portfolio were partially offset by slightly lower charge-offs on other consumer loans.
- 60+ day owned delinquencies were 4.90%, essentially flat with 4.93% last quarter. Non-performing assets increased to $87 million from $8 million in the prior quarter reflecting the student loans affected by the bankruptcy of a pilot training school.
- Reserves for credit losses for our private student lending portfolio were increased by approximately $120 million (to approximately $138 million at March 31, 2008), primarily due to the previously discussed establishment of a reserve for loans to students of a pilot training school. There are no other large single-school exposures within the private student loan portfolio.

Expenses

- Salaries and general operating expenses were down $59.0 million from last quarter and $37.8 million from a year ago, reflecting lower employee headcount. The decrease is reflected across most expense categories, primarily lower salary and incentive compensation accruals.
- Charges for severance and related real estate exit activities totaled $69.1 million and reflects reductions of approximately 500 employees throughout the organization, as we continue to adjust to current market conditions and streamline certain processes. Expected annual savings from these actions are approximately $75 million, of which approximately $7 million was realized in the current quarter.
- Employee headcount totaled approximately 6,100 at March 31, 2008, down from 6,700 at December 31, 2007, and 7,500 a year ago.

Loss on Debt-related Derivative Extinguishments

- The pre-tax loss of $148.1 million is due to the discontinuation of hedge accounting for interest rate swaps hedging our commercial paper program. The swaps converted commercial paper, essentially a floating rate liability, to fixed rate for the funding of fixed rate assets with terms similar to the swaps. This loss resulted from declines in market interest rates since inception of the swaps. This loss had been previously reflected in other comprehensive income and therefore the loss had a negligible impact on shareholders' equity.

5

Income Tax Provision

- The effective tax rate of 55% for the quarter is the result of tax benefits generated by losses at high tax rates exceeding tax expense on income taxed at lower tax rates.
- The quarter results included $253.6 million of tax benefit related to the reported net loss for the home-lending and consumer lending segments, the loss on the interest rate swaps economically hedging the commercial paper program, and the valuation allowance related to asset-based lending commitments held for sale.
- Excluding these items and other noteworthy items, the effective tax rate is estimated to be approximately 20%, reflecting a higher proportion of international earnings.

Volume and Assets

- Total origination volumes, excluding factoring, declined from last quarter and last year as we have strategically limited new origination volumes to balance our liquidity goals with franchise value considerations. Origination volume in our commercial businesses for the quarter was $5.1 billion, down from $7.8 billion last quarter and $6.6 billion for the year ago quarter.
- Managed assets were up 2% from last quarter as the Company controlled balance sheet growth. The growth was primarily in the Corporate Finance segment, reflecting a modestly higher level of line utilization by clients, and the Consumer segment, reflecting the funding of existing commitments for government-guaranteed student loans. Managed assets are expected to be lower by the end of the second quarter as a result of our planned liquidity actions.
- Financing and leasing assets held for sale were $2.6 billion at March 31, 2008, up $1.0 billion from last quarter, and included approximately $500 million in commercial aircraft and $1.1 billion in revolving asset-based commercial loans with anticipated sales in conjunction with our planned liquidity measures.

**Segment Results:**

*Corporate Finance*

- Total net revenues (the sum of net finance revenue and other income) decreased from both prior year quarter and last quarter. The 10% increase in net finance revenue on higher asset levels over the last year quarter and the modest increase over last quarter was more than offset by lower other income. The declines in other income reflect a significantly lower level of loan sales and syndication activity.
- Net finance revenue as a percentage of average earning assets remained stable from the prior year quarter and last quarter. Excluding the construction finance business, which was sold during the second quarter of 2007, volume was down 33% from last year, impacted by market conditions and management's decision to strategically limit new origination volumes. Current quarter includes approximately $335 million of loans funded through CIT Bank.
- Net charge-offs increased from both last year and last quarter mainly due to one exposure to a company that filed for bankruptcy during the quarter for which we charged-off approximately $22 million. Delinquencies and non-performing assets increased from last quarter and last year reflecting a few additional accounts in various industries.
- Excluding the valuation allowance on assets being sold for liquidity purposes, Corporate Finance pre-tax income was $88.2 million, down from $115.6 million last quarter and $125.5 million last year.

*Transportation Finance*

- Total net revenues were up over both last year and last quarter due to asset growth and higher gains on equipment sales, particularly in aerospace. Our commercial aircraft portfolio continued to be fully utilized.
- Net finance revenue as a percentage of average earning assets after depreciation was up from last year on strength in non-operating lease margins and aerospace rentals, but down from last quarter on lower rail lease rates.
- Volume was up from the prior year on higher new aircraft deliveries, but down from the prior quarter. All aircraft scheduled for delivery in our aerospace order book through December 2009 have been placed.
- Credit quality continued strong with net recoveries, and modestly higher aerospace delinquencies and non-performing asset levels.
- Return on risk-adjusted capital increased from last quarter and last year quarter to 19.8%.

*Trade Finance*

- Total net revenues were down from both last year and the prior quarter as competitive pressures lowered rates and volumes were down slightly.
- Net finance revenue as a percentage of average earning assets decreased on lower rates.
- Net charge-offs were up over last quarter and last year. Delinquencies and non-performing loans were up from last quarter, but below last year levels.
- Return on risk-adjusted capital was 15.8% down slightly from both last quarter and last year.

*Vendor Finance*

- Total net revenues were down from both last year and the prior quarter. Higher finance revenues driven by asset growth were offset by increased funding costs. Other income was down on lower joint venture income (reflecting the termination of our interest in the DFS joint venture) and lower fees.
- Other income also included a pre-tax $33 million impairment charge reflecting the repricing of debt costs underlying one of the securitization conduit vehicles.
- Net finance revenue as a percentage of average earning assets after depreciation was down from last year and last quarter due to higher borrowing spreads.
- Credit losses were down from last quarter and up over last year. Delinquencies and non-performing asset levels increased over both periods as the increases in our international operations offset the lower U.S. operation balances.
- Total new business volume declined from last year driven by lower U.S. volumes, as declines in Dell volume were partially offset by new vendor relationships.

*Home Lending*

- Total net revenues were down from last year reflecting lower asset balances and higher funding costs (principally on the 2007 third quarter securitization), but above last quarter. Adjustments to the valuation allowance for assets held for sale totaled $23 million for the quarter and related to $338 million (approximately $480 million unpaid principal balance) of manufactured home receivables that have been moved into assets held for investment at March 31, 2008.
- Home lending assets held for investment were $8.7 billion at quarter-end, reflecting unpaid principal balance of $9.4 billion and discounts of $0.7 billion. Reserves for credit losses were $400 million at March 31, 2008.

- Gross charge-offs for the quarter were $274 million, of which $206 million were applied to the existing valuation discount. The current quarter provision for loan losses was $218 million, which resulted in an increase to reserves of $150 million.
- Delinquencies and non-performing assets increased from last year and the prior quarter reflecting continued deterioration in the housing sector. The balance of Real Estate Owned declined from the prior quarter, as the level of sales exceeded new foreclosures.
- Liquidations of loans held for investment in the quarter totaled approximately $330 million, down from approximately $380 million in the prior quarter.

*Consumer*

- Total net revenues were down from last year and last quarter. Finance income was down as a result of loans to the students of the helicopter school which filed for bankruptcy being placed on non-accrual status and loans resetting at lower interest rates.
- Net charge-offs increased in both student loans and unsecured consumer loan portfolios compared with last quarter and the prior year quarter. Delinquencies were flat with last quarter, and higher than last year. Non-performing assets were up reflecting the student loans affected by the bankruptcy of a pilot training school.
- New business volume increased from last quarter, primarily reflecting additional disbursements on existing government-guaranteed student loan commitments, but was down from last year as we stopped funding certain student lending products in the fourth quarter of 2007.
- Reserves for credit losses were increased by approximately $120 million (to approximately $138 million at March 31, 2008), primarily due to the establishment of a reserve for loans to students of a pilot training school that filed bankruptcy during the quarter.
- We announced on April 3, 2008, that we ceased the origination of new government guaranteed student loans and expect to record a pre-tax charge of approximately $20 million related to closing the originations platform of the student lending business, $15 million of which will be recognized in the second quarter of 2008. We will continue to service the current portfolio and fund any remaining commitments, which are estimated to be approximately $200 million.

*Corporate and Other*

- Corporate and other, principally contains certain credit loss provisioning, preferred stock dividends and other financing costs. The current period also contains the hedge accounting discontinuation charge for the interest rate swaps related to the commercial paper program, as well as the severance and real estate expenses associated with streamlining efforts.

**Conference Call and Webcast:**

We will discuss this quarter's results, as well as ongoing strategy, on a conference call and audio webcast today at 9:00 am (EDT). Interested parties may access the conference call live today by dialing 866-831-6272 for U.S. and Canadian callers or 617-213-8859 for international callers, and reference access code "CIT Group" or access the audio webcast at the following website: http://ir.cit.com. An audio replay of the call will be available beginning shortly after the conclusion of the call until 11:59 pm (EDT) April 24, 2008, by dialing 888-286-8010 for U.S. and Canadian callers or 617-801-6888 for international callers with the access code 38443094, or at the following website: http://ir.cit.com.

**About CIT:**

CIT (NYSE: CIT) is a global commercial finance company that provides financial products and advisory services to more than one million customers in over 50 countries across 30 industries. A leader in middle market financing, CIT has more than $80 billion in managed assets and provides financial solutions for more than half of the Fortune 1000. A member of the S&P 500 and Fortune 500, it maintains leading positions in asset-based, cash flow and Small Business Administration lending, equipment leasing, vendor financing and factoring. The CIT brand platform, Capital Redefined, articulates its value proposition of providing its customers with the relationship, intellectual and financial capital to yield infinite possibilities. Founded in 1908, CIT is celebrating its Centennial throughout 2008. www.cit.com.

**Forward-Looking Statements:**

This release contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. All forward-looking statements (including statements regarding future financial and operating results) involve risks, uncertainties and contingencies, many of which are beyond CIT's control, which may cause actual results, performance, or achievements to differ materially from anticipated results, performance, or achievements. All statements contained in this release that are not clearly historical in nature are forward-looking, and the words "anticipate," "believe," "expect," "estimate," "plan," "target," and similar expressions are generally intended to identify forward-looking statements. The transactions, plans and arrangements related to the Company's liquidity plan and described in this release are subject to a number of uncertainties, and there can be no assurances that any or all such transactions, plans or arrangements will be undertaken, or, if undertaken, completed, or if completed, will be completed on the agreed terms. Economic, business, funding market, competitive and/or regulatory factors, among others, affecting CIT's businesses are examples of factors that could cause actual results to differ materially from those described in the forward-looking statements. More detailed information about these factors are described in CIT's filings with the Securities and Exchange Commission, including its Annual Report on Form 10-K for the year ended December 31, 2007. CIT is under no obligation to (and expressly disclaims any such obligation to) update or alter its forward-looking statements, whether as a result of new information, future events or otherwise. This release includes certain non-GAAP financial measures as defined under SEC rules. As required by SEC rules, we have provided a reconciliation of those measures to the most directly comparable GAAP measures, which is available with this release and on our website at http://ir.cit.com.

###

**Contact:**

| | | | |
|---|---|---|---|
| Investor Relations | Kenneth A. Brause | Executive Vice President, Investor Relations | (212) 771-9650 |
| Media Relations | C. Curtis Ritter | Director of External Communications and Media Relations | (212) 461-7711 curt.ritter@cit.com |

Individuals interested in receiving future updates on CIT via e-mail can register at http://newsalerts.cit.com

**CIT GROUP INC. AND SUBSIDIARIES**
**UNAUDITED CONSOLIDATED INCOME STATEMENTS**
(dollars in millions, except per share data)

| | | Quarters Ended | | | | |
|---|---|---|---|---|---|---|
| | | March 31, 2008 | | December 31, 2007 | | March 31, 2007 |
| Finance revenue | $ | 1,682.0 | $ | 1,839.6 | $ | 1,617.1 |
| Interest expense | | 954.1 | | 1,040.6 | | 873.6 |
| Depreciation on operating lease equipment | | 294.6 | | 311.7 | | 263.6 |
| Net finance revenue | | 433.3 | | 487.3 | | 479.9 |
| Provision for credit losses | | 464.5 | | 385.5 | | 71.1 |
| Net finance revenue after credit provision | | (31.2) | | 101.8 | | 408.8 |
| Valuation allowance for assets held for sale | | 140.5 | | 18.0 | | - |
| Net revenue, after credit provision and valuation allowance | | (171.7) | | 83.8 | | 408.8 |
| Other income | | 174.0 | | 466.2 | | 328.6 |
| Total net revenue after valuation allowance | | 2.3 | | 550.0 | | 737.4 |
| Salaries and general operating expenses | | 318.0 | | 377.0 | | 355.8 |
| Provision for severance and real estate exiting activities | | 69.1 | | - | | - |
| Loss on debt and debt-related derivative extinquishments | | 148.1 | | - | | 139.3 |
| Impairment of goodwill and intangible assets | | - | | 312.7 | | - |
| (Loss) income before provision for income taxes | | (532.9) | | (139.7) | | 242.3 |
| Benefit (provision) for income taxes | | 294.2 | | 18.2 | | (34.1) |
| Minority interest, after tax | | (11.0) | | (1.7) | | (0.1) |
| Net (loss) income before preferred stock dividends | | (249.7) | | (123.2) | | 208.1 |
| Preferred stock dividends | | (7.5) | | (7.5) | | (7.5) |
| Net (Loss) income (attributable) available to common stockholders | $ | (257.2) | $ | (130.7) | $ | 200.6 |
| Per common share data | | | | | | |
| Basic (loss) earnings per share | $ | (1.35) | $ | (0.69) | $ | 1.03 |
| Diluted (loss) earnings per share | $ | (1.35) | $ | (0.69) | $ | 1.01 |
| Number of shares - basic (thousands) | | 191,091 | | 189,810 | | 194,099 |
| Number of shares - diluted (thousands) | | 191,091 | | 189,810 | | 197,922 |
| Other Income | | | | | | |
| Fees and other income[1] | $ | 65.3 | $ | 102.4 | $ | 185.5 |
| Factoring commissions | | 52.1 | | 61.6 | | 52.4 |
| Gains on receivable sales and syndication fees | | 4.7 | | 21.7 | | 53.6 |
| Gains on sales of leasing equipment | | 47.8 | | 25.9 | | 29.5 |
| Gains on securitizations | | 4.1 | | 11.5 | | 7.6 |
| Gain on sale of Dell Financial Svcs. joint venture | | - | | 247.1 | | - |
| Gain (loss) on loan portfolio dispositions | | - | | (4.0) | | - |
| Total other income | $ | 174.0 | $ | 466.2 | $ | 328.6 |

(1) Fees and other income is comprised of asset management and service fees, including securitization-related servicing fees and accretion net of impairment charge, advisory and agent fees, as well as income from joint ventures.

**CIT GROUP INC. AND SUBSIDIARIES**
**UNAUDITED CONSOLIDATED BALANCE SHEETS**
**(dollars in millions)**

| | March 31, 2008 | December 31, 2007 |
|---|---|---|
| **ASSETS** | | |
| Financing and leasing assets held for investment: | | |
| Finance receivables | $ 63,538.9 | $ 62,536.5 |
| Reserve for credit losses | (1,121.9) | (831.5) |
| Net finance receivables | 62,417.0 | 61,705.0 |
| Operating lease equipment, net | 12,203.7 | 12,610.5 |
| Financing and leasing assets held for sale | 2,615.7 | 1,606.0 |
| Cash and cash equivalents | 10,340.3 | 6,792.3 |
| Retained interests in securitizations and other investments | 1,233.2 | 1,289.9 |
| Goodwill and intangible assets, net | 1,159.5 | 1,152.5 |
| Other assets | 5,754.3 | 5,091.8 |
| **Total Assets** | $ 95,723.7 | $ 90,248.0 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Debt: | | |
| Commercial paper | $ 1,338.4 | $ 2,822.3 |
| Bank Lines | 7,300.0 | - |
| Non-recourse, secured borrowings | 19,090.3 | 17,430.3 |
| Variable-rate senior unsecured notes | 18,584.5 | 19,888.2 |
| Fixed-rate senior unsecured notes | 30,668.5 | 29,477.6 |
| Junior subordinated notes and convertible debt | 1,440.0 | 1,440.0 |
| Total debt | 78,421.7 | 71,058.4 |
| Deposits | 2,406.5 | 2,745.8 |
| Credit balances of factoring clients | 3,572.9 | 4,542.2 |
| Accrued liabilities and payables | 4,624.7 | 4,883.5 |
| **Total Liabilities** | 89,025.8 | 83,229.9 |
| **Minority interest** | 54.3 | 57.5 |
| Stockholders' Equity: | | |
| Preferred stock | 500.0 | 500.0 |
| Common stock | 2.1 | 2.1 |
| Paid-in capital | 10,367.3 | 10,453.9 |
| Accumulated deficit | (3,207.0) | (2,949.8) |
| Accumulated other comprehensive income | 152.8 | 194.8 |
| Less: treasury stock, at cost | (1,171.6) | (1,240.4) |
| Total Common Stockholders' Equity | 6,143.6 | 6,460.6 |
| **Total Stockholders' Equity** | 6,643.6 | 6,960.6 |
| **Total Liabilities and Stockholders' Equity** | $ 95,723.7 | $ 90,248.0 |
| **Other Assets** | | |
| Receivables from derivative counterparties | $ 1,994.8 | $ 1,097.0 |
| Deposits on commercial aerospace flight equipment | 740.6 | 821.7 |
| Accrued interest and dividends | 647.2 | 703.5 |
| Investments in and receivables from non-consolidated subsidiaries | 215.1 | 233.8 |
| Repossessed assets and off-lease equipment | 201.4 | 226.6 |
| Equity and debt investments | 347.6 | 294.3 |
| Furniture and fixtures | 189.5 | 190.8 |
| Prepaid expenses | 119.6 | 131.4 |
| Miscellaneous receivables and other assets | 1,298.5 | 1,392.7 |
| | $ 5,754.3 | $ 5,091.8 |

CIT GROUP INC. AND SUBSIDIARIES
OWNED AND MANAGED ASSET COMPOSITION
(dollars in millions)

| | March 31, 2008 | | December 31, 2007 | | March 31, 2007 | |
|---|---|---|---|---|---|---|
| **Corporate Finance** | | | | | | |
| Finance receivables | $ | 21,222.0 | $ | 21,326.2 | $ | 20,679.5 |
| Operating lease equipment, net | | 364.6 | | 459.6 | | 185.5 |
| Financing and leasing assets held for sale | | 1,840.0 | | 669.3 | | 974.6 |
| Owned assets | | 23,426.6 | | 22,455.1 | | 21,839.6 |
| Finance receivables securitized and managed by CIT | | 1,347.7 | | 1,526.7 | | 1,436.6 |
| Managed assets | | 24,774.3 | | 23,981.8 | | 23,276.2 |
| **Transportation Finance** | | | | | | |
| Finance receivables | | 2,620.1 | | 2,551.3 | | 2,186.7 |
| Operating lease equipment, net | | 10,740.8 | | 11,031.6 | | 10,174.7 |
| Financing and leasing assets held for sale | | 500.5 | | - | | 71.1 |
| Owned assets | | 13,861.4 | | 13,582.9 | | 12,432.5 |
| **Trade Finance** | | | | | | |
| Finance receivables - Owned Assets | | 7,003.9 | | 7,330.4 | | 6,889.2 |
| **Vendor Finance** | | | | | | |
| Finance receivables | | 10,824.8 | | 10,373.3 | | 9,239.1 |
| Operating lease equipment, net | | 1,098.3 | | 1,119.3 | | 934.2 |
| Financing and leasing assets held for sale | | 198.7 | | 460.8 | | 351.4 |
| Owned assets | | 12,121.8 | | 11,953.4 | | 10,524.7 |
| Finance receivables securitized and managed by CIT | | 3,954.0 | | 4,104.0 | | 4,083.3 |
| Managed assets | | 16,075.8 | | 16,057.4 | | 14,608.0 |
| **Home Lending** | | | | | | |
| Finance receivables | | 8,749.2 | | 8,775.6 | | 11,049.9 |
| Financing and leasing assets held for sale | | - | | 345.8 | | 115.0 |
| Owned assets | | 8,749.2 | | 9,121.4 | | 11,164.9 |
| Finance receivables securitized and managed by CIT | | 652.3 | | 680.5 | | 794.8 |
| Managed assets | | 9,401.5 | | 9,801.9 | | 11,959.7 |
| **Consumer** | | | | | | |
| Finance receivables - student lending | | 12,561.9 | | 11,499.9 | | 9,493.4 |
| Finance receivables - other | | 557.0 | | 679.9 | | 588.6 |
| Financing and leasing assets held for sale | | 76.5 | | 130.1 | | 442.8 |
| Owned assets | | 13,195.4 | | 12,309.9 | | 10,524.8 |
| **Other** | | | | | | |
| Equity Investments | | 233.6 | | 165.8 | | 21.2 |
| **Consolidated Totals** | | | | | | |
| **Finance receivables** | $ | 63,538.9 | $ | 62,536.6 | $ | 60,126.4 |
| **Operating lease equipment, net** | | 12,203.7 | | 12,610.5 | | 11,294.4 |
| **Other financing and leasing assets held for sale** | | 2,615.7 | | 1,606.0 | | 1,954.9 |
| **Financing and leasing assets excl. equity investments** | | 78,358.3 | | 76,753.1 | | 73,375.7 |
| **Equity investments** | | 233.6 | | 165.8 | | 21.2 |
| **Owned assets** | | 78,591.9 | | 76,918.9 | | 73,396.9 |
| **Finance receivables securitized and managed by CIT** | | 5,954.0 | | 6,311.2 | | 6,314.7 |
| **Managed assets** | $ | 84,545.9 | $ | 83,230.1 | $ | 79,711.6 |

CIT GROUP INC. AND SUBSIDIARIES
SEGMENT DATA
(dollars in millions)

| | | | Quarters Ended | | | |
|---|---|---|---|---|---|---|
| | | March 31, 2008 | | December 31, 2007 | | March 31, 2007 |
| **Corporate Finance** | | | | | | |
| Net finance revenue, before depreciation | $ | 184.4 | $ | 181.4 | $ | 167.5 |
| Other income | | 63.8 | | 92.0 | | 102.4 |
| Depreciation on operating lease equipment | | 9.2 | | 9.8 | | 9.8 |
| Provision for credit losses | | 36.6 | | 24.0 | | 20.5 |
| Salaries & general operating expenses | | 114.2 | | 124.0 | | 114.1 |
| Other pre-tax items | | 117.5 | | - | | - |
| Income before taxes & other items | | (29.3) | | 115.6 | | 125.5 |
| Provision for income taxes & other after-tax items | | 9.1 | | (45.3) | | (45.4) |
| Net income (loss) | $ | (20.2) | $ | 70.3 | $ | 80.1 |
| Return on risk-adjusted capital | | -3.1% | | 11.1% | | 13.8% |
| New business volume | $ | 2,161.2 | $ | 4,181.5 | $ | 3,588.2 |
| | | | | | | |
| **Transportation Finance** | | | | | | |
| Net finance revenue, before depreciation | $ | 243.5 | $ | 244.4 | $ | 210.8 |
| Other income | | 39.7 | | 16.5 | | 17.7 |
| Depreciation on operating lease equipment | | 149.5 | | 144.8 | | 133.5 |
| Provision for credit losses | | (0.4) | | (6.8) | | (22.5) |
| Salaries & general operating expenses | | 40.6 | | 50.5 | | 33.3 |
| Other pre-tax items | | - | | - | | - |
| Income before taxes & other items | | 93.5 | | 72.4 | | 84.2 |
| Provision for income taxes & other after-tax items | | (9.0) | | (10.8) | | (7.9) |
| Net income | $ | 84.5 | $ | 61.6 | $ | 76.3 |
| Return on risk-adjusted capital | | 19.8% | | 14.2% | | 19.3% |
| New business volume | $ | 710.1 | $ | 920.4 | $ | 686.2 |
| | | | | | | |
| **Trade Finance** | | | | | | |
| Net finance revenue | $ | 36.2 | $ | 46.3 | $ | 41.4 |
| Other income | | 65.9 | | 74.4 | | 67.8 |
| Provision for credit losses | | 9.5 | | 7.3 | | 8.0 |
| Salaries & general operating expenses | | 39.2 | | 36.3 | | 41.3 |
| Other pre-tax items | | - | | - | | - |
| Income before taxes & other items | | 53.4 | | 77.1 | | 59.9 |
| Provision for income taxes & other after-tax items | | (20.2) | | (29.3) | | (23.3) |
| Net income | $ | 33.2 | $ | 47.8 | $ | 36.6 |
| Return on risk-adjusted capital | | 15.8% | | 18.9% | | 17.0% |
| | | | | | | |
| **Vendor Finance** | | | | | | |
| Net finance revenue, before depreciation | $ | 266.3 | $ | 300.9 | $ | 251.5 |
| Other income* | | 11.8 | | 318.0 | | 111.0 |
| Depreciation on operating lease equipment | | 136.1 | | 157.4 | | 120.4 |
| Provision for credit losses | | 28.2 | | 28.4 | | 10.4 |
| Salaries & general operating expenses | | 104.0 | | 122.5 | | 115.3 |
| Other pre-tax items | | - | | - | | - |
| Income before taxes & other items | | 9.8 | | 310.6 | | 116.4 |
| Provision for income taxes & other after-tax items | | (3.0) | | (105.1) | | (40.1) |
| Net income | $ | 6.8 | $ | 205.5 | $ | 76.3 |
| Return on risk-adjusted capital | | 1.6% | | 45.6% | | 20.4% |
| New business volume | $ | 2,240.8 | $ | 2,664.5 | $ | 2,310.0 |
| | | | | | | |
| **Home Lending** | | | | | | |
| Net finance revenue | $ | 20.3 | $ | 26.4 | $ | 54.0 |
| Other income | | (4.4) | | (38.4) | | 11.5 |
| Provision for credit losses | | 217.8 | | 256.1 | | 35.3 |
| Salaries & general operating expenses | | 20.2 | | 19.1 | | 31.2 |
| Other pre-tax items | | 23.0 | | 18.0 | | - |
| Income (loss) before taxes & other items | | (245.1) | | (305.2) | | (1.0) |
| Provision for income taxes & other after-tax items | | 91.8 | | 116.5 | | 1.5 |
| Net income (loss) | $ | (153.3) | $ | (188.7) | $ | 0.5 |
| Return on risk-adjusted capital | | -58.1% | | -253.2% | | 0.3% |
| New business volume | $ | 7.6 | $ | 10.9 | $ | 2,193.1 |
| | | | | | | |
| **Consumer** | | | | | | |
| Net finance revenue | $ | 27.2 | $ | 29.3 | $ | 31.9 |
| Other income | | (8.4) | | 4.7 | | 17.8 |
| Provision for credit losses | | 149.6 | | 26.4 | | 7.9 |
| Salaries & general operating expenses | | 21.3 | | 22.4 | | 25.5 |
| Other pre-tax items | | - | | 312.7 | | - |
| Income (loss) before taxes & other items | | (152.1) | | (327.5) | | 16.3 |
| Provision for income taxes & other after-tax items | | 56.9 | | 16.7 | | (4.9) |
| Net income (loss) | $ | (95.2) | $ | (310.8) | $ | 11.4 |
| Return on risk-adjusted capital | | -143.7% | | -267.0% | | 9.1% |
| New business volume | $ | 1,210.0 | $ | 968.6 | $ | 2,001.8 |
| | | | | | | |
| **Corporate and Other** | | | | | | |
| Net finance revenue, before depreciation | $ | (50.0) | $ | (29.7) | $ | (13.6) |
| Other income | | 5.6 | | (1.0) | | 0.3 |
| Depreciation on operating lease equipment | | (0.2) | | (0.3) | | (0.1) |
| Provision for credit losses | | 23.2 | | 50.1 | | 11.5 |
| Salaries & general operating expenses | | (21.5) | | 2.2 | | (4.9) |
| Other pre-tax items | | 217.2 | | - | | 139.3 |
| Income (loss) before taxes & other items | | (263.1) | | (82.7) | | (159.1) |
| Provision for income taxes & other after-tax items | | 150.1 | | 66.3 | | 78.4 |
| Net (loss) | $ | (113.0) | $ | (16.4) | $ | (80.7) |
| Return on risk-adjusted capital | | -8.8% | | -1.9% | | -3.3% |

\* The 2008 balance includes a pre-tax impairment charge on a retained interest of approximately $33 million. The 2007 December quarter includes pre-tax gains on the sale of our interest in the DFS joint venture and sale of a systems leasing business totaling approximately $270 million.

13

CIT GROUP INC. AND SUBSIDIARIES
CREDIT METRICS
(dollars in millions)

| | | Quarters Ended | | | | | |
|---|---|---|---|---|---|---|---|
| | | March 31, 2008 | | December 31, 2007 | | March 31, 2007 | |
| **Net Credit Losses - Owned as a Percentage of Average Finance Receivables** | | | | | | | |
| Corporate Finance | $ | 39.5 | 0.70% | $ 22.6 | 0.42% | $ 20.8 | 0.41% |
| Transportation Finance | | (0.6) | (0.09)% | (6.9) | (1.10)% | (22.5) | (4.15)% |
| Trade Finance | | 8.9 | 0.51% | 7.5 | 0.38% | 7.0 | 0.42% |
| Vendor Finance | | 19.5 | 0.73% | 22.3 | 0.87% | 10.0 | 0.43% |
| Commercial Segments | | 67.3 | 0.63% | 45.5 | 0.43% | 15.3 | 0.16% |
| Home Lending | | 67.8 | 3.15% | 6.1 | 0.27% | 34.5 | 1.32% |
| Consumer | | 30.8 | 0.97% | 24.4 | 0.81% | 7.4 | 0.30% |
| Total | $ | 165.9 | 1.04% | $ 76.0 | 0.48% | $ 57.2 | 0.39% |
| **Net Credit Losses - Managed as a Percentage of Average Managed Finance Receivables** | | | | | | | |
| Corporate Finance | $ | 42.2 | 0.75% | $ 24.9 | 0.44% | $ 22.8 | 0.42% |
| Transportation Finance | | (0.6) | (0.09)% | (6.9) | (1.10)% | (22.5) | (4.15)% |
| Trade Finance | | 8.9 | 0.51% | 7.5 | 0.38% | 7.0 | 0.42% |
| Vendor Finance | | 29.4 | 0.80% | 29.5 | 0.82% | 13.4 | 0.41% |
| Commercial Segments | | 79.9 | 0.66% | 55.0 | 0.46% | 20.7 | 0.19% |
| Home Lending | | 76.0 | 3.28% | 12.4 | 0.51% | 41.9 | 1.48% |
| Consumer | | 30.8 | 0.97% | 24.4 | 0.81% | 7.4 | 0.30% |
| Total | $ | 186.7 | 1.09% | $ 91.8 | 0.50% | $ 70.0 | 0.43% |

| | | March 31, 2008 | | December 31, 2007 | | March 31, 2007 | |
|---|---|---|---|---|---|---|---|
| **Finance Receivables Past Due 60 days or more - Owned as a Percentage of Finance Receivables** | | | | | | | |
| Corporate Finance | $ | 266.6 | 1.26% | $ 194.8 | 0.91% | $ 112.4 | 0.54% |
| Transportation Finance | | 14.6 | 0.56% | 9.8 | 0.39% | 16.3 | 0.75% |
| Trade Finance | | 86.1 | 1.23% | 71.1 | 0.97% | 94.9 | 1.38% |
| Vendor Finance | | 339.6 | 3.14% | 336.0 | 3.24% | 201.4 | 2.18% |
| Commercial Segments | | 706.9 | 1.70% | 611.7 | 1.47% | 425.0 | 1.09% |
| Home Lending | | 1,185.8 | 12.95% | 962.1 | 9.91% | 569.7 | 5.16% |
| Consumer | | 642.8 | 4.90% | 600.8 | 4.93% | 460.0 | 4.56% |
| Total | $ | 2,535.5 | 3.97% | $ 2,174.6 | 3.43% | $ 1,454.7 | 2.42% |

| | | March 31, 2008 | | December 31, 2007 | | March 31, 2007 | |
|---|---|---|---|---|---|---|---|
| **Non-performing Assets - Owned as a Percentage of Finance Receivables** | | | | | | | |
| Corporate Finance | $ | 442.3 | 2.08% | $ 242.2 | 1.14% | $ 153.9 | 0.74% |
| Transportation Finance | | 7.9 | 0.30% | 3.3 | 0.13% | 7.6 | 0.35% |
| Trade Finance | | 44.4 | 0.63% | 41.6 | 0.57% | 57.9 | 0.84% |
| Vendor Finance | | 205.6 | 1.90% | 190.6 | 1.84% | 83.7 | 0.91% |
| Commercial Segments | | 700.2 | 1.68% | 477.7 | 1.15% | 303.1 | 0.78% |
| Home Lending | | 1,057.1 | 11.54% | 892.3 | 9.19% | 576.8 | 5.22% |
| Consumer | | 87.7 | 0.67% | 8.5 | 0.07% | 3.2 | 0.03% |
| Total | $ | 1,845.0 | 2.90% | $ 1,378.5 | 2.17% | $ 883.1 | 1.47% |

| | | March 31, 2008 | | December 31, 2007 | | March 31, 2007 | |
|---|---|---|---|---|---|---|---|
| **Finance Receivables Past Due 60 days or more - Managed as a Percentage of Managed Financial Assets** | | | | | | | |
| Corporate Finance | $ | 291.0 | 1.19% | $ 201.8 | 0.86% | $ 122.6 | 0.53% |
| Transportation Finance | | 14.6 | 0.47% | 9.8 | 0.39% | 16.3 | 0.72% |
| Trade Finance | | 86.1 | 1.23% | 71.1 | 0.97% | 94.9 | 1.38% |
| Vendor Finance | | 510.5 | 3.41% | 520.7 | 3.49% | 325.2 | 2.38% |
| Commercial Segments | | 902.2 | 1.82% | 803.4 | 1.68% | 559.0 | 1.22% |
| Home Lending | | 1,251.6 | 12.76% | 1,031.3 | 9.92% | 633.1 | 5.29% |
| Consumer | | 642.8 | 4.87% | 600.8 | 4.88% | 460.0 | 4.37% |
| Total | $ | 2,796.6 | 3.86% | $ 2,435.5 | 3.42% | $ 1,652.1 | 2.42% |

NOTE
Home lending contractual delinquency and non-performing statistics as a percentage of unpaid principal balance.
December 2007 home lending contractual delinquency and non-performing statistics as a percentage of unpaid principal balance - held for investment portfolio only.

**CIT GROUP INC. AND SUBSIDIARIES**
**RATIOS AND OTHER DATA**
**(dollars in millions, except per share data)**

| | Quarters Ended | | |
|---|---|---|---|
| | March 31, 2008 | December 31, 2007 | March 31, 2007 |
| **Profitability** | | | |
| Net finance revenue as a percentage of AEA | 2.35% | 2.67% | 2.83% |
| Net finance revenue after provision as a percentage of AEA | -0.17% | 0.56% | 2.41% |
| Salaries and general operating expenses as a percentage of AMA(1) | 1.59% | 1.91% | 1.92% |
| Efficiency ratio(2) | 52.4% | 39.5% | 44.0% |
| Return on average common stockholders' equity | -15.8% | -7.8% | 11.5% |
| Return on AEA | -1.39% | -0.72% | 1.18% |
| Return on AMA | -1.29% | -0.66% | 1.08% |

See "Non-GAAP Disclosures" for additional information regarding profitability ratio and metric comparisons.

(1) The salaries and general operating expenses do not include the provision for severance and real estate exiting activities.

(2) The efficiency ratio is the ratio of salaries and general operating expenses (excluding the provision for severance and real estate exiting activities) to total net revenues (before provision for credit losses and valuation allowance).

| **Average Balances** | | | |
|---|---|---|---|
| Average Finance Receivables (AFR) | $ 64,050.6 | $ 62,931.5 | $ 58,798.1 |
| Average Earning Assets (AEA) | 73,869.5 | 72,975.1 | 67,920.9 |
| Average Managed Assets (AMA) | 79,996.1 | 78,999.1 | 74,100.6 |
| Average Operating Leases (AOL) | 12,541.4 | 12,215.7 | 11,168.2 |
| Average Common Stockholders' Equity | 6,507.3 | 6,678.1 | 6,955.4 |

| | March 31, 2008 | December 31, 2007 | March 31, 2007 |
|---|---|---|---|
| **Capital and Leverage** | | | |
| Total tangible stockholders' equity to managed assets | 8.33% | 8.82% | 8.65% |
| Tangible book value per common share | $26.63 | $28.42 | $29.43 |
| Book value per common share | $32.68 | $34.48 | $35.96 |
| **Reserve for Credit Losses** | | | |
| Reserve for credit losses (excluding reserves related to impaired loans) as a percentage of finance receivables, excluding home lending and student loans | 1.23% | 1.20% | 1.18% |
| Reserve for credit losses (excluding reserves related to impaired loans) as a percentage of finance receivables, excluding home lending and guaranteed student loans | 1.53% | 1.22% | 1.16% |
| Reserve for credit losses as a percentage of finance receivables | 1.77% | 1.33% | 1.17% |
| Reserve for credit losses as a percentage of non-performing assets, excluding home lending and student lending | 82.0% | 114.3% | 162.9% |
| Reserve for credit losses as a percentage of finance receivables past due 60 days or more, excluding home lending and student lending | 81.2% | 88.0% | 115.4% |

**CIT GROUP INC. AND SUBSIDIARIES**
**Select Concentration Data**
**(dollars in millions unless specified)**

**Commercial Aerospace Portfolio:**

| | March 31, 2008 | | December 31, 2007 | | March 31, 2007 | |
|---|---|---|---|---|---|---|
| | Net Investment | Number | Net Investment | Number | Net Investment | Number |
| *By Region:* | | | | | | |
| Europe | $ 2,788.8 | 90 | $ 2,906.2 | 94 | $ 2,826.2 | 88 |
| U.S. and Canada | 1,237.4 | 62 | 1,279.5 | 60 | 1,262.0 | 59 |
| Asia Pacific | 2,465.1 | 84 | 2,274.9 | 82 | 1,758.8 | 54 |
| Latin America | 1,236.9 | 40 | 1,136.0 | 36 | 984.5 | 31 |
| Africa / Middle East | 553.5 | 13 | 567.8 | 15 | 486.8 | 12 |
| Total | $ 8,281.7 | 289 | $ 8,164.4 | 287 | $ 7,318.3 | 244 |
| *By Manufacturer:* | | | | | | |
| Boeing | $ 3,574.6 | 153 | $ 3,579.6 | 154 | $ 3,162.9 | 126 |
| Airbus | 4,698.5 | 135 | 4,575.8 | 132 | 4,150.0 | 118 |
| Other | 8.6 | 1 | 9.0 | 1 | 5.4 | - |
| Total | $ 8,281.7 | 289 | $ 8,164.4 | 287 | $ 7,318.3 | 244 |
| *By Body Type (1):* | | | | | | |
| Narrow body | $ 6,217.4 | 230 | $ 6,136.4 | 226 | $ 5,394.7 | 186 |
| Intermediate | 1,822.6 | 48 | 1,821.9 | 48 | 1,657.9 | 43 |
| Wide body | 233.1 | 10 | 197.1 | 12 | 260.3 | 15 |
| Other | 8.6 | 1 | 9.0 | 1 | 5.4 | - |
| Total | $ 8,281.7 | 289 | $ 8,164.4 | 287 | $ 7,318.3 | 244 |
| *By Product:* | | | | | | |
| Operating lease | $ 7,298.8 | 220 | $ 7,120.1 | 219 | $ 6,439.1 | 198 |
| Leveraged lease (other) | 38.8 | 2 | 40.8 | 2 | 40.5 | 2 |
| Leveraged lease (tax optimized) | 43.6 | 1 | 45.4 | 1 | 43.9 | 1 |
| Capital lease | 208.7 | 9 | 225.5 | 9 | 214.2 | 8 |
| Loan | 691.8 | 57 | 732.6 | 56 | 580.6 | 35 |
| Total | $ 8,281.7 | 289 | $ 8,164.4 | 287 | $ 7,318.3 | 244 |
| | | | | | | |
| Number of accounts | 104 | | 105 | | 94 | |
| Weighted average age of fleet (years) | 6 | | 5 | | 6 | |
| Largest customer net investment | $ 286.6 | | $ 287.3 | | $ 286.0 | |
| Off-lease aircraft | - | | - | | - | |
| | | | | | | |
| New Aircraft Delivery Order Book (dollars in billions) | | | | | | |
| For the Years Ending December 31, | | | | | | |
| 2007 (Remaining 2007) | - | - | - | - | 1.1 | 21 |
| 2008 | - | - | 1.4 | 23 | 1.4 | 24 |
| 2009 | 1.4 | 23 | 0.9 | 14 | 0.8 | 13 |
| 2010 | 0.7 | 12 | 1.2 | 21 | 1.0 | 18 |
| 2011 | 1.1 | 22 | 1.1 | 23 | - | - |
| 2012 | 1.2 | 22 | 0.7 | 11 | 0.6 | 5 |
| Thereafter | 3.7 | 41 | 2.0 | 15 | 0.7 | 5 |
| Total | $ 8.1 | 120 | $ 7.3 | 107 | $ 5.6 | 86 |

(1) Narrow body are single aisle design and consist primarily of Boeing 737 and 757 series and Airbus A320 series aircraft. Intermediate body are smaller twin aisle design and consist primarily of Boeing 767 series and Airbus A330 series aircraft. Wide body are large twin aisle design and consist primarily of Boeing 747 and 777 series and McDonnell Douglas DC10 series aircraft.

| **Managed Home Lending Portfolio Statistics** | | | |
|---|---|---|---|
| | March 31, 2008(1) | December 31, 2007(1)(2) | March 31, 2007 |
| Managed assets (UPB) | $ 9,772.9 | $ 10,180.0 | $ 11,552.6 |
| Portfolio assets (UPB) | $ 9,267.1 | $ 9,656.9 | $ - |
| Portfolio assets | $ 8,642.4 | $ 9,010.4 | $ 10,952.1 |
| % of first mortgages | 89% | 88% | 89% |
| Average loan size | $ 127.4 | $ 126.3 | $ 124.3 |
| Fixed-rate mortgage % | 47% | 47% | 42% |
| Weighted Average loan-to-value | 82% | 82% | 82% |
| Average FICO score | 638 | 638 | 636 |
| Delinquencies (sixty days or more) | 12.94% | 9.99% | 5.15% |
| Net charge-offs-managed basis | 3.14% | 0.42% | 1.30% |
| Net charge-offs-owned basis | 3.15% | 0.26% | 1.20% |

(1) The December and March 2008 amounts are based on unpaid principal balances and exclude valuation adjustments.
(2) The December 2007 balances exclude approximately $270 million consisting primarily of manufactured housing vendor receivables that are included in the segment results.

16

**CIT GROUP INC. AND SUBSIDIARIES**
**Non-GAAP Disclosures**
**(dollars in millions)**

| | March 31, 2008 | December 31, 2007 | March 31, 2007 |
|---|---|---|---|
| **Managed assets** [1]: | | | |
| Finance receivables | $ 63,538.9 | $ 62,536.6 | $ 60,126.5 |
| Operating lease equipment, net | 12,203.7 | 12,610.5 | 11,294.4 |
| Financing and leasing assets held for sale | 2,615.7 | 1,606.0 | 1,954.9 |
| Equity and venture capital investments (included in other assets) | 233.6 | 165.8 | 21.2 |
| Total financing and leasing portfolio assets | 78,591.9 | 76,918.9 | 73,397.0 |
| Securitized assets | 5,954.0 | 6,311.2 | 6,314.6 |
| Managed assets | $ 84,545.9 | $ 83,230.1 | $ 79,711.6 |
| **Earning assets** [2]: | | | |
| Total financing and leasing portfolio assets | $ 78,591.9 | $ 76,918.9 | $ 73,397.0 |
| Credit balances of factoring clients | (3,572.9) | (4,542.2) | (3,769.9) |
| Earning assets | $ 75,019.0 | $ 72,376.7 | $ 69,627.1 |
| **Tangible equity** [3]: | | | |
| Total equity | $ 6,143.6 | $ 6,460.6 | $ 6,927.9 |
| Other comprehensive income relating to derivative financial instruments | 122.0 | 96.6 | (11.6) |
| Unrealized gain on securitization investments | (3.8) | (7.8) | (15.5) |
| Goodwill and intangible assets | (1,159.5) | (1,152.5) | (1,252.4) |
| Tangible common equity | 5,102.3 | 5,396.9 | 5,648.4 |
| Junior subordinated notes and convertible debt | 1,440.0 | 1,440.0 | 750.0 |
| Preferred stock | 500.0 | 500.0 | 500.0 |
| **Tangible equity** | $ 7,042.3 | $ 7,336.9 | $ 6,898.4 |

| | | Quarters Ended | |
|---|---|---|---|
| | March 31, 2008 | December 31, 2007 | March 31, 2007 |
| Total net revenues [4] | | | |
| Net Finance Revenue | $ 433.3 | $ 487.3 | $ 479.9 |
| Other Income | 174.0 | 466.2 | 328.6 |
| Total net revenues | $ 607.3 | $ 953.5 | $ 808.5 |

Non-GAAP financial measures disclosed by management are meant to provide additional information and insight relative to trends in the business to investors and, in certain cases, to present financial information as measured by rating agencies and other users of financial information. These measures are not in accordance with, or a substitute for, GAAP and may be different from, or inconsistent with, non-GAAP financial measures used by other companies.

1) Managed assets are utilized in certain credit and expense ratios. Securitized assets are included in managed assets because CIT retains certain credit risk and the servicing related to assets that are funded through securitizations.

2) Earning assets are utilized in certain revenue and earnings ratios. Earning assets are net of credit balances of factoring clients. This net amount, which corresponds to amounts funded, is a basis for revenues earned.

3) Tangible equity is utilized in leverage ratios, and is consistent with certain rating agency measurements. Other comprehensive income and unrealized gains on securitization investments (both included in the separate component of equity) are excluded from the calculation, as these amounts are not necessarily indicative of amounts which will be realized.

4) Total net revenues are the combination of net finance revenues after depreciation on operating leases and other income.



**FOR IMMEDIATE RELEASE**

### CIT REPORTS THIRD QUARTER RESULTS

<u>**Quarterly Financial Highlights**</u>

- Net loss per share of $0.24
- Home lending pre-tax charge of $465 million
- Commercial businesses performed well
- Strong asset growth
- Solid commercial credit quality
- Moderating expenses

NEW YORK – October 17, 2007 – CIT Group Inc. (NYSE: CIT), today reported diluted net loss per share of $0.24 for the third quarter of 2007, due to the home lending charge, versus $1.44 of earnings per share for the 2006 quarter. Net loss attributable to common shareholders was $46.3 million for the current quarter, versus net income of $290.8 million last year.

The Company took the following actions on its home lending liquidation strategy:

- Recorded a lower of cost or market ("LOCOM") charge relating to home lending of $465.5 million, or $290.5 million after-tax (EPS decrease of $1.53)
- Closed the origination operations (as previously announced) and recorded a pre-tax charge of $39.6 million (EPS decrease of $0.12);
- Retained $9.7 billion of the portfolio to be liquidated under contractual terms over time (now classified as held-for-investment), of which approximately $7.5 billion of collateral was securitized (proceeds of $4.3 billion in September and $0.8 billion in October, accounted for as on-balance sheet non-recourse, secured borrowings);
- Contracted to sell approximately $875 million of non-performing and delinquent loans in October at prices approximating the September 30, 2007 adjusted carrying value. Continuing to market the balance of loans in held-for-sale; and
- Generated $23 million of income in the home lending segment, excluding the aforementioned charges, (EPS contribution of $0.12).

Excluding the home lending segment, results were driven by improved finance revenue on higher earning assets, stable net finance revenue as a percentage of average earning assets, continued strong commercial credit quality, lower expense levels and a lower effective tax rate.

"We made good strategic progress this quarter in a very challenging market environment which highlights the value of our model and the resilience of our franchise," said Jeffrey M. Peek, Chairman and Chief Executive Officer of CIT. "CIT's commercial businesses continued to perform well with strong asset growth, increased revenues and stable credit quality. We also advanced our home lending liquidation strategy and mitigated risk through plans to sell $875 million worth of non-performing loans, all while raising $10 billion in asset backed financing."

As required under generally accepted accounting principles, the Company reduced the home lending receivables portfolio to the lower of cost or market. The aforementioned charge reflects further deterioration in the market value of home lending receivables during the quarter based on observable market transactions and other market data. At September 30, 2007, the $11.1 billion mortgage portfolio (excluding repossessed assets) was valued at $10.0 billion, a 9.7% discount to the unpaid principal balance compared to 6.4% at June 30, 2007.

**Consolidated Financial Highlights:**

Net Finance Revenue

- Net finance revenue was up 1% from last quarter and 19% from last year. Average earning assets declined from the prior quarter due to the construction sale last quarter and the LOCOM adjustment on the home lending receivables, but increased from last year on strong asset growth.
- Net finance revenue as a percentage of average earning assets was 2.96% versus 2.89% last quarter and 2.99% last year. Funding costs increased over the prior quarter and last year, but were more than offset by higher home lending yields (the elimination of amortization of capitalized origination costs due to the LOCOM adjustment on that portfolio).
- Operating lease net revenue was 6.90% of average operating leases, down from 6.97% last quarter, due to lower railcar utilization, and up from 6.54% last year due to strength in aerospace rental rates.

Other Income

- Other income decreased from last quarter, primarily reflecting: (1) a significant gain on the sale of construction assets last quarter, (2) lower gains on receivable sales and syndication fees (3) higher fees and (4) higher factoring commissions. The current quarter also includes $9.5 million of post-closing income from the prior quarter's sale of the construction business. The year-over-year decline in other income was due to reduced loan sales and syndication activity.
- Fees and other income improved from last quarter, largely due to higher advisory fees and other income in our healthcare unit.
- Factoring commissions increased this quarter on seasonal volume increases, and were essentially flat with the prior year.
- Gains on receivable sales and syndication fees were down sharply from last quarter and last year, due to the lack of liquidity and lower activity in the syndicated loan markets and no home lending sales. Loan sale and syndication volume was $1.2 billion (13% of origination volume), down from $5.7 billion (52%) and $3.6 billion (33%) in the prior quarter and prior year quarter.

Credit Quality

- Net charge-offs as a percentage of average finance receivables were 0.46% (excluding home lending and student lending), up slightly from last quarter due to higher losses in the other consumer portfolios in the Consumer segment and flat with a year ago.
- 60+ day owned delinquencies were 1.34% (excluding home lending and student lending), up from last quarter, primarily in Corporate Finance and international Vendor Finance, and flat with a year ago.
- Non-performing assets were 1.03% (excluding home lending and student lending), up from last quarter and down from last year.
- The percentages in the three preceding items exclude home lending and student lending, both the credit metric as well as the asset base.

- Net charge-offs in the home lending portfolio were $55.5 million, up from $38.4 million last quarter and $18.5 million last year. Home lending net charge-offs were not included in third quarter 2007 net charge-offs as losses on these receivables are reflected as a change in our LOCOM adjustment for the quarter.
- Reserves for credit losses increased $27 million from June 30, 2007. Excluding specific reserves, U.S. Government guaranteed student loans and home loans, the reserve was 1.20% of finance receivables, down slightly from last quarter reflecting seasonal growth in factoring and essentially flat with last year.

Expenses

- Salaries and general operating expenses were down 3% from last quarter and up 5% from a year ago. Lower headcount, legal fees, advertising and variable compensation accruals were offset by higher expenses related to the acquisition of a mergers and acquisition advisory firm. The increase from last year primarily relates to costs associated with various acquisitions, partially offset by expense reduction initiatives.
- The provision for severance and real estate exit activities totaled $42 million, which included provisions for the elimination of approximately 600 positions, primarily in our home lending business. Approximately 400 of these positions were eliminated in the third quarter, with the remaining scheduled to terminate in the fourth quarter.
- Employee headcount totaled approximately 7,010 at September 30, 2007, down from 7,310 last quarter and 7,200 a year ago.

Income Tax Provision

- The third quarter results included a $95.6 million tax benefit on a $133.3 million pretax loss.
- Excluding the home lending adjustment, the third quarter effective tax rate approximated 25%. On a go-forward basis, the annual effective tax rate is anticipated to approximate 27%.

Volume and Assets

- Origination volume for the quarter, excluding factoring and home lending, was $8.6 billion, down from $9.4 billion last quarter and $9.0 billion a year ago. Solid new business volume in Transportation Finance and Vendor Finance was offset by lower Corporate Finance originations, reflecting the sale of the construction business and softer market conditions. The decline from last year is due to the construction business sale and lower healthcare volumes.
- Managed assets were up 5% from June 30, 2007 due in part to seasonal growth in Trade Finance and Student Lending and up 17% over last year (21% excluding home lending), driven by the combination of solid origination volume and acquisitions.
- Excluding home lending, finance receivables held for sale increased $0.7 billion during the quarter to $3.0 billion primarily on higher Vendor Finance levels.

Capitalization, Funding and Liquidity

- The ratio of total tangible equity to managed assets at September 30, 2007 was 7.69%, down from 8.27% last quarter and 9.36% last year.
- During the quarter we funded our business principally in the asset-backed markets. We raised approximately $9.8 billion of proceeds through on and off balance sheet financings including: $4.3 billion secured by home loans, $2.8 billion secured by student loans, $1.5 billion secured by factoring receivables and $1.2 billion secured by equipment.

- In October, we received an additional $0.8 billion of proceeds from home lending receivables securitizations.
- Commercial paper outstandings declined to $3.6 billion from $6.2 billion at June 30 2007.
- Alternate liquidity at September 30, 2007 included cash and equivalents approximating $5.0 billion, committed and available bank lines of $7.5 billion, and committed and available asset-backed facilities of $2.4 billion.
- The Company's preferred stock and junior subordinated notes require the Company to satisfy dividend and interest payments with the net proceeds from the sale of common stock in the event the Company's rolling four-quarter fixed charge coverage ratio is less than 1.10. Following the previously discussed home lending actions, the Board of Directors authorized the Company to issue and sell common stock in amount sufficient to allow it to pay dividends and make interest payments on the aforementioned securities. As a result of selling shares of common stock on October 16, 2007, the Company satisfied the conditions necessary to permit the declaration and payment of preferred stock dividends payable December 17, 2007.

**Segment Results:**

Our segment disclosures reflect changes in our operations relating to the former Consumer and Small Business Lending segment. The presentation of prior period data has been conformed to current period presentation.

- The home lending business is being reported as a separate segment, due to changed market conditions and our outlook that such conditions will prevail for the foreseeable future.
- The student lending business and certain small consumer loan portfolios previously in the Consumer and Small Business Lending segment, are reported in the Consumer segment.
- The small business lending unit was transferred from the former Consumer and Small Business Lending segment to the Corporate Finance segment during the quarter, in line with recent management reporting changes.

*Corporate Finance*

- Total net revenues (the sum of net finance revenue and other income) decreased from the prior year as revenue from higher assets and improved advisory fee income from our recent acquisition was offset by lower gains from loan sales and syndications, due to lower market liquidity and syndication activity. We syndicated or sold approximately $850 million of receivables compared to $1.9 billion last year.
- Net finance revenue as a percentage of average earning assets was essentially flat with last year.
- Net charge-offs increased from last year due to lower recoveries. Delinquencies and non-performing assets increased from last quarter, but remain below last year's levels.
- Volume decreased from record levels last year due to market conditions and the sale of the construction business.
- Return on risk-adjusted capital was 13.9%, improved from last quarter excluding the construction sale gain, and down from the prior year on lower other income and fewer recoveries.

*Transportation Finance*

- Total net revenues were up from last year due to asset growth, improved rental rates and higher gains on equipment sales.

- Net finance revenue as a percentage of average earning assets after depreciation was essentially flat with the prior year as continued strength in aerospace rentals was offset by a modest decline in railcar utilization (from nearly full utilization levels).
- Credit quality continued strong with net recoveries, stable delinquencies and level non-performing assets.
- Volume was strong, effectively doubling from the prior year, as we had good financing flow and took delivery of and placed four new aircraft on leases. All of the scheduled aerospace deliveries through March 2009 have been placed.
- Return on risk-adjusted capital improved from last quarter to 16.8% and declined from the prior year, as the year ago period benefited from the release of deferred tax liabilities.

*Trade Finance*

- Total net revenues were down slightly from last year as increased net finance revenue on higher net receivables was offset by lower commission rates.
- Factored volume seasonally increased in the third quarter, but was flat with the prior year.
- Net finance revenue as a percentage of average earning assets decreased from the prior year on competitive pricing.
- Net charge-offs, delinquencies and non-performing loans were all down from last quarter and last year.
- Return on risk-adjusted capital improved to 18.6% from both last quarter and last year.

*Vendor Finance*

- Total net revenues were up modestly from last year, as higher net finance revenues driven by asset growth more than offset lower other revenue.
- Net finance revenue as a percentage of average earning assets after depreciation was down from last year, primarily due to higher borrowing costs and lower international lending spreads, reflecting recent acquisition activity.
- Credit losses were flat versus last quarter and up slightly from last year. Delinquencies and non-performing asset levels increased over both periods.
- Total new business volume grew 13% over last year driven by international operations. US volumes were essentially flat as declines in Dell volume were offset by improved volume from new vendor relationships. Excluding Dell, volumes were up 60%.
- Return on risk-adjusted capital of 13.1% was down from last quarter and last year, reflecting lower joint venture earnings and recent acquisitions for which cost synergies have not yet been realized.

*Home Lending*

- Total net revenues were $67 million, before the LOCOM adjustment, flat with last year.
- Net finance revenue as a percentage of average earning assets increased due to the fair value adjustment, which reduced the book value of the assets and eliminated amortization of previously capitalized loan origination costs.
- Net charge-offs of $55 million, which were applied against the LOCOM adjustment, were above forecast due to increased foreclosures. Net charge-offs included $0.6 million of non-home mortgage receivables, which include our liquidating manufactured housing and recreation vehicle portfolios. Delinquencies and non-performing assets increased from last quarter and last year reflecting portfolio seasoning and continued deterioration in the housing sector.

- New business volume was approximately $500 million. The origination platform was closed on August 28, 2007.
- Pre-tax earnings were $45 million before allocated corporate overhead and the LOCOM adjustment, in-line with our estimate.

*Consumer*

- Total net revenues were up from last year, as higher net finance revenues driven by asset growth more than offset lower other revenue.
- Net finance revenue as a percentage of average earning assets declined due to higher funding costs.
- Net charge-offs increased in the other consumer portfolios, while delinquencies increased moderately, largely reflecting seasoning of the student lending portfolio.
- New business volume improved from last quarter and was flat year-over-year, as school channel volume increased as a percentage of originations.
- Return on risk-adjusted capital for the segment was 7.0%, down year over year on lower revenues.

*Corporate and Other*

- Corporate and other expenses, principally certain credit loss provisioning, preferred stock dividends and other financing costs, dampened return on equity by approximately 140 basis points this quarter and 100 basis points last year.

**Conference Call and Webcast:**

We will discuss this quarter's results, as well as ongoing strategy, on a conference call and audio webcast today at 11:00 am (EDT). Interested parties may access the conference call live today by dialing 866-831-6272 for U.S. and Canadian callers or 617-213-8859 for international callers, and reference access code "CIT Group" or access the audio webcast at the following website: http://ir.cit.com. An audio replay of the call will be available beginning shortly after the conclusion of the call until 11:59 pm (EDT) October 24, 2007, by dialing 888-286-8010 for U.S. and Canadian callers or 617-801-6888 for international callers with the access code 81502007, or at the following website: http://ir.cit.com.

**About CIT:**

Founded in 1908, CIT (NYSE: CIT) is a global commercial finance company that provides financial products and advisory services to more than one million customers in over 50 countries across 30 industries. A leader in middle market financing, CIT has more than $80 billion in managed assets and provides financial solutions for more than half of the Fortune 1000. A member of the S&P 500 and Fortune 500, it maintains leading positions in asset-based, cash flow and small business administration lending, equipment leasing, vendor financing and factoring. CIT's brand, Capital Redefined, articulates its value proposition of providing its customers relationship, intellectual and financial capital. www.cit.com.

**Forward-Looking Statements:**

This release contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. All forward-looking statements (including statements regarding future financial and operating results) involve risks, uncertainties and contingencies, many of which are beyond CIT's control, which may cause actual results, performance, or achievements to differ materially from anticipated results, performance, or achievements. All statements contained in this release that are not clearly historical in nature are forward-looking, and the words "anticipate," "believe," "expect," "estimate," "plan," "target," and similar expressions are generally intended to identify forward-looking statements. Economic, business, funding market, competitive and/or regulatory factors, among others, affecting CIT's businesses are examples of factors that could cause actual results to differ materially from those described in the forward-looking statements. More detailed information about these factors are described in CIT's filings with the Securities and Exchange Commission, including its Annual Report on Form 10-K for the year ended December 31, 2006. CIT is under no obligation to (and expressly disclaims any such obligation to) update or alter its forward-looking statements, whether as a result of new information, future events or otherwise. This release includes certain non-GAAP financial measures as defined under SEC rules. As required by SEC rules, we have provided a reconciliation of those measures to the most directly comparable GAAP measures, which is available with this release and on our website at http://ir.cit.com.

###

**Contact:**

| | | | |
|---|---|---|---|
| Investor Relations | Kenneth A. Brause | Executive Vice President, Investor Relations | (212) 771-9650 |
| Media Relations | C. Curtis Ritter | Director of External Communications and Media Relations | (212) 461-7711 curt.ritter@cit.com |

Individuals interested in receiving future updates on CIT via e-mail can register at http://newsalerts.cit.com

CIT GROUP INC. AND SUBSIDIARIES
UNAUDITED CONSOLIDATED INCOME STATEMENTS
(dollars in millions, except per share data)

| | | Quarters Ended | | | | | | Nine Months Ended September 30, | | |
| | September 30, 2007 | | June 30, 2007 | | September 30, 2006 | | 2007 | | 2006 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Finance revenue** | $ | 1,810.0 | $ | 1,758.1 | $ | 1,471.5 | $ | 5,185.3 | $ | 4,145.4 |
| Interest expense | | 975.4 | | 942.6 | | 768.8 | | 2,791.7 | | 2,044.8 |
| Depreciation on operating lease equipment | | 304.7 | | 292.3 | | 256.5 | | 860.6 | | 762.1 |
| Net finance revenue | | 529.9 | | 523.2 | | 446.2 | | 1,533.0 | | 1,338.5 |
| Provision for credit losses | | 64.2 | | 73.0 | | 72.5 | | 208.3 | | 154.0 |
| Net finance revenue, after credit provision | | 465.7 | | 450.2 | | 373.7 | | 1,324.7 | | 1,184.5 |
| Valuation allowance for assets held for sale | | 465.5 | | 787.9 | | 15.0 | | 1,253.4 | | 15.0 |
| Total net revenue, after credit provision and valuation allowance | | 0.2 | | (337.7) | | 358.7 | | 71.3 | | 1,169.5 |
| Other income | | 276.3 | | 509.1 | | 339.7 | | 1,114.0 | | 903.3 |
| **Total net revenue and other income** | | 276.5 | | 171.4 | | 698.4 | | 1,185.3 | | 2,072.8 |
| Salaries and general operating expenses | | 367.9 | | 378.0 | | 351.7 | | 1,101.7 | | 1,019.6 |
| Provision for severance and real estate exit activities | | 41.9 | | 34.9 | | 8.5 | | 76.8 | | 19.6 |
| Loss on early extinguishments of debt | | - | | - | | - | | 139.3 | | - |
| Income (loss) before provision for income taxes | | (133.3) | | (241.5) | | 338.2 | | (132.5) | | 1,033.6 |
| (Provision) benefit for income taxes | | 95.6 | | 114.7 | | (39.7) | | 176.1 | | (252.9) |
| Minority interest, after tax | | (1.1) | | (0.2) | | (0.2) | | (1.4) | | (1.5) |
| Net income (loss) before preferred stock dividends | | (38.8) | | (127.0) | | 298.3 | | 42.2 | | 779.2 |
| Preferred stock dividends | | (7.5) | | (7.5) | | (7.5) | | (22.5) | | (22.7) |
| Net income (loss) available (attributable) to common stockholders | $ | (46.3) | $ | (134.5) | $ | 290.8 | $ | 19.7 | $ | 756.5 |
| **Per common share data** | | | | | | | | | | |
| Basic earnings (loss) per share | $ | (0.24) | $ | (0.70) | $ | 1.46 | $ | 0.10 | $ | 3.80 |
| Diluted earnings (loss) per share | $ | (0.24) | $ | (0.70) | $ | 1.44 | $ | 0.10 | $ | 3.72 |
| Number of shares - basic (thousands) | | 189,930 | | 191,808 | | 198,724 | | 191,946 | | 199,113 |
| Number of shares - diluted (thousands) | | 189,930 | | 191,808 | | 202,151 | | 194,933 | | 203,498 |
| **Other Income** | | | | | | | | | | |
| Fees and other income[1] | $ | 131.2 | $ | 108.2 | $ | 139.9 | $ | 424.9 | $ | 413.4 |
| Factoring commissions | | 60.1 | | 52.5 | | 61.3 | | 165.0 | | 173.0 |
| Gains on receivable sales and syndication fees | | 29.0 | | 76.4 | | 88.8 | | 159.0 | | 192.5 |
| Gains on sales of leasing equipment | | 28.1 | | 33.6 | | 36.1 | | 91.2 | | 90.7 |
| Gains on securitizations | | 18.4 | | 7.8 | | 13.6 | | 33.8 | | 33.7 |
| Gain on sale of U.S. construction portfolio | | 9.5 | | 230.6 | | - | | 240.1 | | - |
| Total other income | $ | 276.5 | $ | 509.1 | $ | 339.7 | $ | 1,114.0 | $ | 903.3 |

(1) Fees and other income is comprised of asset management and service fees, including securitization-related servicing fees and accretion, advisory and agent fees, as well as income from joint ventures.

**CIT GROUP INC. AND SUBSIDIARIES**
**UNAUDITED CONSOLIDATED BALANCE SHEETS**
**(dollars in millions)**

|  | September 30, 2007 | December 31, 2006 |
|---|---|---|
| **ASSETS** | | |
| Financing and leasing assets held for investment: | | |
| Finance receivables, including receivables pledged of $16,154.9 million and $3,963.8 million | $ 52,596.2 | $ 45,203.6 |
| Reserve for credit losses | (535.0) | (659.3) |
| Non-home lending receivable, net of credit reserves | 52,061.2 | 44,544.3 |
| Home Lending Finance receivables, including receivables pledged of $7,498.1 million and $0 | 9,174.0 | 9,861.3 |
| Net finance receivables | 61,235.2 | 54,405.6 |
| Operating lease equipment, net | 11,930.3 | 11,017.9 |
| Financing and leasing assets held for sale: | | |
| Home lending finance receivables | 884.3 | 288.9 |
| Other finance receivables | 2,976.4 | 1,504.8 |
| Cash and cash equivalents | 4,998.0 | 4,458.4 |
| Retained interests in securitizations and other investments | 1,428.4 | 1,059.4 |
| Goodwill and intangible assets, net | 1,459.1 | 1,008.4 |
| Other assets | 4,026.7 | 3,324.5 |
| **Total Assets** | $ 88,938.4 | $ 77,067.9 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Debt: | | |
| Commercial paper | $ 3,559.4 | $ 5,365.0 |
| Deposits | 3,023.7 | 2,399.6 |
| Non-recourse, secured borrowings | 14,838.0 | 4,398.5 |
| Variable-rate senior unsecured notes | 23,131.1 | 19,184.3 |
| Fixed-rate senior unsecured notes | 27,474.3 | 29,107.1 |
| Junior subordinated notes | 750.0 | - |
| Preferred capital securities | - | 250.3 |
| Total debt | 72,776.5 | 60,704.8 |
| Credit balances of factoring clients | 4,527.2 | 4,131.3 |
| Accrued liabilities and payables | 4,410.9 | 4,440.8 |
| **Total Liabilities** | 81,714.6 | 69,276.9 |
| **Minority interest** | 54.4 | 39.9 |
| Stockholders' Equity: | | |
| Preferred stock | 500.0 | 500.0 |
| Common stock | 2.1 | 2.1 |
| Paid-in capital | 10,690.3 | 10,678.9 |
| Accumulated deficit | (2,967.9) | (2,838.9) |
| Accumulated other comprehensive income | 200.4 | 129.6 |
| Less: treasury stock, at cost | (1,255.5) | (720.6) |
| Total Common Stockholders' Equity | 6,669.4 | 7,251.1 |
| **Total Stockholders' Equity** | 7,169.4 | 7,751.1 |
| **Total Liabilities and Stockholders' Equity** | $ 88,938.4 | $ 77,067.9 |
| | - | |
| **Other Assets** | | |
| Deposits on commercial aerospace flight equipment | $ 909.9 | $ 719.0 |
| Accrued interest and receivables from derivative counterparties | 805.0 | 643.6 |
| Investments in and receivables from non-consolidated subsidiaries | 183.3 | 535.7 |
| Repossessed assets and off-lease equipment | 236.0 | 124.1 |
| Prepaid expenses | 150.5 | 99.2 |
| Furniture and fixtures, miscellaneous receivables and other assets | 1,742.0 | 1,202.9 |
| | $ 4,026.7 | $ 3,324.5 |

**CIT GROUP INC. AND SUBSIDIARIES**
**OWNED AND MANAGED ASSET COMPOSITION**
(dollars in millions)

| | September 30, 2007 | June 30, 2007 | September 30, 2006 |
|---|---|---|---|
| **Corporate Finance** | | | |
| Finance receivables | $ 20,232.1 | $ 19,042.0 | $ 18,886.8 |
| Operating lease equipment, net | 229.9 | 160.9 | 170.4 |
| Financing and leasing assets held for sale | 904.6 | 901.7 | 455.9 |
| Owned assets | 21,366.6 | 20,104.6 | 19,513.1 |
| Finance receivables securitized and managed by CIT | 1,636.9 | 1,090.7 | 2,005.0 |
| Managed assets | 23,003.5 | 21,195.3 | 21,518.1 |
| **Transportation Finance** | | | |
| Finance receivables | 2,477.8 | 2,163.8 | 1,527.1 |
| Operating lease equipment, net | 10,601.9 | 10,513.6 | 9,322.7 |
| Financing and leasing assets held for sale | 4.2 | 4.6 | 148.6 |
| Owned assets | 13,083.9 | 12,682.0 | 10,998.4 |
| **Trade Finance** | | | |
| Finance receivables - Owned Assets | 7,945.6 | 6,900.5 | 7,484.9 |
| **Vendor Finance** | | | |
| Finance receivables | 10,169.9 | 10,481.5 | 6,987.8 |
| Operating lease equipment, net | 1,098.5 | 1,258.0 | 979.4 |
| Financing and leasing assets held for sale | 1,418.3 | 777.2 | 627.3 |
| Owned assets | 12,686.7 | 12,516.7 | 8,594.5 |
| Finance receivables securitized and managed by CIT | 4,211.4 | 4,085.8 | 3,611.1 |
| Managed assets | 16,898.1 | 16,602.5 | 12,205.6 |
| **Home Lending** | | | |
| Finance receivables | 9,174.0 | 31.3 | 10,011.9 |
| Financing and leasing assets held for sale | 884.3 | 10,518.3 | 272.0 |
| Owned assets | 10,058.3 | 10,549.6 | 10,283.9 |
| Finance receivables securitized and managed by CIT | 713.2 | 750.7 | 894.5 |
| Managed assets | 10,771.5 | 11,300.3 | 11,178.4 |
| **Consumer** | | | |
| Finance receivables - student lending | 10,960.3 | 9,695.4 | 7,772.1 |
| Finance receivables - other | 810.5 | 785.6 | 490.4 |
| Financing and leasing assets held for sale | 649.3 | 645.9 | 264.7 |
| Owned assets | 12,420.1 | 11,126.9 | 8,527.2 |
| **Other** | | | |
| Equity Investments | 161.7 | 151.9 | 28.0 |
| **Consolidated Totals** | | | |
| **Finance receivables, excluding home lending** | $ 52,596.2 | $ 49,068.8 | $ 43,149.1 |
| **Finance receivables - home lending** | 9,174.0 | 31.3 | 10,011.9 |
| **Operating lease equipment, net** | 11,930.3 | 11,932.5 | 10,472.5 |
| **Home lending finance receivables held for sale** | 884.3 | 10,518.3 | 272.0 |
| **Other financing and leasing assets held for sale** | 2,976.4 | 2,329.4 | 1,496.5 |
| **Financing and leasing assets excl. equity investments** | 77,561.2 | 73,880.3 | 65,402.0 |
| **Equity investments (included in other assets)** | 161.7 | 151.9 | 28.0 |
| **Owned assets** | 77,722.9 | 74,032.2 | 65,430.0 |
| **Finance receivables securitized and managed by CIT** | 6,561.5 | 5,927.2 | 6,510.6 |
| **Managed assets** | $ 84,284.4 | $ 79,959.4 | $ 71,940.6 |
| **Managed assets, excluding home lending** | $ 73,512.9 | $ 68,659.1 | $ 60,762.2 |

**CIT GROUP INC. AND SUBSIDIARIES**
**SEGMENT DATA**
(dollars in millions)

| | Quarters Ended | | | | | | Nine Months Ended September 30, | | |
| | September 30, 2007 | | June 30, 2007 | | September 30, 2006 | | 2007 | | 2006 |
|---|---|---|---|---|---|---|---|---|---|
| **Corporate Finance** | | | | | | | | | |
| Net finance revenue, before depreciation | $ | 170.1 | $ | 185.8 | $ | 155.6 | $ | 523.4 | $ | 448.6 |
| Depreciation on operating lease equipment | | 7.5 | | 10.6 | | 7.5 | | 27.9 | | 24.0 |
| Provision for credit losses | | 13.0 | | 11.4 | | 6.5 | | 44.9 | | 10.6 |
| Valuation allowance for assets held for sale | | - | | 22.5 | | - | | 22.5 | | - |
| Other income | | 99.2 | | 328.5 | | 128.8 | | 530.2 | | 283.3 |
| Total net revenue and other income | | 248.8 | | 469.8 | | 270.4 | | 958.3 | | 697.3 |
| Provision for income taxes | | (47.8) | | (133.0) | | (54.5) | | (226.1) | | (128.0) |
| Net income* | | 83.3 | | 219.3 | | 93.6 | | 382.7 | | 225.8 |
| Return on risk-adjusted capital | | 13.9% | | 35.0% | | 17.0% | | 20.7% | | 14.6% |
| New business volume | $ | 3,582.4 | $ | 4,622.6 | $ | 4,519.1 | $ | 11,793.3 | $ | 11,033.2 |
| | | | | | | | | | |
| **Transportation Finance** | | | | | | | | | |
| Net finance revenue, before depreciation | $ | 229.8 | $ | 226.9 | $ | 172.6 | $ | 667.5 | $ | 531.9 |
| Depreciation on operating lease equipment | | 136.7 | | 137.0 | | 112.8 | | 407.2 | | 328.1 |
| Provision for credit losses | | (3.0) | | 0.3 | | - | | (25.1) | | 1.0 |
| Valuation allowance for assets held for sale | | - | | - | | 15.0 | | - | | 15.0 |
| Other income | | 20.4 | | 19.4 | | 16.9 | | 57.5 | | 56.2 |
| Total net revenue and other income | | 116.5 | | 109.0 | | 61.7 | | 342.9 | | 244.0 |
| Provision for income taxes | | (10.5) | | (10.8) | | 56.5 | | (28.9) | | 53.4 |
| Net income | | 70.3 | | 62.9 | | 86.8 | | 209.6 | | 200.8 |
| Return on risk-adjusted capital | | 16.8% | | 15.4% | | 24.4% | | 17.1% | | 15.2% |
| New business volume | $ | 757.5 | $ | 696.3 | $ | 458.9 | $ | 2,140.0 | $ | 1,741.7 |
| | | | | | | | | | |
| **Trade Finance** | | | | | | | | | |
| Net finance revenue, before depreciation | $ | 45.1 | $ | 42.0 | $ | 41.3 | $ | 128.5 | $ | 118.4 |
| Provision for credit losses | | 7.8 | | 10.3 | | 16.7 | | 26.0 | | 29.1 |
| Other income | | 72.3 | | 66.5 | | 77.3 | | 206.5 | | 216.7 |
| Total net revenue and other income | | 109.6 | | 98.2 | | 101.9 | | 309.0 | | 306.0 |
| Provision for income taxes | | (26.7) | | (21.7) | | (23.4) | | (71.7) | | (70.4) |
| Net income | | 43.5 | | 36.1 | | 39.1 | | 116.2 | | 118.2 |
| Return on risk-adjusted capital | | 18.6% | | 16.5% | | 17.5% | | 17.4% | | 18.2% |
| | | | | | | | | | |
| **Vendor Finance** | | | | | | | | | |
| Net finance revenue, before depreciation | $ | 306.4 | $ | 291.9 | $ | 259.9 | $ | 849.8 | $ | 787.2 |
| Depreciation on operating lease equipment | | 160.8 | | 144.8 | | 136.1 | | 426.0 | | 410.0 |
| Provision for credit losses | | 7.5 | | 5.8 | | 8.4 | | 23.7 | | 36.0 |
| Other income | | 76.8 | | 79.7 | | 94.9 | | 267.4 | | 275.9 |
| Total net revenue and other income | | 214.9 | | 221.0 | | 210.3 | | 667.5 | | 617.1 |
| Provision for income taxes | | (32.4) | | (30.6) | | (46.2) | | (102.9) | | (120.4) |
| Net income | | 58.2 | | 70.1 | | 60.5 | | 204.5 | | 198.6 |
| Return on risk-adjusted capital | | 13.1% | | 16.2% | | 23.3% | | 15.9% | | 25.2% |
| New business volume | $ | 2,296.4 | $ | 2,462.6 | $ | 2,028.8 | $ | 7,068.9 | $ | 6,018.9 |
| | | | | | | | | | |
| **Home Lending** | | | | | | | | | |
| Net finance revenue, before depreciation | $ | 68.1 | $ | 58.0 | $ | 53.0 | $ | 180.1 | $ | 155.7 |
| Provision for credit losses | | 0.4 | | 60.3 | | 17.0 | | 95.9 | | 50.4 |
| Valuation allowance for assets held for sale | | 465.5 | | 765.4 | | - | | 1,230.9 | | - |
| Other income | | (0.7) | | 8.3 | | 14.3 | | 19.2 | | 38.2 |
| Total net revenue and other income | | (398.5) | | (759.4) | | 50.3 | | (1,127.5) | | 143.5 |
| Provision for income taxes | | 178.6 | | 281.9 | | (5.6) | | 461.8 | | (16.2) |
| Net income** | | (290.6) | | (510.4) | | 11.7 | | (800.5) | | 27.2 |
| Return on risk-adjusted capital | | NM | | NM | | 6.0% | | NM | | 4.9% |
| New business volume | $ | 499.2 | $ | 1,489.2 | $ | 2,038.7 | $ | 4,181.5 | $ | 5,791.7 |
| | | | | | | | | | |
| **Consumer** | | | | | | | | | |
| Net finance revenue, before depreciation | $ | 36.6 | $ | 35.5 | $ | 28.5 | $ | 103.9 | $ | 83.3 |
| Provision for credit losses | | 13.3 | | 7.8 | | 4.0 | | 29.0 | | 10.4 |
| Other income | | 7.3 | | 17.4 | | 13.6 | | 42.5 | | 37.8 |
| Total net revenue and other income | | 30.6 | | 45.1 | | 38.1 | | 117.4 | | 110.7 |
| Provision for income taxes | | (2.7) | | (2.9) | | (5.7) | | (10.5) | | (6.9) |
| Net income | | 9.4 | | 15.1 | | 12.7 | | 35.9 | | 24.7 |
| Return on risk-adjusted capital | | 7.00 % | | 11.60 % | | 10.90 % | | 9.20 % | | 7.30 % |
| New business volume | $ | 1,992.5 | $ | 1,667.3 | $ | 1,964.4 | $ | 5,661.6 | $ | 5,131.1 |
| | | | | | | | | | |
| **Corporate and Other** | | | | | | | | | |
| Net finance revenue, before depreciation | $ | (21.5) | $ | (24.6) | $ | (8.2) | $ | (59.6) | $ | (24.5) |
| Provision for credit losses | | 25.2 | | (22.9) | | 19.9 | | 13.9 | | 16.5 |
| Other income | | 1.0 | | (10.7) | | (6.1) | | (9.3) | | (4.8) |
| Total net revenue and other income | | (45.4) | | (12.3) | | (34.3) | | (82.3) | | (45.8) |
| Provision for income taxes | | 37.1 | | 31.8 | | 39.2 | | 154.4 | | 35.6 |
| Net (loss) income | | (20.4) | | (27.6) | | (13.6) | | (128.7) | | (38.8) |
| Return on risk-adjusted capital | | (1.4)% | | (2.6)% | | (1.0)% | | (2.1)% | | (2.3)% |

NM - not meaningful

\* The June 2007 results include a $235.0 million gain on sale of construction portfolio.
\*\* The June 2007 results include a $765 million pretax fair value adjustment on the home lending portfolio.

CIT GROUP INC. AND SUBSIDIARIES
CREDIT METRICS
(dollars in millions)

| | Quarters Ended | | | | | | Nine Months Ended September 30, | | | |
| | September 30, 2007 | | June 30, 2007 | | September 30, 2006 | | 2007 | | 2006 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Net Credit Losses - Owned as a Percentage of Average Finance Receivables** | | | | | | | | | | |
| Corporate Finance | $ 16.5 | 0.33% | $ 9.7 | 0.18% | $ 6.2 | 0.14% | $ 47.0 | 0.31% | $ 7.9 | 0.08% |
| Transportation Finance | (3.3) | (0.56)% | 0.4 | 0.08% | - | - | (25.4) | (1.49)% | 1.4 | 0.11% |
| Trade Finance | 7.2 | 0.39% | 10.0 | 0.59% | 16.3 | 0.95% | 24.2 | 0.47% | 28.8 | 0.58% |
| Vendor Finance | 13.3 | 0.51% | 12.4 | 0.48% | 11.1 | 0.62% | 35.7 | 0.47% | 32.1 | 0.59% |
| Home Lending | 0.6 | 11.41% | 41.8 | 1.46% | 22.7 | 0.94% | 76.9 | 1.57% | 66.1 | 0.95% |
| Consumer | 13.5 | 0.49% | 7.8 | 0.30% | 3.6 | 0.18% | 28.7 | 0.37% | 8.6 | 0.16% |
| Total | $ 47.8 | 0.37% | $ 82.1 | 0.53% | $ 59.9 | 0.47% | $ 187.1 | 0.44% | $ 144.9 | 0.40% |
| Total, excluding home lending and student loans | $ 47.2 | 0.46% | $ 40.3 | 0.39% | $ 37.2 | 0.43% | $ 110.2 | 0.36% | $ 78.8 | 0.32% |
| **Net Credit Losses - Managed as a Percentage of Average Managed Finance Receivables** | | | | | | | | | | |
| Corporate Finance | $ 18.0 | 0.34% | $ 12.8 | 0.22% | $ 8.0 | 0.16% | $ 53.6 | 0.33% | $ 15.1 | 0.11% |
| Transportation Finance | (3.3) | (0.56)% | 0.4 | 0.08% | - | - | (25.4) | (1.49)% | 1.4 | 0.11% |
| Trade Finance | 7.2 | 0.39% | 10.0 | 0.59% | 16.3 | 0.95% | 24.2 | 0.47% | 28.8 | 0.58% |
| Vendor Finance | 19.1 | 0.52% | 18.5 | 0.51% | 15.4 | 0.58% | 51.0 | 0.48% | 44.2 | 0.55% |
| Home Lending | 7.6 | 4.04% | 48.2 | 1.58% | 30.2 | 1.14% | 97.8 | 1.78% | 96.2 | 1.25% |
| Consumer | 13.5 | 0.49% | 7.8 | 0.30% | 3.6 | 0.18% | 28.7 | 0.37% | 8.6 | 0.16% |
| Total | $ 62.1 | 0.44% | $ 97.7 | 0.57% | $ 73.5 | 0.51% | $ 229.9 | 0.49% | $ 194.3 | 0.46% |
| Total, excluding home lending and student loans | $ 54.5 | 0.47% | $ 49.5 | 0.42% | $ 43.3 | 0.43% | $ 132.1 | 0.39% | $ 98.1 | 0.33% |

| | September 30, 2007 | | June 30, 2007 | | September 30, 2006 | |
|---|---|---|---|---|---|---|
| **Finance Receivables Past Due 60 days or more - Owned as a Percentage of Finance Receivables** | | | | | | |
| Corporate Finance | $ 174.0 | 0.86% | $ 137.2 | 0.72% | $ 162.3 | 0.85% |
| Transportation Finance | 11.4 | 0.46% | 12.5 | 0.58% | 16.0 | 1.04% |
| Trade Finance | 78.8 | 0.99% | 87.2 | 1.26% | 105.5 | 1.41% |
| Vendor Finance | 277.0 | 2.72% | 209.6 | 2.00% | 184.7 | 2.64% |
| Consumer | 616.2 | 5.24% | 497.6 | 4.75% | 333.8 | 4.04% |
| Total, excluding home lending | $ 1,157.4 | 2.20% | $ 944.1 | 1.92% | $ 802.3 | 1.86% |
| Home Lending | $ 1,130.0 | 10.11% | $ 765.0 | 6.65% | $ 370.5 | 3.70% |
| Total, excluding home lending and student loans | $ 558.8 | 1.34% | $ 456.2 | 1.16% | $ 473.9 | 1.34% |
| **Non-performing Assets - Owned as a Percentage of Finance Receivables** | | | | | | |
| Corporate Finance | $ 223.9 | 1.11% | $ 147.3 | 0.77% | $ 265.4 | 1.41% |
| Transportation Finance | 4.3 | 0.17% | 5.0 | 0.23% | 8.2 | 0.54% |
| Trade Finance | 49.5 | 0.62% | 53.2 | 0.77% | 69.8 | 0.93% |
| Vendor Finance | 142.0 | 1.40% | 117.5 | 1.12% | 59.3 | 0.85% |
| Consumer | 7.3 | 0.06% | 3.8 | 0.04% | 1.9 | 0.02% |
| Total, excluding home lending | $ 427.0 | 0.81% | $ 326.8 | 0.67% | $ 404.6 | 0.94% |
| Home Lending | $ 1,123.0 | 10.04% | $ 771.0 | 6.70% | $ 361.1 | 3.61% |
| Total, excluding home lending and student loans | $ 427.0 | 1.03% | $ 326.8 | 0.83% | $ 404.6 | 1.14% |
| **Finance Receivables Past Due 60 days or more - Managed as a Percentage of Managed Financial Assets** | | | | | | |
| Corporate Finance | $ 180.8 | 0.79% | $ 142.7 | 0.68% | $ 182.9 | 0.86% |
| Transportation Finance | 11.4 | 0.46% | 12.5 | 0.58% | 16.0 | 0.95% |
| Trade Finance | 78.8 | 0.99% | 87.2 | 1.26% | 105.5 | 1.41% |
| Vendor Finance | 449.7 | 2.85% | 356.7 | 2.33% | 301.8 | 2.69% |
| Consumer | 616.2 | 4.96% | 497.5 | 4.47% | 333.8 | 3.91% |
| Total, excluding home lending | $ 1,336.9 | 2.18% | $ 1,096.6 | 1.94% | $ 940.0 | 1.87% |
| Home Lending | $ 1,195.0 | 10.24% | $ 828.0 | 6.86% | $ 440.8 | 3.95% |
| Total, excluding home lending and student loans | $ 738.3 | 1.48% | $ 609.0 | 1.32% | $ 611.0 | 1.45% |

The following segment changes are reflected in the above metrics:
1. Corporate Finance includes Small Business Lending, which had been reflected in the former Consumer and Small Business Lending segment.
2. Home Lending includes the activities of other liquidating consumer related loans formerly included in Vendor Finance.
3. Consumer includes student lending and the CIT industrial bank, which had been reflected in the former Consumer and Small Business Lending segment.
NOTE.
Home lending contractual delinquency and non-performing statistics as a percentage of unadjusted principal balance.

**CIT GROUP INC. AND SUBSIDIARIES**
**RATIOS AND OTHER DATA**
**(dollars in millions, except per share data)**

| | Quarters Ended | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|
| | September 30, 2007 | June 30, 2007 | September 30, 2006 | 2007 | 2006 |
| **Profitability** | | | | | |
| Net finance revenue as a percentage of AEA | 2.96% | 2.89% | 2.99% | 2.90% | 3.17% |
| Net finance revenue after provision as a percentage of AEA | 2.60% | 2.49% | 2.51% | 2.50% | 2.80% |
| Salaries and general operating expenses as a percentage of AMA | 1.89% | 1.92% | 2.13% | 1.92% | 2.15% |
| Efficiency ratio | 45.6% | 36.6% | 44.8% | 41.6% | 45.5% |
| Return on average common stockholders' equity | -2.7% | -7.8% | 16.9% | 0.4% | 15.1% |
| Return on AEA | -0.26% | -0.74% | 1.95% | 0.04% | 1.79% |
| Return on AMA | -0.24% | -0.68% | 1.76% | 0.03% | 1.60% |
| See "Non-GAAP Disclosures" for additional information regarding profitability ratio and metric comparisons. | | | | | |
| **Average Balances** | | | | | |
| Average Finance Receivables (AFR) | $ 51,000.0 | $ 62,417.8 | $ 51,503.3 | $ 56,574.0 | $ 48,514.6 |
| Average Earning Assets (AEA) | 71,696.7 | 72,352.8 | 59,616.2 | 70,557.1 | 56,331.0 |
| Average Managed Assets (AMA) | 77,697.8 | 78,640.9 | 66,109.3 | 76,666.6 | 63,098.3 |
| Average Operating Leases (AOL) | 11,963.3 | 11,695.6 | 10,619.5 | 11,626.3 | 10,312.7 |
| Average Common Stockholders' Equity | 6,763.6 | 6,889.1 | 6,881.0 | 6,878.4 | 6,691.6 |

| | September 30, 2007 | June 30, 2007 | September 30, 2006 |
|---|---|---|---|
| **Capital and Leverage** | | | |
| Total tangible stockholders' equity to managed assets | 7.69% | 8.27% | 9.36% |
| Tangible book value per common share | $27.60 | $28.13 | $30.07 |
| Book value per common share | $35.29 | $35.37 | $35.34 |
| **Reserve for Credit Losses** | | | |
| Reserve for credit losses as a percentage of finance receivables, excluding student loans | 1.28% | 1.42% | 1.45% |
| Reserve for credit losses (excluding reserves related to impaired loans and hurricane reserves) as a percentage of finance receivables, excluding home lending and student loans | 1.20% | 1.22% | 1.18% |
| Reserve for credit losses as a percentage of finance receivables | 0.90% | 1.19% | 1.23% |
| Reserve for credit losses as a percentage of non-performing assets, excluding home lending and student lending | 124.5% | 154.4% | 120.1% |
| Reserve for credit losses as a percentage of finance receivables past due 60 days or more, excluding home lending and student lending | 95.5% | 98.7% | 104.0% |

13

**CIT GROUP INC. AND SUBSIDIARIES**
Select Concentration Data
(dollars in millions unless specified)

**Commercial Aerospace Portfolio:**

| | September 30, 2007 | | June 30, 2007 | | September 30, 2006 | |
|---|---|---|---|---|---|---|
| | Net Investment | Number | Net Investment | Number | Net Investment | Number |
| *By Region:* | | | | | | |
| Europe | $ 2,900.0 | 90 | $ 2,893.7 | 88 | $ 2,762.1 | 87 |
| U.S. and Canada | 1,370.5 | 62 | 1,237.8 | 59 | 887.3 | 36 |
| Asia Pacific | 2,013.2 | 77 | 1,822.0 | 57 | 1,494.3 | 50 |
| Latin America | 1,073.7 | 34 | 985.4 | 31 | 849.9 | 28 |
| Africa / Middle East | 493.2 | 13 | 497.2 | 13 | 363.6 | 9 |
| Total | $ 7,850.6 | 276 | $ 7,436.1 | 248 | $ 6,357.2 | 210 |
| *By Manufacturer:* | | | | | | |
| Boeing | $ 3,539.6 | 151 | $ 3,204.7 | 126 | $ 2,832.3 | 114 |
| Airbus | 4,301.7 | 124 | 4,222.0 | 121 | 3,507.3 | 93 |
| Other | 9.3 | 1 | 9.4 | 1 | 17.6 | 3 |
| Total | $ 7,850.6 | 276 | $ 7,436.1 | 248 | $ 6,357.2 | 210 |
| *By Body Type (1):* | | | | | | |
| Narrow body | $ 5,879.7 | 216 | $ 5,537.4 | 190 | $ 4,918.6 | 171 |
| Intermediate | 1,652.4 | 45 | 1,631.8 | 43 | 1,243.0 | 26 |
| Wide body | 309.2 | 14 | 257.5 | 14 | 178.0 | 10 |
| Other | 9.3 | 1 | 9.4 | 1 | 17.6 | 3 |
| Total | $ 7,850.6 | 276 | $ 7,436.1 | 248 | $ 6,357.2 | 210 |
| *By Product:* | | | | | | |
| Operating lease | $ 6,729.9 | 209 | $ 6,645.2 | 205 | $ 5,883.0 | 189 |
| Leveraged lease (other) | 40.8 | 2 | 40.5 | 2 | 148.2 | 5 |
| Leveraged lease (tax optimized) | 45.0 | 1 | 44.3 | 1 | 68.2 | 2 |
| Capital lease | 231.2 | 9 | 145.1 | 5 | 155.6 | 6 |
| Loan | 803.7 | 55 | 561.0 | 35 | 102.2 | 8 |
| Total | $ 7,850.6 | 276 | $ 7,436.1 | 248 | $ 6,357.2 | 210 |
| | | | | | | |
| Number of accounts | | 102 | | 98 | | 94 |
| Weighted average age of fleet (years) | | 6 | | 6 | | 6 |
| Largest customer net investment | $ | 279.7 | $ | 282.8 | $ | 291.6 |
| Off-lease aircraft | | - | | - | | - |
| | | | | | | |
| New Aircraft Delivery Order Book (dollars in billions) | | | | | | |
| For the Years Ending December 31, | | | | | | |
| 2006 (Remaining 2006) | $ | - | $ | - | $ 0.4 | 8 |
| 2007 (Remaining 2007) | 0.6 | 10 | 0.7 | 14 | 1.3 | 26 |
| 2008 | 1.4 | 23 | 1.4 | 24 | 1.4 | 24 |
| 2009 | 0.9 | 14 | 0.8 | 13 | 0.6 | 11 |
| Thereafter | 4.6 | 65 | 4.1 | 60 | 1.1 | 10 |
| Total | $ 7.5 | 112 | $ 7.0 | 111 | $ 4.8 | 79 |

(1) Narrow body are single aisle design and consist primarily of Boeing 737 and 757 series and Airbus A320 series aircraft. Intermediate body are smaller twin aisle design and consist primarily of Boeing 767 series and Airbus A330 series aircraft. Wide body are large twin aisle design and consist primarily of Boeing 747 and 777 series and McDonnell Douglas DC10 series aircraft.

**Managed Home Lending Portfolio Statistics**

| | September 30, 2007 * | June 30, 2007 | September 30, 2006 |
|---|---|---|---|
| Managed assets | $ 11,519.9 | $ 11,894.2 | $ 10,747.6 |
| Portfolio assets | $ 10,974.8 * | $ 11,324.7 | $ 10,072.4 |
| % of first mortgages | 89% | 89% | 89% |
| Average loan size | $ 129.5 | $ 127.9 | $ 120.7 |
| Fixed-rate mortgage % | 44% | 43% | 44% |
| Weighted Average loan-to-value | 82% | 82% | 81% |
| Average FICO score | 637 | 637 | 636 |
| Delinquencies (sixty days or more) | 10.34% | 6.60% | 3.77% |
| Net charge-offs-managed basis | 2.04% | 1.43% | 0.90% |
| Net charge-offs-owned basis | 2.00% | 1.37% | 0.79% |

*September amounts are based on unpaid principal balances and exclude valuation adjustments.

14

**CIT GROUP INC. AND SUBSIDIARIES**
**Non-GAAP Disclosures**
**(dollars in millions)**

| | | September 30, 2007 | | June 30, 2007 | | September 30, 2006 |
|---|---|---|---|---|---|---|
| **Managed assets [1]:** | | | | | | |
| Finance receivables, excluding home lending | $ | 52,596.2 | $ | 49,068.8 | $ | 43,149.1 |
| Finance receivables - home lending | | 9,174.0 | | 31.3 | | 10,011.9 |
| Operating lease equipment, net | | 11,930.3 | | 11,932.5 | | 10,472.5 |
| Financing and leasing assets held for sale | | 2,976.4 | | 2,329.4 | | 1,496.5 |
| Home lending finance receivables held for sale | | 884.3 | | 10,518.3 | | 272.0 |
| Equity and venture capital investments (included in other assets) | | 161.7 | | 151.9 | | 28.0 |
| Total financing and leasing portfolio assets | | 77,722.9 | | 74,032.2 | | 65,430.0 |
| Securitized assets | | 6,561.5 | | 5,927.2 | | 6,510.6 |
| Managed assets | $ | 84,284.4 | $ | 79,959.4 | $ | 71,940.6 |
| **Earning assets [2]:** | | | | | | |
| Total financing and leasing portfolio assets | $ | 77,722.9 | $ | 74,032.2 | $ | 65,430.0 |
| Credit balances of factoring clients | | (4,527.2) | | (3,911.0) | | (4,318.7) |
| Earning assets | $ | 73,195.7 | $ | 70,121.2 | $ | 61,111.3 |
| **Tangible equity [3]:** | | | | | | |
| Total equity | $ | 6,669.4 | $ | 6,813.8 | $ | 7,059.2 |
| Other comprehensive income relating to derivative financial instruments | | 29.9 | | (59.5) | | (30.1) |
| Unrealized gain on securitization investments | | (7.3) | | (8.2) | | (15.2) |
| Goodwill and intangible assets | | (1,459.1) | | (1,382.1) | | (1,028.0) |
| Tangible common equity | | 5,232.9 | | 5,364.0 | | 5,985.9 |
| Preferred stock | | 500.0 | | 500.0 | | 500.0 |
| Preferred capital securities [4] | | - | | - | | 250.7 |
| 60 year junior subordinated notes | | 750.0 | | 750.0 | | - |
| **Tangible equity** | $ | 6,482.9 | $ | 6,614.0 | $ | 6,736.6 |

| | | Quarters Ended | | | | |
|---|---|---|---|---|---|---|
| | | September 30, 2007 | | June 30, 2007 | | September 30, 2006 |
| **Total net revenues [5]** | | | | | | |
| Net Finance Revenue after Depreciation | | 529.9 | | 523.2 | | 446.2 |
| Other Income | | 276.3 | | 509.1 | | 339.7 |
| Total net revenues | $ | 806.2 | $ | 1,032.3 | $ | 785.9 |

| | | Nine Months Ended | | |
|---|---|---|---|---|
| | | September 30, 2007 | | September 30, 2006 |
| Net Finance Revenue after Depreciation | | 1,533.0 | | 1,338.5 |
| Other Income | | 1,114.0 | | 903.3 |
| Total net revenues | $ | 2,647.0 | $ | 2,241.8 |

Non-GAAP financial measures disclosed by management are meant to provide additional information and insight relative to trends in the business to investors and, in certain cases, to present financial information as measured by rating agencies and other users of financial information. These measures are not in accordance with, or a substitute for, GAAP and may be different from, or inconsistent with, non-GAAP financial measures used by other companies.

1) Managed assets are utilized in certain credit and expense ratios. Securitized assets are included in managed assets because CIT retains certain credit risk and the servicing related to assets that are funded through securitizations.

2) Earning assets are utilized in certain revenue and earnings ratios. Earning assets are net of credit balances of factoring clients. This net amount, which corresponds to amounts funded, is a basis for revenues earned.

3) Tangible equity is utilized in leverage ratios, and is consistent with certain rating agency measurements. Other comprehensive income and unrealized gains on securitization investments (both included in the separate component of equity) are excluded from the calculation, as these amounts are not necessarily indicative of amounts which will be realized.

4) The preferred capital securities were called on March 16, 2007.

5) Total net revenues are the combination of net finance revenues after depreciation on operating leases and other income.



**FOR IMMEDIATE RELEASE**

## CIT REPORTS THIRD QUARTER RESULTS

---

### Quarterly Financial Highlights

- Net loss per share of $0.24
- Home lending pre-tax charge of $465 million
- Commercial businesses performed well
- Strong asset growth
- Solid commercial credit quality
- Moderating expenses

---

NEW YORK – October 17, 2007 – CIT Group Inc. (NYSE: CIT), today reported diluted net loss per share of $0.24 for the third quarter of 2007, due to the home lending charge, versus $1.44 of earnings per share for the 2006 quarter. Net loss attributable to common shareholders was $46.3 million for the current quarter, versus net income of $290.8 million last year.

The Company took the following actions on its home lending liquidation strategy:
- Recorded a lower of cost or market ("LOCOM") charge relating to home lending of $465.5 million, or $290.5 million after-tax (EPS decrease of $1.53)
- Closed the origination operations (as previously announced) and recorded a pre-tax charge of $39.6 million (EPS decrease of $0.12);
- Retained $9.7 billion of the portfolio to be liquidated under contractual terms over time (now classified as held-for-investment), of which approximately $7.5 billion of collateral was securitized (proceeds of $4.3 billion in September and $0.8 billion in October, accounted for as on-balance sheet non-recourse, secured borrowings);
- Contracted to sell approximately $875 million of non-performing and delinquent loans in October at prices approximating the September 30, 2007 adjusted carrying value. Continuing to market the balance of loans in held-for-sale; and
- Generated $23 million of income in the home lending segment, excluding the aforementioned charges, (EPS contribution of $0.12).

Excluding the home lending segment, results were driven by improved finance revenue on higher earning assets, stable net finance revenue as a percentage of average earning assets, continued strong commercial credit quality, lower expense levels and a lower effective tax rate.

"We made good strategic progress this quarter in a very challenging market environment which highlights the value of our model and the resilience of our franchise," said Jeffrey M. Peek, Chairman and Chief Executive Officer of CIT. "CIT's commercial businesses continued to perform well with strong asset growth, increased revenues and stable credit quality. We also advanced our home lending liquidation strategy and mitigated risk through plans to sell $875 million worth of non-performing loans, all while raising $10 billion in asset backed financing."

As required under generally accepted accounting principles, the Company reduced the home lending receivables portfolio to the lower of cost or market. The aforementioned charge reflects further deterioration in the market value of home lending receivables during the quarter based on observable market transactions and other market data. At September 30, 2007, the $11.1 billion mortgage portfolio (excluding repossessed assets) was valued at $10.0 billion, a 9.7% discount to the unpaid principal balance compared to 6.4% at June 30, 2007.

**Consolidated Financial Highlights:**

Net Finance Revenue

- Net finance revenue was up 1% from last quarter and 19% from last year. Average earning assets declined from the prior quarter due to the construction sale last quarter and the LOCOM adjustment on the home lending receivables, but increased from last year on strong asset growth.
- Net finance revenue as a percentage of average earning assets was 2.96% versus 2.89% last quarter and 2.99% last year. Funding costs increased over the prior quarter and last year, but were more than offset by higher home lending yields (the elimination of amortization of capitalized origination costs due to the LOCOM adjustment on that portfolio).
- Operating lease net revenue was 6.90% of average operating leases, down from 6.97% last quarter, due to lower railcar utilization, and up from 6.54% last year due to strength in aerospace rental rates.

Other Income

- Other income decreased from last quarter, primarily reflecting: (1) a significant gain on the sale of construction assets last quarter, (2) lower gains on receivable sales and syndication fees (3) higher fees and (4) higher factoring commissions. The current quarter also includes $9.5 million of post-closing income from the prior quarter's sale of the construction business. The year-over-year decline in other income was due to reduced loan sales and syndication activity.
- Fees and other income improved from last quarter, largely due to higher advisory fees and other income in our healthcare unit.
- Factoring commissions increased this quarter on seasonal volume increases, and were essentially flat with the prior year.
- Gains on receivable sales and syndication fees were down sharply from last quarter and last year, due to the lack of liquidity and lower activity in the syndicated loan markets and no home lending sales. Loan sale and syndication volume was $1.2 billion (13% of origination volume), down from $5.7 billion (52%) and $3.6 billion (33%) in the prior quarter and prior year quarter.

Credit Quality

- Net charge-offs as a percentage of average finance receivables were 0.46% (excluding home lending and student lending), up slightly from last quarter due to higher losses in the other consumer portfolios in the Consumer segment and flat with a year ago.
- 60+ day owned delinquencies were 1.34% (excluding home lending and student lending), up from last quarter, primarily in Corporate Finance and international Vendor Finance, and flat with a year ago.
- Non-performing assets were 1.03% (excluding home lending and student lending), up from last quarter and down from last year.
- The percentages in the three preceding items exclude home lending and student lending, both the credit metric as well as the asset base.

2

- Net charge-offs in the home lending portfolio were $55.5 million, up from $38.4 million last quarter and $18.5 million last year. Home lending net charge-offs were not included in third quarter 2007 net charge-offs as losses on these receivables are reflected as a change in our LOCOM adjustment for the quarter.
- Reserves for credit losses increased $27 million from June 30, 2007. Excluding specific reserves, U.S. Government guaranteed student loans and home loans, the reserve was 1.20% of finance receivables, down slightly from last quarter reflecting seasonal growth in factoring and essentially flat with last year.

Expenses

- Salaries and general operating expenses were down 3% from last quarter and up 5% from a year ago. Lower headcount, legal fees, advertising and variable compensation accruals were offset by higher expenses related to the acquisition of a mergers and acquisition advisory firm. The increase from last year primarily relates to costs associated with various acquisitions, partially offset by expense reduction initiatives.
- The provision for severance and real estate exit activities totaled $42 million, which included provisions for the elimination of approximately 600 positions, primarily in our home lending business. Approximately 400 of these positions were eliminated in the third quarter, with the remaining scheduled to terminate in the fourth quarter.
- Employee headcount totaled approximately 7,010 at September 30, 2007, down from 7,310 last quarter and 7,200 a year ago.

Income Tax Provision

- The third quarter results included a $95.6 million tax benefit on a $133.3 million pretax loss.
- Excluding the home lending adjustment, the third quarter effective tax rate approximated 25%. On a go-forward basis, the annual effective tax rate is anticipated to approximate 27%.

Volume and Assets

- Origination volume for the quarter, excluding factoring and home lending, was $8.6 billion, down from $9.4 billion last quarter and $9.0 billion a year ago. Solid new business volume in Transportation Finance and Vendor Finance was offset by lower Corporate Finance originations, reflecting the sale of the construction business and softer market conditions. The decline from last year is due to the construction business sale and lower healthcare volumes.
- Managed assets were up 5% from June 30, 2007 due in part to seasonal growth in Trade Finance and Student Lending and up 17% over last year (21% excluding home lending), driven by the combination of solid origination volume and acquisitions.
- Excluding home lending, finance receivables held for sale increased $0.7 billion during the quarter to $3.0 billion primarily on higher Vendor Finance levels.

Capitalization, Funding and Liquidity

- The ratio of total tangible equity to managed assets at September 30, 2007 was 7.69%, down from 8.27% last quarter and 9.36% last year.
- During the quarter we funded our business principally in the asset-backed markets. We raised approximately $9.8 billion of proceeds through on and off balance sheet financings including: $4.3 billion secured by home loans, $2.8 billion secured by student loans, $1.5 billion secured by factoring receivables and $1.2 billion secured by equipment.

- In October, we received an additional $0.8 billion of proceeds from home lending receivables securitizations.
- Commercial paper outstandings declined to $3.6 billion from $6.2 billion at June 30 2007.
- Alternate liquidity at September 30, 2007 included cash and equivalents approximating $5.0 billion, committed and available bank lines of $7.5 billion, and committed and available asset-backed facilities of $2.4 billion.
- The Company's preferred stock and junior subordinated notes require the Company to satisfy dividend and interest payments with the net proceeds from the sale of common stock in the event the Company's rolling four-quarter fixed charge coverage ratio is less than 1.10. Following the previously discussed home lending actions, the Board of Directors authorized the Company to issue and sell common stock in amount sufficient to allow it to pay dividends and make interest payments on the aforementioned securities. As a result of selling shares of common stock on October 16, 2007, the Company satisfied the conditions necessary to permit the declaration and payment of preferred stock dividends payable December 17, 2007.

**Segment Results:**

Our segment disclosures reflect changes in our operations relating to the former Consumer and Small Business Lending segment. The presentation of prior period data has been conformed to current period presentation.

- The home lending business is being reported as a separate segment, due to changed market conditions and our outlook that such conditions will prevail for the foreseeable future.
- The student lending business and certain small consumer loan portfolios previously in the Consumer and Small Business Lending segment, are reported in the Consumer segment.
- The small business lending unit was transferred from the former Consumer and Small Business Lending segment to the Corporate Finance segment during the quarter, in line with recent management reporting changes.

*Corporate Finance*

- Total net revenues (the sum of net finance revenue and other income) decreased from the prior year as revenue from higher assets and improved advisory fee income from our recent acquisition was offset by lower gains from loan sales and syndications, due to lower market liquidity and syndication activity. We syndicated or sold approximately $850 million of receivables compared to $1.9 billion last year.
- Net finance revenue as a percentage of average earning assets was essentially flat with last year.
- Net charge-offs increased from last year due to lower recoveries. Delinquencies and non-performing assets increased from last quarter, but remain below last year's levels.
- Volume decreased from record levels last year due to market conditions and the sale of the construction business.
- Return on risk-adjusted capital was 13.9%, improved from last quarter excluding the construction sale gain, and down from the prior year on lower other income and fewer recoveries.

*Transportation Finance*

- Total net revenues were up from last year due to asset growth, improved rental rates and higher gains on equipment sales.

4

- Net finance revenue as a percentage of average earning assets after depreciation was essentially flat with the prior year as continued strength in aerospace rentals was offset by a modest decline in railcar utilization (from nearly full utilization levels).
- Credit quality continued strong with net recoveries, stable delinquencies and level non-performing assets.
- Volume was strong, effectively doubling from the prior year, as we had good financing flow and took delivery of and placed four new aircraft on leases. All of the scheduled aerospace deliveries through March 2009 have been placed.
- Return on risk-adjusted capital improved from last quarter to 16.8% and declined from the prior year, as the year ago period benefited from the release of deferred tax liabilities.

*Trade Finance*

- Total net revenues were down slightly from last year as increased net finance revenue on higher net receivables was offset by lower commission rates.
- Factored volume seasonally increased in the third quarter, but was flat with the prior year.
- Net finance revenue as a percentage of average earning assets decreased from the prior year on competitive pricing.
- Net charge-offs, delinquencies and non-performing loans were all down from last quarter and last year.
- Return on risk-adjusted capital improved to 18.6% from both last quarter and last year.

*Vendor Finance*

- Total net revenues were up modestly from last year, as higher net finance revenues driven by asset growth more than offset lower other revenue.
- Net finance revenue as a percentage of average earning assets after depreciation was down from last year, primarily due to higher borrowing costs and lower international lending spreads, reflecting recent acquisition activity.
- Credit losses were flat versus last quarter and up slightly from last year. Delinquencies and non-performing asset levels increased over both periods.
- Total new business volume grew 13% over last year driven by international operations. US volumes were essentially flat as declines in Dell volume were offset by improved volume from new vendor relationships. Excluding Dell, volumes were up 60%.
- Return on risk-adjusted capital of 13.1% was down from last quarter and last year, reflecting lower joint venture earnings and recent acquisitions for which cost synergies have not yet been realized.

*Home Lending*

- Total net revenues were $67 million, before the LOCOM adjustment, flat with last year.
- Net finance revenue as a percentage of average earning assets increased due to the fair value adjustment, which reduced the book value of the assets and eliminated amortization of previously capitalized loan origination costs.
- Net charge-offs of $55 million, which were applied against the LOCOM adjustment, were above forecast due to increased foreclosures. Net charge-offs included $0.6 million of non-home mortgage receivables, which include our liquidating manufactured housing and recreation vehicle portfolios. Delinquencies and non-performing assets increased from last quarter and last year reflecting portfolio seasoning and continued deterioration in the housing sector.

- New business volume was approximately $500 million. The origination platform was closed on August 28, 2007.
- Pre-tax earnings were $45 million before allocated corporate overhead and the LOCOM adjustment, in-line with our estimate.

*Consumer*

- Total net revenues were up from last year, as higher net finance revenues driven by asset growth more than offset lower other revenue.
- Net finance revenue as a percentage of average earning assets declined due to higher funding costs.
- Net charge-offs increased in the other consumer portfolios, while delinquencies increased moderately, largely reflecting seasoning of the student lending portfolio.
- New business volume improved from last quarter and was flat year-over-year, as school channel volume increased as a percentage of originations.
- Return on risk-adjusted capital for the segment was 7.0%, down year over year on lower revenues.

*Corporate and Other*

- Corporate and other expenses, principally certain credit loss provisioning, preferred stock dividends and other financing costs, dampened return on equity by approximately 140 basis points this quarter and 100 basis points last year.

**Conference Call and Webcast:**

We will discuss this quarter's results, as well as ongoing strategy, on a conference call and audio webcast today at 11:00 am (EDT). Interested parties may access the conference call live today by dialing 866-831-6272 for U.S. and Canadian callers or 617-213-8859 for international callers, and reference access code "CIT Group" or access the audio webcast at the following website: http://ir.cit.com. An audio replay of the call will be available beginning shortly after the conclusion of the call until 11:59 pm (EDT) October 24, 2007, by dialing 888-286-8010 for U.S. and Canadian callers or 617-801-6888 for international callers with the access code 81502007, or at the following website: http://ir.cit.com.

**About CIT:**

Founded in 1908, CIT (NYSE: CIT) is a global commercial finance company that provides financial products and advisory services to more than one million customers in over 50 countries across 30 industries. A leader in middle market financing, CIT has more than $80 billion in managed assets and provides financial solutions for more than half of the Fortune 1000. A member of the S&P 500 and Fortune 500, it maintains leading positions in asset-based, cash flow and small business administration lending, equipment leasing, vendor financing and factoring. CIT's brand, Capital Redefined, articulates its value proposition of providing its customers relationship, intellectual and financial capital. www.cit.com.

**Forward-Looking Statements:**

This release contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. All forward-looking statements (including statements regarding future financial and operating results) involve risks, uncertainties and contingencies, many of which are beyond CIT's control, which may cause actual results, performance, or achievements to differ materially from anticipated results, performance, or achievements. All statements contained in this release that are not clearly historical in nature are forward-looking, and the words "anticipate," "believe," "expect," "estimate," "plan," "target," and similar expressions are generally intended to identify forward-looking statements. Economic, business, funding market, competitive and/or regulatory factors, among others, affecting CIT's businesses are examples of factors that could cause actual results to differ materially from those described in the forward-looking statements. More detailed information about these factors are described in CIT's filings with the Securities and Exchange Commission, including its Annual Report on Form 10-K for the year ended December 31, 2006. CIT is under no obligation to (and expressly disclaims any such obligation to) update or alter its forward-looking statements, whether as a result of new information, future events or otherwise. This release includes certain non-GAAP financial measures as defined under SEC rules. As required by SEC rules, we have provided a reconciliation of those measures to the most directly comparable GAAP measures, which is available with this release and on our website at http://ir.cit.com.

###

**Contact:**

| Investor Relations | Kenneth A. Brause | Executive Vice President, Investor Relations | (212) 771-9650 |
| Media Relations | C. Curtis Ritter | Director of External Communications and Media Relations | (212) 461-7711 curt.ritter@cit.com |

Individuals interested in receiving future updates on CIT via e-mail can register at http://newsalerts.cit.com

7

**CIT GROUP INC. AND SUBSIDIARIES**
**UNAUDITED CONSOLIDATED INCOME STATEMENTS**
(dollars in millions, except per share data)

| | Quarters Ended | | | | | | Nine Months Ended September 30, | | |
| | September 30, 2007 | | June 30, 2007 | | September 30, 2006 | | 2007 | | 2006 |
|---|---|---|---|---|---|---|---|---|---|
| **Finance revenue** | $ | 1,810.0 | $ | 1,758.1 | $ | 1,471.5 | $ 5,185.3 | $ | 4,145.4 |
| Interest expense | | 975.4 | | 942.6 | | 768.8 | 2,791.7 | | 2,044.8 |
| Depreciation on operating lease equipment | | 304.7 | | 292.3 | | 256.5 | 860.6 | | 762.1 |
| Net finance revenue | | 529.9 | | 523.2 | | 446.2 | 1,533.0 | | 1,338.5 |
| Provision for credit losses | | 64.2 | | 73.0 | | 72.5 | 208.3 | | 154.0 |
| Net finance revenue, after credit provision | | 465.7 | | 450.2 | | 373.7 | 1,324.7 | | 1,184.5 |
| Valuation allowance for assets held for sale | | 465.5 | | 787.9 | | 15.0 | 1,253.4 | | 15.0 |
| Total net revenue, after credit provision and valuation allowance | | 0.2 | | (337.7) | | 358.7 | 71.3 | | 1,169.5 |
| Other income | | 276.3 | | 509.1 | | 339.7 | 1,114.0 | | 903.3 |
| Total net revenue and other income | | 276.5 | | 171.4 | | 698.4 | 1,185.3 | | 2,072.8 |
| Salaries and general operating expenses | | 367.9 | | 378.0 | | 351.7 | 1,101.7 | | 1,019.6 |
| Provision for severance and real estate exit activities | | 41.9 | | 34.9 | | 8.5 | 76.8 | | 19.6 |
| Loss on early extinguishments of debt | | - | | - | | - | 139.3 | | - |
| Income (loss) before provision for income taxes | | (133.3) | | (241.5) | | 338.2 | (132.5) | | 1,033.6 |
| (Provision) benefit for income taxes | | 95.6 | | 114.7 | | (39.7) | 176.1 | | (252.9) |
| Minority interest, after tax | | (1.1) | | (0.2) | | (0.2) | (1.4) | | (1.5) |
| Net income (loss) before preferred stock dividends | | (38.8) | | (127.0) | | 298.3 | 42.2 | | 779.2 |
| Preferred stock dividends | | (7.5) | | (7.5) | | (7.5) | (22.5) | | (22.7) |
| Net income (loss) available (attributable) to common stockholders | $ | (46.3) | $ | (134.5) | $ | 290.8 | $ 19.7 | $ | 756.5 |
| **Per common share data** | | | | | | | | | |
| Basic earnings (loss) per share | $ | (0.24) | $ | (0.70) | $ | 1.46 | $ 0.10 | $ | 3.80 |
| Diluted earnings (loss) per share | $ | (0.24) | $ | (0.70) | $ | 1.44 | $ 0.10 | $ | 3.72 |
| Number of shares - basic (thousands) | | 189,930 | | 191,808 | | 198,724 | 191,946 | | 199,113 |
| Number of shares - diluted (thousands) | | 189,930 | | 191,808 | | 202,151 | 194,933 | | 203,498 |
| **Other Income** | | | | | | | | | |
| Fees and other income[1] | $ | 131.2 | $ | 108.2 | $ | 139.9 | $ 424.9 | $ | 413.4 |
| Factoring commissions | | 60.1 | | 52.5 | | 61.3 | 165.0 | | 173.0 |
| Gains on receivable sales and syndication fees | | 29.0 | | 76.4 | | 88.8 | 159.0 | | 192.5 |
| Gains on sales of leasing equipment | | 28.1 | | 33.6 | | 36.1 | 91.2 | | 90.7 |
| Gains on securitizations | | 18.4 | | 7.8 | | 13.6 | 33.8 | | 33.7 |
| Gain on sale of U.S. construction portfolio | | 9.5 | | 230.6 | | - | 240.1 | | - |
| Total other income | $ | 276.3 | $ | 509.1 | $ | 339.7 | $ 1,114.0 | $ | 903.3 |

(1) Fees and other income is comprised of asset management and service fees, including securitization-related servicing fees and accretion, advisory and agent fees, as well as income from joint ventures.

**CIT GROUP INC. AND SUBSIDIARIES**
**UNAUDITED CONSOLIDATED BALANCE SHEETS**
(dollars in millions)

| | September 30, 2007 | December 31, 2006 |
|---|---|---|
| **ASSETS** | | |
| Financing and leasing assets held for investment: | | |
| Finance receivables, including receivables pledged of $16,154.9 million and $3,963.8 million | $ 52,596.2 | $ 45,203.6 |
| Reserve for credit losses | (535.0) | (659.3) |
| Non-home lending receivable, net of credit reserves | 52,061.2 | 44,544.3 |
| Home Lending Finance receivables, including receivables pledged of $7,498.1 million and $0 | 9,174.0 | 9,861.3 |
| Net finance receivables | 61,235.2 | 54,405.6 |
| Operating lease equipment, net | 11,930.3 | 11,017.9 |
| Financing and leasing assets held for sale: | | |
| Home lending finance receivables | 884.3 | 288.9 |
| Other finance receivables | 2,976.4 | 1,504.8 |
| Cash and cash equivalents | 4,998.0 | 4,458.4 |
| Retained interests in securitizations and other investments | 1,428.4 | 1,059.4 |
| Goodwill and intangible assets, net | 1,459.1 | 1,008.4 |
| Other assets | 4,026.7 | 3,324.5 |
| **Total Assets** | $ 88,938.4 | $ 77,067.9 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Debt: | | |
| Commercial paper | $ 3,559.4 | $ 5,365.0 |
| Deposits | 3,023.7 | 2,399.6 |
| Non-recourse, secured borrowings | 14,838.0 | 4,398.5 |
| Variable-rate senior unsecured notes | 23,131.1 | 19,184.3 |
| Fixed-rate senior unsecured notes | 27,474.3 | 29,107.1 |
| Junior subordinated notes | 750.0 | - |
| Preferred capital securities | - | 250.3 |
| Total debt | 72,776.5 | 60,704.8 |
| Credit balances of factoring clients | 4,527.2 | 4,131.3 |
| Accrued liabilities and payables | 4,410.9 | 4,440.8 |
| **Total Liabilities** | 81,714.6 | 69,276.9 |
| **Minority interest** | 54.4 | 39.9 |
| Stockholders' Equity: | | |
| Preferred stock | 500.0 | 500.0 |
| Common stock | 2.1 | 2.1 |
| Paid-in capital | 10,690.3 | 10,678.9 |
| Accumulated deficit | (2,967.9) | (2,838.9) |
| Accumulated other comprehensive income | 200.4 | 129.6 |
| Less: treasury stock, at cost | (1,255.5) | (720.6) |
| Total Common Stockholders' Equity | 6,669.4 | 7,251.1 |
| **Total Stockholders' Equity** | 7,169.4 | 7,751.1 |
| **Total Liabilities and Stockholders' Equity** | $ 88,938.4 | $ 77,067.9 |
| | - | |
| **Other Assets** | | |
| Deposits on commercial aerospace flight equipment | $ 909.9 | $ 719.0 |
| Accrued interest and receivables from derivative counterparties | 805.0 | 643.6 |
| Investments in and receivables from non-consolidated subsidiaries | 183.3 | 535.7 |
| Repossessed assets and off-lease equipment | 236.0 | 124.1 |
| Prepaid expenses | 150.5 | 99.2 |
| Furniture and fixtures, miscellaneous receivables and other assets | 1,742.0 | 1,202.9 |
| | $ 4,026.7 | $ 3,324.5 |

9

CIT GROUP INC. AND SUBSIDIARIES
OWNED AND MANAGED ASSET COMPOSITION
(dollars in millions)

| | September 30, 2007 | June 30, 2007 | September 30, 2006 |
|---|---|---|---|
| **Corporate Finance** | | | |
| Finance receivables | $ 20,232.1 | $ 19,042.0 | $ 18,886.8 |
| Operating lease equipment, net | 229.9 | 160.9 | 170.4 |
| Financing and leasing assets held for sale | 904.6 | 901.7 | 455.9 |
| Owned assets | 21,366.6 | 20,104.6 | 19,513.1 |
| Finance receivables securitized and managed by CIT | 1,636.9 | 1,090.7 | 2,005.0 |
| Managed assets | 23,003.5 | 21,195.3 | 21,518.1 |
| **Transportation Finance** | | | |
| Finance receivables | 2,477.8 | 2,163.8 | 1,527.1 |
| Operating lease equipment, net | 10,601.9 | 10,513.6 | 9,322.7 |
| Financing and leasing assets held for sale | 4.2 | 4.6 | 148.6 |
| Owned assets | 13,083.9 | 12,682.0 | 10,998.4 |
| **Trade Finance** | | | |
| Finance receivables - Owned Assets | 7,945.6 | 6,900.5 | 7,484.9 |
| **Vendor Finance** | | | |
| Finance receivables | 10,169.9 | 10,481.5 | 6,987.8 |
| Operating lease equipment, net | 1,098.5 | 1,258.0 | 979.4 |
| Financing and leasing assets held for sale | 1,418.3 | 777.2 | 627.3 |
| Owned assets | 12,686.7 | 12,516.7 | 8,594.5 |
| Finance receivables securitized and managed by CIT | 4,211.4 | 4,085.8 | 3,611.1 |
| Managed assets | 16,898.1 | 16,602.5 | 12,205.6 |
| **Home Lending** | | | |
| Finance receivables | 9,174.0 | 31.3 | 10,011.9 |
| Financing and leasing assets held for sale | 884.3 | 10,518.3 | 272.0 |
| Owned assets | 10,058.3 | 10,549.6 | 10,283.9 |
| Finance receivables securitized and managed by CIT | 713.2 | 750.7 | 894.5 |
| Managed assets | 10,771.5 | 11,300.3 | 11,178.4 |
| **Consumer** | | | |
| Finance receivables - student lending | 10,960.3 | 9,695.4 | 7,772.1 |
| Finance receivables - other | 810.5 | 785.6 | 490.4 |
| Financing and leasing assets held for sale | 649.3 | 645.9 | 264.7 |
| Owned assets | 12,420.1 | 11,126.9 | 8,527.2 |
| **Other** | | | |
| Equity Investments | 161.7 | 151.9 | 28.0 |
| **Consolidated Totals** | | | |
| **Finance receivables, excluding home lending** | $ 52,596.2 | $ 49,068.8 | $ 43,149.1 |
| **Finance receivables - home lending** | 9,174.0 | 31.3 | 10,011.9 |
| **Operating lease equipment, net** | 11,930.3 | 11,932.5 | 10,472.5 |
| **Home lending finance receivables held for sale** | 884.3 | 10,518.3 | 272.0 |
| **Other financing and leasing assets held for sale** | 2,976.4 | 2,329.4 | 1,496.5 |
| **Financing and leasing assets excl. equity investments** | 77,561.2 | 73,880.3 | 65,402.0 |
| **Equity investments (included in other assets)** | 161.7 | 151.9 | 28.0 |
| **Owned assets** | 77,722.9 | 74,032.2 | 65,430.0 |
| **Finance receivables securitized and managed by CIT** | 6,561.5 | 5,927.2 | 6,510.6 |
| **Managed assets** | $ 84,284.4 | $ 79,959.4 | $ 71,940.6 |
| **Managed assets, excluding home lending** | $ 73,512.9 | $ 68,659.1 | $ 60,762.2 |

10

CIT GROUP INC. AND SUBSIDIARIES
SEGMENT DATA
(dollars in millions)

| | Quarters Ended | | | Nine Months Ended September 30, | |
| | September 30, 2007 | June 30, 2007 | September 30, 2006 | 2007 | 2006 |
|---|---|---|---|---|---|
| **Corporate Finance** | | | | | |
| Net finance revenue, before depreciation | $ 170.1 | $ 185.8 | $ 155.6 | $ 523.4 | $ 448.6 |
| Depreciation on operating lease equipment | 7.5 | 10.6 | 7.5 | 27.9 | 24.0 |
| Provision for credit losses | 13.0 | 11.4 | 6.5 | 44.9 | 10.6 |
| Valuation allowance for assets held for sale | - | 22.5 | - | 22.5 | - |
| Other income | 99.2 | 328.5 | 128.8 | 530.2 | 283.3 |
| Total net revenue and other income | 248.8 | 469.8 | 270.4 | 958.3 | 697.3 |
| Provision for income taxes | (47.8) | (133.0) | (54.5) | (226.1) | (128.0) |
| Net income* | 83.3 | 219.3 | 93.6 | 382.7 | 225.8 |
| Return on risk-adjusted capital | 13.9% | 35.0% | 17.0% | 20.7% | 14.6% |
| New business volume | $ 3,582.4 | $ 4,622.6 | $ 4,519.1 | $ 11,793.3 | $ 11,033.2 |
| | | | | | |
| **Transportation Finance** | | | | | |
| Net finance revenue, before depreciation | $ 229.8 | $ 226.9 | $ 172.6 | $ 667.5 | $ 531.9 |
| Depreciation on operating lease equipment | 136.7 | 137.0 | 112.8 | 407.2 | 328.1 |
| Provision for credit losses | (3.0) | 0.3 | - | (25.1) | 1.0 |
| Valuation allowance for assets held for sale | - | - | 15.0 | - | 15.0 |
| Other income | 20.4 | 19.4 | 16.9 | 57.5 | 56.2 |
| Total net revenue and other income | 116.5 | 109.0 | 61.7 | 342.9 | 244.0 |
| Provision for income taxes | (10.5) | (10.8) | 56.5 | (28.9) | 53.4 |
| Net income | 70.3 | 62.9 | 86.8 | 209.6 | 200.8 |
| Return on risk-adjusted capital | 16.8% | 15.4% | 24.4% | 17.1% | 15.2% |
| New business volume | $ 757.5 | $ 696.3 | $ 458.9 | $ 2,140.0 | $ 1,741.7 |
| | | | | | |
| **Trade Finance** | | | | | |
| Net finance revenue, before depreciation | $ 45.1 | $ 42.0 | $ 41.3 | $ 128.5 | $ 118.4 |
| Provision for credit losses | 7.8 | 10.3 | 16.7 | 26.0 | 29.1 |
| Other income | 72.3 | 66.5 | 77.3 | 206.5 | 216.7 |
| Total net revenue and other income | 109.6 | 98.2 | 101.9 | 309.0 | 306.0 |
| Provision for income taxes | (26.7) | (21.7) | (23.4) | (71.7) | (70.4) |
| Net income | 43.5 | 36.1 | 39.1 | 116.2 | 118.2 |
| Return on risk-adjusted capital | 18.6% | 16.5% | 17.5% | 17.4% | 18.2% |
| | | | | | |
| **Vendor Finance** | | | | | |
| Net finance revenue, before depreciation | $ 306.4 | $ 291.9 | $ 259.9 | $ 849.8 | $ 787.2 |
| Depreciation on operating lease equipment | 160.8 | 144.8 | 136.1 | 426.0 | 410.0 |
| Provision for credit losses | 7.5 | 5.8 | 8.4 | 23.7 | 36.0 |
| Other income | 76.8 | 79.7 | 94.9 | 267.4 | 275.9 |
| Total net revenue and other income | 214.9 | 221.0 | 210.3 | 667.5 | 617.1 |
| Provision for income taxes | (32.4) | (30.6) | (46.2) | (102.9) | (120.4) |
| Net income | 58.2 | 70.1 | 60.5 | 204.5 | 198.6 |
| Return on risk-adjusted capital | 13.1% | 16.2% | 23.3% | 15.9% | 25.2% |
| New business volume | $ 2,296.4 | $ 2,462.6 | $ 2,028.8 | $ 7,068.9 | $ 6,018.9 |
| | | | | | |
| **Home Lending** | | | | | |
| Net finance revenue, before depreciation | $ 68.1 | $ 58.0 | $ 53.0 | $ 180.1 | $ 155.7 |
| Provision for credit losses | 0.4 | 60.3 | 17.0 | 95.9 | 50.4 |
| Valuation allowance for assets held for sale | 465.5 | 765.4 | - | 1,230.9 | - |
| Other income | (0.7) | 8.3 | 14.3 | 19.2 | 38.2 |
| Total net revenue and other income | (398.5) | (759.4) | 50.3 | (1,127.5) | 143.5 |
| Provision for income taxes | 178.6 | 281.9 | (5.6) | 461.8 | (16.2) |
| Net income** | (290.6) | (510.4) | 11.7 | (800.5) | 27.2 |
| Return on risk-adjusted capital | NM | NM | 6.0% | NM | 4.9% |
| New business volume | $ 499.2 | $ 1,489.2 | $ 2,038.7 | $ 4,181.5 | $ 5,791.7 |
| | | | | | |
| **Consumer** | | | | | |
| Net finance revenue, before depreciation | $ 36.6 | $ 35.5 | $ 28.5 | $ 103.9 | $ 83.3 |
| Provision for credit losses | 13.3 | 7.8 | 4.0 | 29.0 | 10.4 |
| Other income | 7.3 | 17.4 | 13.6 | 42.5 | 37.8 |
| Total net revenue and other income | 30.6 | 45.1 | 38.1 | 117.4 | 110.7 |
| Provision for income taxes | (2.7) | (2.9) | (5.7) | (10.5) | (6.9) |
| Net income | 9.4 | 15.1 | 12.7 | 35.9 | 24.7 |
| Return on risk-adjusted capital | 7.00 % | 11.60 % | 10.90 % | 9.20 % | 7.30 % |
| New business volume | $ 1,992.5 | $ 1,667.3 | $ 1,964.4 | $ 5,661.6 | $ 5,131.1 |
| | | | | | |
| **Corporate and Other** | | | | | |
| Net finance revenue, before depreciation | $ (21.5) | $ (24.6) | $ (8.2) | $ (59.6) | $ (24.5) |
| Provision for credit losses | 25.2 | (22.9) | 19.9 | 13.9 | 16.5 |
| Other income | 1.0 | (10.7) | (6.1) | (9.3) | (4.8) |
| Total net revenue and other income | (45.4) | (12.3) | (34.3) | (82.3) | (45.8) |
| Provision for income taxes | 37.1 | 31.8 | 39.2 | 154.4 | 35.6 |
| Net (loss) income | (20.4) | (27.6) | (13.6) | (128.7) | (38.8) |
| Return on risk-adjusted capital | (1.4)% | (2.6)% | (1.0)% | (2.1)% | (2.3)% |

NM - not meaningful

* The June 2007 results include a $235.0 million gain on sale of construction portfolio.

** The June 2007 results include a $765 million pretax fair value adjustment on the home lending portfolio.

**CIT GROUP INC. AND SUBSIDIARIES**
**CREDIT METRICS**
**(dollars in millions)**

| | Quarters Ended | | | | | | Nine Months Ended September 30, | | | |
| | September 30, 2007 | | June 30, 2007 | | September 30, 2006 | | 2007 | | 2006 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Net Credit Losses - Owned as a Percentage of Average Finance Receivables** | | | | | | | | | | |
| Corporate Finance | $ 16.5 | 0.33% | $ 9.7 | 0.18% | $ 6.2 | 0.14% | $ 47.0 | 0.31% | $ 7.9 | 0.08% |
| Transportation Finance | (3.3) | (0.56)% | 0.4 | 0.08% | - | - | (25.4) | (1.49)% | 1.4 | 0.11% |
| Trade Finance | 7.2 | 0.39% | 10.0 | 0.59% | 16.3 | 0.95% | 24.2 | 0.47% | 28.8 | 0.58% |
| Vendor Finance | 13.3 | 0.51% | 12.4 | 0.48% | 11.1 | 0.62% | 35.7 | 0.47% | 32.1 | 0.59% |
| Home Lending | 0.6 | 11.41% | 41.8 | 1.46% | 22.7 | 0.94% | 76.9 | 1.57% | 66.1 | 0.95% |
| Consumer | 13.5 | 0.49% | 7.8 | 0.30% | 3.6 | 0.18% | 28.7 | 0.37% | 8.6 | 0.16% |
| Total | $ 47.8 | 0.37% | $ 82.1 | 0.53% | $ 59.9 | 0.47% | $ 187.1 | 0.44% | $ 144.9 | 0.40% |
| Total, excluding home lending and student loans | $ 47.2 | 0.46% | $ 40.3 | 0.39% | $ 37.2 | 0.43% | $ 110.2 | 0.36% | $ 78.8 | 0.32% |
| **Net Credit Losses - Managed as a Percentage of Average Managed Finance Receivables** | | | | | | | | | | |
| Corporate Finance | $ 18.0 | 0.34% | $ 12.8 | 0.22% | $ 8.0 | 0.16% | $ 53.6 | 0.33% | $ 15.1 | 0.11% |
| Transportation Finance | (3.3) | (0.56)% | 0.4 | 0.08% | - | - | (25.4) | (1.49)% | 1.4 | 0.11% |
| Trade Finance | 7.2 | 0.39% | 10.0 | 0.59% | 16.3 | 0.95% | 24.2 | 0.47% | 28.8 | 0.58% |
| Vendor Finance | 19.1 | 0.52% | 18.5 | 0.51% | 15.4 | 0.58% | 51.0 | 0.48% | 44.2 | 0.55% |
| Home Lending | 7.6 | 4.04% | 48.2 | 1.58% | 30.2 | 1.14% | 97.8 | 1.78% | 96.2 | 1.25% |
| Consumer | 13.5 | 0.49% | 7.8 | 0.30% | 3.6 | 0.18% | 28.7 | 0.37% | 8.6 | 0.16% |
| Total | $ 62.1 | 0.44% | $ 97.7 | 0.57% | $ 73.5 | 0.51% | $ 229.9 | 0.49% | $ 194.3 | 0.46% |
| Total, excluding home lending and student loans | $ 54.5 | 0.47% | $ 49.5 | 0.42% | $ 43.3 | 0.43% | $ 132.1 | 0.39% | $ 98.1 | 0.33% |

| | September 30, 2007 | | June 30, 2007 | | September 30, 2006 | |
|---|---|---|---|---|---|---|
| **Finance Receivables Past Due 60 days or more - Owned as a Percentage of Finance Receivables** | | | | | | |
| Corporate Finance | $ 174.0 | 0.86% | $ 137.2 | 0.72% | $ 162.3 | 0.86% |
| Transportation Finance | 11.4 | 0.46% | 12.5 | 0.58% | 16.0 | 1.04% |
| Trade Finance | 78.8 | 0.99% | 87.2 | 1.26% | 105.5 | 1.41% |
| Vendor Finance | 277.0 | 2.72% | 209.6 | 2.00% | 184.7 | 2.64% |
| Consumer | 616.2 | 5.24% | 497.6 | 4.75% | 333.8 | 4.04% |
| Total, excluding home lending | $ 1,157.4 | 2.20% | $ 944.1 | 1.92% | $ 802.3 | 1.86% |
| Home Lending | $ 1,130.0 | 10.11% | $ 765.0 | 6.65% | $ 370.5 | 3.70% |
| Total, excluding home lending and student loans | $ 558.8 | 1.34% | $ 456.2 | 1.16% | $ 473.9 | 1.34% |
| **Non-performing Assets - Owned as a Percentage of Finance Receivables** | | | | | | |
| Corporate Finance | $ 223.9 | 1.11% | $ 147.3 | 0.77% | $ 265.4 | 1.41% |
| Transportation Finance | 4.3 | 0.17% | 5.0 | 0.23% | 8.2 | 0.54% |
| Trade Finance | 49.5 | 0.62% | 53.2 | 0.77% | 69.8 | 0.93% |
| Vendor Finance | 142.0 | 1.40% | 117.5 | 1.12% | 59.3 | 0.85% |
| Consumer | 7.3 | 0.06% | 3.8 | 0.04% | 1.9 | 0.02% |
| Total, excluding home lending | $ 427.0 | 0.81% | $ 326.8 | 0.67% | $ 404.6 | 0.94% |
| Home Lending | $ 1,123.0 | 10.04% | $ 771.0 | 6.70% | $ 361.1 | 3.61% |
| Total, excluding home lending and student loans | $ 427.0 | 1.03% | $ 326.8 | 0.83% | $ 404.6 | 1.14% |
| **Finance Receivables Past Due 60 days or more - Managed as a Percentage of Managed Financial Assets** | | | | | | |
| Corporate Finance | $ 180.8 | 0.79% | $ 142.7 | 0.68% | $ 182.9 | 0.86% |
| Transportation Finance | 11.4 | 0.46% | 12.5 | 0.58% | 16.0 | 0.95% |
| Trade Finance | 78.8 | 0.99% | 87.2 | 1.26% | 105.5 | 1.41% |
| Vendor Finance | 449.7 | 2.85% | 356.7 | 2.33% | 301.8 | 2.69% |
| Consumer | 616.2 | 4.96% | 497.5 | 4.47% | 333.8 | 3.91% |
| Total, excluding home lending | $ 1,336.9 | 2.18% | $ 1,096.6 | 1.94% | $ 940.0 | 1.87% |
| Home Lending | $ 1,195.0 | 10.24% | $ 828.0 | 6.86% | $ 440.8 | 3.95% |
| Total, excluding home lending and student loans | $ 738.3 | 1.48% | $ 609.0 | 1.32% | $ 611.0 | 1.45% |

The following segment changes are reflected in the above metrics:
1. Corporate Finance includes Small Business Lending, which had been reflected in the former Consumer and Small Business Lending segment.
2. Home Lending includes the activities of other liquidating consumer related loans formerly included in Vendor Finance.
3. Consumer includes student lending and the CIT industrial bank, which had been reflected in the former Consumer and Small Business Lending segment.
NOTE:
Home lending contractual delinquency and non-performing statistics as a percentage of unadjusted principal balance.

12

**CIT GROUP INC. AND SUBSIDIARIES**
**RATIOS AND OTHER DATA**
**(dollars in millions, except per share data)**

| | Quarters Ended | | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- | --- |
| | September 30, 2007 | June 30, 2007 | September 30, 2006 | 2007 | 2006 |
| **Profitability** | | | | | |
| Net finance revenue as a percentage of AEA | 2.96% | 2.89% | 2.99% | 2.90% | 3.17% |
| Net finance revenue after provision as a percentage of AEA | 2.60% | 2.49% | 2.51% | 2.50% | 2.80% |
| Salaries and general operating expenses as a percentage of AMA | 1.89% | 1.92% | 2.13% | 1.92% | 2.15% |
| Efficiency ratio | 45.6% | 36.6% | 44.8% | 41.6% | 45.5% |
| Return on average common stockholders' equity | -2.7% | -7.8% | 16.9% | 0.4% | 15.1% |
| Return on AEA | -0.26% | -0.74% | 1.95% | 0.04% | 1.79% |
| Return on AMA | -0.24% | -0.68% | 1.76% | 0.03% | 1.60% |
| See "Non-GAAP Disclosures" for additional information regarding profitability ratio and metric comparisons. | | | | | |
| **Average Balances** | | | | | |
| Average Finance Receivables (AFR) | $ 51,000.0 | $ 62,417.8 | $ 51,503.3 | $ 56,574.0 | $ 48,514.6 |
| Average Earning Assets (AEA) | 71,696.7 | 72,352.8 | 59,616.2 | 70,557.1 | 56,331.0 |
| Average Managed Assets (AMA) | 77,697.8 | 78,640.9 | 66,109.3 | 76,666.6 | 63,098.3 |
| Average Operating Leases (AOL) | 11,963.3 | 11,695.6 | 10,619.5 | 11,626.3 | 10,312.7 |
| Average Common Stockholders' Equity | 6,763.6 | 6,889.1 | 6,881.0 | 6,878.4 | 6,691.6 |

| | September 30, 2007 | June 30, 2007 | September 30, 2006 |
| --- | --- | --- | --- |
| **Capital and Leverage** | | | |
| Total tangible stockholders' equity to managed assets | 7.69% | 8.27% | 9.36% |
| Tangible book value per common share | $27.60 | $28.13 | $30.07 |
| Book value per common share | $35.29 | $35.37 | $35.34 |
| | | | |
| **Reserve for Credit Losses** | | | |
| Reserve for credit losses as a percentage of finance receivables, excluding student loans | 1.28% | 1.42% | 1.45% |
| Reserve for credit losses (excluding reserves related to impaired loans and hurricane reserves) as a percentage of finance receivables, excluding home lending and student loans | 1.20% | 1.22% | 1.18% |
| Reserve for credit losses as a percentage of finance receivables | 0.90% | 1.19% | 1.23% |
| Reserve for credit losses as a percentage of non-performing assets, excluding home lending and student lending | 124.5% | 154.4% | 120.1% |
| Reserve for credit losses as a percentage of finance receivables past due 60 days or more, excluding home lending and student lending | 95.5% | 98.7% | 104.0% |

**CIT GROUP INC. AND SUBSIDIARIES**
**Select Concentration Data**
**(dollars in millions unless specified)**

**Commercial Aerospace Portfolio:**

| | September 30, 2007 | | June 30, 2007 | | September 30, 2006 | |
|---|---|---|---|---|---|---|
| | Net Investment | Number | Net Investment | Number | Net Investment | Number |
| *By Region:* | | | | | | |
| Europe | $  2,900.0 | 90 | $  2,893.7 | 88 | $  2,762.1 | 87 |
| U.S. and Canada | 1,370.5 | 62 | 1,237.8 | 59 | 887.3 | 36 |
| Asia Pacific | 2,013.2 | 77 | 1,822.0 | 57 | 1,494.3 | 50 |
| Latin America | 1,073.7 | 34 | 985.4 | 31 | 849.9 | 28 |
| Africa / Middle East | 493.2 | 13 | 497.2 | 13 | 363.6 | 9 |
| Total | $  7,850.6 | 276 | $  7,436.1 | 248 | $  6,357.2 | 210 |
| *By Manufacturer:* | | | | | | |
| Boeing | $  3,539.6 | 151 | $  3,204.7 | 126 | $  2,832.3 | 114 |
| Airbus | 4,301.7 | 124 | 4,222.0 | 121 | 3,507.3 | 93 |
| Other | 9.3 | 1 | 9.4 | 1 | 17.6 | 3 |
| Total | $  7,850.6 | 276 | $  7,436.1 | 248 | $  6,357.2 | 210 |
| *By Body Type (1):* | | | | | | |
| Narrow body | $  5,879.7 | 216 | $  5,537.4 | 190 | $  4,918.6 | 171 |
| Intermediate | 1,652.4 | 45 | 1,631.8 | 43 | 1,243.0 | 26 |
| Wide body | 309.2 | 14 | 257.5 | 14 | 178.0 | 10 |
| Other | 9.3 | 1 | 9.4 | 1 | 17.6 | 3 |
| Total | $  7,850.6 | 276 | $  7,436.1 | 248 | $  6,357.2 | 210 |
| *By Product:* | | | | | | |
| Operating lease | $  6,729.9 | 209 | $  6,645.2 | 205 | $  5,883.0 | 189 |
| Leveraged lease (other) | 40.8 | 2 | 40.5 | 2 | 148.2 | 5 |
| Leveraged lease (tax optimized) | 45.0 | 1 | 44.3 | 1 | 68.2 | 2 |
| Capital lease | 231.2 | 9 | 145.1 | 5 | 155.6 | 6 |
| Loan | 803.7 | 55 | 561.0 | 35 | 102.2 | 8 |
| Total | $  7,850.6 | 276 | $  7,436.1 | 248 | $  6,357.2 | 210 |
| | | | | | | |
| Number of accounts | 102 | | 98 | | 94 | |
| Weighted average age of fleet (years) | 6 | | 6 | | 6 | |
| Largest customer net investment | $  279.7 | | $  282.8 | | $  291.6 | |
| Off-lease aircraft | | - | | - | | - |
| | | | | | | |
| New Aircraft Delivery Order Book (dollars in billions) | | | | | | |
| For the Years Ending December 31, | | | | | | |
| 2006 (Remaining 2006) | $  - | - | $  - | - | $  0.4 | 8 |
| 2007 (Remaining 2007) | 0.6 | 10 | 0.7 | 14 | 1.3 | 26 |
| 2008 | 1.4 | 23 | 1.4 | 24 | 1.4 | 24 |
| 2009 | 0.9 | 14 | 0.8 | 13 | 0.6 | 11 |
| Thereafter | 4.6 | 65 | 4.1 | 60 | 1.1 | 10 |
| Total | $  7.5 | 112 | $  7.0 | 111 | $  4.8 | 79 |

(1) Narrow body are single aisle design and consist primarily of Boeing 737 and 757 series and Airbus A320 series aircraft. Intermediate body are smaller twin aisle design and consist primarily of Boeing 767 series and Airbus A330 series aircraft. Wide body are large twin aisle design and consist primarily of Boeing 747 and 777 series and McDonnell Douglas DC10 series aircraft.

| **Managed Home Lending Portfolio Statistics** | September 30, 2007 * | June 30, 2007 | September 30, 2006 |
|---|---|---|---|
| Managed assets | $  11,519.9 | $  11,894.2 | $  10,747.6 |
| Portfolio assets | $  10,974.8  * | $  11,324.7 | $  10,072.4 |
| % of first mortgages | 89% | 89% | 89% |
| Average loan size | $  129.5 | $  127.9 | $  120.7 |
| Fixed-rate mortgage % | 44% | 43% | 44% |
| Weighted Average loan-to-value | 82% | 82% | 81% |
| Average FICO score | 637 | 637 | 636 |
| Delinquencies (sixty days or more) | 10.34% | 6.60% | 3.77% |
| Net charge-offs-managed basis | 2.04% | 1.43% | 0.90% |
| Net charge-offs-owned basis | 2.00% | 1.37% | 0.79% |

*September amounts are based on unpaid principal balances and exclude valuation adjustments.

**CIT GROUP INC. AND SUBSIDIARIES**
**Non-GAAP Disclosures**
**(dollars in millions)**

|  | September 30, 2007 | June 30, 2007 | September 30, 2006 |
|---|---|---|---|
| **Managed assets** [1]: |  |  |  |
| Finance receivables, excluding home lending | $    52,596.2 | $    49,068.8 | $    43,149.1 |
| Finance receivables - home lending | 9,174.0 | 31.3 | 10,011.9 |
| Operating lease equipment, net | 11,930.3 | 11,932.5 | 10,472.5 |
| Financing and leasing assets held for sale | 2,976.4 | 2,329.4 | 1,496.5 |
| Home lending finance receivables held for sale | 884.3 | 10,518.3 | 272.0 |
| Equity and venture capital investments (included in other assets) | 161.7 | 151.9 | 28.0 |
| Total financing and leasing portfolio assets | 77,722.9 | 74,032.2 | 65,430.0 |
| Securitized assets | 6,561.5 | 5,927.2 | 6,510.6 |
| Managed assets | $    84,284.4 | $    79,959.4 | $    71,940.6 |
| **Earning assets** [2]: |  |  |  |
| Total financing and leasing portfolio assets | $    77,722.9 | $    74,032.2 | $    65,430.0 |
| Credit balances of factoring clients | (4,527.2) | (3,911.0) | (4,318.7) |
| Earning assets | $    73,195.7 | $    70,121.2 | $    61,111.3 |
| **Tangible equity** [3]: |  |  |  |
| Total equity | $    6,669.4 | $    6,813.8 | $    7,059.2 |
| Other comprehensive income relating to derivative financial instruments | 29.9 | (59.5) | (30.1) |
| Unrealized gain on securitization investments | (7.3) | (8.2) | (15.2) |
| Goodwill and intangible assets | (1,459.1) | (1,382.1) | (1,028.0) |
| Tangible common equity | 5,232.9 | 5,364.0 | 5,985.9 |
| Preferred stock | 500.0 | 500.0 | 500.0 |
| Preferred capital securities [4] | - | - | 250.7 |
| 60 year junior subordinated notes | 750.0 | 750.0 | - |
| **Tangible equity** | $    6,482.9 | $    6,614.0 | $    6,736.6 |

|  | **Quarters Ended** | | |
|---|---|---|---|
|  | September 30, 2007 | June 30, 2007 | September 30, 2006 |
| Total net revenues [5] |  |  |  |
| Net Finance Revenue after Depreciation | 529.9 | 523.2 | 446.2 |
| Other Income | 276.3 | 509.1 | 339.7 |
| Total net revenues | $    806.2 | $    1,032.3 | $    785.9 |

|  | **Nine Months Ended** | |
|---|---|---|
|  | September 30, 2007 | September 30, 2006 |
| Net Finance Revenue after Depreciation | 1,533.0 | 1,338.5 |
| Other Income | 1,114.0 | 903.3 |
| Total net revenues | $    2,647.0 | $    2,241.8 |

Non-GAAP financial measures disclosed by management are meant to provide additional information and insight relative to trends in the business to investors and, in certain cases, to present financial information as measured by rating agencies and other users of financial information. These measures are not in accordance with, or a substitute for, GAAP and may be different from, or inconsistent with, non-GAAP financial measures used by other companies.

1) Managed assets are utilized in certain credit and expense ratios. Securitized assets are included in managed assets because CIT retains certain credit risk and the servicing related to assets that are funded through securitizations.

2) Earning assets are utilized in certain revenue and earnings ratios. Earning assets are net of credit balances of factoring clients. This net amount, which corresponds to amounts funded, is a basis for revenues earned.

3) Tangible equity is utilized in leverage ratios, and is consistent with certain rating agency measurements. Other comprehensive income and unrealized gains on securitization investments (both included in the separate component of equity) are excluded from the calculation, as these amounts are not necessarily indicative of amounts which will be realized.

4) The preferred capital securities were called on March 16, 2007.

5) Total net revenues are the combination of net finance revenues after depreciation on operating leases and other income.



**FOR IMMEDIATE RELEASE**

### CIT REPORTS RECORD FIRST QUARTER RESULTS
*STRONG REVENUE AND ORIGINATION GROWTH, MODERATING EXPENSE TRENDS AND LOW NET CHARGE-OFFS*

<u>**Financial Highlights**</u>

- EPS of $1.37, versus $1.12 last year
- EPS of $1.30, up 15%, excluding noteworthy items
- New business volume of $10.8 billion, up 24%
- Revenue growth of 14%, excluding noteworthy items

NEW YORK – April 18, 2007 – CIT Group Inc. (NYSE: CIT), today reported diluted earnings per share (EPS) of $1.37 for the quarter, up from $1.12 for the 2006 quarter. Net income available to common shareholders was $271.4 million and $229.7 million for the current and prior year quarters.

Excluding noteworthy items, diluted EPS of $1.30 ($257.8 million net income available to common shareholders) for the quarter improved 15% from $1.13 ($230.6 million) in 2006. On this basis, return on average common equity was 14.8%, up from 14.2% last year.

The current quarter noteworthy items increased EPS by $0.07 including a tax expense reduction of $20.6 million due to the release of certain international tax reserves ($0.10 diluted EPS increase) and an interest expense increase of $14.8 million due to certain costs related to early extinguishments of high cost debt ($0.04 diluted EPS decrease). See noteworthy items, which are detailed in the attached Non-GAAP tables on page 16.

"CIT is off to a solid start in 2007 with our operating EPS increasing 15% from a year ago," said Jeffrey M. Peek, Chairman and Chief Executive Officer of CIT. "The key drivers of our success have been broad-based and are rooted in the growth strategies and initiatives that are building CIT's future. Our sales force investment continues to pay dividends. Top-line revenue grew 14% as a result of our 24% increase in new business volume.

Our decision to acquire Citigroup's U.S. Business Technology Finance unit was a milestone for CIT and adds $2 billion in assets. This acquisition will increase our economies of scale and increase our global market share in the vendor finance sector. Looking ahead, we will continue to leverage our asset origination, risk management and client servicing capabilities to increase future shareholder returns."

**Consolidated Financial Highlights:**

Overview

- Assets increased 7% in the quarter on organic growth and the $2 billion Barclay's vendor finance acquisition, which expands our presence in the U.K. and Germany. Assets were up 22% from a year ago.
- Fees and other income were strong.
- Overall credit quality remained high, with excellent commercial performance offset by weakening home lending metrics.
- Efficiency improved from last year on sales force productivity gains, and was relatively unchanged from last quarter reflecting expense management initiatives.
- EPS and return on average common equity benefited from capital initiatives and lower tax rates.

Total Net Revenue

- Total net revenue before credit provision was $808.5 million (excluding the charge for retiring the high-coupon debt) for the quarter; up 14% from last year reflecting increased finance revenue on higher assets and improved other revenue.
- Other revenue performance was led by strong fee and other income, as well as increased gains from receivable sales and syndications.

Net Finance Revenue

- Net finance revenue was up 7% from last year and 3% from last quarter (excluding the noteworthy item) due to strong asset growth, tempered by margin compression.
- Net finance revenue as a percentage of average earning assets was 2.74% (2.83% excluding the noteworthy item), down from 3.36% last year and 2.96% last quarter. The declines are primarily due to product mix, competitive pricing, capital initiatives, as well as higher yield-related fees last year.
- Operating lease net revenue was 6.82% of average operating leases, compared to 6.60% last year and 7.09% last quarter.

Other Revenue

- Other revenue increased to $328.6 million, up from $260.1 million last year. Fees and other income increased in the quarter, and gains from receivable sales and syndications were up from the prior year.
- During the quarter, we sold or syndicated receivables of $2.4 billion (23% of origination volume), compared to $1.4 billion (16%) last year. Gains on receivable sales and syndications fees were $53.6 million and $40.6 million for these periods. The current quarter gains were tempered by a fair value write down of approximately $13 million on an energy receivable.
- Other revenue was 41% of total net revenue for the quarter, up from 37% last year.

Credit Quality

- Net charge-offs were 0.39% of average finance receivables, up slightly with 0.37% last year and improved from 0.58% last quarter. The current quarter net charge-offs for our businesses aside from our consumer segment were minimal and included strong recoveries in aerospace and

energy. Recoveries were 31 basis points this quarter, up from 17 basis points last year and 18 basis points last quarter.

- Total 60+ day owned delinquencies were 1.98% of finance receivables (excluding student lending), relatively unchanged from December 31, 2006, as lower commercial portfolio delinquencies were offset by an increase in home lending delinquencies.
- Non-performing assets (non-accrual loans plus repossessed assets) were 1.74% of finance receivables (excluding student lending), up from 1.65% last quarter reflecting trends consistent with delinquencies.
- The provision for credit losses was $71.1 million, versus $33.3 million in the prior year. Reserves for credit losses increased $44.7 million in the quarter to $704.0 million, reflecting asset growth and home lending trends.
- Excluding both student lending receivables and specific reserves for impaired loans, the reserve for credit losses was 1.32% of finance receivables, versus 1.30% last quarter and 1.27% last year, reflecting higher home lending reserves.
- Student lending receivables are excluded from the above metrics, as they are guaranteed by the U.S. Government.

Salaries and General Operating Expenses

- Total salaries and general operating expenses benefited from focused expense management initiatives. For the quarter, excluding a restructuring provision reversal, expenses were $358.3 million, essentially flat with $358.2 million last quarter, and up from $323.1 million a year ago. The increase from last year reflects higher salary and benefit expenses on increased headcount, as well as incremental costs associated with acquisitions.
- The efficiency ratio, excluding noteworthy items in each period, was 44.3% for the quarter, improved from 45.7% last year and flat sequentially. Including the noteworthy items, the efficiency ratios were 44.8% for the current and prior quarters, and 47.3% for the prior year quarter.
- Employee headcount totaled approximately 7,500 at March 31, 2007 up from 7,345 at December 31, 2006. The increase is primarily due to the international vendor finance acquisition.
- In April, we continued our expense management initiatives by taking cost saving actions across the Company, which will result in the payment of approximately $20 million in termination benefits to 250 employees in the second quarter of 2007.

Effective Tax Rate

- The effective tax rate was 30.0%, compared to 31.8% last year. The decrease reflects the continued benefit from relocating and funding certain aerospace assets offshore and improved international earnings. These effective tax rates exclude deferred tax liability releases.
- The effective tax rates were 23.9% and 29.8% for the current and prior year quarters, including deferred tax liability releases in noteworthy items.

Volume and Assets

- Origination volume for the quarter, excluding factoring, was $10.8 billion, up 24% over last year, on strong results across all businesses.
- Managed assets were $79.7 billion at March 31, 2007, up 22% from last year, driven by strong origination volume and the international vendor acquisition.

3

- On April 2, 2007, we signed a definitive purchase agreement to acquire the U.S. Business Technology Finance unit of Citigroup Inc. The transaction is expected to close in the second quarter and will add approximately $2 billion of vendor finance assets.

Capitalization
- In the first quarter, we sold $750 million in 60-year junior subordinated notes, which are classified as debt, but are included in tangible capital (hybrid debt). In January, we agreed to purchase $500 million of our common stock through an accelerated stock buyback program. During the quarter, approximately 7.65 million shares were purchased, with the final share purchase expected in the second quarter.
- Effective January 1, 2007, we early adopted Statement of Financial Accounting Standard No. 159 "The Fair Value Option for Financial Assets and Financial Liabilities", based on our interpretation of current guidance. We applied the standard, which provides for elective fair value accounting on selected financial instruments, to fixed high-coupon debt securities, which were hedged in accordance with SFAS 133, resulting in an $85.3 million direct after tax reduction of retained earnings. In response to our tender offer, a portion of these securities were refinanced near the end of the quarter with lower cost floating rate debt. The tender premium was reflected in first quarter earnings.

**Segment Results:**

- Beginning with the first quarter of 2007, we refined our capital allocation methodology and began allocating certain expenses to our segments to measure segment performance on a more fully allocated basis. These expenses, primarily a portion of the provisions for credit losses in excess of net charge-offs, equity-based compensation and corporate support costs, had previously been recorded in Corporate and Other. Prior year amounts have been conformed to this presentation. Certain other expenses are not allocated to the operating segments. These are reported in Corporate and Other and consist primarily of the following: (1) certain funding costs, as the segment results reflect debt transfer pricing that matches assets and liabilities from an interest rate and maturity perspective; (2) certain tax provisions and benefits; (3) the portion of credit loss provisioning in excess of amounts recorded in the segments; and (4) interest and dividends on preferred securities, as segment risk adjusted returns are based on the allocation of common equity.
- The net effect of these allocation changes was to reduce the individual segment risk adjusted capital returns by up to 7%, while also reducing the dampening effect of unallocated corporate and other on our consolidated returns less than 1%.

**Commercial Finance Group**

*Corporate Finance*

- Total net revenues (before provision for credit losses) were $236.4 million up from $178.3 million last year.
- Net finance revenue after depreciation totaled $148.7 million, up from $118.3 million last year. As a percentage of average earning assets, net finance revenue decreased 28 basis points ("bps") from last year on tighter spreads.
- Other revenue increased from last year on strong asset sale gains and syndication fees. During the quarter, we syndicated or sold $1.0 billion of receivables, compared to $0.6 billion last year.

- Net charge-offs were up from last year due to the $22 million charge-off of a loan to a water bottling company. The current quarter includes an $8.6 million recovery on an energy account. Delinquencies and non-performing assets declined from last quarter.
- Volume was up 36% from last year and was broad-based.
- Return on risk adjusted capital was 15.9%, up from 12.2% last year.

*Transportation Finance*

- Total net revenues were $95.1 million up from $86.7 million last year.
- Net finance revenue after depreciation totaled $77.4 million, down from $80.6 million last year. As a percentage of average earning assets, net finance revenue after depreciation decreased 55 bps from last year, which included higher prepayment fees. Aerospace utilization and lease rates were stable, while rail utilization and rates declined slightly in the quarter.
- Other revenue was up from last year on higher fees and gains from equipment sales.
- The current quarter included a $22.5 million recovery from a previously charged-off aerospace account. Delinquencies were up slightly from last quarter, while non-performing accounts declined.
- Volume for the quarter was up from last year on an additional aircraft delivery and higher rail volume.
- Return on risk-adjusted capital improved to 19.3% from 14.6% last year.

*Trade Finance*

- Total net revenues were $109.0 million, up slightly with $108.2 million last year.
- Net finance revenue totaled $41.3 million, up from $38.5 million last year. As a percentage of average earning assets, net finance revenue decreased 60 bps from the prior year reflecting high market liquidity and competitive pricing.
- Other revenue was also down from the prior year on lower commission rates reflecting high liquidity in the market and the benign credit environment.
- Net charge-offs were relatively unchanged from last year, while delinquencies and non-performing accounts were down slightly from last quarter.
- Factored volumes were up 3% over last year.
- Return on risk adjusted capital declined to 17.0% from 19.1% last year.

**Specialty Finance Group**

*Vendor Finance*

- Total net revenues were $244.9 million, up from $215.1 million last year.
- Net finance revenue after depreciation totaled $132.1 million, up from $130.3 million last year. As a percentage of average earning assets, net finance revenue after depreciation was down from last year, primarily due to the international vendor acquisition.
- Other revenue of $112.8 million was up from last year reflecting on strong loan sale gains (primarily U.S. vendor receivables).
- Credit metrics remained strong. Net charge-offs of 0.57% for the quarter were down from last year. Delinquencies improved and non-performing accounts were up only slightly.

- Total new business volume grew 19% over last year on higher international volumes. Excluding Dell in the U.S., volumes were up 34%. Dell volumes continued to decline, however, at a lower rate than last quarter.
- Return on risk-adjusted capital was 19.7% for the quarter versus 22.7% last year. The decline is due to lower international results, as acquisition synergies have not yet been realized.

*Consumer and Small Business Lending*

- Total net revenues of $136.2 million increased from $123.9 million last year.
- Net finance revenue totaled $93.9 million, up from $84.7 million last year. Net finance revenue was down 34 bps as a percentage of average earning assets from last year primarily due to lower home and student lending spreads.
- Other revenue increased from last year on higher gains on sales of student lending and home lending receivables. During the quarter, $1.2 billion (including $0.5 billion of home lending) was sold, versus $0.8 billion ($0.3 billion) last year.
- Net charge-offs were 0.78%, up from 0.54% last year on higher home lending charge-offs, which increased to 1.20% this quarter from 0.69% last year. Increases in home lending delinquencies (5.02% from 4.60%) and non-performing accounts (5.09% from 4.40%), reflected the negative influences of economic conditions in this sector. See page 15 for selected home lending portfolio statistics.
- New business volume increased over last year across all consumer businesses. Home lending receivable portfolios purchased totaled approximately $1.1 billion during the quarter versus $0.9 billion last year.
- Return on risk-adjusted capital declined to 5.7% from 6.8% last year primarily reflecting higher charge-offs.

**Corporate and Other**

- Corporate and other expenses reduced return on equity by approximately 50 bps for the current and prior quarter, versus 20 bps for the prior year.

**Conference Call and Webcast:**

We will discuss this quarter's results, as well as ongoing strategy, on a conference call and audio web cast today at 11:00 am (ET). Interested parties may access the conference call live today by dialing 866-831-6272 for U.S. and Canadian callers or 617-213-8859 for international callers, and reference access code "CIT Group" or access the audio web cast at the following website: http://ir.cit.com. An audio replay of the call will be available beginning shortly after the conclusion of the call until 11:59 pm (ET) April 25, 2007, by dialing 888-286-8010 for U.S. and Canadian callers or 617-801-6888 for international callers with the access code 13791892, or at the following website: http://ir.cit.com.

**About CIT:**

CIT Group Inc. (NYSE: CIT), a leading commercial and consumer finance company, provides clients with financing and leasing products and advisory services. Founded in 1908, CIT has approximately $80 billion in managed assets and possesses the financial resources, industry expertise and product knowledge to serve the needs of clients across approximately 30 industries worldwide. CIT, a Fortune 500 company and a member of the S&P 500 Index, holds leading positions in cash flow lending, vendor financing, factoring, equipment and transportation financing, Small Business Administration loans, and asset-based lending. With its global headquarters in New York City, CIT has approximately 7,500 employees in locations throughout North America, Europe, Latin America, and Asia Pacific. www.CIT.com

**Forward-Looking Statements:**

This release contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. All forward-looking statements (including statements regarding future financial and operating results) involve risks, uncertainties and contingencies, many of which are beyond CIT's control, which may cause actual results, performance, or achievements to differ materially from anticipated results, performance, or achievements. All statements contained in this release that are not clearly historical in nature are forward-looking, and the words "anticipate," "believe," "expect," "estimate," "plan," "target," and similar expressions are generally intended to identify forward-looking statements. Economic, business, funding market, competitive and/or regulatory factors, among others, affecting CIT's businesses are examples of factors that could cause actual results to differ materially from those described in the forward-looking statements. More detailed information about these factors are described in CIT's filings with the Securities and Exchange Commission, including its Annual Report on Form 10-K for the year ended December 31, 2006. CIT is under no obligation to (and expressly disclaims any such obligation to) update or alter its forward-looking statements, whether as a result of new information, future events or otherwise. This release includes certain non-GAAP financial measures as defined under SEC rules. As required by SEC rules, we have provided a reconciliation of those measures to the most directly comparable GAAP measures, which is available with this release and on our website at http://ir.cit.com.

###

**Contact:**

| | | | |
|---|---|---|---|
| Investor Relations | Steven Klimas | Vice President | (973) 535-3769 |
| Media Relations | C. Curtis Ritter | Director of External Communications and Media Relations | (212) 461-7711 curt.ritter@cit.com |

CIT GROUP INC. AND SUBSIDIARIES
UNAUDITED CONSOLIDATED INCOME STATEMENTS
(dollars in millions, except per share data)

| | Quarters Ended | | | | | |
| | March 31, 2007 | | December 31, 2006 | | March 31, 2006 | |
|---|---|---|---|---|---|---|
| Finance revenue | $ | 1,617.1 | $ | 1,548.5 | $ | 1,294.6 |
| Interest expense | | 888.4 | | 823.0 | | 598.3 |
| Depreciation on operating lease equipment | | 263.6 | | 261.4 | | 249.4 |
| Net finance revenue | | 465.1 | | 464.1 | | 446.9 |
| Provision for credit losses | | 71.1 | | 68.2 | | 33.3 |
| Net finance revenue, after credit provision | | 394.0 | | 395.9 | | 413.6 |
| Other revenue | | 328.6 | | 345.5 | | 260.1 |
| Total net revenue, after credit provision | | 722.6 | | 741.4 | | 673.7 |
| Salaries and general operating expenses | | 355.8 | | 363.0 | | 323.1 |
| Provision for restructuring | | - | | - | | 11.1 |
| Income before provision for income taxes | | 366.8 | | 378.4 | | 339.5 |
| Provision for income taxes | | (87.8) | | (111.5) | | (101.3) |
| Minority interest, after tax | | (0.1) | | (0.1) | | (0.8) |
| Net income before preferred stock dividends | | 278.9 | | 266.8 | | 237.4 |
| Preferred stock dividends | | (7.5) | | (7.5) | | (7.7) |
| Net income available to common stockholders | $ | 271.4 | $ | 259.3 | $ | 229.7 |
| Per common share data | | | | | | |
| Basic earnings per share | $ | 1.40 | $ | 1.31 | $ | 1.15 |
| Diluted earnings per share | $ | 1.37 | $ | 1.28 | $ | 1.12 |
| Number of shares - basic (thousands) | | 194,099 | | 198,308 | | 199,462 |
| Number of shares - diluted (thousands) | | 197,922 | | 201,948 | | 204,455 |
| **Other Revenue** | | | | | | |
| Fees and other income[1] | $ | 185.5 | $ | 133.9 | $ | 128.7 |
| Factoring commissions | | 52.4 | | 60.4 | | 55.8 |
| Gains on receivable sales and syndication fees | | 53.6 | | 105.8 | | 40.6 |
| Gains on sales of leasing equipment | | 29.5 | | 32.1 | | 21.4 |
| Gains on securitizations | | 7.6 | | 13.3 | | 13.6 |
| Total other revenue | $ | 328.6 | $ | 345.5 | $ | 260.1 |

(1) Fees and other income primarily includes servicing fees and structuring and advisory fees.

**CIT GROUP INC. AND SUBSIDIARIES**
**UNAUDITED CONSOLIDATED BALANCE SHEETS**
**(dollars in millions)**

|  | March 31, 2007 | December 31, 2006 |
|---|---|---|
| **ASSETS** | | |
| Financing and leasing assets: | | |
| Finance receivables | $ 60,126.5 | $ 55,064.9 |
| Reserve for credit losses | (704.0) | (659.3) |
| Net finance receivables | 59,422.5 | 54,405.6 |
| Operating lease equipment, net | 11,294.4 | 11,017.9 |
| Financing and leasing assets held for sale | 1,954.9 | 1,793.7 |
| Cash and cash equivalents | 3,464.3 | 4,458.4 |
| Retained interests in securitizations and other investments | 1,223.8 | 1,059.4 |
| Goodwill and intangible assets, net | 1,252.4 | 1,008.4 |
| Other assets | 3,447.4 | 3,324.5 |
| **Total Assets** | $ 82,059.7 | $ 77,067.9 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Debt: | | |
| Commercial paper | $ 5,261.4 | $ 5,365.0 |
| Deposits | 2,908.8 | 2,399.6 |
| Non-recourse, secured borrowings | 4,333.8 | 4,398.5 |
| Variable-rate senior unsecured notes | 23,009.4 | 19,184.3 |
| Fixed-rate senior unsecured notes | 29,939.0 | 29,107.1 |
| Junior subordinated notes | 750.0 | - |
| Preferred capital securities | 259.1 | 250.3 |
| Total debt | 66,461.5 | 60,704.8 |
| Credit balances of factoring clients | 3,769.9 | 4,131.3 |
| Accrued liabilities and payables | 4,375.3 | 4,440.8 |
| **Total Liabilities** | 74,606.7 | 69,276.9 |
| Minority interest | 39.6 | 39.9 |
| Stockholders' Equity: | | |
| Preferred stock | 500.0 | 500.0 |
| Common stock | 2.1 | 2.1 |
| Paid-in capital | 10,633.6 | 10,678.9 |
| Accumulated deficit | (2,704.1) | (2,838.9) |
| Accumulated other comprehensive income | 121.5 | 129.6 |
| Less: treasury stock, at cost | (1,139.7) | (720.6) |
| Total Common Stockholders' Equity | 6,913.4 | 7,251.1 |
| Total Stockholders' Equity | 7,413.4 | 7,751.1 |
| **Total Liabilities and Stockholders' Equity** | $ 82,059.7 | $ 77,067.9 |
| **Other Assets** | | |
| Deposits on commercial aerospace flight equipment | $ 752.5 | $ 719.0 |
| Accrued interest and receivables from derivative counterparties | 656.8 | 643.6 |
| Investments in and receivables from non-consolidated subsidiaries | 466.9 | 535.7 |
| Repossessed assets and off-lease equipment | 168.3 | 124.1 |
| Prepaid expenses | 118.0 | 99.2 |
| Furniture and fixtures, miscellaneous receivables and other assets | 1,284.9 | 1,202.9 |
| | $ 3,447.4 | $ 3,324.5 |

9

CIT GROUP INC. AND SUBSIDIARIES
OWNED AND MANAGED ASSET COMPOSITION
(dollars in millions)

| | March 31, 2007 | December 31, 2006 | March 31, 2006 |
|---|---|---|---|
| **Commercial Finance Group** | | | |
| **Corporate Finance** | | | |
| Finance receivables | $ 19,421.8 | $ 18,989.5 | $ 14,533.3 |
| Operating lease equipment, net | 185.5 | 204.4 | 165.9 |
| Financing and leasing assets held for sale | 921.9 | 563.1 | 195.1 |
| Owned assets | 20,529.2 | 19,757.0 | 14,894.3 |
| Finance receivables securitized and managed by CIT | 1,436.6 | 1,568.7 | 2,255.6 |
| Managed assets | 21,965.8 | 21,325.7 | 17,149.9 |
| **Transportation Finance** | | | |
| Finance receivables | 2,186.7 | 2,123.3 | 1,548.7 |
| Operating lease equipment, net | 10,174.7 | 9,846.3 | 8,972.0 |
| Financing and leasing assets held for sale | 71.1 | 75.7 | 83.8 |
| Owned assets | 12,432.5 | 12,045.3 | 10,604.5 |
| **Trade Finance** | | | |
| Finance receivables | 6,889.2 | 6,975.2 | 6,719.5 |
| **Specialty Finance Group** | | | |
| **Vendor Finance** | | | |
| Finance receivables | 9,452.0 | 7,102.5 | 7,325.8 |
| Operating lease equipment, net | 934.2 | 967.2 | 1,028.1 |
| Financing and leasing assets held for sale | 351.4 | 529.3 | 655.9 |
| Owned assets | 10,737.6 | 8,599.0 | 9,009.8 |
| Finance receivables securitized and managed by CIT | 4,277.5 | 4,057.8 | 3,875.9 |
| Managed assets | 15,015.1 | 12,656.8 | 12,885.7 |
| **Consumer and Small Business Lending** | | | |
| Finance receivables - home lending | 10,837.1 | 9,647.7 | 8,982.5 |
| Finance receivables - student lending | 9,493.4 | 8,488.9 | 6,117.3 |
| Finance receivables - small business lending | 1,257.7 | 1,200.7 | 1,237.6 |
| Finance receivables - other | 588.6 | 537.1 | 376.6 |
| Financing and leasing assets held for sale | 610.5 | 625.6 | 616.2 |
| Owned assets | 22,787.3 | 20,500.0 | 17,330.2 |
| Home lending finance receivables securitized and managed by CIT | 600.5 | 634.8 | 781.6 |
| Managed assets | 23,387.8 | 21,134.8 | 18,111.8 |
| **Other - Equity Investments** | 21.2 | 25.4 | 31.1 |
| **Total** | | | |
| **Finance receivables** | $ 60,126.5 | $ 55,064.9 | $ 46,841.3 |
| **Operating lease equipment, net** | 11,294.4 | 11,017.9 | 10,166.0 |
| **Financing and leasing assets held for sale** | 1,954.9 | 1,793.7 | 1,551.0 |
| **Financing and leasing assets excl. equity investments** | 73,375.8 | 67,876.5 | 58,558.3 |
| **Equity investments (included in other assets)** | 21.2 | 25.4 | 31.1 |
| **Owned assets** | 73,397.0 | 67,901.9 | 58,589.4 |
| **Finance receivables securitized and managed by CIT** | 6,314.6 | 6,261.3 | 6,913.1 |
| **Managed assets** | $ 79,711.6 | $ 74,163.2 | $ 65,502.5 |

CIT GROUP INC. AND SUBSIDIARIES

SEGMENT DATA

(dollars in millions)

| | Quarters Ended | | | | | |
|---|---|---|---|---|---|---|
| | March 31, 2007 | | December 31, 2006 | | March 31, 2006 | |
| **Commercial Finance Group** | | | | | | |
| **Corporate Finance** | | | | | | |
| Net finance revenue, before depreciation | $ | 158.5 | $ | 153.9 | $ | 127.0 |
| Depreciation on operating lease equipment | | 9.8 | | 9.4 | | 8.7 |
| Provision for credit losses | | (4.5) | | 33.8 | | (2.6) |
| Other revenue | | 87.7 | | 80.7 | | 60.0 |
| Total net revenue, after credit provision | | 240.9 | | 191.4 | | 180.9 |
| Provision for income taxes | | (46.1) | | (27.9) | | (31.9) |
| Net income | | 87.4 | | 53.1 | | 54.3 |
| Return on risk-adjusted capital | | 15.9% | | 9.8% | | 12.2% |
| New business volume | $ | 3,318.0 | $ | 4,094.3 | $ | 2,438.0 |
| | | | | | | |
| **Transportation Finance** | | | | | | |
| Net finance revenue, before depreciation | $ | 210.9 | $ | 207.9 | $ | 184.9 |
| Depreciation on operating lease equipment | | 133.5 | | 127.2 | | 104.3 |
| Provision for credit losses | | (22.5) | | 1.2 | | (0.4) |
| Other revenue | | 17.7 | | 11.9 | | 6.1 |
| Total net revenue, after credit provision | | 117.6 | | 91.4 | | 87.1 |
| Provision for income taxes | | (7.7) | | 1.2 | | (4.2) |
| Net income | | 76.3 | | 58.9 | | 49.5 |
| Return on risk-adjusted capital | | 19.3% | | 16.0% | | 14.6% |
| New business volume | $ | 686.2 | $ | 1,395.5 | $ | 497.1 |
| | | | | | | |
| **Trade Finance** | | | | | | |
| Net finance revenue, before depreciation | $ | 41.3 | $ | 44.3 | $ | 38.5 |
| Provision for credit losses | | 7.9 | | 9.0 | | 7.0 |
| Other revenue | | 67.7 | | 74.7 | | 69.7 |
| Total net revenue, after credit provision | | 101.1 | | 110.0 | | 101.2 |
| Provision for income taxes | | (23.3) | | (27.1) | | (23.6) |
| Net income | | 36.6 | | 44.0 | | 39.8 |
| Return on risk-adjusted capital | | 17.0% | | 18.3% | | 19.1% |
| | | | | | | |
| **Total Commercial Finance Group** | | | | | | |
| Net finance revenue, before depreciation | $ | 410.7 | $ | 406.1 | $ | 350.4 |
| Depreciation on operating lease equipment | | 143.3 | | 136.6 | | 113.0 |
| Provision for credit losses | | (19.1) | | 44.0 | | 4.0 |
| Other revenue | | 173.1 | | 167.3 | | 135.8 |
| Total net revenue, after credit provision | | 459.6 | | 392.8 | | 369.2 |
| Provision for income taxes | | (77.1) | | (53.8) | | (59.7) |
| Net income | | 200.3 | | 156.0 | | 143.6 |
| Return on risk-adjusted capital | | 17.2% | | 13.5% | | 14.5% |
| New business volume, excluding factoring | $ | 4,004.2 | $ | 5,489.8 | $ | 2,935.1 |

11

CIT GROUP INC. AND SUBSIDIARIES

SEGMENT DATA

(dollars in millions)

| | | Quarters Ended | | | |
|---|---|---|---|---|---|
| | | March 31, 2007 | | December 31, 2006 | March 31, 2006 |

**Specialty Finance Group**
**Vendor Finance**

| | | March 31, 2007 | | December 31, 2006 | | March 31, 2006 |
|---|---|---|---|---|---|---|
| Net finance revenue, before depreciation | $ | 252.5 | $ | 250.7 | $ | 266.8 |
| Depreciation on operating lease equipment | | 120.4 | | 124.8 | | 136.5 |
| Provision for credit losses | | 13.5 | | 13.3 | | 17.5 |
| Other revenue | | 112.8 | | 113.5 | | 84.8 |
| Total net revenue, after credit provision | | 231.4 | | 226.1 | | 197.6 |
| Provision for income taxes | | (37.9) | | (47.8) | | (35.3) |
| Net income | | 73.5 | | 73.4 | | 62.1 |
| Return on risk-adjusted capital | | 19.7% | | 27.9% | | 22.7% |
| New business volume | $ | 2,317.6 | $ | 2,193.3 | $ | 1,949.0 |

**Consumer and Small Business Lending**

| | | | | | | |
|---|---|---|---|---|---|---|
| Net finance revenue, before depreciation | $ | 93.9 | $ | 88.1 | $ | 84.7 |
| Provision for credit losses | | 43.7 | | 18.2 | | 20.6 |
| Other revenue | | 42.3 | | 61.4 | | 39.2 |
| Total net revenue, after credit provision | | 92.5 | | 131.3 | | 103.3 |
| Provision for income taxes | | (9.8) | | (21.3) | | (12.2) |
| Net income | | 20.3 | | 40.3 | | 21.6 |
| Return on risk-adjusted capital | | 5.7% | | 11.7% | | 6.8% |
| New business volume | $ | 4,457.4 | $ | 3,916.7 | $ | 3,831.6 |

**Total Specialty Finance Group**

| | | | | | | |
|---|---|---|---|---|---|---|
| Net finance revenue, before depreciation | $ | 346.4 | $ | 338.8 | $ | 351.5 |
| Depreciation on operating lease equipment | | 120.4 | | 124.8 | | 136.5 |
| Provision for credit losses | | 57.2 | | 31.5 | | 38.1 |
| Other revenue | | 155.1 | | 174.9 | | 124.0 |
| Total net revenue, after credit provision | | 323.9 | | 357.4 | | 300.9 |
| Provision for income taxes | | (47.7) | | (69.1) | | (47.5) |
| Net income | | 93.8 | | 113.7 | | 83.7 |
| Return on risk-adjusted capital | | 12.8% | | 18.7% | | 14.1% |
| New business volume | $ | 6,775.0 | $ | 6,110.0 | $ | 5,780.6 |

**Corporate and Other**

| | | | | | | |
|---|---|---|---|---|---|---|
| Net finance revenue, before depreciation | $ | (28.4) | $ | (19.4) | $ | (5.6) |
| Provision for credit losses | | 33.0 | | (7.3) | | (8.8) |
| Other revenue | | 0.4 | | 3.3 | | 0.3 |
| Total net revenue, after credit provision | | (60.9) | | (8.8) | | 3.6 |
| Provision for income taxes | | 37.0 | | 11.4 | | 5.9 |
| Net (loss) income | | (22.7) | | (10.4) | | 2.4 |

**CIT GROUP INC. AND SUBSIDIARIES**
**CREDIT METRICS**
(dollars in millions)

| | Quarters Ended | | | | | |
| | March 31, 2007 | | December 31, 2006 | | March 31, 2006 | |
|---|---|---|---|---|---|---|
| **Net Credit Losses - Owned as a Percentage of Average Finance Receivables** | | | | | | |
| Corporate Finance | $ 17.8 | 0.37% | $ 26.7 | 0.57% | $ 0.2 | 0.01% |
| Transportation Finance | (22.5) | (4.15)% | - | - | - | - |
| Trade Finance | 7.0 | 0.42% | 8.6 | 0.46% | 6.7 | 0.41% |
| Total Commercial Finance Group | 2.3 | 0.03% | 35.3 | 0.51% | 6.9 | 0.12% |
| Vendor Finance | 13.7 | 0.57% | 15.4 | 0.84% | 13.8 | 0.74% |
| Consumer and Small Business Lending | 41.2 | 0.78% | 29.4 | 0.60% | 21.6 | 0.54% |
| Total Specialty Finance Group | 54.9 | 0.72% | 44.8 | 0.66% | 35.4 | 0.60% |
| Total | $ 57.2 | 0.39% | $ 80.1 | 0.58% | $ 42.3 | 0.37% |
| Total, excluding student loans | $ 57.2 | 0.46% | $ 80.1 | 0.69% | $ 42.3 | 0.42% |
| **Net Credit Losses - Managed as a Percentage of Average Managed Finance Receivables** | | | | | | |
| Corporate Finance | $ 19.8 | 0.38% | $ 31.8 | 0.62% | $ 1.3 | 0.03% |
| Transportation Finance | (22.5) | (4.15)% | - | - | - | - |
| Trade Finance | 7.0 | 0.42% | 8.6 | 0.46% | 6.7 | 0.41% |
| Total Commercial Finance Group | 4.3 | 0.06% | 40.4 | 0.55% | 8.0 | 0.13% |
| Vendor Finance | 20.0 | 0.59% | 19.8 | 0.71% | 21.7 | 0.77% |
| Consumer and Small Business Lending | 45.7 | 0.84% | 33.8 | 0.67% | 28.2 | 0.67% |
| Total Specialty Finance Group | 65.7 | 0.74% | 53.6 | 0.68% | 49.9 | 0.71% |
| Total | $ 70.0 | 0.43% | $ 94.0 | 0.62% | $ 57.9 | 0.44% |
| Total, excluding student loans | $ 70.0 | 0.50% | $ 94.0 | 0.71% | $ 57.9 | 0.49% |
| **Finance Receivables Past Due 60 days or more - Owned as a Percentage of Finance Receivables** | March 31, 2007 | | December 31, 2006 | | March 31, 2006 | |
| Corporate Finance | $ 59.9 | 0.31% | $ 105.2 | 0.55% | $ 69.6 | 0.48% |
| Transportation Finance | 16.3 | 0.75% | 15.3 | 0.72% | 21.8 | 1.41% |
| Trade Finance | 94.9 | 1.38% | 101.8 | 1.46% | 42.8 | 0.64% |
| Total Commercial Finance Group | 171.1 | 0.60% | 222.3 | 0.79% | 134.2 | 0.59% |
| Vendor Finance | 226.8 | 2.40% | 200.7 | 2.83% | 223.4 | 3.05% |
| Consumer and Small Business Lending | 1,056.9 | 4.77% | 898.9 | 4.52% | 464.8 | 2.78% |
| Total Specialty Finance Group | 1,283.7 | 4.06% | 1,099.6 | 4.08% | 688.2 | 2.86% |
| Total | $ 1,454.8 | 2.42% | $ 1,321.9 | 2.40% | $ 822.4 | 1.76% |
| Total, excluding student loans | $ 1,001.9 | 1.98% | $ 921.8 | 1.98% | $ 627.2 | 1.54% |
| **Non-performing Assets - Owned as a Percentage of Finance Receivables** | | | | | | |
| Corporate Finance | $ 99.0 | 0.51% | $ 150.4 | 0.79% | $ 163.7 | 1.13% |
| Transportation Finance | 7.6 | 0.35% | 7.9 | 0.37% | 14.2 | 0.92% |
| Trade Finance | 57.9 | 0.84% | 60.4 | 0.87% | 4.4 | 0.07% |
| Total Commercial Finance Group | 164.5 | 0.58% | 218.7 | 0.78% | 182.3 | 0.80% |
| Vendor Finance | 108.7 | 1.15% | 78.2 | 1.10% | 103.6 | 1.41% |
| Consumer and Small Business Lending | 609.9 | 2.75% | 473.6 | 2.38% | 256.4 | 1.53% |
| Total Specialty Finance Group | 718.6 | 2.27% | 551.8 | 2.05% | 360.0 | 1.50% |
| Total | $ 883.1 | 1.47% | $ 770.5 | 1.40% | $ 542.3 | 1.16% |
| Total, excluding student loans | $ 883.1 | 1.74% | $ 770.5 | 1.65% | $ 542.3 | 1.33% |
| **Finance Receivables Past Due 60 days or more - Managed as a Percentage of Managed Financial Assets** | | | | | | |
| Corporate Finance | $ 70.0 | 0.32% | $ 114.8 | 0.54% | $ 74.8 | 0.44% |
| Transportation Finance | 16.3 | 0.72% | 15.3 | 0.69% | 21.8 | 1.34% |
| Trade Finance | 94.9 | 1.38% | 101.8 | 1.46% | 42.8 | 0.64% |
| Total Commercial Finance Group | 181.2 | 0.59% | 231.9 | 0.77% | 139.4 | 0.55% |
| Vendor Finance | 363.2 | 2.58% | 340.1 | 2.91% | 319.3 | 2.69% |
| Consumer and Small Business Lending | 1,107.6 | 4.74% | 955.8 | 4.52% | 537.5 | 2.97% |
| Total Specialty Finance Group | 1,470.8 | 3.93% | 1,295.9 | 3.95% | 856.8 | 2.86% |
| Total | $ 1,652.0 | 2.42% | $ 1,527.8 | 2.42% | $ 996.2 | 1.80% |
| Total, excluding student loans | $ 1,199.1 | 2.05% | $ 1,127.7 | 2.07% | $ 801.0 | 1.64% |

13

CIT GROUP INC. AND SUBSIDIARIES
RATIOS AND OTHER DATA
(dollars in millions, except per share data)

| | Quarters Ended | | |
| --- | --- | --- | --- |
| **Profitability** | March 31,<br>2007 | December 31,<br>2006 | March 31,<br>2006 |
| Net finance revenue as a percentage of AEA | 2.74% | 2.96% | 3.36% |
| Net finance revenue after provision as a percentage of AEA | 2.32% | 2.52% | 3.11% |
| Salaries and general operating expenses as a percentage of AMA | 1.92% | 2.10% | 2.22% |
| Efficiency ratio | 44.8% | 44.8% | 47.3% |
| Return on average common stockholders' equity | 15.6% | 14.6% | 14.1% |
| Return on AEA | 1.60% | 1.65% | 1.73% |
| Return on AMA | 1.47% | 1.50% | 1.52% |
| See "Non-GAAP Disclosures" for additional information regarding profitability ratio and metric comparisons. | | | |
| **Average Balances** | | | |
| Average Finance Receivables (AFR) | $   58,798.1 | $   54,830.9 | $   45,765.1 |
| Average Earning Assets (AEA) | 67,920.9 | 62,774.7 | 53,222.2 |
| Average Managed Assets (AMA) | 74,100.6 | 68,996.3 | 60,276.7 |
| Average Operating Leases (AOL) | 11,168.2 | 10,818.9 | 9,825.4 |
| Average Common Stockholders' Equity | 6,953.2 | 7,106.5 | 6,508.1 |

| | March 31,<br>2007 | December 31,<br>2006 | March 31,<br>2006 |
| --- | --- | --- | --- |
| **Capital and Leverage** | | | |
| Total tangible stockholders' equity to managed assets | 8.65% | 9.36% | 9.72% |
| Tangible book value per common share | $29.36 | $31.22 | $28.10 |
| | | | |
| **Reserve for Credit Losses** | | | |
| Reserve for credit losses as a percentage of finance receivables, excluding student loans | 1.39% | 1.42% | 1.52% |
| Reserve for credit losses (excluding reserves related to impaired loans and hurricane reserves) as a percentage of finance receivables, excluding student loans | 1.32% | 1.30% | 1.27% |
| Reserve for credit losses as a percentage of finance receivables | 1.17% | 1.20% | 1.32% |
| Reserve for credit losses as a percentage of non-performing assets | 79.7% | 85.6% | 114.4% |
| Reserve for credit losses as a percentage of finance receivables past due 60 days or more | 48.4% | 49.9% | 75.4% |
| Reserve for credit losses as a percentage of finance receivables past due 60 days or more, excluding student lending | 70.3% | 71.5% | 98.9% |

14

**CIT GROUP INC. AND SUBSIDIARIES**
Select Concentration Data
(dollars in millions unless specified)

**Commercial Aerospace Portfolio:**

| | March 31, 2007 | | December 31, 2006 | | March 31, 2006 | |
|---|---|---|---|---|---|---|
| | Net Investment | Number | Net Investment | Number | Net Investment | Number |
| *By Region:* | | | | | | |
| Europe | $ 2,826.2 | 88 | $ 2,880.2 | 88 | $ 2,340.2 | 73 |
| U.S. and Canada | 1,262.0 | 59 | 1,288.0 | 60 | 1,214.8 | 54 |
| Asia Pacific | 1,758.8 | 54 | 1,705.6 | 52 | 1,635.6 | 54 |
| Latin America | 984.5 | 31 | 835.4 | 27 | 680.2 | 24 |
| Africa / Middle East | 486.8 | 12 | 402.1 | 10 | 295.4 | 7 |
| Total | $ 7,318.3 | 244 | $ 7,111.3 | 237 | $ 6,166.2 | 212 |
| *By Manufacturer:* | | | | | | |
| Boeing | $ 3,162.9 | 126 | $ 3,105.7 | 124 | $ 2,594.1 | 115 |
| Airbus | 4,150.0 | 118 | 3,996.2 | 113 | 3,538.6 | 91 |
| Other | 5.4 | - | 9.4 | - | 33.5 | 6 |
| Total | $ 7,318.3 | 244 | $ 7,111.3 | 237 | $ 6,166.2 | 212 |
| *By Body Type (1):* | | | | | | |
| Narrow body | $ 5,394.7 | 186 | $ 5,168.9 | 179 | $ 4,553.1 | 168 |
| Intermediate | 1,657.9 | 43 | 1,690.3 | 43 | 1,394.3 | 28 |
| Wide body | 260.3 | 15 | 242.7 | 15 | 185.3 | 10 |
| Other | 5.4 | - | 9.4 | - | 33.5 | 6 |
| Total | $ 7,318.3 | 244 | $ 7,111.3 | 237 | $ 6,166.2 | 212 |
| *By Product:* | | | | | | |
| Operating lease | $ 6,439.1 | 198 | $ 6,274.0 | 192 | $ 5,651.8 | 187 |
| Leveraged lease (other) | 40.5 | 2 | 95.2 | 4 | 147.9 | 5 |
| Leveraged lease (tax optimized) | 43.9 | 1 | 43.1 | 1 | 90.0 | 5 |
| Capital lease | 214.2 | 8 | 151.9 | 6 | 68.9 | 2 |
| Loan | 580.6 | 35 | 547.1 | 34 | 207.6 | 13 |
| Total | $ 7,318.3 | 244 | $ 7,111.3 | 237 | $ 6,166.2 | 212 |
| | | | | | | |
| Number of accounts | 94 | | 92 | | 92 | |
| Weighted average age of fleet (years) | 6 | | 5 | | 6 | |
| Largest customer net investment | $ 286.0 | | $ 288.6 | | $ 296.3 | |
| Off-lease aircraft | | - | | - | | 6 |
| | | | | | | |
| New Aircraft Delivery Order Book (dollars in billions) | | | | | | |
| For the Years Ending December 31, | | | | | | |
| 2006 (Remaining 2006) | $ - | - | $ - | - | $ 0.8 | 15 |
| 2007 (Remaining 2007) | 1.1 | 21 | 1.3 | 26 | 1.0 | 23 |
| 2008 | 1.4 | 24 | 1.4 | 24 | 0.8 | 19 |
| 2009 | 0.8 | 13 | 0.8 | 13 | - | - |
| Thereafter | 2.3 | 28 | 2.3 | 28 | 0.5 | 5 |
| Total | $ 5.6 | 86 | $ 5.8 | 91 | $ 3.1 | 62 |

(1) Narrow body are single aisle design and consist primarily of Boeing 737 and 757 series and Airbus A320 series aircraft. Intermediate body are smaller twin aisle design and consist primarily of Boeing 767 series and Airbus A330 series aircraft. Wide body are large twin aisle design and consist primarily of Boeing 747 and 777 series and McDonnell Douglas DC10 series aircraft.

**Managed Home Lending Portfolio Statistics**

| | March 31, 2007 | December 31, 2006 | March 31, 2006 |
|---|---|---|---|
| Managed assets | $ 11,552.6 | $ 10,522.5 | $ 10,084.6 |
| Portfolio assets | $ 10,952.1 | $ 9,887.7 | $ 9,303.0 |
| % of first mortgages | 89% | 89% | 91% |
| Average loan size | $ 124.3 | $ 120.9 | $ 119.6 |
| Fixed-rate mortgage % | 42% | 43% | 43% |
| Weighted Average loan-to-value | 82% | 82% | 81% |
| Average FICO score | 636 | 636 | 635 |
| Delinquencies (sixty days or more) | 5.15% | 4.76% | 2.93% |
| Net charge-offs-unanaged basis | 1.30% | 0.99% | 0.91% |
| Net charge-offs-owned basis | 1.20% | 0.87% | 0.69% |

**CIT GROUP INC. AND SUBSIDIARIES**
**Non-GAAP Disclosures**
**(dollars in millions)**

| | | Quarters Ended | |
|---|---|---|---|
| | March 31, 2007 | December 31, 2006 | March 31, 2006 |
| **Revenue, excluding certain noteworthy items(1):** | | | |
| Total net revenues (before provision for credit losses) | $ 793.7 | $ 809.6 | $ 707.0 |
| Loss on call of high coupon debt | 14.8 | - | - |
| Total net revenues - adjusted | $ 808.5 | $ 809.6 | $ 707.0 |
| **Net income, excluding certain noteworthy items(1):** | | | |
| Net income available to common shareholders | $ 271.4 | $ 259.3 | $ 229.7 |
| Revenue-related items | | | |
| Loss on call of high coupon debt | 8.4 | - | - |
| Non revenue-related items | | | |
| Income tax liability reversals | (20.6) | (7.6) | (6.5) |
| Provisions for restructuring | (1.4) | - | 7.4 |
| Early termination on NYC lease / legal settlement | - | 2.8 | - |
| Net income - adjusted | $ 257.8 | $ 254.5 | $ 230.6 |

(1) In addition to the results of operations presented in accordance with accounting principles generally accepted in the U.S., our management uses certain non-GAAP financial measures to: evaluate and present CIT and segment results on a comparable basis; to determine amounts awarded under certain compensation programs; and to enable analysis of past performance.

CIT GROUP INC. AND SUBSIDIARIES
Non-GAAP Disclosures
(dollars in millions)

| | March 31, 2007 | December 31, 2006 | March 31, 2006 |
|---|---|---|---|
| Managed assets [1]: | | | |
| Finance receivables | $ 60,126.5 | $ 55,064.9 | $ 46,841.3 |
| Operating lease equipment, net | 11,294.4 | 11,017.9 | 10,166.0 |
| Financing and leasing assets held for sale | 1,954.9 | 1,793.7 | 1,551.0 |
| Equity and venture capital investments (included in other assets) | 21.2 | 25.4 | 31.1 |
| Total financing and leasing portfolio assets | 73,397.0 | 67,901.9 | 58,589.4 |
| Securitized assets | 6,314.6 | 6,261.3 | 6,913.1 |
| Managed assets | $ 79,711.6 | $ 74,163.2 | $ 65,502.5 |
| Earning assets [2]: | | | |
| Total financing and leasing portfolio assets | $ 73,397.0 | $ 67,901.9 | $ 58,589.4 |
| Credit balances of factoring clients | (3,769.9) | (4,131.3) | (4,048.9) |
| Earning assets | $ 69,627.1 | $ 63,770.6 | $ 54,540.5 |
| Tangible equity [3]: | | | |
| Total equity | $ 6,913.4 | $ 7,251.1 | $ 6,704.9 |
| Other comprehensive income relating to derivative financial instruments | (11.6) | (34.2) | (60.3) |
| Unrealized gain on securitization investments | (15.5) | (18.4) | (13.1) |
| Goodwill and intangible assets | (1,252.4) | (1,008.4) | (1,013.5) |
| Tangible common equity | 5,633.9 | 6,190.1 | 5,618.0 |
| Preferred stock | 500.0 | 500.0 | 500.0 |
| Preferred capital securities [4] | 259.1 | 250.3 | 251.6 |
| 60 year junior subordinated notes [4] | 500.0 | - | - |
| Tangible equity | $ 6,893.0 | $ 6,940.4 | $ 6,369.6 |

Non-GAAP financial measures disclosed by management are meant to provide additional information and insight relative to trends in the business to investors and, in certain cases, to present financial information as measured by rating agencies and other users of financial information. These measures are not in accordance with, or a substitute for, GAAP and may be different from, or inconsistent with, non-GAAP financial measures used by other companies.

1) Managed assets are utilized in certain credit and expense ratios. Securitized assets are included in managed assets because CIT retains certain credit risk and the servicing related to assets that are funded through securitizations.

2) Earning assets are utilized in certain revenue and earnings ratios. Earning assets are net of credit balances of factoring clients. This net amount, which corresponds to amounts funded, is a basis for revenues earned.

3) Tangible equity is utilized in leverage ratios, and is consistent with certain rating agency measurements. Other comprehensive income and unrealized gains on securitization investments (both included in the separate component of equity) are excluded from the calculation, as these amounts are not necessarily indicative of amounts which will be realized.

4) The preferred capital securities were called on April 10, 2007. On March 16, 2007, $250 million of additional junior subordinated notes were issued in anticipation of the preferred capital securities call. Accordingly only $500 million of the junior subordinated notes were included in our March 31, 2007 capitalization ratios.

▼ **Vendor Finance**



# Dunkin' Donuts®



"CIT has been a true partner in helping Dunkin' Donuts grow. They developed creative solutions for financing new franchises, both individuals and groups, based on extensive knowledge of the franchising business and our specific growth strategy and business model."

JASON MACEDA
DIRECTOR OF TREASURY SERVICES
DUNKIN' BRANDS

 America runs on Dunkin'™—and so does much of the world. Dunkin' Donuts is indisputably one of the world's best-known brands. With more than 7,600 locations worldwide, including 5,600 locations in 34 U.S. states and 31 countries (as of December 2007), the company is the world's largest coffee and baked goods chain, serving high-quality coffee, donuts, bagels and other baked goods to 3 million loyal customers each day. Internationally, Dunkin' Donuts has locations in 30 countries, with a significant presence in the Philippines, Indonesia, South Korea and Thailand. The company is a wholly owned subsidiary of Dunkin' Brands, Inc., based in Canton, Massachusetts.

## Challenge

Several years ago, Dunkin' Donuts embarked on a growth plan to take the brand national. The company is executing an ambitious expansion plan, intending to open approximately 10,000 new franchised stores. Many of these stores will be in the western U.S., where Dunkin' Donuts has relatively few locations.

Dunkin' Donuts was considered a Northeast regional brand, and lenders outside the northeast were hesitant to provide capital in some newer markets. This was the case when the company announced its expansion into the western U.S. Prospective franchisees faced the possibility of being unable to leverage the power of the Dunkin' Donuts brand in high-potential markets like Texas and Nevada.

The company turned to CIT for a solution. Because of our long-standing relationship with the company, and our in-depth understanding of its operations, CIT created a comprehensive franchisee financing plan. For more than half a century, CIT has partnered with Dunkin' Donuts to grow its business, providing more than $2 billion in financing to franchisees. With deep roots in vendor and franchise financing, we understand the company's business model, including the unique challenges and opportunities it faces as it expands its global brand.

## Solution

CIT offered a comprehensive franchise financing plan that encompassed creative financing structures to accommodate the needs of a diverse range of franchisees. Significantly, our plan included commitment to finance locations across the country, even in new markets for Dunkin' Donuts. This commitment was based on our in-depth knowledge of the company, which enabled us to understand the true potential of the brand, the company's management team and its growth strategy.

Supplementing our franchise financing, CIT Small Business Lending is providing commercial real estate financing to franchisees. With this seamless, full-service solution, franchisees can meet all their financing needs from a single source. At the same time, our vendor-centric approach ensures that the needs of the franchisees are met with customized, full-service franchise solutions that make the complex franchise financing process easy to navigate.

## Results

In 2007, CIT was named Preferred Lender to Dunkin' Donuts franchisees, a significant validation of the success of our past relationship and our commitment to helping the company grow. We are working with several large-area developers to finance multiple new locations, as well as with individual entrepreneurs seeking to leverage the power of the Dunkin' Donuts brand to realize their personal dreams. Most importantly, the company has a supportive, long-term partner that will enable it to continue to execute its growth strategy.

CIT Group Inc.
505 Fifth Avenue
New York, NY 10017

Dunkin' Donuts trademarks, service marks and logos are registered trademarks and service marks of DD IP Holder, LLC and are used under license.

8-K 1 e27687_8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

### Washington, D.C. 20549

### FORM 8-K

### CURRENT REPORT

### Pursuant to Section 13 or 15(d) of the
### Securities Exchange Act of 1934

Date of Report (Date of earliest event reported) June 21, 2007

## CIT GROUP INC.
(Exact name of registrant as specified in its charter)

| Delaware | 001-31369 | 65-1051192 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

505 Fifth Avenue
New York, New York 10017
(Address of registrant's principal executive office)

Registrant's telephone number, including area code (212) 771-0505

Not Applicable

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[_]    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[_]    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[_]    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[_]    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

1

## Section 8 — Other Events

**Item 8.01. Other Events.**

This Current Report on Form 8-K includes as an exhibit a press release, dated June 21, 2007, reporting that CIT Group Inc. has signed a purchase agreement to sell its U.S. construction lending business unit to Wells Fargo &Company. CIT Construction had $2.4 billion in assets and 235 employees as of March 31, 2007. The press release is attached as Exhibit 99.1 and is incorporated by reference herein.

## Section 9 — Financial Statements and Exhibits

**Item 9.01. Financial Statements and Exhibits.**

*(d) Exhibits.*

99.1 Press Release issued by CIT Group Inc. on June 21, 2007

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

<u>**CIT GROUP INC.**</u>
(Registrant)

By:

William J. Taylor
Executive Vice President, Controller and
Principal Accounting Officer

Dated: June 22, 2007

2

8-K 1 e27669_8k.htm FORM 8-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**

**Washington, D.C. 20549**

**FORM 8-K**

**CURRENT REPORT**

**Pursuant to Section 13 or 15(d) of the**
**Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): June 20, 2007

# CIT GROUP INC.
(Exact name of registrant as specified in its charter)

| Delaware | 001-31369 | 65-1051192 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

(Address of registrant's principal executive office)

505 Fifth Avenue
New York, New York 10017

Registrant's telephone number, including area code: (212) 771-0505

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[ ]    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ]    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ]    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ]    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

1

**Section 1 – Registrant's Business and Operations**

**Item 8.01. Other Events.**

On June 20, 2007, C.I.T. Leasing Corporation, a wholly owned subsidiary of CIT Group Inc. doing business as CIT Aerospace, entered into an amendment to a prior purchase agreement with Airbus S.A.S. to acquire twenty-five new A320 family aircraft, along with options for additional A320 aircraft, and seven A350XWB aircraft. Five of the A350XWB aircraft replace five A350 aircraft previously ordered by CIT, which had a list price at the time of order of $810 million. The total value based on current manufacturer's list prices is approximately $3.3 billion. Actual purchase prices at delivery will be lower than the list prices based upon available discount levels, offset by price escalators based on changes in certain specified price indexes, and will be further affected by the aircraft specifications. The actual purchase prices are subject to a confidentiality agreement with Airbus. Deliveries of the A350XWB are scheduled for 2014 through 2016. Deliveries of the A320 family aircraft are scheduled for 2010 through 2012 and are in addition to pending orders of other Airbus A320 and A330 aircraft types that remain subject to previous purchase agreements.

CIT also announced the purchase of seven ship sets of Trent XWB engines from Rolls-Royce to power the A350XWBs with a value of $300 million based on list prices and ten ship sets of V2500 engines from IAE to power the A320 family aircraft valued at $250 million based on list prices. The prices of the Rolls-Royce and IAE engines are included in the purchase prices of the A350XWB and A320 family aircraft referenced above. Actual purchase prices at delivery will be lower than the list prices based upon available discount levels, offset by price escalators based on changes in certain specified price indexes.

**Section 9 – Financial Statements and Exhibits**

**Item 9.01. Financial Statements and Exhibits.**

(c) *Exhibits.*

      99.1   Press release issued by CIT Group Inc. on June 20, 2007.

      99.2   Press release issued by CIT Group Inc. on June 20, 2007.

      99.3   Press release issued by CIT Group Inc. on June 20, 2007.

    This document contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. All forward-looking statements (including statements regarding future financial and operating results) involve risks, uncertainties and contingencies, many of which are beyond CIT's control, which may cause actual results, performance, or achievements to differ materially from anticipated results, performance, or achievements. All statements contained in this document that are not clearly historical in nature are forward-looking, and the words "anticipate," "believe," "expect," "estimate," "plan," "target" and similar expressions are generally intended to identify forward-looking statements. Economic, business, funding market, competitive and/or regulatory factors, among others, affecting CIT's businesses are examples of factors that could cause actual results to differ materially from those described in the forward-looking statements. More detailed information about these factors are described in CIT's filings with the Securities and Exchange Commission, including its Annual Report on Form 10-K for the year ended December 31, 2006. CIT is under no obligation to (and expressly disclaims any such obligation to) update or alter its forward-looking statements, whether as a result of new information, future events or otherwise.

2

---

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**CIT GROUP INC.**
(Registrant)

By: /s/ William J. Taylor

---

William J. Taylor
Executive Vice President, Controller and
Principal Accounting Officer

Dated: June 20, 2007

3